**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| S.W., by his parents and next friends, | ) | |
|     SETH WOLFE and AMANDA WOLFE; | ) | |
| | ) | |
| and | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| J.S., by his parents and next friends, | ) | |
|     JEFFERY SMITH and RENAE SMITH; | ) | |
| | ) | |
|     *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-1536 |
| | ) | |
| LOUDOUN COUNTY SCHOOL BOARD, | ) | |
| | ) | |
|     *Defendant.* | ) | |
| | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES

Plaintiffs S.W., a minor by his parents and next friends, Seth Wolfe and Amanda Wolfe, and J.S., a minor by his parents and next friends, Jeffery Smith and Renae Smith, for their Verified Complaint against Loudoun County School Board—the government entity that governs the Loudoun County School System (together with the School Board, "LCPS")—state as follows:

### INTRODUCTION

1.    This civil rights action arises under the Free Speech, Equal Protection, Due Process, and Free Exercise of Religion Clauses of the U.S. and Virginia Constitutions, as well as under Title IX of the Education Amendments of 1972 ("Title IX") and Virginia's Religious Freedom Restoration Act ("VRFRA").

2.      LCPS violated each of these provisions of law by intentionally and invidiously discriminating against Plaintiffs, who are Christian boys, after they spoke up against being required to share a locker room with a female student—who in every meaningful way appeared as a female—and by punishing them with suspension for their protected speech and religious expression.

3.      While using the public-school boys' locker room, Plaintiffs simply asked questions and shared opinions among each other when they noticed this female student was also inside the boys' locker room. No material disturbance or disruption ever developed. No altercations, fights, or verbal confrontations ever occurred. And Plaintiffs never spoke adversely—or in any other way—to the female student.

4.      Thereafter, the female student complained to LCPS about the expressions of discomfort she heard from boys inside the locker room while she was in the boys' locker room.

5.      LCPS also received an accusation that the female student recorded the Plaintiffs inside the boys' locker room, violating LCPS policies.

6.      LCPS also received from the female student additional, more severe accusations against a Muslim student.

7.      However, LCPS then dismissed its investigation against the Muslim student by stating, as its reason, that even if the allegations were true, it would not constitute a Title IX violation.

8.      Likewise, LCPS refused to investigate whether the female student violated Title IX or LCPS's corresponding Policy 8035.

9.      Yet LCPS continued investigating the Plaintiffs and ultimately punished them with suspension.

10.     In doing this, LCPS engaged in marked, invidious discrimination, refusing to give the Plaintiffs the same favorable treatment it gave to the Muslim student and the female student, and instead punishing them with suspension.

11.     In doing this, LCPS violated Plaintiffs' rights to free speech and free exercise of religion as protected by the U.S. and Virginia Constitutions and VRFRA.

12.     Furthermore, despite LCPS offering sex-segregated locker rooms as authorized by Title IX and permitted under the Fourteenth Amendment's Equal Protection Clause and Article I, Section 11 of the Virginia Constitution, LCPS permitted a female to access a male locker room, thereby denying the Plaintiffs privacy from the other sex. Furthermore, when the Plaintiffs requested of LCPS the right to use a male locker room without the presence of the female student, LCPS denied their request and explained that pursuant to LCPS Policy 8040 and Regulation 8040, the Plaintiffs should be the ones to use a private changing area while the female student was permitted to continue accessing the male locker room.

13.     LCPS discriminated against the Plaintiffs on the basis of sex in violation of Title IX, the Fourteenth Amendment's Equal Protection Clause, and Article I, Section 11 of the Virginia Constitution.

14.     LCPS also violated the Plaintiffs' right to the free exercise of religion as protected by the Virginia Constitution.

15.     LCPS caused Plaintiffs great harm and significant emotional distress.

16.     LCPS Policy 8040 and Regulation 8040 facially violate Title IX, in that they authorize LCPS to allow female students to access locker rooms designated as male-only and for male students to access locker rooms designated as female-only.

JURISDICTION AND VENUE

17.    The Court has subject-matter jurisdiction over the federal-law aspects of this matter pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a) (deprivation of a federal right).

18.    The Court has subject-matter jurisdiction over the state-law aspects of this matter pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) because the state-law claim is sufficiently related to the federal-law claim in this action such that they form part of the same case or controversy.

19.    This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988 and Va. Code § 57-2.02(D).

20.    Venue is proper in this Court because the acts supporting this Complaint took place in this district and because Defendant has its place of business in this district.

THE PARTIES

21.    S.W. is a resident of Loudoun County, Virginia. He has been a student at Stone Bridge High School ("Stone Bridge") from 2023 to the present. He was in the tenth grade during the 2024–2025 school year. In August 2025, he began the eleventh grade.

22.    J.S. was a resident of Loudoun County, Virginia, until the summer of 2025. He was a student at Stone Bridge from 2023 through the end of the 2024–2025 school year. He was in the tenth grade during the 2024–2025 school year. In the summer of 2025, J.S. moved out of state and unenrolled from Stone Bridge and the LCPS system.

23.     Plaintiffs are Christians and hold religious beliefs directing the importance of personally maintaining basic distinctions between males and females, and hold significant religious objections to being in a state of undress in the presence of the opposite sex or with an undressed member of the opposite sex, particularly in sex-separate changing facilities.

