# EXHIBIT B



**Loudoun County Public Schools**
**Department of Human Resources and Talent Development**
**Title IX Office**
**21000 Education Court**
**Ashburn, VA 20148**

**Friday, August 15, 2025**

**Delivered VIA Email and Certified Mail**



**RE: Notice of Title IX Investigation Determination**

Dear ⬛:

The Decision-Makers thank the parties for their cooperation in the resolution process while Loudon County Public Schools (LCPS) conducted a thorough and neutral fact-finding investigation. The investigation considered allegations reported by the Complainant on March 21, 2025, of "unwanted touching or specified acts of sexual violence," "unwanted behavior of a sexual nature," and "harassment based on gender identity," describing that the behavior had been occurring during the 2024-25 academic year. Complainant also made Title IX Incident Reports on March 25, 2025, and March 27, 2025, alleging additional harassing comments. The Complainant's allegations, inclusive of all incident reports, accused the Respondents of harassing the Complainant for using the boy's locker room and calling Complainant "it" and "girl-boy." The Complainant also reported that the Respondents told Complainant that if Complainant used the boy's locker room they were going to "beat his ass."

The allegations implicate LCPS School Board Policy 8035 and Regulation 8035-REG, regarding Title IX, Sex-Based Discrimination, Sexual Harassment. Together, these policies and procedures provide for the prompt, thorough, and equitable resolution of complaints alleging sexual harassment under Title IX, and for a grievance process compliant with federal Title IX regulations.

The Decision-Makers have thoroughly and comprehensively reviewed all relevant and directly-related evidence, including both inculpatory and exculpatory evidence prior to making findings and a final determination. In doing so, the Decision-Makers also presumed that the Respondents



Friday, August 15, 2025

are not responsible for the allegations unless and until the evidence may prove otherwise, as required by federal regulations and LCPS Policy. In making findings and a final determination, the Decision-Makers applied the preponderance of the evidence standard to determine whether it is more likely than not that the conduct occurred as alleged and whether such conduct violated district policy. Decision-Makers did not rely on evidence related to impact/mitigation provided by the parties in making findings and a determination. The Decision-Makers considered the relative credibility of the parties in making the findings and determination. The Decision-Makers hold no bias for or against complainants or respondents generally, or for or against this Complainant or these Respondents, specifically, in making the findings and determination described below.

> The preponderance of the evidence **supports** a determination that Respondent 2 violated LCPS School Board Policy 8035: Title IX, Sex-Based Discrimination, Sexual Harassment.

Respondent 2 is therefore found **responsible** for the allegations.

### Applicable Policies[1]

The allegations implicate two provisions of LCPS School Board Policy 8035: Title IX Sex-Based Discrimination, Sexual Harassment and LCPS School Board Regulation 8035-REG: Title IX Sex-Based Discrimination, Sexual Harassment.

> Section (A)(3)(b) of Policy 8035 and Section (A)(16)(b) of 8035-Reg, prohibit sexual harassment as defined under federal Title IX regulations, which provides for the following definition of sexual harassment (in pertinent part):

>> Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to LCPS's education program or activity.

> Section (A)(2) of Policy 8035 and Section A(15) of 8035-Reg define sex-based discrimination as:

>> Sex-based discrimination includes, but is not limited to discrimination in programs, athletics, extra-curricular activities, facilities, course offerings, and funding.

---

[1] This determination cannot and does not address the question of whether LCPS Policies are consistent with federal or state law. Our role as Decision-Makers is only to apply the Policy as written to the facts, not to make legal or political assessments that would be well beyond the scope of our charge.

2



Friday, August 15, 2025

### The Allegations and Findings

The Decision-Makers recognize that there are two named Respondents,[2] and that the allegations arise out of substantially similar events and facts as to each Respondent. Therefore, for much of this Grievance Process Outcome Letter, the Decision-Makers will review and weigh evidence with simultaneous discussion of both Respondents making necessary findings of fact. However, this letter only includes the Decision-Makers' review and weighing of evidence as it relates to the attribution of statements to this Respondent only, and as such determinations were made independently as to each Respondent.

### Procedural History

On March 21, 2025, an Assistant Principal at Stone Bridge High School received a report from the Complainant. The specific allegation of a threatening statement prompted the report; however, the Complainant reported that other harassing statements had occurred with frequency throughout the school year in the locker room prior to the students' shared physical education (PE) class.

On March 25, 2025, the Deputy Title IX Coordinator (DTIXC), Danyelle Reese, met with the Complainant and the Complainant's mother to conduct an intake meeting. On March 27, 2025, the Complainant's mother submitted a formal Title IX complaint on behalf of the Complainant. Upon initial assessment of the allegations, the Title IX Coordinator, Christopher Moy, determined that the information provided constituted a formal complaint of allegations of Sexual Harassment (Hostile Environment) under Title IX and LCPS policy. LCPS commenced a formal investigation into the allegations, and Moy assigned Dr. Reese to serve as Title IX Investigator.

On March 28, 2025, the Title IX office sent a Notice of Investigation and Allegation (NOIA) to the parties.[3] Dr. Reese completed the investigation and her initial report on May 19, 2025. The parties were provided with an updated NOIA on May 30, 2025, to notify the parties that LCPS had determined that the allegations also implicated the Sex-Based Discrimination provision of Policy 8035.

The parties were then provided with a 10-day opportunity to review and respond to the Investigator's initial report. The Respondents submitted a response and an additional piece of

---

[2] The Decision-Makers acknowledge that there was a third Respondent for whom allegations were dismissed prior to this investigation being transferred to the Decision-Makers for consideration. Reference to "Respondents" in this written determination refers to both Respondent 1 and Respondent 2, in tandem.

[3] On May 7, 2025, the parties were provided with an updated NOIA related to allegations specific to a third respondent during science class during the 2023-24 academic year. Those allegations were later dismissed by LCPS on May 30, 2025.



