**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | | |
|---|---|---|
| S.W., et. al.; | ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No. 1:25-cv-1536 |
| v. | ) | |
| | ) | |
| LOUDOUN COUNTY SCHOOL BOARD, | ) | |
| *Defendant*. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

**INTRODUCTION**.............................................................................................................1

**BACKGROUND** ...............................................................................................................1

I.   March 21, 2025, incident involving the Female Student recording in the boys' locker room ....................................................................................................................................3

II.  Defendant's response and investigation...........................................................................4

III. Defendant's disciplinary actions and current procedural posture......................................5

**PRELIMINARY INJUNCTION STANDARD** .................................................................6

**ARGUMENT** ....................................................................................................................7

I.   Plaintiffs are likely to prevail on the merits.....................................................................7

    A. *Plaintiffs are likely to succeed on religious discrimination claims* ..............................7

    B. *Plaintiffs are likely to succeed on sex discrimination claims under Title IX, the Fourteenth Amendment, and Article I, Section 11 of the Virginia Constitution* ............9

    C. *Plaintiffs are likely to succeed on free speech claims* ...................................................10

       1. The Plaintiffs' speech was constitutionally protected ...........................................10

       2. LCPS suspended the Plaintiffs because of their constitutionally protected speech........................................................................................................................12

    D. *LCPS applied Title IX in an unconstitutional manner* .................................................13

       1. Title IX, properly applied, can survive strict scrutiny ...........................................13

       2. The School Board applied Title IX to punish speech it disfavored ......................14

       3. LCPS's flawed Title IX investigation and findings were a pretext for viewpoint discrimination ........................................................................................................17

    E. *Plaintiffs are likely to succeed on their remaining claims as well* ..............................18

II.  Without relief, the Plaintiffs will suffer irreparable harm ................................................18

III.    The balance of equities favors the Plaintiffs .......................................................................19

IV.    Public interest favors the Plaintiffs ....................................................................................20

**CONCLUSION** ...........................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**UNITED STATES SUPREME COURT CASES**                                          Page(s)

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) ............................................................................ 11

*Davis v. Monroe Cnty. Bd. Of Educ.*,
    526 U.S. 629 (1999) .......................................................... 13, 14, 16, 17

*Dep't of Educ. v. Louisiana*,
    603 U.S. 866 (2024) ............................................................................ 18

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ............................................................................ 12

*Goss v. Lopez*,
    419 U.S. 565 (1975) ...................................................................... 13, 19

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ............................................................................. 13

*Janus v. Am. Fed. of State, Cnty., and Mun. Emps., Council 31*,
    585 U.S. 878 (2018) ............................................................................ 11

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ............................................................................ 11

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) .............................................................................. 8

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) ............................................................................ 11

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ............................................................................ 12

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................................ 11

*Street v. New York*,
    394 U.S. 576 (1969) ............................................................................ 11

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................................ 10

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
    393 U.S. 503 (1969) ........................................................................... 11, 12

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000) ............................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 7

## OTHER FEDERAL CASES

*Booker v. South Carolina Dept. of Corr.*,
    855 F.3d 533 (4th Cir. 2017) ................................................................ 10

*Caudill v. N.C. Symphony Society, Inc.*,
    750 F. Supp. 3d 531 (E.D. N.C. 2024) ................................................... 8

*Causey v. Balog*,
    162 F.3d 795 (4th Cir. 1998) .................................................................. 7

*Centro Tepeyac v. Montgomery Cnty.*,
    722 F.3d 184 (4th Cir. 2013) ....................................................... 7, 19, 20

*Chalmers v. Tulon Co. of Richmond*,
    101 F.3d 1012 (4th Cir. 1996) ................................................................ 8

*Coleman v. Newburgh Enlarged City Sch. Dist.*,
    319 F. Supp. 2d 446 (S.D.N.Y. 2004) .................................................. 18

*DeAngelis v. El Paso Mun. Police Officers Ass'n*,
    51 F.3d 591 (5th Cir. 1995) ................................................................. 13

*DeJohn v. Temple Univ.*,
    537 F.3d 301 (3rd Cir. 2008) ............................................................... 13

*DJ by and through Hughes v. Sch. Bd. of Henrico Cnty.*,
    488 F. Supp. 3d 307 (E.D. Va. 2020) .................................................. 14

*Doe v. Marshall Univ. Bd. of Governors*,
    683 F. Supp. 3d 522 (S.D. W. Va. 2023) ............................................... 9

*Feminist Majority Found. v. Hurley*,
    911 F.3d 674 (4th Cir. 2018) ............................................................... 14

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ......................................................... 19, 20

*Int'l Refugee Assistance Proj. v. Trump,*
    857 F.3d 554 (4th Cir. 2017) ........................................................ 20

*Jennings v. Univ. of N.C.,*
    482 F.3d 686 (4th Cir. 2007) ................................................. 13, 14

*Jones v. Bd. of Governors of Univ. of N.C.,*
    704 F.2d 713 (4th Cir. 1983) ........................................................ 7

*Morrison v. Garraghty,*
    239 F.3d 648 (4th Cir. 2001) ........................................................ 7

