**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| S.W., by his parents and next friends, | ) | |
|     SETH WOLFE and AMANDA WOLFE, et al., | ) | |
|         Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:25-cv-1536 |
| | ) | |
| LOUDOUN COUNTY SCHOOL BOARD, | ) | |
| | ) | |
|         Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

COMES NOW Defendant, Loudoun County School Board ("LCPS"), by counsel, and for its Opposition to Plaintiffs' Motion for Preliminary Injunction states, as follows:

**INTRODUCTION**

Plaintiffs mischaracterize the factual background which led to discipline being imposed upon them by LCPS. They assert that LCPS disciplined them – in violation of their rights – for speaking out against LCPS's policy on the Rights of Transgender and Gender-Expansive Students: Policy 8040. *See* Exhibit 1. Specifically, Plaintiffs maintain that they spoke out against the provision of Policy 8040, which permits students to use restrooms and locker rooms that correspond to their consistently asserted gender identity. *Id.*, p. 2. Plaintiffs did no such thing. Instead, what Plaintiffs did was sexually harass a student who was born female, but identifies as

1

male,[1] and subject this student to a hostile environment in violation of School Board Policy 8035: Title IX, Sex-Based Discrimination, Sexual Harassment. *See* Exhibit 2.

Tired of the relentless harassment, which had been ongoing for much of the school year, Complainant recorded a 2 minute 22 second video/audio on March 21, 2025,[2] capturing Plaintiffs' harassment of him, which was submitted to LCPS in connection with a formal Title IX complaint filed on March 27, 2025, against Plaintiffs and a third Respondent ("Respondent 3"), who Plaintiffs allege is a Muslim student in their Complaint. The Title IX report resulted in Title IX investigations being opened. Plaintiffs and Respondent 3 were advised of the investigations and the allegations which Complainant lodged against them on March 28, 2025. S.W. was interviewed as part of the Title IX investigation on April 30, 2025, and J.S. was interviewed on May 13, 2025. Both students denied the majority of the allegations raised by Complainant, despite the evidence (including the video/audio) shared with them during their interviews.[3] Fearing they might face discipline, Plaintiffs lodged a counter-attack, by filing Title IX claims against Complainant on May 13 and 14, 2025, raising concerns about the audio/video that Complainant recorded to substantiate the harassment to which Plaintiffs were subjecting him. LCPS – on May 16, 2025 – advised Plaintiffs

---

[1] In their briefing, Plaintiffs refer to this student as "Female Student." Plaintiffs are well aware that this student identifies as male and that it is offensive to this student to be referred to as female. LCPS will refer to this student as Complainant and/or by male pronouns throughout this pleading.

[2] The recording captures 16 seconds of video, where students are depicted fully clothed and not in the process of changing clothing. The remainder of the video is audio only. This video/audio is protected by the Family Educational Rights and Privacy Act ("FERPA"), and thus it is not being filed with the court at this time.

[3] Respondent 3 also denied the allegations and, as will be discussed herein below, there was no evidence that he had engaged in harassment of Complainant, which is why the Title IX complaint against Respondent 3 was determined to be unfounded.

that their complaints did not rise to the level of a Title IX violation, and investigations were not opened.

LCPS continued its Title IX investigations into the complaints made against Plaintiffs. Nineteen (19) student witnesses were interviewed,[4] in addition to the Complainant, Plaintiffs, and Respondent 3. Five (5) staff witnesses were also interviewed. At the conclusion of the investigation, LCPS turned the case file(s) over to three (3) independent decisionmakers ("Decision Makers") to review. In detailed reports, dated August 15, 2025, the Decision Makers found that Plaintiffs each subjected Complainant to hostile environment sexual harassment and discrimination based on sex, in violation of School Board Policy 8035. *See* ECF Nos. 29-2 and 29-3. Plaintiffs each appealed the Title IX Decision Maker's Determination of Responsibility. *See* ECF Nos. 29-4, p. 3; 29-5, p. 3. Those appeals were dismissed as unfounded. *See* ECF Nos. 29-4 and 29-5. A suspension of ten (10) days was imposed on each Plaintiff. They filed petitions for review. Those petitions were considered and denied. *See* ECF Nos. 29-8 and 29-9.

Not satisfied with the outcome of the Title IX investigations, Plaintiffs have filed suit in this court raising multiple claims of alleged deprivation of First Amendment rights protected by the United States and Virginia Constitutions, sex-based discrimination, denial of due process, and interference with Plaintiffs' religious beliefs. Plaintiffs ask that the court enter a preliminary injunction to stay any discipline, and remove any adverse information from their student files, until this case is fully litigated. Because Plaintiffs' claims are based on allegations which have been concocted after-the-fact and are without merit, Plaintiffs cannot establish that they are entitled to

---

[4] 21 student witnesses declined to participate in the investigation.

the extraordinary remedy of a preliminary injunction, and LCPS asks that the court deny the requested relief.

## FACTUAL BACKGROUND SUBSTANTIATED BY TITLE IX INVESTIGATIONS

Complainant filed a Title IX complaint, asserting that Plaintiffs and Respondent 3 had been harassing him throughout the 2024-2025 academic school year. ECF No. 29-3, p. 1.[5] He reported that the harassment was based on gender identity. *Id.* Complainant accused Plaintiffs and Respondent 3 of harassing him for using the boys' locker room and referring to Complainant as "it" and "girl-boy." Complainant also asserted that Plaintiffs and Respondent 3 threatened to "beat his ass" if he continued to use the boys' locker room. *Id.*

Plaintiffs were provided Notices of Investigation and Allegation ("NOIA") advising of claims which had been asserted against them which might constitute sexual harassment hostile environment under School Board Policy 8035. *Id.*, p. 4. After LCPS completed its investigation, Plaintiffs were provided with an updated NOIA on May 30, 2025, to notify them that LCPS had determined that the allegations also implicated sex-based discrimination under School Board Policy 8035. *Id.* Plaintiffs then had an opportunity to review and respond to the initial report. *Id.*, p. 5. They did so, and the report was thereafter finalized. *Id.* Plaintiffs had an opportunity to review and respond to the final report, which they did. *Id.* On July 21, 2025, after the review and response periods had concluded, LCPS sent the entire file to the panel of Decision Makers for a final determination. The Decision Makers thoroughly reviewed the evidence to make factual findings and a final determination. *Id.*, p. 2.

---

[5] ECF No. 29-3 pertains to S.W. It is identical in most respects to the report pertaining to J.S., ECF No. 29-2. For ease of reference, LCPS will primarily cite to ECF No. 29-3.