24.     Plaintiffs were known to be Christians at Stone Bridge, and frequently wore necklaces displaying a cross, signifying their Christian faith.

25.     Since 2023, S.W. has spearheaded and continues to lead a Bible club open to his high school peers, which meets at Stone Bridge. This activity has been well-known by both students and staff at Stone Bridge.

26.     Having power to sue and be sued pursuant to Va. Code § 22.1-71, Defendant Loudoun County School Board is the public body that operates Loudoun County Public Schools.

27.     LCPS receives federal funding.

28.     LCPS controls and operates Stone Bridge High School.

FACTS

***LCPS allows students to use locker rooms designated for the opposite sex.***

29.     In Virginia, every public-school board, including LCPS, is required to have policies directing that public school locker rooms be separated by biological sex, not gender identity.

30.     Virginia Code § 22.1-23.3 requires every Virginia school board, including Loudoun County School Board, to adopt policies concerning "sex specific . . . school facilities," such as locker rooms, that are consistent with the current model policies provided by the Virginia Department of Education ("VDOE").

31.     Over two years ago—in July 2023—VDOE released its most current model policies regarding transgender students. These policies provide that the use of Virginia public school locker rooms must be separated based on biological sex.

32.     Title IX also authorizes schools to maintain "separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33.

33.     Sex, as defined by Title IX, means biological sex.

34.     Article I, Section 11 of the Virginia Constitution prohibits "government discrimination upon the basis of [] sex," but explicitly states that "the mere separation of the sexes shall not be considered discrimination."

35.     The Virginia legislature has recognized that "sex" does not mean "gender identity." Virginia Code § 2.2-3900.

36.     LCPS Regulation 8040 provides the following definition of "gender identity": "A person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary. Gender identity is an innate part of a person's identity and can be the same or different from the sex they were assigned at birth."

37.     LCPS's locker room facilities are, and have always been, segregated by sex.

38.     However, LCPS provides a broad exception to sex-segregated locker rooms under Policy 8040, entitled "Rights of Transgender and Gender-Expansive Students." Specifically, that policy provides that "[transgender and gender-expansive] [s]tudents should be allowed to use [locker rooms] that correspond to their consistently asserted gender identity," rather than strictly based on biological sex.

39.     Regulation 8040 defines "transgender" as: "A self-identifying term that describes a person whose gender identity is different from their sex assigned at birth. A transgender girl is a

girl who was presumed to be male when she was born, and a transgender boy is a boy who was presumed to be female when he was born. Note that there is a wide range of gender identities in addition to transgender male and transgender female, such as nonbinary. A transgender student is a student who consistently and sincerely asserts a gender identity different from the gender identity associated with the student's sex assigned at birth."

40.    Regulation 8040 states the following about the term "gender-expansive": "Gender-expansive/gender-diverse/gender-fluid/gender nonbinary/agender: Terms that convey a wider, more inclusive range of gender identity and/or expression than typically associated with the social construct of a binary (two discrete and opposite categories of male and female) gender system.

41.    Regulation 8040 defines "gender identity" as: "A person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary. Gender identity is an innate part of a person's identity and can be the same or different from the sex they were assigned at birth."

42.    Per Policy 8040, LCPS staff are required to accept a student's claimed transgender or gender-expansive status without any substantiating evidence. Furthermore, Regulation 8040 makes clear that parental notification or consent is not required for LCPS to accept a student's claimed transgender or gender-expansive status.

43.    In August 2024, Plaintiffs began the tenth grade at Stone Bridge.

44.    Plaintiffs both participated in physical education (P.E.) class, and they regularly used the school's boys' locker room before and after athletic activities and P.E. class.

45.    The boys' locker room at Stone Bridge is designed for and has been used by male students—including Plaintiffs—to undress and change their clothes or to shower.

46.     During the fall months of 2024, when Plaintiffs attempted to use the boys' locker room, they routinely encountered a female student (hereafter, the "Female Student") who also accessed the boys' locker room often when Plaintiffs did.

47.     At all points relative to this matter, the Female Student had no right to be in the boys' locker room. State and federal law prohibited LCPS from allowing the Female Student to use the boys' locker room.

48.     At all times during these encounters between Plaintiffs and the Female Student, the Female Student expressed herself as a female—having the physical characteristics of a young woman. She had long hair, painted fingernails, and wore makeup.

49.     Upon information and belief, the Female Student never undertook many of the steps associated with transgender identity. She was never medically diagnosed as having gender dysphoria, never received sex-change hormone treatments, never underwent sex reassignment surgery, and never obtained a new birth certificate reflecting a male gender identity.

50.     Upon information and belief, the Female Student did not and does not consistently assert a male gender identity, nor did she or does she consistently assert herself as transgender or gender-expansive.

51.     During the Fall 2024 school semester, both Plaintiffs raised concerns with LCPS about the Female Student using the boys' locker room, apprising LCPS leadership of their faith-based concerns to having to be in the presence of a female student in the boys' locker room.

52.     By allowing the Female Student to continue to use the boys' locker room, LCPS denied Plaintiffs' appropriate privacy—so much so that, they would conscientiously refrain from fully undressing whenever a female student was present in the boys' locker room to avoid the indignity and awkwardness of being seen unclothed by the opposite sex.

53. Additionally, Plaintiffs were aware that, at any time, the Female Student (or any other female believing herself to be transgender or gender-expansive) could begin to fully undress herself or use the boys' locker room shower facilities—a profoundly disturbing prospect.