Friday, August 15, 2025

evidence, a video of the Complainant taken in a school hallway, on June 23, 2025.[4] Dr. Reese then completed the final investigation report, which was provided to the parties for a second 10-day review period beginning on June 26, 2025, including the opportunity to submit any written questions to the other party or any witness. The Respondents requested an extension, and the deadline was extended for all parties until July 18, 2025. On July 15, 2025, the Decision-Makers asked the Investigator to clarify information in the Complainant's Second Interview Transcript (Appendix M) regarding the time stamps that correlated with the Complainant's contention about statements that could be heard on the locker room recording (Appendix NN).[5] Additionally, the Decision-Makers requested that the Investigator provide a video or photos of the empty locker room; the Investigator provided video of the empty locker room to the Decision-Makers on July 17, 2025. The Respondents provided a written response on July 18, 2025, to the Decision-Makers, including impact statements from both of the Respondents and their families.

On July 21, 2025, Mr. Moy transferred the matter and final versions of all materials to the Decision-Makers for a final determination.

## Analysis and Findings

LCPS has jurisdiction over this matter because the alleged misconduct involves allegations of student-on-student hostile environment and sex-based discrimination that occurred during the school day in a school setting.

The revised NOIA Letters sent to the parties on May 30, 2025, included the following allegations:

> It is alleged throughout the entire 2024-2025 school year at Stone Bridge High School, in the boys' locker room during every PE class, the Respondents have continuously harassed the Complainant based on his sex and/or failure to conform to sex stereotypes.

> Specifically, it is alleged the Respondents constantly screamed at the Complainant calling him a "Boy-girl," "It," and "Girl female." It is alleged the Respondents repeatedly yelled out things like "Yo somebody get this girl out of the locker room" "Yo why is there a girl/female in the locker room?" "Get out of this locker room" "why do they let females in here?" "Somebody get it out of here" "Yo there's a girl-boy in here" repeatedly and continuously and very loudly they will say these sorts of things, in front of all students.

---

[4] The Decision Makers note that this submission date contemplates that the parties had 10 days to respond following the issuance of the May 30th NOIA.
[5] Appendix NN.



Friday, August 15, 2025

> *It is alleged on March 21, 2025, the Respondents threatened the Complainant by getting in their face and saying, "If you ever come in here again, we're gonna beat your ass."*

## Findings of Fact

The Decision-Makers note that the allegations in the NOIA are specific to conduct that occurred in the locker room. During the investigation, some witnesses also described incidents or behaviors that were observed in gym class, or in school hallways, and one recording submitted in the investigation was from the school hallway outside of the locker room. The Decision-Makers did not consider these other settings as part of the allegations; but did consider this evidence as relevant to the allegations themselves.

The Decision-Makers first analyzed and made factual findings related to the various statements alleged to have been made. Next, the Decision-Makers analyzed whether the substantiated statements constituted hostile environment sexual harassment. Lastly, the Decision-Makers analyzed which statements could be attributed to which Respondent. After completing this analysis regarding the allegations of hostile environment sexual harassment, the Decision-Makers then considered and analyzed the sex discrimination allegation.

The Decision-Makers made the following findings of fact (whether the conduct occurred as alleged) related to the locker room setting and the context for these allegations:

- We note that the NOIA letters cite "every PE class;" however, the evidence does not substantiate that the alleged statements were made "every PE class." Instead, there is evidence to support a finding that statements were made in multiple classes over a period of weeks and months. Different witnesses corroborated the span of time in which statements were overheard. The Decision-Makers found it compelling that one staff witness and one student witness offered the additional detail that the statements started a few weeks following the start of the school year because students were in driver's education for the first few weeks of the school year, and therefore not in the locker room.
- Students attended gym class on alternating days of the week, with non-gym class days designated as "A" days and gym class days designated as "B" days. As such, students attended gym multiple times per week, but not every day of the school week.
- The evidence supports a finding that near the start of every PE class, all boys from the shared gym period comprising multiple classes went into the locker room for a few minutes (one to three minutes, with some students possibly in the locker room for five minutes) where they would leave their bags and return to the PE area for class. During this interval, some boys used the restroom and/or they would talk with friends. Most students explained that they did not change their clothing for PE class, but a few did. Some witnesses described it as noisy. Audio from the locker room recording does indicate

5



Friday, August 15, 2025

- considerable background noise, multiple conversations at once, and echoing voices creating a dull roar of overlapping, loud conversations. Witness testimony indicated there were approximately 40 students in the locker room during this time.
- The locker room area was not supervised or monitored by a school employee or teacher as a matter of standard practice.[6] For a short interval near the end of the 2024-25 school year, the school placed a school employee at the entrance to the locker room to monitor, in response to the facts underlying these allegations.
- In addition to the locker room recording made by the Complainant, Decision-makers reviewed a video of the complete layout of the locker room, during which the investigator walked around the empty room to demonstrate the dimensions, layout, placement of lockers, benches, stalls, and bathroom and shower facilities.

**Locker Room Recording**

The Complainant submitted a video (2:22 long) that the Complainant contends portrayed the Complainant's typical experience in the locker room. In Complainant's second interview, the Complainant said that the Complainant began recording as the students were finishing PE class and walking back to the locker room, so the first minute-and-a-half of the video is general noise and conversation. As the students ostensibly entered the locker room, the following comments can be heard:

- Timestamp 1:30 – "is there a girl in here"
- 1:35 – "there's a girl"
- 1:40 – "why is there a girl"
- 1:50 – "why is there a girl"
- 2:00 – "I'm so uncomfortable there's a girl"
- 2:02 – "that's a female bro get out of here"

The Complainant said that the speaker of the comments from 1:30 to 2:00 is Respondent 2, and that the speaker of the comment at 2:02 is Respondent 1. Respondent 2 reviewed the recording and acknowledged that he had made several of the comments captured in the recording but could not definitively say if that was his voice on the recording. Respondent 1 said he had also made several comments like the ones captured on the recording but denied saying "get out of here" and said he was unable to identify the specific speakers on the recording.

---

[6] The Decision-Makers note that this practice changed following the Title IX Incident Reports underlying this investigation, and the PE teachers began to be present more.



Friday, August 15, 2025

Neither Respondent directly addressed the Complainant's attribution of the statements to each Respondent in their 10-day review response.