*Ross v. Meese,*
    818 F.2d 1132 (4th Cir. 1987) ..................................................... 18

*Salomon & Ludwig, LLC v. Winters,*
    2025 WL 2314652 (4th Cir. Aug. 12, 2025)................................... 7

*Saxe v. State Coll. Area Sch. Dist.,*
    240 F.3d 200 (3rd Cir. 2001) ..................................................... 13

*Sheppard v. Visitors of Va. State Univ.,*
    993 F.3d 230 (4th Cir. 2021) ........................................................ 9

*St. Michael's Media Inc. v. Mayor and City Council of Balt.,*
    566 F. Supp. 3d 327 (D. Md. 2021)............................................ 17

*Wollschlaeger v. Governor, Florida,*
    848 F.3d 1293 (11th Cir. 2017) ................................................. 13

**STATE CASES**

*Loudoun Cnty. Sch. Bd. v. Cross,*
    2021 WL 9276274 (Va. August 30, 2021) ................................... 11

*Vlaming v. West Point Sch. Bd.,*
    302 Va. 504 (2023) .................................................................... 11

*Willis v. Mullett,*
    263 Va. 653 (2002) ...................................................................... 9

## INTRODUCTION

In this case, the Defendant seeks to punish two male students who complained after a female student entered the boys' locker room before gym class, a time when students are undressing and changing, and surreptitiously recorded herself on her phone. That recording captured boys saying things like: "There's a girl in here?"; "Why is there a girl?"; and "I'm so uncomfortable there's a girl." Doc. 1 at ¶ 71. Instead of finding wrongdoing on the part of the female for filming in the boys' locker room, the Defendant pursued a Title IX claim *against the boys* for sexual harassment.

After administering discipline in a manner that prevented S.W. from seeking relief before punishment began and forcing him into a *de facto* one-day suspension, S.W. obtained temporary relief from this Court. Doc. 10. Plaintiffs now seek the entry of a Preliminary Injunction to prevent the Defendant from (1) entering a finding of sexual harassment onto their permanent student records and (2) administering discipline for the same until they can avail themselves of the judicial remedies available to them for the Defendant's violation of their constitutional rights.

The conversion of the TRO into a Preliminary Injunction is necessary because the School Board has, thus far, refused all requests—even those of the Court[1]—to agree to hold the discipline in abeyance pending the outcome of this litigation. Without a Preliminary Injunction, the threat of discipline hangs over both Plaintiffs' heads and could be imposed at any time.

## BACKGROUND

S.W. and J.S. ("the boys" or "the Plaintiffs") are two minor boys who have been forcefully retaliated against by the Loudoun County School Board ("the Defendant" or "School Board") for exercising their First Amendment speech and religious rights, and then suffered further violations

---

[1] For this reason, Plaintiffs also seek their fees and costs associated with this motion.

of their Due Process rights under federal and state law. In August 2024, the Plaintiffs began their sophomore year at Stone Bridge High School ("Stone Bridge"). Stone Bridge is in Ashburn, Virginia, is a part of the Loudoun County Public Schools ("LCPS"), and is under the jurisdiction and control of Defendant School Board.

Both Plaintiffs were enrolled in a Physical Education ("P.E.") class, where all the students would go to the locker room to drop their school bags for the duration of the class and use whatever facilities they needed. During the fall months of 2024, a specific female student ("Female Student") repeatedly entered and lingered in the male locker room facilities. Both Plaintiffs raised concerns with LCPS leadership about the Female Student using the boys' locker room, apprising LCPS leadership of their opposition to the presence of a female student in the boys' locker room in the fall months of 2024. In March 2025, the Female Student entered the boys' room and surreptitiously recorded a 2-minute 22-second video, which she then immediately submitted to the school, whereupon the school opened an investigation of sexual harassment into the boys for questioning her presence in the locker room.

Defendant seeks to impose a two-week suspension from school on S.W. and J.S. (who now attends school in a different jurisdiction, but the threat of discipline remains if he returns to LCPS). The findings and discipline remain on J.S.'s academic record, and both boys continue to face the risk of imminent, irreversible harm without relief from this Court. The School Board does not face any risk of harm, as demonstrated by the fact that disciplinary actions are currently stayed.

Plaintiffs filed suit on September 15, 2025. Doc. 1. The same day, they filed an Emergency Motion for Temporary Restraining Order ("TRO"). Doc. 3. This Court entered a TRO the following day and ordered the Defendant to allow S.W. to return to class. Doc. 10. Plaintiffs now ask the Court to convert its TRO into a Preliminary Injunction to ensure their rights are preserved

while their claims are heard. For Plaintiff S.W., a ten-day suspension, once served, would be impossible to remedy. For both Plaintiffs, if the Defendant were to erroneously enter a finding of Title IX Sexual Harassment onto their records, the harm will have been done.