The Decision Makers determined that the investigation revealed that multiple witnesses, some of whom were friends with Plaintiffs, confirmed that Plaintiffs had made statements reported by Complainant as part of his Title IX complaint, in multiple classes over a period of weeks and months. *Id.*, pp. 6, 8-11, 14. The audio/video confirmed that, on March 21, 2025, the following statements were made by Plaintiffs in the boys' locker room, not to a small circle of friends and not to protest School Board Policy 8040, but in an effort to harass and embarrass Complainant:

> "Is there a girl in here?"
> "There's a girl."
> "Why is there a girl?"
> "Why is there a girl?"
> "I'm so uncomfortable there's a girl."
> "That's a female bro get out of here."

*Id.*, pp. 6, 14.

Another video, 11 seconds in length, was submitted which reflected J.S. in the hallway yelling "girl boy" at Complainant six (6) times during the short video. *Id.*, p. 7.

The Decision Makers expressly found:

> [T]he Respondents' statements both inside and outside the locker room regarding Complainant are repetitive (as reflected on both recordings) as well as over weeks and months (as corroborated by witness testimony). If the Respondents' goal was truly to express their discomfort, either with the Complainant being in the locker room or with LCPS Policy 8040 on the Rights of Transgender and Gender Expansive Students, which permits students to use facilities that correspond to their consistently asserted gender identity, then repeating their questions at a loud volume over weeks and months typically outside the presence of any authority figure does not align with that description. If, however, the Complainant's allegations regarding the Respondents' motivation – to harass Complainant based on Complainant's sex – was true, one might expect Respondents to engage in precisely the type of conduct in precisely the type of circumstances (repeatedly, loudly, with an audience, out of view of authority figures) portrayed by the recordings and characterized by Complainant's allegations supported by a large volume of staff and student witness testimony.

*Id.*, p. 15.

The investigation did not find corroborating support for Complainant's report that Plaintiffs and/or Respondent 3 had threatened to "beat his ass." *Id.*, pp. 12-13.

After determining that the comments attributed to Plaintiffs – with the exception of "beat his ass" – were in fact made by Plaintiffs and intended to harass Complainant based on his sex, the Decision Makers analyzed the other factors necessary to establish hostile environment sexual harassment under School Board Policy 8035. *Id.*, pp. 15-23; ECF No. 29-2, pp. 15-22. There was ample support to establish that each element was met. *Id.* Thus, the Decision Makers found by a preponderance of evidence that each Plaintiff was responsible for violating the hostile environment sexual harassment provision of School Board Policy 8035. ECF No. 29-2, p. 22; ECF No. 29-3, p. 23.

Decision Makers also evaluated whether Plaintiffs' substantiated harassment of Complainant constituted harassment based on sex in violation of School Board Policy 8035. ECF No. 29-2, pp. 22-24; ECF No. 29-3, pp. 23-25. Again, the Decision Makers found ample support to conclude that each Plaintiff harassed Complainant on the basis of sex in violation of School Board Policy 8035. ECF No. 29-2, pp. 22-24; ECF No. 29-3, pp. 23-24.

After Decision Makers issued the final determinations, Plaintiffs appealed the decisions. ECF No. 29-4 and 29-5. One of the issues raised by Plaintiffs was their contention that the Title IX Coordinator was biased against Plaintiffs "based on religion." ECF No. 29-4, p. 7.[6] Plaintiffs

---

[6] This section of ECF No. 29-4, which pertains to J.S., is identical to ECF No. 29-5, which pertains to S.W. LCPS therefore cites only to ECF No. 29-4, intending such references to be as to both Plaintiffs.

claimed that dismissal of the charges against Respondent 3 – but not against them – established religious discrimination. *Id.* There was – and is – no merit to such a contention.[7]

As Plaintiffs were advised when they first raised this issue:

Respondents are correct when they note that Complainant's *allegations* against Respondent 3 were largely identical to the allegations made against the Respondents here—except that Respondent 3 was alleged to have made an additional comment calling Complainant "a disappointment to humanity."

\*\*\*

[However, a] plain review of the determination reveals that the Title IX Coordinator's decision was made after weighing the available evidence. For example, "the record shows that [Respondent 3] did not make loud comments about the Complainant in the boys' PE locker room." The determination also notes that, regarding "the alleged threat, 'If you ever come in here again, we're gonna beat your ass,'" the record indicates that "the Complainant confirmed that [Respondent 3] was not the Respondent who made that alleged comment." And for the final allegation—that Respondent 3 called Complainant "a disappointment to humanity"—the determination states that Respondent 3 "denied making the comment" and that the "comment was not corroborated by any other student." On the face of the letter, it is manifestly clear that the Title IX Coordinator's conclusions came after evaluating the available evidence. And it is equally apparent that the lack of corroborating evidence related to Respondent 3 was distinguishable from the volume of evidence against the appealing Respondents, which included corroboration of the alleged misconduct by their own statements and the statements of others.

*Id.* (emphasis in original).

Failing to establish bias and a reversal of the final determinations, Plaintiffs appealed the ten (10) day suspensions that they each received. ECF Nos. 29-8 and 29-9. On September 15, 2025, the suspensions were upheld as consistent with School Board Policy 8210. *See* Exhibit 3. This lawsuit followed. The following counts are asserted:

Count I:      First Amendment: Freedom of Speech (42 U.S.C. § 1983)
Count II:     Virginia Constitution: Freedom of Speech (Va. Const. Art. I, § 12)

---

[7] It should be noted that Plaintiffs' counsel herein also represents Respondent 3 and, thus, is fully aware of the facts related to dismissal of the Title IX complaint against him.

| Count III: | Fourteenth Amendment: Intentional Religious Discrimination (42 U.S.C. § 1983) |
| Count IV: | Virginia Constitution: Religious Discrimination (Va. Const. Art. I, § 11) |
| Count V: | Virginia Religious Freedom Restoration Act (Va. Code § 57-2.02) |
| Count VI: | Virginia Constitution: Free Exercise of Religion (Va. Const. Art. I, § 16) |
| Count VII: | Fourteenth Amendment: Sex Discrimination (42 U.S.C. § 1983) |
| Count IX:[8] | Virginia Constitution: Sex Discrimination (Va. Const. Art. I, § 11) |
| Count X: | Title IX: Sex Discrimination (20 U.S.C. ch. 38 § 1681 et seq.) |
| Count XI: | Fourteenth Amendment: Deprivation of Due Process (42 U.S.C. § 1983) |
| Count XII: | Virginia Constitution: Deprivation of Due Process (Va. Const. Art. I, § 1a) |

Presently before the court is Plaintiffs' request for a preliminary injunction to prevent LCPS from entering a finding of sexual harassment onto their permanent student records[9] and administering discipline until this case is fully litigated. ECF No. 30, p. 7.[10] LCPS opposes Plaintiffs' request and asks that it be denied.