54. Despite this, LCPS took no action to assist with the Plaintiffs' concerns except informing S.W. that he was free to change his clothes elsewhere.

55. LCPS did not inform the Female Student that she should change elsewhere.

56. Around October 2024, while using the boys' locker room, the Female Student again re-entered it. At that time, several boys—including Plaintiffs—expressed questions about why a girl was in the boys' locker room.

57. Upon learning about this occurrence, school administrators took the boys, including Plaintiffs, aside and sternly directed them to not ask such questions or to make any comments about the fact that a female student was in their locker room.

58. Despite being censored, Plaintiffs nevertheless followed this directive and kept their discomfort and privacy concerns to themselves for the rest of the fall 2024 school semester.

59. In February 2025, LCPS's Policy 8040 faced another significant legal problem. That month, through various Executive Orders, the Executive Branch of the U.S. Government declared as its official policy that, pursuant to Title IX, all public schools receiving federal funding were barred from permitting students to access locker room facilities designated for use by the opposite sex.

60. Additionally, on February 12, 2025, the Office of Civil Rights for the United States Department of Education ("OCR") opened a civil rights investigation into LCPS to determine whether Policy 8040 and Regulation 8040 violated Title IX.

61.    Thereafter, nearly every Virginia school district that had not already enacted policies consistent with Title IX, did so. LCPS, however, refused to comply.

62.    Knowing that Virginia law and the U.S. Executive Branch both prohibit LCPS from allowing the Female Student to use the boys' locker room at Stone Bridge, Plaintiffs again began to ask why the Female Student was in the boys' locker room.

***The Female Student video records the boys in the locker room.***

63.    On March 21, 2025, Plaintiffs were in the boys' locker room and were both preparing for P.E. class.

64.    Then, as Plaintiffs continued their preparation for P.E. class, from a distance, they saw the Female Student enter the boys' locker room.

65.    In every meaningful way, the Female Student appeared to be a female.

66.    As was the case on past occasions, having a girl in the boys' changing facility was very awkward and uncomfortable for Plaintiffs. They could not understand why the Female Student was there.

67.    Plaintiffs then began speaking among themselves and questioning why there was a girl in the boys' locker room.

68.    As she entered the boys' locker room on this occasion, the Female Student secretly used her cell phone to video record the boys in the locker room. She recorded a video lasting 2 minutes and 22 seconds. This video records various boys questioning why a female student was in the locker room.

69.    The boys' locker room is an echoey environment, and on this recording, various boys' voices could be heard from considerable distance creating a cacophonous set of chattering

voices. However, some boys who were concerned about having a female student in the locker room could be heard on the Female Student's video recording.

70.     In making this recording, the Female Student engaged in a premeditated act to try to provoke an adverse reaction from the boys to get them in trouble. At the start of the video, while still in the gymnasium outside of the boys' locker room, the Female Student is heard saying, "I'll find out" to another student. She then walked into the boys' locker room while filming.

71.     After the Female Student entered the boys' locker room, the following statements were made by various males inside the boys' locker room: "There's a girl in here?"; "Why is there a girl?"; "I'm so uncomfortable there's a girl."; and another male voice said to another male, "A female? Bro, get out of here."

72.     The last statement, "Bro, get out of here.", was clearly said from a distance away from the Female Student, made between boys, made either to indicate the boys' own intention to leave the locker room to avoid any problems or as a colloquial expression of disbelief, similar to saying "You've got to be joking" or "No way, that's wild." The statement was not made in a confrontational fashion.

73.     For every one of those recorded statements, no male student—including Plaintiffs—spoke to the Female Student directly or had any physical contact with her. Plaintiffs remained at a distance and eventually left the locker room.

74.     Neither Plaintiff has ever spoken to the Female Student, either on March 21, 2025, or on any other occasion.

75.     For every occasion when Plaintiffs expressed distress, discomfort, and disagreement with having the Female Student in the boys' locker room, they asked questions or

shared opinions among each other. No material disturbance or disruption ever developed. No altercations, fights, or verbal confrontations ever occurred.

76.     By expressing distress, discomfort, and disagreement with having the Female Student in the boys' locker room, Plaintiffs spoke on a matter of significant, public concern.

77.     Illustrative of this, articles addressing student privacy and the cultural debate over transgender school policies are published almost daily in the news.

78.     By video-recording the boys in the boys' locker room, the Female Student violated LCPS Policy 8655, which provides that "[p]hotography, audio, or video recording is prohibited in . . . locker rooms" and that, absent an emergency or medical need, "[s]tudents are prohibited from using phones, tablets, and other personal technology devices" in locker rooms.

79.     By making this video recording, the Female Student created significant privacy concerns for all male students who use Stone Bridge's locker rooms, including Plaintiffs, regarding the risk of possible future secret video recording when undressing, changing clothes, or showering.

80.     Yet, after the Plaintiffs filed complaints against the Female Student, LCPS specifically refused to investigate whether her actions violated Title IX or LCPS Policy 8035.

**LCPS Investigates Plaintiffs for allegedly violating Title IX and LCPS Policy 8035.**

81.     After creating the March 21, 2025, video recording in the boys' locker room, the Female Student submitted it to LCPS officials and made a complaint against S.W., J.S., and another tenth grade boy of Muslim faith (hereafter the "Muslim Student").