**Hallway Video**

The Complainant submitted a video (0:11 long) that Complainant contends portrayed Respondent 2 following the Complainant in the hallway after the students left the locker room. A speaker can be heard saying "girl boy" three times between the start of the video and the 0:05 timestamp. The speaker then yells the same phrase twice at the 0:06 timestamp and the 0:08 timestamp. The Complainant turned the camera to show the speaker immediately before the 0:08 timestamp, and the video appears to show Respondent 2 yelling the phrase in the hallway.

The Complainant said this video shows Respondent 2 saying "girl boy girl boy" repeatedly as the students walked down the hallway after PE class to leave the school for the day. Respondent 2 elected not to answer questions related to the video in his investigative interview, and neither Respondent directly addressed the Complainant's attribution of the statements to Respondent 2 in their 10-day review response.

**Findings Related to Statements Alleged to Have Been Made by One or Both Respondents, Generally**

The Decision-Makers noted that several variations of statements alleged to have been made by the Respondents were discussed and recounted in testimony provided by the parties and witnesses. In the interest of being both efficient and precise, the following statements are analyzed below as to the likelihood that they were uttered by one or both Respondents. Decision-Makers then determined which statements are attributable to each Respondent.

The Decision-Makers also noted that the parties and witnesses overwhelmingly agreed, and the preponderance of the evidence was therefore sufficient to conclude, that not all potential witnesses to any singular alleged occurrence were likely to have been in a place to hear, observe, or otherwise experience the conduct firsthand. Staff and student witnesses were consistent in their testimony that students spent only minutes in the locker room. Student witnesses' estimates of the amount of time on any given day spent in the locker room varied from 30 seconds to a few minutes at most.

Most student witnesses indicated their intent was to enter and leave the locker room as quickly as possible. Further, the locker room is fairly large and had several sections, stalls, and privacy barriers, limiting line of sight and reducing the number of eyewitnesses to any particular incident. Based on this information, the Decision-Makers noted the likelihood that many student

7



Friday, August 15, 2025

witnesses would not have seen and/or heard *all* of the alleged conduct in the locker room, even if it all occurred as described by the allegations. With the frequency of students entering and leaving, and given the physical barriers in the room, it would not be surprising at all if many students did not witness or observe certain alleged conduct, even if it *did* occur as alleged.

Findings for each phrase include substantially similar phrases alleged by the Complainant or discussed by the parties and witnesses, where minor changes in wording, phrasing, or sentence structure were determined by the Decision-Makers to be immaterial and not an obstacle to aggregation.

**"There's a girl in the locker room" or "Why is there a girl in the locker room" or "girl."**

As an initial matter, the Decision-Makers concluded that these statements are functionally the same. Although one is a statement, one is a question, and one is a single word, for the purposes of analysis and in the context of the allegations, each formulation was alleged to have conveyed the same message – questioning whether the Complainant should be using the boys' locker room. Complainant alleged that both Respondents uttered some formulation of these statements repeatedly on multiple occasions in the locker room throughout the 2024-25 school year. Respondents acknowledged that they made these statements, particularly "why is there a girl in the locker room," but disagreed that the statements were uttered loudly and asserted that they were sincere questions about LCPS policy related to locker room use.

The locker room recording submitted by the Complainant contains statements like "there's a girl in here?" and "why is there a girl in here?" as well as the statement "that's a female." Further, twelve witnesses recalled hearing "there's a girl in the locker room" or "why is there a girl in the locker room." One of these witnesses, Student Witness 2, heard about the comments from Complainant. The rest were direct witnesses who were present in the locker room when the statements were uttered. Three additional witnesses recalled hearing references to "girl" in the locker room.

Witnesses were also clear that these statements occurred repeatedly. Multiple witnesses said they heard the statements multiple times. For instance, Student Witness 17 said he heard the statements eight to nine times. Student Witness 13, Student Witness 15, and Student Witness 19 said they heard the statement repeatedly, but less than or around five times. Student Witness 10 said he heard it more than five times. Student Witness 5 and Student Witness 11 said they heard it three or four times. Student Witness 12 and Student Witness 16 could not remember the exact number of times they heard it, but said it was "multiple times."

Based on video evidence and witness testimony corroborating the Complainant's allegation, and the Respondents' acknowledgement that they each made these or very similar statements in the

8



Friday, August 15, 2025

locker room, the preponderance of the evidence is sufficient to conclude that the Respondents repeatedly made the statements as alleged. For the purposes of credibility, the corroborative witness testimony and indisputable video evidence bolster the Complainant's credibility and diminish the Respondents' credibility, as the Respondents' assertions that the statements were made in private to a small group of friends and not intended to be heard by the Complainant or other students is inconsistent with the indisputable video evidence and corroborative witness testimony.

**"Boy/Girl" or "Girl/Boy"**

During Complainant's investigative interview, the Complainant described that some of the comments included calling Complainant a "girl/boy." The Complainant described that "girl-boy" taunts occurred outside of the locker room, too, including in the hallways of the school. The Respondents denied making any statement referring to the Complainant as "boy/girl" or "girl/boy," either inside or outside the locker room.

Three pieces of evidence corroborate the likelihood that the statements "boy/girl" and/or "girl/boy" were made in the locker room. First, Student Witness 13 recalled hearing statements like "boy/girl" and "girl/boy" in the locker room. Second, the Complainant identified Respondent 2 repeating the phrase "boy/girl" after PE class in the school hallway video. Third, Student Witness 2 provided corroborative testimony of the phrase "boy/girl" being used in the school hallway and during a PE class.

Based on the video evidence, combined with two credible witnesses, one of whom was a neutral witness, the preponderance of the evidence shows that the phrase "boy/girl" and/or "girl/boy" was made in the locker room. For the purposes of credibility, the corroborative witness testimony and video evidence bolster the Complainant's credibility and diminish the Respondents' credibility, as the Respondents' denials are directly contradicted by the recording evidence and corroborative witness testimony.