I.    **March 21, 2025, incident involving the Female Student recording in the boys' locker room**.

On March 21, 2025, Plaintiffs were in the boys' locker room and were both preparing for P.E. class. Doc. 1 at ¶ 63. As Plaintiffs continued their preparation for P.E. class, from a distance, they saw the Female Student enter the boys' locker room. *Id.* at ¶ 64. As was the case on prior occasions, having a girl in the boys' changing facility was awkward and uncomfortable for them. *Id.* at ¶ 66.

Plaintiffs then began speaking among themselves and questioning why there continued to be a girl in the boys' locker room. *Id.* at ¶ 67. As she entered the boys' locker room on this occasion, the Female Student secretly used her cell phone to video record the boys in the locker room. *Id.* at ¶ 68. She recorded a video lasting 2 minutes and 22 seconds. *Id*. This video records various boys questioning why a female student was in the locker room. *Id*.

The boys' locker room is a reverberant environment, and in this recording, various boys' voices could be heard from a considerable distance, creating a cacophonous and overlapping set of chattering voices. Doc 1 at ¶ 69. However, some boys concerned about having a female student in the locker room could be heard on the Female Student's video recording. *Id*. In making this recording, the Female Student engaged in a premeditated act to provoke an adverse reaction from the boys to get them in trouble. *Id.* at ¶ 70. At the start of the video, while still in the gymnasium outside of the boys' locker room, the Female Student is heard saying, "I'll find out" to another student. She then walked into the boys' locker room while filming. *Id*.

3

After the Female Student entered the boys' locker room, the following statements were made by various males inside the boys' locker room: "There's a girl in here?"; "Why is there a girl?"; "I'm so uncomfortable there's a girl."; and another male voice said to another male, "A female? Bro, get out of here." *Id.* 1 at ¶ 71. The last statement, "Bro, get out of here.", was said from a distance away from the Female Student, made between boys, made as a colloquial expression of disbelief, similar to saying "You've got to be joking" or "No way." The statement was not made in a confrontational fashion. *Id.* at ¶ 72.

For every one of those recorded statements, no male student—including Plaintiffs—spoke to the Female Student directly or had any physical contact with her. Assuming, *arguendo*, that the statement "Bro, get out of here" was made directly to her (it was not), it still would not rise to an objectively offensive level such that it would be actionable. But the fact is, the Plaintiffs remained at a distance and eventually left the locker room. *Id.* at ¶ 73. Neither Plaintiff spoke to the Female Student on March 21, 2025, nor has either spoken to her since. *Id.* at ¶ 74. For every occasion when Plaintiffs expressed distress, discomfort, and disagreement with having the Female Student in the boys' locker room, they asked questions or shared opinions among each other. *Id.* at ¶ 75. No material disturbance or disruption ever developed. *Id.* No altercations, fights, or verbal confrontations ever occurred. *Id.*

## II.    Defendant's response and investigation.

After creating the March 21, 2025, video recording in the boys' locker room, the Female Student submitted it to LCPS officials and made a complaint against S.W., J.S., and a Muslim Student. Doc 1 at ¶ 81. On March 28, 2025, LCPS informed both Plaintiffs and the Muslim Student that it had initiated formal investigations against each of them for possibly violating LCPS Policy 8035 through what it referred to as "sexual harassment." *Id.* at ¶ 82. At that time, LCPS stated it

was investigating the Plaintiffs and the Muslim Student for identical accusations. *Id.* at ¶ 83. On May 7, 2025, LCPS informed the Muslim Student that it was also investigating him for additional accusations that the Plaintiffs were not subject to. *Id.* at ¶ 84.

After notifying the Plaintiffs and the Muslim Student that LCPS had initiated a formal investigation against them, members of the Muslim community in Northern Virginia began speaking out against LCPS's actions. *Id.* at ¶ 86. A cleric from a local mosque, where the Muslim Student attends religious services, contacted a School Board member to express dismay and disapproval at LCPS's investigation. *Id*. On May 30, 2025, LCPS dismissed the accusations against the Muslim Student, stating that the Title IX complaint "must be dismissed" because "**the conduct alleged would not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved.**" Doc 1 at ¶ 87. (emphasis in original).

On July 10, 2025, J.S.'s parents apprised LCPS that he was permanently unenrolling from LCPS. Doc 1 at ¶ 90. LCPS policy provides that when a student unenrolls from its school system, LCPS is permitted to end Title IX disciplinary investigations against that student. Exhibit A, Doc. 29-1, at 10. J.S., through counsel, requested that LCPS end its investigation against him because he was unenrolling from the LCPS system. Doc 1 at ¶ 92. However, LCPS persisted with its investigation and decided that it would not dismiss the Title IX complaint against him. *Id*.

### III.    Defendant's disciplinary actions and current procedural posture.

On August 15, 2025, the Defendant issued a decision against both Plaintiffs. Exhibits B & C, Docs. 29-2 & 29-3, at 2. It concluded that both Plaintiffs violated LCPS Policy 8035 through impermissible sexual harassment and sex-based discrimination because of the Plaintiffs' statements made in the Stone Bridge boys' locker room. *Id*. The Plaintiffs appealed the suspension on August 18. Exhibits D & E, Docs. 29-4 & 29-5, at 3. On August 19, Plaintiffs also appealed the

entire decision, which caused a stay of the appeal of the suspension, as all disciplinary measures were placed in abeyance. *Id*.