## LAW AND ARGUMENT

### A. Standard of Review.

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)). Such remedy is "never awarded as of right." *Winter*, 555 U.S. at 24. The power to issue a preliminary injunction derives from the common law of equity and is frequently described as an "extraordinary" remedy that is left to the discretion of the trial court. *Id.* (citations

---

[8] There is no Count VIII.

[9] Discipline records are only retained five (5) years after the end of the academic year where discipline did not result in expulsion. Title IX records are maintained for seven (7) years. There is no scenario – here – where the records at issue would be in Plaintiffs' "permanent student records."

[10] Plaintiffs sought additional preliminary injunctive relief in their Complaint, but they have not included that other relief as part of the motion pending before the court, and LCPS therefore assumes that has been abandoned.

omitted); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2941 (3d ed. Oct. 2020).

To obtain a preliminary injunction, the moving party must demonstrate **each** of the following factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and, (4) granting the injunction is in the public interest. *Winter*, 555 U.S. at 20; *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010), reinstated in relevant part, 607 F.3d 355 (4th Cir. 2010). The party seeking a preliminary injunction, here Plaintiffs S.W. and J.S., bears the burden of establishing that each factor supports granting the injunction. *Real Truth*, 575 F.3d at 346. Each factor must be demonstrated by a "clear showing." *Winter*, 555 U.S. at 22. The failure to show any one of the relevant factors mandates denial of the preliminary injunction. *Real Truth*, 575 F.3d at 346.

### B. A Preliminary Injunction Cannot Be Granted to Plaintiffs, as They Have Not Established That They Are Likely to Succeed on the Merits of Any Claim.

At the outset, LCPS notes that Plaintiffs have come forward with no **evidence** sufficient to establish a "clear showing" of a likelihood of success on the merits. For the most part, they have relied wholly on allegations stated in the Complaint. *See* ECF No. 30, pp. 1-11. The law is clear, however, that a "plaintiff seeking a preliminary injunction generally cannot rely on mere allegations in the complaint but must come forward with some evidence showing a likelihood of success on the merits." *See Winter*, 555 U.S. at 20-21.[11] Having failed to do so, LCPS submits that

---

[11] To the extent Plaintiffs may argue that the Complaint is "verified," pursuant to 28 U.S.C. § 1746, and that is enough, such an argument would be faulty. First, the verification is not in accord with 28 U.S.C. § 1746, because the signatories (Seth Wolfe and Amanda Smith) have added, "to the

the motion should be denied on this basis alone. Notwithstanding, LCPS also addresses the arguments made by Plaintiffs as to each claim.

### i.     Plaintiffs are not likely to succeed on their religious discrimination claims.

Plaintiffs maintain that they "were disciplined differently from [Respondent 3] on the basis of religion." ECF No. 30, p. 7. They claim that "Defendant here plainly treated the Plaintiffs differently from [Respondent 3] when they dismissed the investigation against [Respondent 3], but proceeded to harshly punish the Plaintiffs." *Id.*, p. 14. Remarkably, Plaintiffs continue by asserting to this court that, "[t]he only detail that distinguishes [Respondent 3] from the Plaintiffs is the differing religion." *Id.* Plaintiffs – who are represented by the same attorney as Respondent 3 – know this representation is false.

As Plaintiffs were clearly advised when they first raised a claim of religious discrimination after the Title IX complaint against Respondent 3 was dismissed, although the ***allegations*** against Respondent 3 originally mirrored the allegations against Plaintiffs, the ***findings*** did not support a claim against Respondent 3. First, in contrast to the vast witness testimony and audio/video supporting Complainant's allegations against Plaintiffs, not a single witness or piece of evidence supported any claim that Respondent 3 made any comment to or about Complainant in the boys' locker room on March 21, 2025, or at any time. To the extent that it was alleged that Respondent 3 made a single comment that Complainant, was "a disappointment to humanity," in a classroom, he denied doing so and not a single corroborating witness was located. The Complainant also later

---

best of my knowledge." Furthermore, as is apparent, given the nature of the factual background leading to this litigation, neither of these individuals have personal knowledge of the allegations in the Complaint. *See*, *e.g., Walker v. Tyler Cnty. Com'n,* 11 Fed. App'x 270, 274 (4th Cir. 2001) (per curiam) (holding the "verified complaint cannot be considered the equivalent of an opposing affidavit" and was "mere pleading allegations" because "[t]he factual allegations in the complaint do not indicate which, if any, are based on personal knowledge.").

clarified and confirmed that it was not Respondent 3 who had threatened to "beat his ass." ECF No. 29-4, p. 7. Thus, LCPS determined, and Plaintiffs were so advised, "that the lack of corroborating evidence related to Respondent 3 was distinguishable from the volume of evidence against the appealing Respondents[/Plaintiffs], which included corroboration of the alleged misconduct by their own statements and statements of others." ECF No. 29-4, p. 7.

There is simply no evidence which supports Plaintiffs' claim that they were "singled out for harsher punishment because of their religion." ECF No. 30, p. 14. This is fiction, created after-the-fact, in an attempt to avoid discipline which was properly imposed by LCPS in response to Plaintiffs' violation of School Board Policy 8035. Plaintiffs were found to be in violation of Policy 8035 and disciplined because the evidence preponderated against them. The Title IX complaint against Respondent 3 had to be dismissed, and was properly dismissed, not because of his religion, but because the evidence did not substantiate that he had violated School Board Policy 8035. As such, Plaintiffs are not likely to succeed on their religious discrimination claims. (Counts III, IV, V and VI).

**ii.      Plaintiffs are not likely to succeed on their sex discrimination claims.**

Plaintiffs contend, first, that they were discriminated against on the basis of sex because the Complainant's Title IX complaint was investigated whereas theirs were not when, purportedly "they involved the same set of operative facts, which occurred at the same time in the same place." ECF No. 30, p. 15. On this basis, Plaintiffs contend that they were similarly situated to Complainant, but treated differently on the basis of sex. There is no factual support for this claim, and Plaintiffs are unlikely to prevail on it.