82.     On March 28, 2025, LCPS informed both Plaintiffs and the Muslim Student that it had initiated formal investigations against each of them for possibly violating LCPS Policy 8035 through what it referred to as "sexual harassment."

83.    At that time, LCPS stated it was investigating the Plaintiffs and the Muslim Student for identical accusations.

84.    Then, on May 7, 2025, LCPS informed the Muslim Student that it was also investigating him for additional accusations.

85.    At that point, all of the accusations against each of the three boys were the same, except that, against the Muslim Student, the Female Student had made additional, specific accusations, alleging that he "consistently misgender[ed]" her by referring to her with female pronouns when she preferred male pronouns and by stating directly to her: "You guys are a disappointment to humanity," regarding her supposed transgender identity.

86.    After notifying the Plaintiffs and the Muslim Student that LCPS had initiated a formal investigation against them, members of the Muslim community in Northern Virginia began speaking out against LCPS's actions. Additionally, a cleric from a local Muslim mosque where the Muslim Student attends contacted a Loudoun County School Board member to express dismay and disapproval at LCPS's investigation.

87.    Then, on May 30, 2025, LCPS dismissed the accusations against the Muslim Student, stating that the Title IX complaint "must be dismissed" because, it stated in bold: **"[T]he conduct alleged would not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved.**"

88.    But even though the allegations against Plaintiffs (Christian students) were identical to those faced by the Muslim Student—except that the Christians faced one less paragraph of accusations compared to the Muslim Student—in an act of egregious discrimination, LCPS did not dismiss the accusations against Plaintiffs.

89.    Instead, LCPS added an additional accusation of "Sex-Based Discrimination" against Plaintiffs and continued its disciplinary investigation process against Plaintiffs.

90.    On July 10, 2025, J.S.'s parents apprised LCPS that he was permanently unenrolling from LCPS.

91.    LCPS policy provides that when a student unenrolls from its school system, LCPS is permitted to end Title IX disciplinary investigation against that student.

92.    J.S., through counsel, requested that LCPS end its investigation against him because he was unenrolling from the LCPS system. However, LCPS persisted with its investigation and decided that it would not dismiss the Title IX complaint against him.

### DOE OCR determines that LCPS's Policy 8040 and Regulation 8040 violate Title IX

93.    On July 25, 2025, the United States Department of Education's Office of Civil Rights ("OCR") announced that it had "determined that [LCPS's] policies, which allow students to access intimate, sex segregated facilities based on the students' subjective 'gender identity,' violate Title IX of the Education Amendments of 1972." OCR offered a proposed resolution agreement to LCPS which would require it to rescind Policy 8040 and Regulation 8040, issue a memorandum to each school explaining that any future policies related to access to intimate facilities must be consistent with Title IX by separating students strictly on the basis of sex and that Title IX ensures women's equal opportunity in any education program or activity, and to adopt biology-based definitions of the words "male" and "female" in all practices related to Title IX.

94.    On August 12, 2025, the School Board voted to refuse to accept OCR's proposed resolution agreement.[1]

---

[1] As a result of LCPS's unwillingness to comply with Title IX, on August 19, 2025, the United States Department of Education placed LCPS on "high risk" status and transitioned it to a reimbursement-only payment structure.

***LCPS punishes Plaintiffs.***

95.    On August 15, 2025, just three days after refusing to come into compliance with Title IX, LCPS issued a decision against both Plaintiffs. LCPS concluded that both Plaintiffs violated LCPS Policy 8035 through impermissible sexual harassment and sex-based discrimination because of the Plaintiffs' statements made in the Stone Bridge boys' locker room.

96.    In reaching this decision, LCPS acknowledged that most of the statements attributed to Plaintiffs, made in the locker room, "were made more passively" and "not [] in a directly confrontational manner." LCPS further acknowledged that of the statements attributed to Plaintiffs in the locker room, "none of [those] statements amounted to a true threat."

97.    Upon determining that Plaintiffs violated its rules, LCPS issued a severely disproportionate punishment against Plaintiffs.

98.    First, LCPS directed that S.W. have no classes with the Female Student and permanently have no contact with the Female Student while on LCPS property. This requirement was not directed toward J.S. because he is no longer enrolled in the LCPS system.

99.    Second, without any details, LCPS directed that Plaintiffs must be subjected to a "Comprehensive Student Support Plan" intended to change Plaintiffs' behavior."

100.    Third, and most significantly, LCPS directed that both Plaintiffs be subjected to a period of suspension lasting ten school days, equal to two weeks of class time. J.S.'s suspension was made contingent upon his return to LCPS as a student.

101.    After Plaintiffs appealed this decision, on September 10, 2025, LCPS affirmed its decision that Plaintiffs violated LCPS Policy 8035.

102.    On September 10, 2025, LCPS made a final decision upholding its decision to suspend the Plaintiffs from school for ten days.

103.    A ten-day suspension from eleventh-grade school attendance, especially one that runs from the early portions thereof, can have significant, detrimental effects on student growth and achievement.

104.    Eleventh grade is commonly considered to be the hardest and most rigorous year of high school, and it is a critical period for academic achievement used by colleges to determine eligibility for acceptance and scholarships.