**"Get out"**

During Complainant's investigative interview, the Complainant said that the Respondents would "tell [Complainant] to 'get out'," which the Complainant appeared to construe as a direction to leave the locker room. In a subsequent interview, the Complainant described it as "they would scream at me to get out." The Decision-Makers note that on the locker room recording, a speaker can clearly be heard to be saying, "get out of here." Both Respondents denied making the statement, generally. Respondent 2 reviewed the locker room recording and denied hearing it, generally, stating "never heard anything like that." Respondent 1 also listened to the locker room recording during his interview; he said he did not know who the speaker was. In addition to the

9



Friday, August 15, 2025

locker room recording, Student Witness 17 believes that he possibly heard "get out" in the locker room, though he could not fully recall whether he heard it himself or whether it was repeated to him by someone telling him about it.

The locker room recording captures a student saying clearly, "get out of here." The Complainant said that both Respondents were in the locker room at the time of the recording. The preponderance of the evidence, particularly because of the locker room recording, is sufficient to conclude that the phrase "get out" was said in the locker room. For the purposes of credibility, the corroborative witness testimony and recording evidence bolster Complainant's credibility and diminish Respondents' credibility, as Respondents' denials are contradicted by the recording evidence and corroborative witness testimony.

Further, the Complainant alleged that the phrase "get out" or "get out of here" was repeatedly stated in the locker room, and Complainant's credibility is superior to Respondents', in large part because recording and witness evidence corroborates Complainant's allegations on many points despite the Respondents' denials. The Decision-Makers find it credible that Complainant heard the statement "get out" or some variation of that statement in the locker room multiple times.

**"It"**

During Complainant's first investigative interview, the Complainant described hearing several variations of the phrase "it's a she" or a general reference to the Complainant as an "it," as opposed to a "he" or a "she." As one example, during Complainant's first interview the Complainant said that during PE class, when "somebody called me a 'they' and then [the Respondents] responded like that's not a 'them.' That's an 'it.'" The Complainant attributed this comment to the fact that Complainant was born biologically female but identifies as male. The Respondents denied making any statement referring to the Complainant as an "it."

Staff Witness 2 recalled hearing the statement while the students were in the locker room but could not identify the speaker. Staff Witness 2 said he heard "it" or "it's a she" at least twice between February and March 2025. Student Witness 19 said he heard "it" approximately five times in the locker room and the hallway from the beginning of the school year until May. Student Witness 19 attributed the comments to three unidentified speakers. Student Witness 17 said he heard some variation of "it" at least four times between December and Spring 2025 and on different days, including statements like "is there an it in here?" and "why is there an it?" Student Witness 17 attributed the comments to two unidentified speakers and heard references to "it" in both the locker room and in gym class.



Friday, August 15, 2025

Student Witness 7 said he heard the word "it" used in reference to the Complainant in the locker room but was unclear on the timing or frequency. Student Witness 7 said the term was used in reference to the Complainant by multiple students, including the Respondents.

The preponderance of the evidence is sufficient to conclude that the Respondents made several statements about the Complainant in the locker room that referred to the Complainant as "it" or "an it" for several reasons. First, aggregated statements from several credible witnesses, including witnesses like Student Witness 7 whose friendship with the Respondents was known and acknowledged by the witness, align with and corroborate the Complainant's allegations. Second, corroborative testimony from Staff Witness 2, an adult employee of the school, is especially persuasive in this context. And finally, the Complainant's superior credibility, as previously outlined, is sufficient to cause Complainant's allegations to overcome the Respondents' denials related to this particular allegation, and the Respondents' general credibility deficit, as previously discussed, further tips the scales in favor of the Complainant's credibility.

**"If you ever come in here again, we're gonna beat your ass."**

At the time of the March 21, 2025, Title IX Incident Report, the Complainant reported that the Respondents said to Complainant, "If you ever come in here again, we're gonna beat your ass." In Complainant's first interview, the Complainant explained Complainant recorded the Respondents' statements in the locker room both to preserve evidence and because Complainant was concerned about safety. The Respondents deny making the statement.

In Complainant's second interview, Complainant no longer described the Respondents as in Complainant's face and instead said that Complainant did not see who made the statement because Complainant was leaving the locker room. In Complainant's third interview, the Complainant described being in the locker room but that the Respondents were closer to Complainant in the locker room than usual when the threat was made. This initial report triggered the school administration to engage in three threat assessment interviews, all of which did not corroborate this statement.

The Decision-Makers observe that there is no corroborative evidence for this statement, including from student witnesses. Additionally, most of the preceding alleged comments were made more passively, which is to say they were not made in a directly confrontational manner. The fact that the preceding alleged comments were sustained was not sufficient to support the allegation of this statement, which is markedly different with respect to direct confrontation. The Complainant indicated that three student witnesses (Student Witness 1, Student Witness 2, Student 1) knew about Complainant's experiences because Complainant discussed them with each witness. Student 1 did not participate in the investigation. Neither Student Witness 1 nor

11



Friday, August 15, 2025

Student Witness 2 recalled any direct threat made by the Respondents to the Complainant like the one the Complainant alleged. Although the Complainant's credibility was generally stronger than Respondents', the complete lack of corroborative evidence and the Complainant's shifting description of this interaction do not sustain this allegation by the preponderance of the evidence, in light of the presumption of non-responsibility that must be applied.

## Credibility

Credibility is a function of the reliability of evidence. Certain factors, such as corroboration, consistency, plausibility, and motive may also bolster or detract from the determination of the credibility of a party, witness, or the evidence. Minor inconsistencies are expected, but significant discrepancies can negatively impact the credibility of the account provided. The Decision-Makers have reviewed information provided by all parties and witnesses to determine areas of consistency or inconsistency. This investigation relies significantly on testimonial evidence, including information provided by the three parties, five staff witnesses, and 19 student witnesses. As such, the Decision-Makers must evaluate the credibility of all these testimonial statements to determine their reliability and give appropriate weight.

**Staff Witnesses**

The Investigator interviewed five LCPS staff members. These witnesses were relevant to determine whether they had any firsthand knowledge, received relevant information from the students involved contemporaneous to the incidents, and/or observed the parties' other interactions. Statements or information provided by these witnesses were found to be generally credible and consistent with other available evidence.