During the pendency of the appeal, discipline was stayed. The school year began on or about August 21, 2025. S.W. began regular attendance at school when it started. Exhibit F, Doc. 29-6, at 2. On September 10, the School Board informed counsel for the Plaintiffs that the administrative appeal had been denied. Exhibits D & E, Docs. 29-4 & 29-5. At that time, the appeal of the suspension reverted back into an active status for consideration. On September 11, counsel requested that any suspension be held in abeyance for a TRO hearing in this Court. Exhibit F, Doc. 29-6. On September 12, the School Board denied that request. Exhibit G, Doc. 29-7, at 2. On September 15, at 1:00 PM the Chief of Schools informed counsel for the Plaintiffs that the appeal of suspension was denied and that the ten-day suspension would begin Tuesday, September 16. Exhibits H & I, Docs. 29-8 & 29-9, at 2.

On September 16, this Court issued a TRO ordering the Defendant to allow S.W. "to continue with in-person education *until the issues raised in this Complaint* are resolved." Doc. 10 (emphasis added). The Court went on to state that it would hold a hearing on turning the TRO into a preliminary injunction "unless the parties are able to agree to a further abeyance of the suspension while this civil action is fully litigated." *Id.* Despite this, the School Board agreed only to hold off the suspension until a Preliminary Injunction motion could be briefed and argued. It has made clear its intent to move forward with *immediate imposition of punishment* in the absence of an Order from this Court.

## PRELIMINARY INJUNCTION STANDARD

A party seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief,"

(3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where there are multiple claims advanced, "finding a likelihood of success on only one claim is sufficient to justify injunctive relief." *Salomon & Ludwig, LLC v. Winters*, 2025 WL 2314652, at *3 (4th Cir. Aug. 12, 2025). "If the balance of hardships tips decidedly in the plaintiff's favor, an injunction preserving the status quo should issue 'if, at least, grave or serious questions are presented.'" *Jones v. Bd. of Governors of Univ. of N.C.*, 704 F.2d 713, 715 (4th Cir. 1983).

## ARGUMENT

Plaintiffs meet all four factors to obtain a preliminary injunction. S.W. and J.S. are likely to prevail on the merits of their claims that LCPS violated their constitutional rights to free speech, free exercise, and due process by disciplining them in retaliation for their speech on a sensitive and controversial political topic. And, as this Court has already held, the remaining factors favor the Plaintiffs; therefore, the TRO should be converted into a preliminary injunction.

**I.    Plaintiffs are likely to prevail on the merits.**

*A.  Plaintiffs are likely to succeed on religious discrimination claims.*

S.W. and J.S. were disciplined differently from the Muslim Student on the basis of religion. To establish an equal protection claim, a plaintiff must show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If a plaintiff demonstrates intentional unequal treatment, the court must then determine whether the treatment is justified. *Id.* A plaintiff's claim of discrimination under § 1983 may be analyzed under the same standards developed in Title VII cases. *See Causey v. Balog*, 162 F.3d

795, 804 (4th Cir. 1998); *Caudill v. N.C. Symphony Society, Inc.*, 750 F. Supp. 3d 531, 562 (E.D. N.C. 2024) (collecting cases).

"To prove a claim under the disparate treatment theory," a plaintiff "can utilize a burden-shifting scheme similar to the one the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) … this might consist of evidence that the [defendant] treated the [plaintiff] more harshly than other[s]" who "had engaged in similar conduct." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996).

The Defendant here plainly treated the Plaintiffs differently from the Muslim Student when they dismissed the investigation against the Muslim Student, but proceeded to harshly punish the Plaintiffs. Despite the acoustics of the locker room, which obscured the identity of the speakers who allegedly harassed the Female Student, and the poor quality of the evidence, the three students who were singled out for investigation received entirely different treatment from the LCPS disciplinary apparatus. In two cases, Defendant seeks to impose a harsh punishment with potential long-term negative effects on educational attainment and career trajectory. In the other case, the investigation was dismissed because "**the conduct alleged would not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved**." Doc. 1 at ¶ 87 (emphasis in original).

The only detail that distinguishes the Muslim Student from the Plaintiffs is the differing religion. The fact that the Muslim Student's investigation dismissal came after the intervention of the local Muslim community, and of a Muslim community-affiliated school board member, makes plain that the Defendant was acting because of the Muslim Student's faith when choosing to apply different discipline. Plaintiffs seek only to be treated the same as their classmate, and not to be singled out for harsher punishment because of their religion.

B.  *Plaintiffs are likely to succeed on sex discrimination claims under Title IX, the Fourteenth Amendment, and Article I, Section 11 of the Virginia Constitution.*

"Title IX prohibits federally-supported educational institutions from practicing discrimination on the basis of sex." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (internal citations omitted). Further, "on the basis of sex" requires only "but for" causation in Title IX claims alleging discriminatory school disciplinary proceedings. *Id.* at 237. Similarly, for a federal equal protection claim, a plaintiff must show that "he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Id.* at 238. Article I, Section 11 is interpreted coextensively with the equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution. *Willis v. Mullett,* 263 Va. 653, 657 (2002).