To establish a selective-enforcement claim, which is what Plaintiffs assert here, it must be plausibly established that, regardless of their guilt or innocence, Plaintiffs' gender was a but-for cause of the severity of the sanctions or of the decision to initiate the challenged disciplinary proceeding in the first place. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235, n.6, 236-237 (4th Cir. 2021). A plaintiff can do this by plausibly showing that a similarly situated person of the opposite sex was treated more favorably. *Id.* The evidence that Plaintiffs have adduced, and will be able to adduce, falls short of this standard.

The complaint made by Complainant was a sex-based complaint, based on actions and words lodged at him, loudly, repetitively, and in public, by Plaintiffs over the course of the school year. The complaint was not based on just what Complainant captured in the March 21, 2025 audio/video. That audio/video was instead an example that Complainant captured to substantiate the behavior of Plaintiffs, which had been ongoing for some time. The conduct that Complainant reported qualified for a Title IX investigation, because an initial review suggested that it might qualify as sexual harassment. As such, an investigation was required. In response to the Title IX complaint lodged against them, Plaintiffs turned around and filed a Title IX complaint against the Complainant, which is starkly different than the complaint that had been asserted against them. The sole basis for Plaintiffs' complaint was that Complainant made the recording in the boys' locker room on March 21, 2025. That video captures 16 seconds of fully clothed boys, not changing clothes or engaged in any other activity which depicts any one of them in an undressed state. Complainant says nothing on the audio or video when in the locker room in the presence of Plaintiffs and the other boys. Because the substance of Plaintiffs' complaint – capturing a video in a locker room – did not possibly meet the elements of a violation of Title IX, the Plaintiffs were

advised that Title IX investigations of their complaints would not be conducted. Plaintiffs' attempt to characterize the complaints that they made as being the same as that lodged by Complainant is factually untrue. Had Plaintiffs lodged a complaint against anyone, which on initial review stated a potential Title IX violation, an investigation would have been opened. But, that did not occur here.

Plaintiffs also complain that when they raised concerns about Complainant using the boys' locker room, they were told that they could find an alternative place to change their clothes. LCPS's investigation did not turn up any evidence to suggest that Plaintiffs complained about Complainant using the boys' locker room before Complainant filed a Title IX complaint. Thus, Plaintiffs were never told they could find an alternative place to change.[12] Plaintiffs continue by arguing that by offering them an alternative place to change their clothes, but allowing the Complainant to use the locker room that matched his gender identity, they were somehow treated differently based on sex, and thus, subjected to sex discrimination. It is difficult to make sense of this argument.

School Board Policy 8040, which is consistent with and mandated by *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F. 3d 586 (4th Cir. 2020), provides, in relevant part:

> All students are entitled to have access to restrooms and locker rooms that are sanitary, safe, and adequate, so that they can comfortably and fully engage in their school programs and activities. Students should be allowed to use the facility that corresponds to their consistently asserted gender identity. While some transgender students will want that access, others may want alternatives that afford more privacy. Taking into account existing school facilities, administrators should take steps to designate gender-inclusive or single-user restrooms commensurate with the size of the school.

Exhibit 1, p. 2.

_____

[12] It is notable that Plaintiffs fail to identify when they allegedly had this conversation or with whom.

Thus, all students are permitted to use the facility that corresponds with their gender identity, which includes both Complainant and Plaintiffs. Neither is treated differently in this respect. And, should any student feel uncomfortable or unsafe in such a facility, alternatives are made available, regardless of a student's sex. This is consistent with Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools, developed by the Virginia Department of Education ("VDOE") in 2023, Exhibit 4, and the Attorney General's Opinion dated August 23, 2023, finding the model policies constitutional. Exhibit 5. So, to suggest that offering any student – regardless of sex – an alternative space to a single-sex locker room to ensure privacy and comfort constitutes sex discrimination is simply an argument unsupported by fact or law. All sexes are treated the same, and accommodations are made available to those who may validly desire them. Here, Complainant did not request an accommodation, nor did Plaintiffs. If there is any evidence, which is in question, whether Plaintiffs made a complaint about Complainant using the boys' locker room prior to the Title IX Complaint because it made them uncomfortable, consistent with the VDOE policy identified herein, as found to be constitutional by the Attorney General, LCPS would have made an alternative space available to Plaintiffs. Such an offer is not sex based, and it is not discriminatory. It is an offer which would be available to any student and has nothing to do with the student's sex or gender identity.

Based on the foregoing, LCPS submits that Plaintiffs have not and cannot establish a likelihood that they will succeed on their sex-based discrimination claims, Counts VII, IX and/or X, and a preliminary injunction should therefore not be granted.

### iii. Plaintiffs are not likely to succeed on their free speech claims.

#### a. Plaintiffs' speech is not constitutionally protected.

Plaintiffs maintain – incorrectly – that their speech was protected because, according to them, "it was on the sensitive and controversial political topic of 'gender identity,' which is 'of profound value and concern to the public' and 'occupies the highest rung of the hierarchy of First Amendment values and merits special protection.' That the Plaintiffs' speech and their views arose out of their religious convictions further protects such speech." ECF N. 30, pp. 117-18. This characterization of what occurred is a complete recasting of what actually occurred. Plaintiffs never sought to discuss the issue of gender identity whether to challenge School Board Policy 8040 or to raise their religious beliefs. Instead, as the Title IX investigation revealed, Plaintiffs targeted the Complainant and harassed him based on his gender and sex. They did so openly, loudly, and repeatedly, in an attempt to intimidate and humiliate Complainant, when no one who had any control over School Board Policy 8040 was even present.

The First Amendment prohibits Congress and, through the Fourteenth Amendment, the States from "abridging the freedom of speech." U.S. Const. Amend. I; *Gitlow v. New York*, 268 U.S. 652, 45 S. Ct. 625, 69 L. Ed. 1138 (1925). It is a "bedrock principle" of the First Amendment that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).

While students retain significant First Amendment rights in the school context, their rights are not coextensive with those of adults. *See Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969). Because of the "special characteristics

of the school environment," *id.* at 505, "school administrators have some latitude in regulating student speech to further educational objectives." *Kowalski v. Berkley County Sch.*, 652 F. 35 565, 571 (4th Cir. 2011). Further, student conduct which "materially disrupts classwork or involves substantial disorder or the invasion of the rights of others" is "not immunized by the constitutional guarantee of freedom of speech." *Id.* at 513.