105.    A student who misses the early portions of eleventh-grade instruction, at a time when more core concepts are being taught and developed, places students at a marked disadvantage by setting them back significantly since they will perpetually be playing catch-up from missing key, foundational instruction.

106.    Likewise, the early portions of a school year are a critical time for students because it is at that time when they are forming their friend and support groups in their new classes, connections which help them through their scholastic experience.

107.    LCPS' actions against Plaintiffs have caused them great harm, irreparable injury, and significant emotional distress.

108.    LCPS continues to permit the Female Student to use the male locker room.

**<u>COUNT I</u>**
**First Amendment: Freedom of Speech**
**(42 U.S.C. § 1983)**

109.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

110.    By expressing distress, discomfort, and disagreement with LCPS allowing the Female Student to be in the boys' locker room, Plaintiffs spoke on a matter of significant public concern.

111.    Likewise, by expressing distress, discomfort, and disagreement with LCPS allowing the Female Student to be in the boys' locker room, Plaintiffs directly engaged in religious expression by stating viewpoints directly informed by their sincerely held religious beliefs.

112.    The issue relating to transgender school policies is a topic often discussed in news media, in school board meetings around the Commonwealth, by state and federal executive officials, and by religious ministers around the nation.

113.    The Supreme Court has been abundantly clear that school children do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). And speech on issues such as "sexual orientation and gender identity" are matters of "profound value and concern to the public" occupying "the highest rung of the hierarchy of First Amendment values" and meriting "special protection." *Janus v. Am. Fed'n of State Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018).

114.    Plaintiffs have significant moral and religious objections to being in a state of undress in the presence of the opposite sex or with someone of the opposite sex who is in a state of undress, particularly in sex-separate changing facilities.

115.    Likewise, Plaintiffs held significant privacy concerns, motivated by their faith, about a girl entering the boys' changing facility.

116.    When the Female Student used the boys' locker room, Plaintiffs felt very uncomfortable and would conscientiously refrain from fully undressing whenever a female student was present in the boys' locker room to avoid the indignity and awkwardness of being seen unclothed by the opposite sex.

117.    For any occasion when Plaintiffs expressed distress, discomfort, and disagreement with the Female Student using the boys' locker room, they never materially and substantially interfered with the school environment and never impinged upon the rights of any other student, including the Female Student.

118.    Throughout the 2024–2025 school year, Plaintiffs never spoke directly to the Female Student or made any physical contact with her. They created no material disturbance or altercation.

119.    By expressing this distress, discomfort, and disagreement in the boys' locker room, Plaintiffs' only spoke among themselves. They never harassed, spoke derisively to, accosted, or confronted the Female Student, nor did they prevent the Female Student from using the boys' locker room.

120.    Indeed, LCPS acknowledged that most of the statements made in the locker room, attributed to Plaintiffs, "were made more passively" and "not [] in a directly confrontational manner," and that none of those "statements amounted to a true threat."

121.    When Plaintiffs expressed this distress, discomfort, and disagreement in the boys' locker room on March 21, 2025, and on other occasions when this occurred, no teacher or other LCPS staff member was present. The students were not involved in instructional or curricular activities during these discussions.

122.    State and federal law prohibited LCPS from allowing the Female Student to access the boys' locker room, but LCPS persistently defied these laws through its Policy 8040.

123.    LCPS' decisions to censor and then punish Plaintiffs' statements expressing distress, discomfort, and disagreement with LCPS permitting the Female Student to use the boys'

locker room are neither justified by a compelling state interest nor accomplished through the least restrictive means.

124.    If Plaintiffs had not expressed distress, discomfort, and disagreement with the Female Student using the boys' locker room, and if they instead sincerely celebrated her presence in the locker room, LCPS would not have censored or punished Plaintiffs' speech.

125.    The level of punishment that LCPS imposed on Plaintiffs was severe and drastically disproportionate to the conduct at issue.

126.    By censoring Plaintiffs' speech, punishing Plaintiffs for their speech, and imposing a severe punishment against Plaintiffs' speech, LCPS committed impermissible viewpoint discrimination, censorship of speech, and retaliation against speech in violation of the Free Speech Clause of the First Amendment of the U.S. Constitution.

## <u>COUNT II</u>
### Virginia Constitution: Freedom of Speech
### (Va. Const. Art. I § 12)

127.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

128.    Virginia Constitution Article I § 12 provides robust protections of freedom of speech. It provides: that freedom of speech is "among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak . . . his sentiments on all subjects . . . ; [and] that the General Assembly shall not pass any law abridging the freedom of speech."

129.    By censoring Plaintiffs' speech, punishing Plaintiffs for their speech, and imposing a severe punishment against Plaintiffs' speech, LCPS committed impermissible viewpoint discrimination, censorship of speech, and retaliation against speech in violation of Article I § 12 of the Virginia Constitution.

## COUNT III
### Fourteenth Amendment: Intentional Religious Discrimination
### (42 U.S.C. § 1983)

130. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

131. The Female Students' accusations against Plaintiffs and the Muslim Student were identical, except that she included additional accusations against the Muslim Student, plainly presenting him in the worst light compared to Plaintiffs.

132. Plaintiffs and the Muslim Student were in every way similarly-situated, except the distinction between the Muslim Student and Christian Plaintiffs' different faiths and the fact that the Muslim Student faced additional accusations beyond those made against Plaintiffs.