**Student Witnesses**

The investigation incorporated testimony from a wide variety of student witnesses, many with unclear alliances, motivations, and/or alignment with either the Complainant or the Respondents. Additionally, timing and happenstance played a role in determining whether any particular witness heard specific statements. The parties and staff and student witnesses were clear that students were in and out of the locker room as quickly as possible, so it is plausible that whomever was in the locker room and able to hear any statements likely varied from day to day. It is not surprising, then, that the evidence is variable regarding each individual's own testimony about what they heard, the frequency of it, and their ability to recollect with precision when they heard it.

Generally speaking, students' friendships with the Complainant or the Respondent(s) could suggest a motivation to provide information in support of that person's allegations (or refutations). However, the information provided by the student witnesses in this matter appears



Friday, August 15, 2025

to be plausible and internally consistent and is generally corroborated, to the extent possible, by the recording evidence. There is no reason to suggest that the student witnesses were not forthcoming in sharing information they observed regarding the incidents, with the exception that many student witnesses didn't identify speakers in the locker room, which may be explained at least in part by fear of social repercussions or other potential retaliation. A popular narrative characterized by precise and specific words – a "private conversation between friends" – emerged during the interviews with some student witnesses that may suggest some coaching or synchronization, but the apparent impact of any coaching or synchronized testimony was limited to that characterization and did not appear to be widespread. The Decision-Makers also noted that interference by parents and/or other advisors of some student witnesses in interviews may have undercut the reliability and/or accuracy of those witnesses' testimony.

**Parties**

The Complainant provided two recordings to illustrate and corroborate Complainant's claims regarding Respondents' statements. Combined, the recordings sustain the Complainant's allegations that Respondents uttered phrases like "there's a girl in here," "why is there a girl in here," "girl-boy," and "get out" in the locker room. The recordings also offer evidence for attribution – discussed below. These recordings have a powerfully positive effect on the Complainant's credibility. At the same time, the recordings manifest an equally powerful negative impact on the Respondents' credibility, because each of them denied uttering or even hearing any of the statements recorded, aside from "why is there a girl in here." Based on the preponderance of the evidence, the Respondents' denials are unsupportable.

Further, the Respondents claimed that they discussed and questioned the presence of a girl in the locker room privately with a small group of friends. The recordings, however, clarify the Respondents' likely volume during each alleged incident, which is clearly designed to be heard by everyone in the locker room. While a private conversation may be one thing, loudly projecting the same messages can easily become bullying and harassment. The preponderance of the evidence supports a finding that the Respondents' characterization of their volume and intended audience is unsupportable on this record.

In addition, the Respondents' statements both inside and outside the locker room regarding Complainant are repetitive (as reflected on both recordings) as well as over weeks and months (as corroborated by witness testimony). If the Respondents' goal was to truly express their discomfort, either with the Complainant being in the locker room or with the LCPS Policy 8040 on the Rights of Transgender and Gender Expansive Students, which permits students to use facilities that correspond to their consistently asserted gender identity, then repeating their questions at a loud volume over weeks and months typically outside the presence of any

13



Friday, August 15, 2025

authority figure does not align with that description. If, however, the Complainant's allegation regarding the Respondents' motivation – to harass Complainant based on Complainant's sex – was true, one might expect Respondents to engage in precisely the type of conduct in precisely the type of circumstances (repeatedly, loudly, with an audience, out of view of authority figures) portrayed by the recordings and characterized by Complainant's allegations supported by a large volume of staff and student witness testimony.

The Complainant's testimony is generally credible. This is not to say it is not occasionally without evidentiary support on some points (like the allegation that the Respondents said "we're gonna beat your ass") or contradictory (like the Complainant's description of the Respondents being "in [Complainant's] face," which the Complainant subsequently changed to "behind" Complainant.) The Complainant's comparative credibility is high, as on the balance of the evidentiary record, Complainant's narrative was supported by the recordings and witness testimony.

By contrast, the Respondents' testimony (individually and together) is generally not credible. This is not to say the Respondents did not testify to facts and circumstances that were corroborated on certain points, but overall the Respondents' testimony did not reliably characterize the facts and circumstances central to the complaint. In addition, the Respondents' comparative credibility was particularly low, as on nearly every point of contradiction with Complainant's testimony, Respondents' version of facts and circumstances was unsupportable, largely not corroborated by witnesses, and contradicted by the recordings.

### Analysis: Hostile Environment

Among the statements substantiated by the evidence above, the Decision-Makers note that none of the statements amounted to a true threat. However, the analysis continues in order to determine whether the statements constituted hostile environment sexual harassment, which necessitates that the statements meet the elements of Policy 8035.

For Complainant's allegations of Sexual Harassment (Hostile Environment) to be sustained, the preponderance of the evidence must show that the alleged misconduct occurred, was sex-based, and contained each of the following elements:

1. Unwelcome conduct
2. Determined by a reasonable person
3. To be so severe
4. Pervasive
5. Objectively offensive

14



Friday, August 15, 2025

6. That it effectively denies a person equal access to the LCPS education program or activity

**On the basis of sex**

Under Board Policy 8035, prohibited conduct must be on the basis of sex in order for the policy to apply. LCPS Policy 8040, which was promulgated along with its Sex Discrimination and/or Sexual Harassment Policy, references a person's sex, gender, or gender identity/expression. Here, the Complainant was using the boys' locker room consistent with Policy 8040. The use of "she" and "girl" and other references to the Complainant is indicative of conduct that is based on the Complainant's sex. Indeed, along with "woman", and "female" (and their male equivalents), these are the most overt sex-based references that can be made. As discussed in more detail below, other students knew that the Complainant identified as a male, with one student witness stating that he believed the Complainant had been using boys' locker rooms since 7th or 8th grade. The Decision-Makers are satisfied by the preponderance of the evidence that the behavior alleged here was "on the basis of sex" as contemplated by LCPS Policy. Regardless of Complainant's sex or status, the Respondents' comments show that they viewed Complainant's sex as the wrong sex to be in that locker room. That was the basis of their actions, which amount to an effort to exclude Complainant from that facility on the basis of Complainant's sex. While Respondents' have a right to question LCPS policy, there is a time and place to do so. Directing comments at Complainant, who has a right to use facilities per LCPS policy, and who had no role in promulgating that policy or the legal precedents in Virginia on which it is based, is not free speech if it rises to the level of creating a hostile educational environment for a specifically targeted individual.