In this case, the Female Student filed a Title IX complaint against the Plaintiffs because of the content of their speech while she was using the boys' locker room. Putting aside for a moment the Female Student's surreptitious recording of boys in a private space in violation of LCPS Policy and all common norms of decency, the Plaintiffs also filed a Title IX complaint against the female for using the boys' locker room. While the allegations in the dueling complaints were different, they involved the same set of operative facts, which occurred at the same time in the same place. Therefore, the Plaintiffs and the Female Student were similarly situated, and their complaints should have been treated equally. *See, e.g., Doe v. Marshall Univ. Bd. of Governors*, 683 F. Supp. 3d 522, 539–40 (S.D. W.Va. 2023).

The School Board, however, refused to investigate the Plaintiffs' Title IX complaints, while it fully investigated the Female Student's complaint against the Plaintiffs, found they violated Title IX, and disciplined them. Clearly, the School Board treated the Plaintiffs worse than the similarly situated Female Student. Further, the entire situation in the Title IX complaints had

to do with the Plaintiffs' discomfort with the Female Student using a boys' locker room and the Female Student's displeasure at being referred to as a female. It is thus indisputable that sex was at least a but for cause of the School Board's disparate treatment.

Additionally, when the Plaintiffs raised their concerns to the School Board about the Female Student using the boys' locker room, they were told that they could find an alternative place to change their clothes. But the School Board never told the Female Student to change her clothes elsewhere, nor did it attempt to provide her with an accommodation that would not deny the Plaintiffs their rights. Again, the Plaintiffs and the Female Student were similarly situated and the School Board's decision to treat the Female Student differently was based on sex—specifically, in accordance with its application of its policies that give female students who choose to use a boys' locker room greater rights in the use of that locker room than males.

### C. Plaintiffs are likely to succeed on free speech claims.

A free speech retaliation claim has "three elements: (1) the plaintiff engaged in constitutionally protected First Amendment activity, (2) the defendant took an action that adversely affected that protected activity, and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct." *Booker v. South Carolina Dept. of Corr.*, 855 F.3d 533, 537 (4th Cir. 2017).

#### 1. The Plaintiffs' speech was constitutionally protected.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). The Supreme Court has held time and again, both within and outside the school context, that the government may not prohibit speech based on the "mere desire to avoid the discomfort and unpleasantness that always accompany an

unpopular viewpoint." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 509 (1969);

*see also 303 Creative LLC v. Elenis*, 600 U.S. 570, 602 (2023) ("if liberty means anything at all,

it means the right to tell people what they do not want to hear."); *Street v. New York*, 394 U.S. 576,

592 (1969) ("The public expression of ideas may not be prohibited merely because the ideas are

themselves offensive to some of their hearers."); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377,

414 (1992) ("The mere fact that expressive activity causes hurt feelings, offense, or resentment

does not render the expression unprotected.").

 Moreover, speech on sensitive and controversial political topics is "of profound value and

concern to the public" and "occupies the highest rung of the hierarchy of First Amendment values

and merits special protection." *Janus v. Am. Fed. of State, Cnty., and Mun. Emps., Council 31*, 585

U.S. 878, 914 (2018). *See also Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (matters of public

concern include anything that "can be fairly considered as relating to any matter of political, social,

or other concern to the community," or "of general interest and of value and concern to the

public."); *Vlaming v. West Point Sch. Bd.,* 302 Va. 504, 569 (2023) (concept of "gender identity"

is among many "controversial subjects" that are rightly perceived as "sensitive political topics.");

*see also Loudoun Cnty. Sch. Bd. v. Cross*, 2021 WL 9276274 (Va. August 30, 2021). And, where

religious concerns are implicated, "the Free Speech Clause provides overlapping protection …

[and] doubly protects religious speech." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523–24

(2022). While the Plaintiffs' speech might not be religious in content, both it and the views they

expressed when objecting to the LCPS Policy arose out of their deeply held religious convictions.

 By LCPS's own admission, the speech was in response to the Female Student's use of a

male locker room pursuant to LCPS Policy 8040, which allows students to use opposite sex locker

rooms based on their "gender identity." It must, therefore, be the case that the boys' speech was

on the sensitive and controversial political topic of "gender identity," which is "of profound value and concern to the public" and "occupies the highest rung of the hierarchy of First Amendment values and merits special protection." That the Plaintiffs' speech and their views arose out of their religious convictions further protects such speech. Consequently, any attempt to regulate such speech must meet constitutional strict scrutiny. By expressing distress, discomfort, and disagreement with having the Female Student in the boys' locker room, Plaintiffs spoke on a matter of significant public concern.