In *Kowalski*, a student was suspended from high school for five (5) days after she created and posted to MySpace.com a webpage called "S.A.S.H." which stood for "Students Against Sluts Herpes," which was directed at ridiculing a particular, fellow student. *Id.* at 567. She challenged the suspension by filing litigation in federal court raising claims of violation of her free speech rights and due process under the First and Fourteenth Amendments. *Id.* The district court entered summary judgment in favor of the school district, holding that it was authorized to punish Kowalski because her webpage was "created for the purpose of inviting others to indulge in disruptive and hateful conduct," which caused an "in-school disruption." *Id.* Kowalski appealed, and the Fourth Circuit affirmed. *Id.* In so doing, the Fourth Circuit stated, as follows:

> the language of *Tinker* supports the conclusion that public schools have a "compelling interest" in regulating speech that interferes with or disrupts the work and discipline of the school, **including discipline for student harassment and bullying**. See *DeJohn v. Temple Univ.*, 537 F.3d 301, 319-20 (3d Cir. 2008).
>
> According to a federal government initiative, student-on-student bullying is a "major concern" in schools across the country and can cause victims to become depressed and anxious, to be afraid to go to school, and to have thoughts of suicide. See StopBullying.gov, available at www.stopbullying .gov (follow "Recognize the Warning Signs" hyperlink). Just as schools have a responsibility to provide a safe environment for students free from messages advocating illegal drug use, *see Morse*, 551 U.S. 393, 127 S. Ct. 2618, 168 L. Ed. 2d 290, schools have a duty to protect their students from harassment and bullying in the school environment, *cf. Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007) ("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place"). Far from being a situation where

school authorities "suppress speech on political and social issues based on disagreement with the viewpoint expressed," *Morse*, 551 U.S. at 423 (Alito, J., concurring), **school administrators must be able to prevent and punish harassment and bullying in order to provide a safe school environment conducive to learning.**

We are confident that Kowalski's speech caused the interference and disruption described in *Tinker* as being **immune from First Amendment protection**. The "S.A.S.H." webpage functioned as a platform for Kowalski and her friends to direct verbal attacks towards classmate Shay N. The webpage contained comments accusing Shay N. of having herpes and being a "slut," as well as photographs reinforcing those defamatory accusations by depicting a sign across her pelvic area, which stated, "Warning: Enter at your own risk" and labeling her portrait as that of a "whore." One student's posting dismissed any concern for Shay N.'s reaction with a comment that said, "screw her." This is not the conduct and speech that our educational system is required to tolerate, as schools attempt to educate students about "habits and manners of civility" or the "fundamental values necessary to the maintenance of a democratic political system." *Fraser*, 478 U.S. at 681 (internal quotation marks and citations omitted).

*Id*. at 572 (emphasis added).

The *Kowalski* court went on to hold:

the School District was authorized by *Tinker* to discipline Kowalski, regardless of where her speech originated, because the speech was materially and substantially disruptive in that it "interfer[ed] . . . with the schools' work [and] **colli[ded] with the rights of other students to be secure and to be let alone.**" *See Tinker*, 393 U.S. at 508, 513.

Given the **targeted, defamatory nature of Kowalski's speech, aimed at a fellow classmate, it created "actual or nascent" substantial disorder and disruption in the school**. *See Tinker*, 393 U.S. at 508, 513; *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 257 (3d Cir. 2002) (indicating that administrators may regulate student speech any time they have a "particular and concrete basis" for forecasting future substantial disruption). First, the creation of the "S.A.S.H." group forced Shay N. to miss school in order to avoid further abuse. Moreover, had the school not intervened, the potential for continuing and more serious harassment of Shay N. as well as other students was real. Experience suggests that unpunished misbehavior can have a snowballing effect, in some cases resulting in "copycat" efforts by other students or in retaliation for the initial harassment.

*Id.*at 573 (emphasis added).

As in *Kowalski*, the speech which Plaintiffs engaged in here is immune from First Amendment protection. It was not – as they have labeled it – speech aimed at discussing School Board Policy 8040 or transgender issues. It was, instead, as substantiated by multiple witnesses and audio and video, disruptive and hateful conduct, spewed at the Complainant, with the express purpose of harassing Complainant due to his gender identity and sex. This type of speech necessarily collides with the Complainant's right to be secure and let alone, and it has no First Amendment protection in the first instance. Consistent with School Board policy, LCPS properly opened a Title IX investigation and determined that the actions in which Plaintiffs engaged toward Complainant violated School Board Policy 8035. Plaintiffs are not likely to establish otherwise or show that the speech which they actually engaged in was protected by the First Amendment.

> **b. LCPS did not suspend Plaintiffs because of constitutionally protected speech.**

At pages 18-19 of Plaintiff's brief, ECF No. 30, Plaintiffs argue – again – that they were suspended because of their constitutionally protected speech. As set forth above, Plaintiffs' speech is not protected by the First Amendment. Plaintiffs were suspended because they created a hostile environment for Complainant and discriminated against him based on his gender identity and sex. They are not likely to succeed in establishing otherwise.

> **iv. LCPS did not apply Title IX in an unconstitutional manner.**

Plaintiffs next argue that LCPS applied Title IX in an unconstitutional manner. *See* ECF No. 30, pp. 19-24. Two (2) pages are then devoted to a recitation of caselaw on the topic, "Title IX, properly applied, can survive strict scrutiny." *Id.*, pp. 19-20. There is no effort by Plaintiffs to connect the string cites within the brief to this case, and there is no argument related to this case. It is, thus, difficult to understand the purpose of this section of Plaintiffs' brief.

Plaintiffs continue by asserting that LCPS applied Title IX to punish Plaintiffs for speech it disfavored. Plaintiffs argue that, "LCPS's findings and resulting discipline are blatant misapplications of Title IX that not only unconstitutionally violated the Plaintiffs' rights to speak on a controversial and sensitive issue, but the result of the investigation can only be viewed as retaliation for their exercise of free speech rights that did not conform to LCPS's preferred viewpoint." ECF No. 30, p. 21. As set forth above, Plaintiffs never spoke "on a controversial and sensitive issue," protected by the First Amendment. Rather, they harassed and attacked an individual student – the Complainant – because of his sex and gender identification. LCPS – both at the school level and through the Decision Makers – evaluated whether the conduct which was reported rose to the level of hostile environment sexual harassment and/or sex-based discrimination. The conclusion at the school level and by the Decision Makers was that Plaintiffs' conduct met all the elements. This is laid out, in detail, in the final reports issued by the Decision Makers. ECF Nos. 29-2 and 29-3. There, after determining that the Plaintiffs targeted the Complainant and made statements to and about him, which he reported as potential Title IX violations, the Decision Makers considered each element of a hostile environment and sex discrimination claim under School Board Policy 8035. *See* ECF No. 29-3, pp. 16-25. With regard to a hostile environment claim, the Decision Makers noted that a preponderance of the evidence would have to establish sex-based misconduct, with the following elements:

1. Unwelcome conduct.
2. Determined by a reasonable person
3. To be so severe
4. Pervasive
5. Objectively offensive[13]

---

[13] Plaintiffs maintain that "the idea that a reasonable female would be offended by a boy telling her to 'get out' of the boys' room defies common sense." ECF No. 30, p. 22. That statement is but one of many spewed at the Complainant, and the argument completely and blatantly ignores the fact

6. That it effectively denies a person equal access to the LCPS education program or activity[14]

*Id.* at p. 16.