133. Despite this similarity, on May 30, 2025, LCPS concluded that it "must" dismiss the accusations against the Muslim Student because, "**even if proved**" the accusations would not violate the rules LCPS considered. But then, that same day, LCPS evaluated the identical (and somewhat better) allegations against the Plaintiffs, who are Christians, and found these allegations had merit. This denied Plaintiffs, Christians, the same benefits that LCPS conferred on the Muslim Student.

134. While consciously having full view of the Female Student's accusations against Plaintiffs and the Muslim Student and reviewing these accusations in the same collection of disciplinary cases, LCPS determined it simply would not further investigate the Muslim Student's actions while simultaneously determining that it would continue to investigate whether to punish Plaintiffs and indeed expanding the charges against Plaintiffs.

135. LCPS's discriminatory, selective enforcement of its rules only against Plaintiffs—and not the Muslim Student—was the product of intentional, invidious discrimination against Plaintiffs' religion.

136.    Additionally, despite the fact that the Female Student created privacy concerns of enormous proportion by video-recording boys within the boys' locker room—thus violating LCPS Policy 8655, when the Plaintiffs filed complaints against the Female Student for this disturbing action, LCPS specifically refused to investigate whether her actions violated Title IX or LCPS Policy 8035.

137.    The Female Student has not identified herself as holding Christian beliefs.

138.    Plaintiffs are well known to Stone Bridge as being Christians, and one way that LCPS was able to identify which students took which course of action related to the Female Student's accusations was based on the cross necklaces both Plaintiffs were known for wearing.

139.    Despite the accusations against Plaintiffs, the Muslim Student, and the Female Student all being related and considered by LCPS in the same context, the only students that LCPS targeted were the Plaintiffs, who were known as Christians.

140.    The Fourteenth Amendment's Equal Protection Clause prohibits the government from intentionally treating similarly situated people differently based on a protected characteristic, including religion.

141.    No justifiable basis exists for LCPS's decision to pursue Plaintiffs for punishment while refusing to even finish investigating the Muslim Student or to investigate the Female Student for alleged violations of Title IX or LCPS 8035.

142.    Through LCPS's intentional, discriminatory choice to pursue Plaintiffs for punishment while refusing to even finish investigating the Muslim Student or to investigate the Female Student for alleged violations of Title IX or LCPS 8035, it violated the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution through illegal, selective enforcement based on religion.

**COUNT IV**
**Virginia Constitution: Religious Discrimination**
**(Va. Const. Art. I § 11)**

143.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

144.    Virginia Constitution Article I § 11 provides "that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin shall not be abridged, except that the mere separation of the sexes shall not be considered discrimination."

145.    Through LCPS' intentional, discriminatory choice to pursue Plaintiffs for punishment while refusing to even finish investigating the Muslim Student or to investigate the Female Student at all for alleged violations of Title IX or LCPS 8035, it intentionally discriminated against Plaintiffs on the basis of religion in violation of Article I § 11 of the Virginia Constitution.

**COUNT V**
**Virginia Religious Freedom Restoration Act**
**(Va. Code § 57-2.02)**

146.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

147.    Virginia's Religious Freedom Restoration Act prohibits Virginia government from inhibiting or curtailing religiously motivated expression unless it demonstrates, by clear and convincing evidence, that its application of the burden to the person is "essential to further a compelling governmental interest" and "the least restrictive means of furthering that compelling governmental interest." Va. Code § 57-2.02.

148.    Plaintiffs have significant religious objections to being in a state of undress in the presence of the opposite sex, particularly in sex-separate changing facilities. When the Female Student used the boys' locker room, Plaintiffs felt very uncomfortable and conflicted with their religious upbringing. Accordingly, they would conscientiously refrain from fully undressing

whenever a female student was present in the boys' locker room to avoid the indignity and awkwardness of being seen unclothed by the opposite sex.

149.    By expressing this distress and discomfort in the boys' locker room, Plaintiffs only spoke among themselves. They never harassed, spoke derisively to, accosted, or confronted the Female Student, nor did they prevent the Female Student from using the boys' locker room.

150.    By expressing this distress and discomfort in the boys' locker room, Plaintiffs were presenting protected religious expression in opposition to the undignified position they had been placed in.

151.    When Plaintiffs expressed this distress, discomfort, and disagreement in the boys' locker room on March 21, 2025, no teacher was present, and the students were not involved in curricular activities.

152.    Virginia's Religious Freedom Restoration Act (Va. Code § 57-2.02) provides that:

"No government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability unless it demonstrates that application of the burden to the person is (i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest.

153.    Under this law, "'Substantially burden' means to inhibit or curtail religiously motivated practice." Va. Code § 57-2.02(A).

154.    And this law places on the government the burden of proving that its burdening of religious expression was "(i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest."

155.    LCPS' punishment of Plaintiffs' was neither essential to further a compelling governmental interest nor the least restrictive means of furthering such interests.

156.    By censoring Plaintiffs' religious expression, punishing Plaintiffs for their religious expression, and imposing a severe punishment against Plaintiffs' speech, LCPS impermissibly deprived Plaintiffs of their rights protected by Virginia's Religious Freedom Restoration Act, impermissibly burdening their religious expression.

## COUNT VI
### Virginia Constitution: Free Exercise of Religion
### (Va. Const. Art. I § 16)

157.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

158.    Virginia Constitution Article I § 16 emphatically protects religious expression, stating:

> That religion or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience . . . . No man shall be . . . enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities.