**Unwelcome conduct**

The Complainant's own testimony was that the comments were and are unwelcome. Evidence indicated that in addition to the March 2025 reports that triggered this investigation, Complainant had brought concerns forward to Staff Witness 3 and Staff Witness 5 in the fall of 2024. Evidence also supports that the Complainant talked with peers about the behaviors throughout the year, including Student Witness 1 and Student Witness 2. Unwelcomeness is a subjective standard under federal regulations, and no evidence exists to rebut Complainant's assertion of unwelcomeness. Thus, the preponderance of the evidence supports a finding of unwelcomeness.

**Determined by a reasonable person to be severe, pervasive, and objectively offensive**

The Decision-Makers note that much of the evidence that is necessary to analyze these elements is overlapping, and therefore, have determined that it is most efficient to analyze these elements together.

15



Friday, August 15, 2025

Severe conduct carries a degree of egregiousness, either as a single incident or a series of events. Verbal conduct can be severe when it is particularly humiliating, threatening, or abusive. Pervasiveness looks to how widespread, openly practiced, or prevalent the conduct is. Unwelcome conduct that is well-known among students can be an indicator of pervasiveness. Conduct that occurs in public spaces is more pervasive than conduct in private. Conduct must also be objectively offensive, which requires application of the reasonable person standard; would a reasonable person in the shoes of the Complainant in the context in which the conduct occurred find the conduct to be offensive?

Hostile environment analysis commands an examination of the totality of the circumstances. Even if, for argument's sake, the Decision-Makers were to grant that statements of "Why is there a girl in the locker room?" were protected speech about the application of LCPS policies to the Complainant (as is alleged by Respondents), such comments provide context for other statements that are more bullying/disparaging, such as the use of "it," "boy/girl," "girl/boy" or "get out." Additionally, although the specific allegations reference only statements made in the locker room, the Decision-Makers considered relevant statements from other school locations, such as school hallways and the gym class itself, to be not only corroborative evidence of the existence of the locker room statements, but also part of the context and totality of the circumstances needed to analyze the locker room statements.

The Decision-Makers note the following evidence regarding the circumstances by which the statements were made:

- The Decision-Makers found it significant that the statements were made in the locker room, a space where all students were required to go. Staff Witness 2 stated that all of the boys went into the locker room. The Complainant and Respondent 1 also corroborated that all students went into the locker room at more or less the same time. Several student witnesses, such as Student Witness 11, describe that prior to the Complainant's creation of the locker room recording, there was little to no adult supervision in the locker room. Staff Witness 2 described that following the allegations, the staff changed where they stand to be more present in the locker room.

- Respondent 1, who characterizes his statements regarding "why is there a girl in the locker room?" as a private conversation with two friends, admitted that his comments were "based on" the Complainant. In his March 21st written incident report form, Respondent 2 stated that his comments were a conversation with a friend about his discomfort with a girl in the locker room. Even if that were true, statements made indirectly to others in a public setting can still create a hostile environment.

16



Friday, August 15, 2025

- Nearly all student witnesses who recalled hearing the statements knew the statements were being made about the Complainant, even when they acknowledged that the statements were not made directly to the Complainant. One student knew that the Complainant had been using boys' locker rooms since 7th or 8th grade.

- The Decision-Makers find that the statements were made loudly in a manner where many other students could and did overhear. This would cause a reasonable student in the Complainant's position to feel embarrassed, ashamed, or humiliated, and particularly in the context of a confined area like a locker room. Although some student witnesses described little or no reaction from the Complainant or other peers,[7] Student Witness 11 recalled that a few people laughed at the comments. The Decision-Makers noted that the examples captured on the recording were loud enough to be picked up and heard and pervade the locker room.

- In addition to the loudness, the delivery heard on the recording did not seem to be in the manner of just making a statement or expressing a concern to a friend. The speakers' statements were proclaimed loudly enough to be heard throughout the locker room. The Decision-Makers considered carefully the Respondents' contention, and some witnesses' descriptions, that the comments were exchanged in a private conversation between a small number of participants privy to the conversation and the comments. A review of the locker room recording, which ostensibly reflected the typical tone, tenor, and volume of the comments indicates that the comments were not delivered in a private manner. They were loud, repeated, and did reach the largest potential audience, i.e. the entire locker room. Respondent 1 described the locker room as "echoey." Further, the comments pervaded and overpowered a cacophonous locker room.

- The phrase "female bro get out of here" was captured on the locker room recording. The moment after the phrase is uttered, several students react by saying "whoa, [Respondent 1]!" but it is not clear what this reaction is in response to, though the surrounding context suggests the students' reactions were in response to Respondent 1's statement. Prior to the statement, another speaker can be heard saying variations of "why is there a girl in here." These statements, based on the Decision-Makers' evaluation of the recording, were not

---

[7] We note that a visible reaction from Complainant or others at the time of the statements is not required to find that a hostile environment was created. We also note that Complainant contemporaneously recorded some of the statements, which supports Complainant's allegations of unwelcomeness, even if others did not perceive a contemporaneous reaction.



Friday, August 15, 2025

made in a manner consistent with a private conversation with one or two friends. The statements are fairly clear and loud, and more likely than not, intended for the locker room to hear, including the Complainant.

- The statements were persistent. Several student witnesses describe the statements as happening multiple times over a period of days or weeks. Student Witness 11 stated that he heard the statements last year in addition to the current academic year. The Decision-Makers certainly appreciate that a student could be legitimately surprised by the presence of a student in the locker room who seemed out of place, but Complainant's presence in the locker room had been ongoing since at least the beginning of the school year. Additionally, when the statements are made multiple times over an extended period of time, it is suggestive of targeting, and likely to be ostracizing and cause embarrassment and humiliation.