    2.    <u>LCPS suspended the Plaintiffs because of their constitutionally protected speech.</u>

A law that "is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165 (2015) (cleaned up). It is well-settled that regulation of content may not be solely on the emotive impact that the allegedly offensive content may have on a listener. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 811–12 (2000) ("The overriding justification for the regulation is concern for the effect of the subject matter on [listeners] … This is the essence of content-based regulation."); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."); *Tinker*, 393 U.S. at 509 (schools may not prohibit speech based on the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint").

Courts throughout the country have recognized that, "Where pure expression is involved, anti-discrimination law steers into the territory of the First Amendment" and "when anti-discrimination laws are applied to harassment claims founded solely on verbal insults, pictorial or literary matter, the statutes impose content-based, viewpoint-discriminatory restrictions on

speech." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3rd Cir. 2001) (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995)); *see also Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1307 (11th Cir. 2017) (quoting *DeJohn v. Temple Univ.*, 537 F.3d 301, 316 (3rd Cir. 2008) ("anti-harassment laws, insofar as they regulate speech based on content, are subject to First Amendment scrutiny"). When speech is regulated based on its purpose, it "sweep[s] in those 'simple acts of teasing and name-calling' that the *Davis* Court explicitly held were insufficient." *Saxe*, 40 F.3rd at 210. Here, it is uncontested that LCPS disciplined the boys for their speech or that a 10-day suspension is adverse. *Goss v. Lopez*, 419 U.S. 565, 575 (1975).

   D.  *LCPS applied Title IX in an unconstitutional manner.*

      1.  <u>Title IX, properly applied, can survive strict scrutiny.</u>

   Title IX's prohibition against sex-based harassment is a content-based regulation that survives strict scrutiny because it is limited to harassment that "is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 652 (1999). For conduct to rise to the level of a hostile environment such that it does not run afoul of the First Amendment, it must both: (1) be viewed subjectively as harassment by the victim, and (2) be objectively severe or pervasive enough that a reasonable person would agree it is harassment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993) (addressing Title VII hostile work environment claims); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (courts "look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX."). Further, the harassment must deprive a student of access to educational opportunities or benefits in several circumstances, "deprive a student of access to educational opportunities or benefits in several circumstances, including when the harassment: (1) results in the physical exclusion of the

victim from an educational program or activity; (2) so undermines and detracts from the victim's educational experience as to effectively deny him or her equal access to an institution's resources and opportunities; or, (3) has a concrete, negative effect on the victim's ability to participate in an educational program or activity." *DJ by and through Hughes v. Sch. Bd. of Henrico Cnty.*, 488 F.Supp. 3d 307, 333 (E.D. Va. 2020) (quoting *Davis*, 526 U.S. at 650–51) (cleaned up).

In the Title IX context, conduct that includes "objectively offensive touching" and vulgar statements such as "I want to get in bed with you" and "I want to feel your boobs" creates a hostile educational environment. *Davis*, 526 U.S. at 633; *see also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 692 (4th Cir. 2018) (threats to "euthanize," "kill," and "rape," Feminist United members creates a hostile environment under Title IX and did not raise any First Amendment concerns); *Jennings*, 482 F.3d at 691 (coach created a hostile educational environment by "engag[ing] in sexually charged talk in team settings" and "bombarded players with crude questions and comments about their sexual activities."). Conversely, the Supreme Court has recognized that "schools are unlike the adult workplace" and that students "may regularly interact in a manner that would be unacceptable among adults" making it "understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Davis*, 526 U.S. at 651–52. Therefore, "simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender" do not constitute harassment under Title IX. *Id.* Further, "when an education institution claims that it has done all its can to address instance of sexual harassment and threats [pursuant to Title IX], a reviewing court should consider whether the institution failed to take other obvious and reasonable steps" that would not implicate First Amendment concerns. *Feminist Majority Found.*, 911 F.3d at 693.

    2.    <u>The School Board applied Title IX to punish speech it disfavored.</u>

After LCPS received a Title IX complaint from the Female Student, it investigated the Plaintiffs pursuant to LCPS Policy 8035 and Regulation 8035-REG, both of which set up a process for reporting, investigating, and disciplining students for conduct that violates Title IX of the Education Amendments Act of 1972. Regulation 8035-REG defines "sexual harassment" as conduct that "may include sexual advances, touching intimate body parts or coercing physical contact, conversations of a sexual nature, and other sexually motivated conduct, communications, or contact." Exhibit A, Doc. 29-1, at 6. Following that investigation, LCPS found that the Plaintiffs had created a hostile educational environment under Title IX, had engaged in discrimination under Title IX, and had engaged in harassment under LCPS Policy 8210. *See* Exhibits B & C, Docs. 29-2 & 29-3, at 20. The justification for the finding—and subsequent discipline—was that the Plaintiffs made the following comments relating to the Female Student's use of the boys' locker room: (1) they described her as "Boy/Girl" or "Girl/Boy", (2) they said "[t]here's a girl in the locker room" or "why is there a girl in the locker room" or "girl," (3) he referred to the Female Student as "it," and (4) they told the Female Student to "get out" of the boys' locker room.

LCPS's findings and resulting discipline are blatant misapplications of Title IX that not only unconstitutionally violated the Plaintiffs' right to speak on a controversial and sensitive issue, but the result of the investigation can only be viewed as retaliation for their exercise of free speech rights that did not conform to LCPS's preferred viewpoint.