The Decision Makers easily found that the conduct by Plaintiffs toward Complainant was based on his sex. *Id.*, p. 16. The constant reference to Complainant with "overt sex-based references", such as "she" and "girl," when Complainant identifies as male, is sex based. *Id.* And, there is legal support for such a conclusion. *See, e.g., Johnson v. Sch. Dist. of Rhinelander Bd. of Educ.*, 2025 U.S. Dist. LEXIS 58935, * 6 (W.D. Wi. March 27, 2025) (recognizing that "based on sex" has been found to include transgender students) (citing *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) (abrogated on other grounds); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020); and *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110 (9th Cir. 2023)); *see also Bostock v. Clayton Cnty.*, 590 U.S. 644, 140 S.Ct. 1731, 1741, 207 L.Ed. 2d 218 (2020) (stating, "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex."). The *Johnson* court also concluded, policies that discriminate against a student based on their nonbinary identity appear to constitute discrimination based on sex under Title IX. *Id.*, at * 8.

---

that Complainant is an individual who identifies as male and is permitted by School Board policy to use the boys' locker room. Misgendering a student and telling him – repeatedly – to leave an are where he is permitted to be is objectively offensive.

[14] Plaintiffs dispute the finding by the Decision Makers that the Complainant stopped using the boys' locker room as a result of the abuse he was suffering at the hands of Plaintiffs. ECF No. 30, p. 23. In support, they attach an email reflecting that the locker room was closed for renovation starting March 31, 2025. But, that email does not contradict the findings which were made, because the Complainant first raised an issue regarding the Plaintiffs on March 21, 2025, the date he recorded the video in the locker room. From that date to March 30, 2025, the Complainant may have refrained from using the boys' locker room. The fact that he later resumed using the boys' locker room is also of no significance to the analysis, because one would expect that once the harassment was under investigation and protections put in place, the Complainant would be safe to resume use of the boys' locker room consistent with School Board Policy 8040.

The Decision Makers also found that the evidence demonstrated the Plaintiffs' conduct was unwelcome. *Id.*, pp. 16-17. Complainant reported as much and had reported the unwelcomeness to a number of people over a period of time. *Id.*, p. 17.

The Decision Makers also considered the severity, pervasiveness, and objective offensiveness of the Plaintiffs' conduct. *Id.*, pp. 16-20. The Decision Makers concluded that each of these elements was met, stating:

> The Decision-Makers conclude, therefore, that under the totality of the circumstances, the statements made in the locker room meet the standard of being severe, pervasive, and objectively offensive. Targeted statements about a teenage student's sex, particularly the use of the disparaging phrases of "it" and "boy/girl" and combined with language like "get out," made with some hostility, and in a repeated manner over a period of weeks and months, satisfies the elements of severity, pervasiveness, and objective offense. The comments would have caused a reasonable student in the Complainant's position to feel distressed, harassed, intimidated, and/or embarrassed, and other students who heard the remarks knew that they were about the Complainant's sex.

*Id.*, p. 20.

The Decision Makers also properly evaluated whether Plaintiffs engaged in discrimination based on sex in violation of School Board Policy 8035. ECF No. 29-3, pp. 23-25. Again, the Decision Makers set forth the elements and referred to the evidence which led to the conclusion that Plaintiffs had engaged in sex discrimination toward the Complainant. *Id.*

Plaintiffs' unsubstantiated assertion that LCPS's "investigation can only be viewed as retaliation for their exercise of free speech rights that did not conform to LCPS's preferred viewpoint," ECF No. 30, p. 21, has no basis in fact whatsoever. Plaintiffs did not engage in the exercise of free speech protected by the First Amendment, and LCPS did not impose discipline to retaliate against Plaintiffs. Rather, in response to a Title IX complaint which LCPS was obligated to investigate, where facts clearly supported the claim of sexual harassment and creation of a

hostile environment for Complainant, LCPS did what it was obligated to do. It imposed discipline against Plaintiffs. Plaintiffs have come forward with no evidence to show clearly or otherwise that LCPS took action to punish Plaintiffs for speech it disfavored.

Plaintiffs next argue that LCPS's purportedly flawed Title IX investigation and findings were a pretext for viewpoint discrimination. They assert, "[i]t is patently obvious from its findings that LCPS is trying to shoehorn "gender identity" discrimination into its Title IX process through a finding of discrimination on the basis of 'sex.' In other words, the entire Title IX investigation, results, and discipline are merely a pretext to discipline the boys for not affirming the claimed 'gender identity' of the Female Student." ECF No. 30, p. 23. The flaw with this argument is that LCPS never sought to have Plaintiffs affirm the gender identity of the Complainant. Had the Complainant not made a formal Title IX complaint, Plaintiffs would not have come to the attention of LCPS's Title IX office or the administration. There was no effort by anyone at LCPS to force Plaintiffs to affirm the gender identity of the Complainant or anyone else. What LCPS did – and was obligated to do – was investigate targeted and hateful behavior which Plaintiffs engaged in toward the Complainant, over an extended period of time, to harass, denigrate and humiliate him. None of the behavior by Plaintiffs – all of which was aimed at a single individual – sought to express Plaintiffs' views on School Board policy or to speak about transgender issues. The behavior sought to harm an individual who is entitled to have his rights protected. Had Plaintiffs simply left Complainant alone, as he was entitled to be, there is no evidence to suggest that LCPS would have forced Plaintiffs to "affirm the 'gender identity' of the Complainant. What LCPS does require – and properly did here – is that students not abuse, harass, and interfere with the rights of other students. There is no place for such behavior in the school system, and Plaintiffs have been

22

disciplined for speech and behavior that is not protected by the constitution and which is prohibited by School Board policy. They are unlikely to be able to establish otherwise or to establish that they are likely to prevail on a claim that LCPS applied Title IX to them in an unconstitutional manner.