159.    This protection is all the more strengthened when viewed in conjunction with the free speech protections contained in the First Amendment to the U.S. Constitution and Article I § 12 of the Virginia Constitution.

160.    By expressing distress, discomfort, and disagreement with LCPS allowing the Female Student to be in the boys' locker room, Plaintiffs directly engaged in religious expression by stating viewpoints informed by their sincerely held religious beliefs.

161.    Plaintiffs did not engage in any action that would pull their expressions outside of the protections of Virginia Constitution Article I § 16.

162.    For every occasion when Plaintiffs expressed distress, discomfort, and disagreement with having the Female Student in the boys' locker room, they simply asked

questions or spoke opinions among each other. No material disturbance developed. No altercations, fights, or verbal confrontations occurred.

163.    By expressing distress, discomfort, and disagreement with having the Female Student in the boys' locker room, Plaintiffs never engaged in overt acts against peace and good order.

164.    By punishing Plaintiffs for expressing distress and discomfort with having the Female Student in the boy's locker room, LCPS violated Virginia Constitution, Article I § 16.

**COUNT VII**
**Fourteenth Amendment: Sex Discrimination**
**(42 U.S.C. § 1983)**

165.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

166.    The Plaintiffs sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

167.    The Female Student sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

168.    When the Plaintiffs expressed that they did not feel safe and comfortable dressing and undressing in a sex-segregated, male locker room because of the presence of the Female Student, they were told by LCPS that they should cease discussing their discomfort and were free to use a private changing area.

169.    LCPS did not advise the Female Student that she should use a private changing area.

170.    LCPS intentionally discriminated against the Plaintiffs on the basis of sex by treating the Female Student more favorably as it concerned the use of a sex-segregated, male locker room.

171.    LCPS did not have an important government interest in allowing the Female Student to use the sex-segregated, male locker room. Further, LCPS's decision to allow the Female Student to use the sex-segregated, male locker room was not substantially related to any important government interest.

172.    Consequently, LCPS violated the Plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause.

## COUNT IX
### Virginia Constitution: Sex Discrimination
### (Va. Const. Art. I § 11)

173.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

174.    The Plaintiffs sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

175.    The Female Student sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

176.    When the Plaintiffs expressed that they did not feel safe and comfortable dressing and undressing in a sex-segregated, male locker room because of the presence of the Female Student, they were told by LCPS that they should cease discussing their discomfort and were free to use a private changing area.

177.    LCPS did not advise the Female Student that she should use a private changing area.

178.    LCPS intentionally discriminated against the Plaintiffs on the basis of sex by treating the Female Student more favorably as it concerned the use of a sex-segregated, male locker room.

179.    LCPS did not have an important government interest in allowing the Female Student to use the sex-segregated, male locker room. Further, LCPS's decision to allow the Female Student to use the sex-segregated, male locker room was not substantially related to any important government interest.

180.    Thus, LCPS violated the Plaintiffs' rights under the Virginia Constitution.

## COUNT X
### Title IX: Sex Discrimination
### (20 U.S.C. ch. 38 § 1681 et seq.)

181.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

182.    At all times relevant herein, LCPS was a recipient of federal funds.

183.    The Plaintiffs sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

184.    The Female Student sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

185.    When the Plaintiffs expressed that they did not feel safe and comfortable dressing and undressing in a sex-segregated, male locker room because of the presence of the Female Student, they were told by LCPS that they should cease discussing their discomfort and were free to use a private changing area.

186.    LCPS did not advise the Female Student that she should use a private changing area.

187.    LCPS did not require the Female Student to use a private changing area.

188.    LCPS did not require the Female Student to use the female changing area

189.    LCPS intentionally discriminated against the Plaintiffs on the basis of sex by treating the Female Student more favorably as it concerned the use of a sex-segregated, male locker room.

190.    Consequently, LCPS violated the Plaintiffs' rights under Title IX.

191.    Furthermore, Policy 8040 and Regulation 8040 facially violate Title IX, as those provisions require LCPS to violate Title IX by allowing students to invade the sex-segregated locker rooms of the opposite sex and requiring students to find private alternatives when they believe their safety, comfort, and privacy are compromised by a member of the opposite sex being allowed to dress and undress in school locker rooms.

## COUNT XI
### Fourteenth Amendment: Deprivation of Due Process
### (42 U.S.C. § 1983)

192.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

193.    Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

194.    Sex is distinct from "gender identity."

195.    LCPS arbitrarily found that the Plaintiffs engaged in sexual harassment and sex discrimination on the basis of "gender identity," which distinct from sex discrimination under Title IX and LCPS's policies, regulations, and practices.

196.    To the extent that Policy and Regulation 8035 prohibit discrimination based on "gender identity," it falsely states that Title IX prohibits discrimination on the basis of "gender identity."

197.    LCPS defines "gender identity" as "[a] person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary. Gender identity is an innate part of a person's identity and can be the same or different from the sex they were assigned at birth."

198.    LCPS's policies, regulations, and related practices are thus so vague, ambiguous, and/or contradictory, that ordinary citizens must guess at its meaning, will differ as to the regulation's application, and do not have a reasonable opportunity to know what is prohibited.

199.    LCPS's policies, regulations, and related practices further burden speech based on arbitrary and subjective feelings of other students.