- The totality of the circumstances suggests that the Respondents' goal was to target the Complainant and that they did it in concert with each other, with statements – "it," and "boy/girl" – that were meant to taunt, mock, belittle, or intimidate Complainant, particularly combined with "get out" and the Complainant's long-standing practice of using the boys' locker room. The Complainant noted that despite having another class with Respondent 2, the comments only occurred in the locker room, when the Respondents were together, suggesting that they were acting in concert and/or when there was minimal adult supervision.

- The Decision-Makers grant that some statements may have been delivered somewhat neutrally, but some statements on the locker room recording had a tone with a tinge of targeted hostility, particularly "get out of here."

- Several student witnesses opined in interviews that the statements were "not okay" and "loud," "repeated," "yelled," "coordinated," "directed at [the Complainant]," "mocking," "rude," and "annoying."

The Decision-Makers conclude that a reasonable student in the Complainant's position, and in this specific context, could feel fearful and reasonably offended by hearing these comments about them, given the degree of frequency, and the location in the locker room, particularly where there was little to no adult supervision.

The statements were made loudly for the Complainant and all other students in the locker room to hear, and the two-on-one dynamic compounded the severity. The Complainant was required to



Friday, August 15, 2025

go into the locker room space before PE class, limiting the Complainant's ability to avoid the environment altogether, and there was no school staff supervision of the locker room space, increasing the sense of vulnerability and lack of safety inherent in the environment in which the Respondents chose to harass the Complainant.

The Decision-Makers conclude, therefore, that under the totality of the circumstances, the statements made in the locker room meet the standard of being severe, pervasive, and objectively offensive. Targeted statements about a teenage student's sex, particularly the use of the disparaging phrases of "it" and "boy/girl" and combined with language like "get out," made with some hostility, and in a repeated manner over a period of weeks and months, satisfies the elements of severity, pervasiveness, and objective offense. The comments would have caused a reasonable student in the Complainant's position to feel distressed, harassed, intimidated, and/or embarrassed, and other students who heard the remarks knew that they were about the Complainant's sex.

**Effectively denies a person equal access to the LCPS education program or activity**

The Complainant shared in an interview that Complainant transitioned when Complainant was twelve years old, so Complainant has developed some ability to tolerate comments regarding sex but finds such comments annoying and they cause Complainant to feel badly. However, the Complainant described that the locker room situation did have an impact because it "gave [Complainant] an adrenaline rush" for the entire class, and that Complainant could not really be comfortable for fear that the Respondents could say something at any moment. Contemporaneous incident reports also noted that the Complainant's "grades are slipping." The Decision-Makers also noted that in March, the Complainant perceived that the comments were escalating, that the harassment was not ending despite being previously reported, and Complainant therefore determined to act by recording the comments. Around this time, the Complainant stopped using the locker room, which shows clear denial of equal access.

**Can the statements be attributed to each of the Respondents?**

The Decision-Makers note that it is not just enough to substantiate certain of the statements and to determine that the statements constitute hostile environment harassment. Given that the allegations did not detail with specificity who is alleged to have said what, the Decision-Makers have also closely reviewed and evaluated the evidence to determine whether the preponderance of the evidence indicates that each of the Respondents made harassing statements such to hold them individually responsible for violating LCPS Policy 8035.

The Decision-Makers note that the locker room was large, comprising three bays or rows of lockers, and that as indicated on the recording, sound carries throughout the space. Therefore, the

19



Friday, August 15, 2025

testimony of many student witnesses is credible in the sense that they could hear the statements being made but not necessarily see the speaker.

This portion of the analysis reviews the evidence related to whether a witness observed one or both Respondents and/or recognized their voices.

Several student witnesses did not necessarily identify the Respondents but referenced in various ways a "group of boys" naming five to six students (including some individuals who were participating witnesses in the investigation) in similar but varied configurations and consistently included both Respondents. Student Witness 5 described a "mix of voices," which is consistent with the locker room recording.

The Decision-Makers reviewed the evidence related to each Respondent in turn. This analysis focuses on attribution to Respondent 2:

The Complainant could identify Respondent 2 by sight, and several students described him as "very tall" in contrast to Respondent 1. The Decision-Makers note that the 11-second video from the school hallway, in which the Complainant identifies Respondent 2, does show a student who is much taller than his peers walking a few feet behind the Complainant and yelling in the direction of the Complainant. Additionally, the Complainant believes that Complainant has a good grasp on the voices for each Respondent, and that Complainant can recognize Respondent 2's voice.

The Complainant was consistent across both interviews in identifying Respondent 2. In the second interview, the Complainant noted that Respondent 2 was generally louder than Respondent 1 in making statements. The Complainant identified Respondent 2 in the hallway video as including the loud vocalizations of "girl/boy;" the Decision-Makers could hear the statements when they reviewed the video. Additionally, the Complainant identified Respondent 2 in the locker room recording. Although not on the locker room recording, the Complainant attributed statements to Respondent 2 at other times, such as "boy/girl," "it," and that he would often make statements in a repetitive manner.

Respondent 2 acknowledged having private conversations in the locker room with two friends in which he said, "why is there a girl in the locker room?" and offered a comparison that the statements he would have made were like the ones heard in the locker room recording. He admits to no other statements. However, other evidence corroborates that Respondent 2 likely made some of the other statements as Complainant contends:

- Student Witness 10 described Respondent 2 as making the statements "Why is there a girl in here?"

20



Friday, August 15, 2025

- Several student witnesses who heard the terms "boy/girl" or "it" identified Respondent 2 or could recognize him or his voice.
- Other student witnesses who did not necessarily hear "boy/girl" or "it" could identify Respondent 2 as one of the speakers and attributed the statements "why is there a girl in the locker room?" to him.
- Student Witness 14, who is identified as a friend of the Respondents, also attributed statements such as "why is there this girl in the locker room?" to Respondent 2; Student Witness 14 said they could hear the statements from a distance of about 10 to 15 feet away.
- In addition to hearing the statements asking about or stating the presence of "a girl in the locker room," Student Witness 17 also heard statements such as "why is there an it?" and "is there an it in here?" and that Respondent 2 was one of the individuals who said it.