LCPS admitted that the purpose of the speech was to protest its policies of allowing girls to use a boys' locker room if that girl identified as a boy. *Id.* at 16. LCPS then went on to rule that the statements were "on the basis of sex," because the boys referred to her by her sex, the statements were spoken loudly enough for her to hear, and that a reasonable person would find

such comments to be so severe, pervasive, and objectively offensive such that it created a hostile educational environment. *Id.* at 17–20. LCPS also gave weight to the fact that the Female Student "was required to go into the locker room space before PE class." *Id.* at 20.

Despite citing the legal standards associated with Title IX, LCPS's application of those standards, to find a violation and impose discipline, was woefully inadequate. Neither Plaintiff made sexually lewd comments to the Female Student nor did either make any physical acts towards the Female Student. Further, the idea that a reasonable female would be offended by a boy telling her to "get out" of the boys' room defies common sense. Further, Title IX explicitly permits a school to maintain separate locker rooms based on sex and the Virginia Constitution explicitly states that "mere separation of the sexes shall not be considered discrimination." VA. CONST. art I, § 11. If it is not discrimination to require females to use a female locker room, speech that seeks to enforce that policy cannot be hostile by any objective standard. At worst, the speech is the kind of teasing, insults, and name-calling that do not constitute sexual harassment under Title IX. *See Davis*, 526 U.S. at 633. LCPS's finding of Title IX harassment was based *solely* on the subjective state of mind of the single Female Student who demanded the right to use the boys' locker room. This is not sufficient to prove Title IX sexual harassment.

LCPS also ruled that the Female Student was denied equal access to an LCPS education program or activity because "the locker room situation … gave her an adrenaline rush" for the entire P.E. class and that she "could not really be comfortable for fear that Respondents could say something at any moment." Exhibits B & C, Docs. 29-2 & 29-3, at 20. LCPS also noted in passing that the Female Student's "grades [were] slipping," but made absolutely no effort to connect the "locker room" situation to her slipping grades. *Id.* Again, this is not the kind of severe, pervasive, and objectively unreasonable denial of equal access that courts have found sufficient under Title

16

IX. There were no sexual advances, conversations of a sexual nature, lewd or lurid sexual remarks, touching of intimate body parts or coercing physical contact, or other sexually motivated conduct, communications, or contact. Further, the Female Student's mere subjective "adrenaline rush" and discomfort during a single P.E. class is simply nowhere near enough to find that there was a "systemic effect" on her equal access to "educational programs and activities." *See Davis*, 526 U.S. at 633.

Equally unpersuasive is LCPS's ruling that the Female Student "stopped using the locker room, which shows clear denial of equal access." Exhibits B & C, Docs. 29-2 & 29-3, at 20. This statement misrepresents a clear fact: *the locker room was closed to all students* due to renovation. Exhibit J, Doc. 29-10, at 2. And when the boys' locker room reopened, she continued to use it over the female locker room. Title IX guarantees equal access to educational programs and activities based on sex—it does not provide access to educational programs based on the subjective desires of a single student to be treated with greater rights than others. Yet that is what the Female Student sought, and what LCPS provided, by abusing the Title IX process to discipline the boys.

### 3. LCPS's flawed Title IX investigation and findings were a pretext for viewpoint discrimination.

LCPS's misapplication of Title IX is not by accident. It is patently obvious from its findings that LCPS is trying to shoehorn "gender identity" discrimination into its Title IX process through a finding of discrimination on the basis of "sex." In other words, the entire Title IX investigation, results, and discipline are merely a pretext to discipline the boys for not affirming the claimed "gender identity" of the Female Student. *See St. Michael's Media Inc. v. Mayor and City Council of Balt.*, 566 F. Supp. 3d 327, 367 (D. Md. 2021) (courts must "determine if the government's justification for a restriction on speech was actually a pretext for viewpoint discrimination").

In 2024, the Department of Education issued a Title IX rule which, *inter alia*, redefined "sex discrimination" to include discrimination based on "gender identity." In August 2024, the Supreme Court affirmed an injunction enjoining the Department of Education's Title IX rule in a 5-4 decision. *Dep't of Educ. v. Louisiana*, 603 U.S. 866 (2024). In a separate opinion, Justice Sotomayor noted that *the entire Court agreed* to affirm the injunction of the provisions extending discrimination and harassment to "gender identity" on the grounds that they were not consistent with the First Amendment. *Id.* at 872–73 (Sotomayor, J., dissenting in part).

Here, the School Board claims that boys calling a female student a "girl" or a "female" constitutes sexual harassment under Title IX. It does not. Instead, the School Board is improperly attempting to sneak "gender identity" into Title IX just under a year after the Supreme Court upheld an injunction against the Department of Education's attempt to do so through rulemaking. The result is a pretextual use of Title IX to force the Plaintiffs to accept the School Board's preferred ideology on a sensitive and controversial political issue—gender identity. That is unconstitutional.