> **v.  Plaintiffs are not likely to prevail on their void for vagueness and overbreadth challenges.**

As in *Hardwick v. Heyward*, 674 F. Supp. 2d 725, 741 (D.C. S.C. 2009), it appears, based on the way that this claim has been asserted, that Plaintiffs attempt to make a facial challenge to School Board Policy 8210. See ECF No. 4, pp. 17-20. Plaintiffs contend that the policy, Exhibit 3, "unlike LCPS Policy and Regulation 8035, … does not define 'harassment,' it does not limit 'harassment' to conduct that is severe, pervasive, and objectively unreasonable, and it provides no examples of what may constitute 'harassment.'" *Id.*, p. 19. Plaintiffs continue, "ordinary people cannot understand what conduct is considered 'harassment" and without such clarity, LCPS is empowered to enforce the provision in an arbitrary and discriminatory manner." *Id.*

Plaintiffs also maintain that Policy 8210 is overbroad, because it does not limit harassment to conduct that is severe, pervasive, and objectively unreasonable. ECF No. 4, p. 20. As such, Plaintiffs maintain that the policy could be used to punish speech that is merely "offensive or disagreeable." *Id.*

A facial challenge to a law or statute "is the most difficult challenge to mount, since the challenger must establish that no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). Generally, courts will not address facial challenges, instead focusing on a law's particular application against the plaintiff. See *Newsom ex rel. Newsom v. Albermarle County Sch. Bd.*, 354 F.3d 249, 257 (4th Cir. 2003). However, the overbreadth doctrine of the First Amendment constitutes a departure

from this traditional rule. *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)); see also *Los Angeles Police Dept. v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38, 120 S. Ct. 483, 145 L. Ed. 2d 451 (1999) (noting that a challenge to a statute based on First Amendment overbreadth constitutes a "prototypical exception" to the traditional rule of standing).

But, the overbreadth doctrine is not "casually employed." *Los Angeles*, 528 U.S. at 39. Because of the wide-reaching effects of striking down a statute, the United States Supreme Court has recognized the overbreadth doctrine as "strong medicine" that should be employed "with hesitation, and then only as a last resort." *Id.* Accordingly, a statute or policy should not be invalidated for overbreadth "unless it reaches a substantial number of impermissible applications," *New York v. Ferber*, 458 U.S. 747, 771, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982), and the policy is not susceptible to a reasonable limiting construction that would render the policy constitutional. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) ("every reasonable construction must be resorted to, in order to save a statute from unconstitutionality") (internal citations omitted).

Further, the overbreadth doctrine "warrants a more hesitant application in the [public school] setting than in other contexts." *Newsom*, 354 F.3d at 258 (quoting S*ypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002)). School officials are not required nor expected "to employ the same level of precision in drafting school disciplinary procedures as is expected of legislative bodies crafting criminal restrictions." *Sypniewski*, 307 F.3d at 260. The Supreme Court has specifically recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures." *New Jersey v. T.L.O.*,

469 U.S. 325, 330, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985). Therefore, given school officials' "need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct [that is] disruptive of the educational process," school disciplinary rules and policies "need not be as detailed as a criminal code which imposes criminal sanctions." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686, 106 S. Ct. 3159, 92 L. Ed. 2d 549 (1986).

Additionally, vagueness standards apply less rigidly in the school context. *New Jersey,* 469 U.S. at 340. School rules and regulations must only be sufficiently clear and specific that a reasonable person would understand what is prohibited or expected. *See, e.g., Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 87 S. Ct. 675, 17 L. Ed. 2d 629 (1967) (holding administrative statutes governing state university system unconstitutional on vagueness grounds).

Considering the above, Plaintiffs are grasping at straws, and have stated no claim upon which they are likely to prevail. Policy 8210 lists offenses for which students may be disciplined. *See* Exhibit 3, p. 4. It begins at paragraph F(1) by advising students that they can be disciplined for "violations of policies on student conduct constituting cause for discipline." *Id.* One such policy is School Board Policy 8035: Title IX, Sex-Based Discrimination, Sexual Harassment. Exhibit 2. That policy – which is the policy that Plaintiffs were found to have violated - defines harassment, which Plaintiffs readily acknowledge. Thus, it is not necessary for Policy 8210 to again define that which is contained within Policy 8035, when 8210 states, expressly, that a student may be disciplined for "violations of policies on student conduct constituting cause for discipline." Exhibit 3, p. 4. The fact that Policy 8210 states that discipline may be imposed for "[p]articipation in an individual or group activity that involves inciting, intimidating, harassing, threatening, or committing an assault or other act of violence," without defining the term "harassment" neither

makes the policy vague, nor overbroad where Policy 8305, the policy Plaintiffs were found to have violated, provides a clear definition of harassment. *See, e.g. Kowalski*, 652 F. 3d 565, 575 (holding that a student is adequately put on notice of the type of behavior that can be punished by reference to multiple policies and documents, read in conjunction). As such, Plaintiffs have failed to demonstrate that they are likely to prevail on this claim.

### C.  Plaintiffs Will Not Suffer Irreparable Harm Without a Preliminary Injunction.

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis added). A showing of the "*possibility* of irreparable harm" is not sufficient. *Id*. (emphasis added). Instead, a plaintiff "must make a clear showing of irreparable harm . . . ." *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020) (quoting *Scotts Co. v. United Indus. Corp*., 315 F.3d 264, 283 (4th Cir. 2002)). Furthermore, "the required irreparable harm must be neither remote nor speculative, but actual and imminent." *Id*. (quoting *Scotts Co*., 315 F.3d at 283). A preliminary injunction is improper where the alleged harm is "not present or immediate but merely problematic, conditioned on possible future events . . . ." *Direx Israel, Ltd. v. Breakthrough Med. Corp. et al*., 952 F.2d 802, 816 (4th Cir. 1991).