200.    LCPS's policies, regulations, and related practices are also contradictory, in that they prohibit discrimination on the basis of "sex" and "gender identity," which are inherently in conflict.

201.    The United States Constitution prohibits the deprivation of liberty without due process of law.

202.    LCPS's policies, regulations, and related practices that censor student speech that is subjectively offensive to a student based on their subjective belief of the arbitrary term "gender identity" were unconstitutionally applied to the Plaintiffs and are void for vagueness.

**COUNT XII**
**Virginia Constitution: Deprivation of Due Process**
**(Va. Const. Art. I § 11)**

203.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

204.    Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

205.    Sex is distinct from "gender identity."

206.    LCPS arbitrarily found that the Plaintiffs engaged in sexual harassment and sex discrimination on the basis of "gender identity," which distinct from sex discrimination under Title IX and LCPS's policies, regulations, and practices.

207.    To the extent that Policy and Regulation 8035 prohibit discrimination based on "gender identity," it falsely states that Title IX prohibits discrimination on the basis of "gender identity."

208.    LCPS defines "gender identity" as "[a] person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary. Gender identity is an innate part of a person's identity and can be the same or different from the sex they were assigned at birth."

209.    LCPS's policies, regulations, and related practices are thus so vague, ambiguous, and/or contradictory, that ordinary citizens must guess at its meaning, will differ as to the regulation's application, and do not have a reasonable opportunity to know what is prohibited.

210.    LCPS's policies, regulations, and related practices further burden speech based on arbitrary and subjective feelings of other students.

211.    LCPS's policies, regulations, and related practices are also contradictory, in that they prohibit discrimination on the basis of "sex" and "gender identity," which are inherently in conflict.

212.    The Virginia Constitution prohibits the deprivation of liberty without due process of law. LCPS's policies, regulations, and related practices that censor student speech that is subjectively offensive to a student based on their subjective belief of the arbitrary term "gender identity" were unconstitutionally applied to the Plaintiffs and are void for vagueness.

The Plaintiffs reserve the right to amend and add any additional claims that might come to their attention through discovery or that the facts support but are not expressly pled herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand the following relief:

a.  A trial by jury on all triable issues of fact;

b.  Declaratory relief holding that LCPS violated the U.S. Constitution's Free Speech and Equal Protection Clauses, the Virginia Constitution's Article I §§ 11, 12, and 16, the Virginia's Religious Freedom Restoration Act, and Title IX of the Educational Amendment Acts of 1972;

c.  Temporary, preliminary, and permanent injunctive relief ordering LCPS, and/or its agents and employees, to retract and expunge its punishments and adverse findings against Plaintiffs;

d.  Temporary, preliminary, and permanent injunctive relief ordering LCPS, and/or its agents and employees, to prohibit students from using the locker rooms of the opposite sex;

e.  Monetary and Compensatory damages, including Punitive damages to the extent permissible by law;

f.  Nominal damages;

g.  Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, Va. Code § 57-2.02; Va. Const. Art. I § 11, 12, and 16;

h.  Pre- and post-judgment interest; and

i.    Such other relief as appears appropriate and equitable in the judgment of the Court.

Dated: September 15, 2025                                     Respectfully submitted,

S.W., by his parents and next friends, SETH WOLFE and AMANDA WOLFE,
and J.S., by his parents and next friends, JEFFERY SMITH and RENAE SMITH,

By Counsel:


   */s/ Andrew J. Block*
Andrew J. Block, Esq. (VSB No. 91537)          Joshua A. Hetzler, Esq. (VSB No. 89247)
Ian Prior, Esq.*                               Michael B. Sylvester, Esq. (VSB No. 95023)
Nicholas R. Barry, Esq.*                       FOUNDING FREEDOMS LAW CENTER
Robert A. Crossin, Esq.*                       707 E. Franklin Street
AMERICA FIRST LEGAL FOUNDATION                 Richmond, VA 23219
611 Pennsylvania Ave. SE #231                  Telephone: (804) 971-5509
Washington, D.C. 20003                         michael@foundingfreedomslaw.org
Telephone: (202) 836-7958                      josh@foundingfreedomslaw.org
andrew.block@aflegal.org
ian.prior@aflegal.org
nicholas.barry@aflegal.org
bobby.crossin@aflegal.org

## VERIFICATION

I, Seth Wolfe, declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing factual allegations contained herein are true and correct to the best of my knowledge.

_____
SETH WOLFE

9/15/25
Date

33

## VERIFICATION

I, Amanda Wolfe, declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing factual allegations contained herein are true and correct to the best of my knowledge.

_____
AMANDA WOLFE

9/15/25
Date

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2025, I served the foregoing document with the

Clerk of Court using the Court's ECF system, thereby serving all counsel who have appeared in

this case. Because Defendants have not yet entered an appearance, I am also serving the foregoing

by email and by certified mail, return receipt requested, at the address below:


Mr. Wesley Allen
Division Counsel
Loudoun County Public Schools
21000 Education Court
Ashburn, VA 20148
Wesley.allen@lcps.org


                                     */s/ Andrew J. Block*
                                    Andrew J. Block
                                    AMERICA FIRST LEGAL FOUNDATION
                                    611 Pennsylvania Ave. SE, #231
                                    Washington, D.C. 20003 (202)
                                    836-7958 andrew.block@aflegal.org