The Decision-Makers conclude that the preponderance of the evidence, and particularly in light of the preceding credibility analysis, clearly indicates that Respondent 2 was a speaker of substantiated comments in the locker room, and that it is more likely than not that Respondent 2 was a speaker who made statements that included the terms "it," "boy/girl" or "girl/boy" and "get out of here."

Therefore, based on the above analysis, the Decision-Makers find by the preponderance of the evidence that Respondent 2 is **responsible** for violating the Hostile Environment provision of Policy 8035.

Analysis: Discrimination Based on Sex

For Complainant's allegations of discrimination based on sex to be sustained, the preponderance of the evidence must show that the alleged misconduct occurred, was based on sex, and contained each of the following elements:

1. Discrimination
2. In programs, athletics, extra-curricular activities, facilities, course offerings, and funding.

**Discrimination**

The Decision-Makers note that LCPS Policy does not provide a further definition of "discrimination," and therefore use the plain meaning of the term in a discrimination policy. Typically, discrimination is different treatment with respect to an individual's participation in an education program or activity based, in whole or in part, upon the individual's actual or perceived protected characteristic.

21



Friday, August 15, 2025

Here, the Decision-Makers discern that there is sufficient evidence to make a finding that the Respondents intended to treat the Complainant differently than they treated other peers, and that the differential treatment was on the basis of the Complainant's sex in that the Complainant did not conform to the Respondents' expectation for how a male should appear, including but not limited to Complainant's hair and clothing choices. In fact, the Complainant explained in the investigation that Complainant began to transition at age 12, and other students were able to describe the Complainant as using the boy's locker room in prior academic years. The Respondents, in contrast, sought to make the Complainant's presentation as a girl and not a boy a central aspect of the investigation, including submitting a video of the Complainant walking down a school hallway with long hair.

The Decision-Makers note that within this entire substantial record, no witnesses describe that the Respondents made verbal characterizations of the visible sex presentations of any other person in the locker room (or elsewhere in the school for that matter). In fact, Student Witness 17, who heard the statements multiple times over multiple dates, described that, in general, nobody does or says anything bad to each other in the locker room. Student Witness 10 described that generally, most students treat each other appropriately in the locker room. Both Respondents made comments during the investigation indicating that the Complainant was the singular focus of their comments.

**In programs, athletics, extra-curricular activities, facilities, course offerings, and funding**

The Decision-Makers find that the Respondents' differential treatment of the Complainant was expressly regarding the Complainant's access to the locker room, which is an LCPS facility. Additionally, the locker room is used in conjunction with the physical education program, which is an LCPS program and course offering.

**On the Basis of Sex**

The Decision-Makers reiterate and incorporate by reference their discussion of "on the basis of sex" above. Additionally, evidence supports that both Respondents intended for the Complainant to be the subject of their statements, and that the statements that they admit to making were made based upon their subjective view that the Complainant appeared to be a female in the boys' locker room. This confirms that the Respondents were making the statements because they perceived the Complainant to not be conforming to their expectations of a boy's sex presentation, thereby relying on sex stereotypes.

**Additional Observations**

The Decision-Makers note that the Respondents claim that their right to discuss their discomfort with the Complainant's presence in the locker room was speech and religious freedom protected

22



Friday, August 15, 2025

by the First Amendment, but we did not conclude that the evidence showed a discussion. The Decision-Makers have already determined that the statements constituted Title IX sexual harassment, which is sufficient to overcome that assertion. The evidence shows sustained taunting, bullying, ostracization, and intent to exclude. That is not protected speech or religious freedom. It is targeting a specific person based on their sex.

Therefore, based on the above analysis, the Decision-Makers find by the preponderance of the evidence that Respondent 2 is **responsible** for violating the Sex-Based Discrimination provision of Policy 8035.

## Evidence Not Relied Upon (Not Relevant)

Although the Decision-Makers did review the Respondents' and their families' written impact statements submitted during the review period, they did not rely upon them, as they did not include relevant information regarding the underlying allegations.

## Appeal

The parties have an opportunity to appeal this decision under the Loudoun County Public Schools' process detailed in Regulation 8035: Title IX, Sex-Based Discrimination, Sexual Harassment. A party who wishes to appeal this decision must submit the appeal request no later than five business days following the date of this letter.

Parties will be notified in writing if an appeal request is received regarding this matter. If no appeal requests are received by the conclusion of the five-business-day period, this decision will become final. Please refer to Regulation 8035 for additional information regarding the appeal process.

## Sanctions Assigned

These findings have been shared with the Director of School Administration for review and appropriate sanction recommendations. A memo with any sanctions and the factors considered is included in addition to this outcome notification.

A record of this matter will be maintained as part of the Respondent's education record pursuant to Loudoun County Public Schools Policy and will be considered as prior conduct history if Respondent is found responsible for any future Policy violations.

Respondent's failure to successfully complete the sanction(s) by the assigned deadline(s) will result in disciplinary action.

Finally, the parties are again reminded that Loudoun County Public Schools' policies on retaliation are in effect and will be enforced should any negative action be taken toward anyone

23



Friday, August 15, 2025

who participated in the resolution process. Please notify the Title IX Coordinator right away should you experience any retaliatory conduct. If you have any questions regarding the grievance process and procedures related to Policy 8035, or the contents of this letter, you may contact Christopher Moy, Title IX Coordinator at (571) 252-1548 or titleixcoordinator@lcps.org.

Thank you for your time and consideration.

Sincerely,

Kimberly A. Pacelli, M.Ed., J.D.*
Decision-Maker


Saundra K. Schuster, M.S., J.D.*
Decision-Maker


Joseph Vincent, M.L.S.
Decision-Maker


cc:     Title IX Case File
        LCPS Title IX Coordinator


*Although Pacelli and Schuster are licensed attorneys, they did not function in that role for LCPS and are not attorneys for the school district.