E. *Plaintiffs are likely to succeed on their remaining claims as well.*

For the reasons briefed in the Motion for TRO, which are closely related to those briefed above, the Plaintiffs are also likely to succeed on their other claims as well. *See* Doc. 4 at 16–19.

## II.    Without relief, the Plaintiffs will suffer irreparable harm.

S.W. and J.S. will suffer irreparable injury absent temporary relief. "The denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987). "A continued suspension [of a student] and accompanying preclusion from extracurricular activities" is sufficient to show irreparable harm for the purposes of temporary relief. *Coleman v. Newburgh Enlarged City Sch. Dist.*, 319 F. Supp. 2d 446, 453 (S.D.N.Y. 2004). This Court has already correctly recognized as

such when it granted the TRO, stating, "The loss of 10 days of in-person school early in the school year could have serious negative effects on S.W." Doc. 10 at 2; *accord Goss*, 419 U.S. at 575 (holding, "A 10-day suspension from school is not de minimis" and "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment."). It is indisputable that losing two weeks of school, which S.W. can never get back, will irreparably harm him.

Beyond the suspension, there are severe long-term consequences for both S.W. and J.S. if this discipline is not stayed. LCPS Regulation 8640 authorizes the school to release educational records to certain persons, including colleges. Exhibit K, Doc. 29-11, at 7. Regulation 8640 specifically allows the school to send "disciplinary records" as part of "Educational and Scholastic Records," to other schools to which a student transfers or applies. *Id.* A finding that they sexually harassed another student would be extraordinarily detrimental to their futures.

### III.    The balance of equities favors the Plaintiffs.

Because LCPS is a state actor, these third and fourth requirements for a preliminary injunction—are "established when there is a likely First Amendment violation." *Centro Tepeyac*, 722 F.3d at 191. Here, the Plaintiffs have raised serious questions about the School Board's findings and discipline and the resultant burdens on their rights to free speech, free exercise, due process, and equal protection. If the School Board's findings and discipline remain in force during the pendency of this litigation it will almost certainly seriously damage their standing with fellow students and teachers, as well as interfere with their opportunities for higher education or employment. *See Goss*, 419 U.S. at 575.

Conversely, the School Board "is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Giovani*

*Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (cleaned up); *accord Centro Tepeyac*, 722 F.3d at 191. Thus, the harm suffered by the Plaintiffs if a preliminary injunction is denied far outweighs the harm, if any, suffered by LCPS if a preliminary injunction is granted to preserve the status quo during this litigation.

## IV.    Public interest favors the Plaintiffs.

Finally, upholding the Constitution always promotes the public interest. *Giovani Carandola*, 303 F.3d at 521 ("upholding constitutional rights surely serves the public interest."). When courts "protect the constitutional rights of the few, it inures to the benefit of all." *Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554, 604 (4th Cir. 2017), *vacated as moot*, 583 U.S. 912 (2017). This Court has already recognized that "the public interest is best served by ensuring high school students remain in school and receive adequate process before being suspended." Doc. 10 at 2. Plaintiffs seek only to continue their education during the pendency of this litigation.

## CONCLUSION

For the foregoing reasons, Plaintiffs S.W. and J.S., by and through counsel, respectfully request that this Court issue the Preliminary Injunction requested in the accompanying motion, and such other relief as this Court deems appropriate, including but not limited to, fees and costs associated herewith.

Dated: September 26, 2025                                  Respectfully Submitted,


    */s/ Andrew J. Block*
Andrew J. Block, Esq. (VSB No. 91537)          Joshua A. Hetzler, Esq. (VSB No. 89247)
Ian Prior, Esq.*                                              Michael B. Sylvester, Esq. (VSB No. 95023)
Nicholas R. Barry, Esq.*                                 FOUNDING FREEDOMS LAW CENTER
Robert A. Crossin, Esq.*                                 707 E. Franklin Street
AMERICA FIRST LEGAL FOUNDATION          Richmond, VA 23219
611 Pennsylvania Ave. SE #231                       Telephone: (804) 971-5509
Washington, D.C. 20003                                 michael@foundingfreedomslaw.org
Telephone: (202) 836-7958                            josh@foundingfreedomslaw.org

andrew.block@aflegal.org
ian.prior@aflegal.org
nicholas.barry@aflegal.org
bobby.crossin@aflegal.org

*Counsel for Plaintiffs*
*\* Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, I filed the foregoing with the Clerk of Court using the CM/ECF system, thereby causing it to be served on all counsel who have appeared in this case, including:

Heather K. Bardot, Esq. (VSB No. 37269)
McGavin, Boyce, Bardot, Thorsen, & Katz, P.C.
9990 Fairfax, Boulevard, Suite 400
Fairfax, Virginia 22030
Telephone: (703) 385-1000
Facsimile: (703) 385-1555
hbardot@mbbtklaw.com

*Counsel for Defendant*

    */s/ Andrew J. Block*
Andrew J. Block
America First Legal Foundation
611 Pennsylvania Ave. SE, #231
Washington, D.C. 20003
(202) 836-7958
andrew.block@aflegal.org