Here, Plaintiffs maintain that they will suffer irreparable injury absent temporary relief simply by virtue of being suspended. They rely on *Coleman v. Newburgh Enlarged City Sch. Dist.*, 319 F. Supp. 2d 446, 453 (S.D.N.Y. 2004), for the proposition that "'[a] continued suspension [of a student] and accompanying preclusion from extracurricular activities' is sufficient to show irreparable harm for the purposes of temporary relief." ECF No. 30, p. 24. *Coleman* was reversed, *see Coleman v. Newburgh Enlarged City Sch. Dist*., 503 F.3d 198, 205 (2d Cir. 2007), with the

court holding, "while Coleman had a right not to be removed from NFA based on an erroneous determination of no manifestation, he had no right to reinstatement while that [administrative] determination was being reviewed." Thus, *Coleman* does not provide any support for Plaintiffs' contention that a ten (10) day suspension is sufficient to establish irreparable harm. Caselaw strongly suggests to the contrary. *See, e.g., Doe v. George Wash. Univ.,* 305 F. Supp. 3d 126, 135 (D.D.C. 2018) (delay in education due to disciplinary matter does not constitute irreparable harm); *Doe v. Vassar Coll.*, No. 19-CV-9601 (NSR), 2019 U.S. Dist. LEXIS 203418, 2019 WL 6222918, at *6 (S.D.N.Y. Nov. 21, 2019) (no irreparable harm as a result of suspension from school); *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio. 2015) ("[C]ourts have also held that a suspension from school is not irreparable.") (citing *Medlock v. Trs. of Ind. Univ.*, No. 1:11-cv-00977, 2011 U.S. Dist. LEXIS 103793, 2011 WL4068453, at *9 (S.D. [*17]  Ind. Sept. 13, 2011)); *Mahmood v. Nat'l Bd. of Med. Examiners*, No. 12-cv-1544, 2012 U.S. Dist. LEXIS 86837, 2012 WL 2368462, at *5 (E.D. Penn. June 21, 2012) (three-year suspension from medical school did not constitute irreparable harm). The fact that Plaintiffs (really only S.W.) will suffer a suspension without a preliminary injunction is simply not the type of harm that is deemed to be irreparable such that a preliminary injunction should be issued.

Plaintiffs also contend that there are "severe long-term consequences for both S.W. and J.S. if this discipline is not stayed." ECF No. 30, p. 25. They point to LCPS Regulation 8640 which authorizes LCPS to release educational records to certain persons, including colleges. Among records which may be released are disciplinary records. Plaintiffs maintain that if their records are released, a finding within those records that Plaintiffs "sexually harassed another student would be extraordinarily detrimental to their futures." *Id.* The problem with this argument, and the reason

it falls flat, is that it is based on speculative harms which might occur if Plaintiffs' records are released to some unidentified persons at some time in the future. This does not establish an actual and imminent harm, but merely identifies a speculative harm based on a possible future event which may never occur.

Further, it should be noted that, as a practical matter, the records at issue can only be released with the consent of the Plaintiffs' parents, and they therefore have the ability to ensure that the records at issue are not released. Since Plaintiffs have control over the very records about which they are concerned, they cannot demonstrate that they will suffer irreparable harm without a preliminary injunction to remove anything adverse from their student records.

Considering the above, Plaintiffs have not demonstrated that they will suffer irreparable harm without a preliminary injunction. The inability to demonstrate this prong, by itself, requires denial of a preliminary injunction.

### D. The Balance of the Equities Does Not Favor Plaintiffs.

Plaintiffs argue only that they have stated a viable First Amendment violation and, as such, the third and fourth requirements for a preliminary injunction have been met. ECF No. 30, p. 25. No such claim has been stated, for reasons outlined herein above. Inasmuch as Plaintiffs have not established that they are likely to prevail on their First Amendment claim, which is the only ground they rely upon for this prong, LCPS submits Plaintiffs have not shown that the balance of the equities favors granting them an injunction.

Instead, the balance of the equities weighs in favor of LCPS and allowing it to enforce its policies and impose discipline on students – like Plaintiffs – who interfere with the rights of other students.

### E.    The Public Interest Does Not Favor Plaintiffs.

Plaintiffs contend that upholding the constitution always promotes the public interest, thus they have established they satisfy this prong. ECF No. 30, p. 26. They suggest that this court, in ruling on the TRO, has already more or less decided this issue in Plaintiffs' favor. *Id.* But, Plaintiffs have not demonstrated that they are likely to establish any constitutional violation by LCPS, and "[t]he public has an interest in keeping school environments safe and free from persons or events that will impede the learning process. In order to accomplish this goal, schools must be allowed to discipline students when discipline is warranted…. For this court to intervene in Defendants' affairs via a [preliminary injunction] will impede the school's ability to discipline its students and effectively maintain a safe and healthy school environment." *See, Gendelman v. Glenbrook N. High Sch.*, 2003 U.S. Dist. LEXIS 8508, * 12 (N.D. Ill. May 21, 2003).

Indeed, the public has an interest in ensuring that students subject to discipline cannot avoid the same, thereby leaving the school population at risk, by running to federal court to try to stay that discipline for periods which, in some instances, might last longer than the remainder of time the student will be within the school system. There is no public interest served by staying student discipline generally, and none demonstrated here. Having failed to satisfy this prong, Plaintiffs are not entitled to a preliminary injunction.

### <u>CONCLUSION</u>

WHEREFORE, considering the above, Defendant, Loudoun County School Board, by counsel, asks that the court deny Plaintiffs' Motion for Preliminary Injunction.

**LOUDOUN COUNTY SCHOOL BOARD**
By Counsel

_____/s/_____

Heather K. Bardot, Esquire
VSB No. 37269
McGAVIN, BOYCE, BARDOT
  THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Telephone:      (703) 385-1000
Facsimile:      (703) 385-1555
hbardot@mbbtklaw.com
Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of October, 2025, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Andrew Block
Ian Prior
Nicholas R. Barry
Robert A. Crossin
America First Legal Foundation
611 Pennsylvania Avenue, SE, #231
Washington, D.C. 20003
(202) 836-7958
andrew.block@aflegal.org
ian.prior@aflegal.com
nicholas.barry@aflegal.com
bobby.crossin@aflegal.com
Counsel for Plaintiff

Joshua A. Hetzler, Esq. (VSB No. 89247)
Michael B. Sylvester, Esq. (VSB No. 95023)
FOUNDING FREEDOMS LAW CENTER
707 E. Franklin Street
Richmond, VA 23219
michael@foundingfreedomslaw.org
josh@foundingfreedomslaw.org
Co-Counsel for Plaintiff

Ellis L. Bennett
Dunlap Bennett & Ludwig PLLC
211 Church Street SE
Leesburg, Virginia 20175
ebennett@dbllawyers.com
Co-Counsel for Plaintiff

Michael Dingman
Virginia Office of the Attorney General
202 N. 9th Street
Richmond, Virginia 23219
mdingman@oag.state.va.us
Counsel for the Commonwealth of Virginia

Kevin M. Gallagher
Virginia Office of the Attorney General
202 N. 9th Street
Richmond, Virginia 23219
kgallagher@oag.state.va.us
Counsel for the Commonwealth of Virginia


_____/s/_____
Heather K. Bardot, Esquire
VSB No. 37269
McGAVIN, BOYCE, BARDOT
 THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Telephone:     (703) 385-1000
Facsimile:     (703) 385-1555
hbardot@mbbtklaw.com
Counsel for Defendant