

# COMMONWEALTH of VIRGINIA

Office of the Attorney General

Jason S. Miyares
Attorney General

202 North Ninth Street
Richmond, Virginia 23219
804-786-2071
Fax 804-786-1991
Virginia Relay Services
800-828-1120
7-1-1

August 23, 2023

The Honorable Glenn Youngkin
Governor of Virginia
Third Floor, Patrick Henry Building
1111 East Broad Street
Richmond, Virginia 23219

Dear Governor Youngkin:

I am responding to your request for an official advisory opinion in accordance with § 2.2-505 of the *Code of Virginia*.

## Issues Presented

You inquire regarding the validity of several model policies developed by the Virginia Department of Education as set forth in the Department's 2023 "Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools."[1] Your request concerns model policies that address athletics, access to student information, pronoun usage, and access to facilities and activities. You ask whether these model policies run afoul of federal or state anti-discrimination laws, specifically the Equal Protection Clause of the Fourteenth Amendment,[2] Title IX of the Education Amendments Act of 1972,[3] or the Virginia Human Rights Act (VHRA).[4] You further ask, in light of this inquiry, whether local school boards are bound to adopt policies consistent with these model policies.

## Response

It is my opinion that the model policies comply with the Equal Protection Clause, Title IX, and the VHRA, and that pursuant to Code § 22.1-23.3, local school boards are required to adopt policies that are consistent with them.

## Background

As "[t]he Supreme Court of the United States has long recognized[,] '[p]ublic education serves vital national interests in preparing the Nation's youth for life in our increasingly complex society and for

---

[1] VIRGINIA DEPARTMENT OF EDUCATION, *Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools* (July 18, 2023) [hereinafter "Model Policies"], available at https://www.doe.virginia.gov/home/showpublisheddocument/46509/638252918535370000.

[2] U.S. CONST. amend. XIV, § 1.

[3] 20 U.S.C. §§ 1681-1688.

[4] VA. CODE ANN. §§ 2.2-3900 to -3909 (2022 & Supp. 2023).

the duties of citizenship in our [Constitutional] Republic.'"[5] Article VIII of the Constitution of Virginia governs the provision of public education in Virginia. Although this Article vests local school boards with general authority over "[t]he supervision of schools in each school division[,]"[6] that power is not absolute. Rather, "primary responsibility and authority for effectuating the educational policy" of the Commonwealth lies with state government, particularly the General Assembly.[7] Thus, with respect to educational matters, "[t]he Constitution of Virginia 'apportions various responsibilities for the creation and maintenance of Virginia's system of public education among the General Assembly, the State Board of Education, and the local school boards.'"[8] As a result, the Supreme Court of Virginia consistently has held that "[s]chool boards only have those powers expressly granted or necessarily implied by statute."[9] Moreover, a school board may adopt policies only to the extent such policies are "not inconsistent with state statutes . . . ."[10]

In accordance with the "triune scheme" established by Article VIII,[11] the General Assembly, with the enactment of Code § 22.1-23.3, has directed the Department of Education to "develop and make available to each school board model policies concerning the treatment of transgender students in public elementary and secondary schools that address common issues regarding transgender students in accordance with evidence-based best practices . . . ."[12] Among other "common issues," the model policies are intended to address the following topics: compliance with applicable nondiscrimination laws; maintenance of a safe learning environment for all students; identification of students; student privacy; participation in sex-specific school activities and events; and use of school facilities.[13]

Pursuant to its mandate, the Department issued an inaugural set of model policies in 2021.[14] Because these model policies "promoted a specific viewpoint aimed at achieving cultural and social transformation in schools" and did not take into account fundamental and consequential legal "principles that significantly impact how schools educate students," the Department withdrew the 2021 model policies and adopted new model policies, which went into effect on July 19, 2023.[15] The revised model policies were designed to correct the failure of the prior policies to recognize that, although "[i]n our system of government, many parents delegate [some] authority . . . to state and local school officials[,]" ultimately, "[t]he education of the youth of this [Commonwealth] is the responsibility of the parents of the students."[16] The current model policies therefore expressly acknowledge "the rights of parents to exercise their

---

[5] 2003 Op. Va. Att'y Gen. 21, 21 (third and fourth alterations in original) (quoting Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 278 (1988)).

[6] VA. CONST. art VIII, § 7.

[7] See VA. CONST. art VIII, § 5(e) (establishing the State Board of Education and granting it authority to effectuate Virginia's educational policy, "[s]ubject to the ultimate authority of the General Assembly"). See also VA CONST. art VIII, § 6 (providing for the appointment of a "Superintendent of Public Instruction," whose "powers and duties . . . shall be prescribed by law").

[8] 2009 Op. Va. Att'y Gen. 77, 78 (quoting Dennis v. Cnty. Sch. Bd., 582 F. Supp. 536, 543 (W.D. Va. 1984)).

[9] Sosebee v. Franklin Cnty. Sch. Bd., 299 Va. 17, 25 (2020) (citing Kellam v. Sch. Bd., 202 Va. 252, 254 (1960)).

[10] VA. CODE ANN. § 22.1-78 (2021).

[11] 2009 Op. Va. Att'y Gen. at 78.

[12] VA. CODE ANN. § 22.1-23.3(A) (2021).

[13] Id.

[14] Those policies were set forth in a document entitled "Model Policies for the Treatment of Transgender Students in Virginia's Public Schools."

[15] Model Policies, supra note 1, at 1, 5.

[16] 2003 Op. Va. Att'y Gen. at 22 (citing Kuhlmeier, 484 U.S. at 273).

fundamental rights . . . to direct the care, upbringing, and education of their children[,]"[17] as guaranteed under state and federal law—rights that are "perhaps the oldest of the fundamental liberty interests recognized" by the United States Supreme Court.[18]

Code § 22.1-23.3 directs "[e]ach school board [to] adopt policies that are consistent with" these model policies.[19] Accordingly, to comply with this law, school boards may not adopt or maintain policies that conflict with the duly developed model policies.[20] In addition to comporting with this law, however, school board policies must not conflict with other applicable federal and state law.[21] You relate that some school boards have expressed concerns regarding whether certain federal or state anti-discrimination laws, namely the Equal Protection Clause, Title IX, or the VHRA, thus preclude the school board from adopting local policies that reflect the particular model polices about which you inquire. These concerns have prompted your request, and I will examine your questions accordingly.

## Applicable Law and Discussion

In guaranteeing that no state shall "deny to any person within its jurisdiction the equal protection of the laws[,]"[22] the Equal Protection Clause directs that "all persons similarly situated should be treated alike."[23] Consistent with this promise, Title IX, with limited exceptions, prohibits discrimination based on sex in all education programs and activities in federally funded schools at all levels.[24] In Virginia, the VHRA prohibits, among other things, discrimination in public accommodations on the basis of sex or gender identity.[25] Your inquiry focuses on the application of these laws to model-policy provisions that address athletics, access to student information, pronoun usage, and access to facilities and activities, specifically Model Policies H, D, and G. As I outline below, these policies are perfectly consistent with federal and state law.

*Model Policy H – Athletics*

Model Policy H provides that, "[f]or any athletic program or activity that is separated by sex, the appropriate participation of students shall be determined by sex rather than gender or gender identity."[26]

---

[17] Model Policies, *supra* note 1, at 1.

[18] Troxel v. Granville, 530 U.S. 57, 65 (2000). *See id.* at 66 ("[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."); Reyna, as next friend of J.F.G. v. Hott, 921 F.3d 204, 210 (4th Cir. 2019) (noting that "there are decisions that recognize the 'power of parents to control the education of their own' children" (quoting Meyer v. Nebraska, 262 U.S. 390, 401 (1923))); VA. CODE ANN. § 1-240.1 (2022) ("A parent has a fundamental right to make decisions concerning the upbringing, education, and care of the parent's child.").

[19] Section 22.1-23.3(B).

[20] *See, e.g.*, 1977-78 Op. Va. Att'y Gen. 369, 369 (noting that school board "regulations must be in harmony with . . . statutes of the Commonwealth"). Although the model policies, by themselves, do not carry the force of law, § 22.1-23.3(B) serves to make them binding on local school boards.

[21] *See* 1977-78 Op. Va. Att'y Gen. at 369.

[22] U.S. CONST. amend. XIV, § 1.

[23] City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

[24] 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]").

[25] VA. CODE ANN. § 2.2-3904 (2022).

[26] Model Policies, *supra* note 1, at 16.

"Sex" is defined as "biological sex."[27] The policy further provides that school divisions may provide "reasonable modifications" to this policy "only to the extent required by law."[28]

As a preliminary matter, I address the suggestion that the Department lacked authority under § 22.1-23.3 to address athletics in the first instance. Narrowly reading the statute to prohibit consideration of athletics is incorrect. The statute directs the Department to "develop and make available . . . model policies concerning the treatment of transgender students . . . that address *common issues regarding transgender students* . . . ."[29] It further directs that these policies must at the very least "include information, guidance, procedures, and standards relating to" eight identified topics.[30] Among those topics is "[s]tudent participation in sex-specific school activities and events and use of school facilities."[31] The statute then provides: "Activities and events do not include athletics."[32] The statutory mandate, however, is to develop policies "that address common issues regarding transgender students." The list of topics set forth in the statute is a nonexclusive list that includes *required* subject matter; it is not an exclusive definition of topics that qualify as "common issues regarding transgender students."[33] Athletics are indisputably a "common issue[] regarding transgender students." The Department therefore has discretion conferred by the General Assembly to address athletics in the model policies even if it is not required to do so.

I turn then to whether Model Policy H complies with the relevant federal and state laws. As with any sex-based policy, to comport with the Equal Protection Clause, Model Policy H must serve an important governmental objective and the classification must substantially relate to that objective.[34] The Equal Protection Clause "guarantees equal laws, not equal results[,]"[35] and does not forbid state regulations that "realistically reflect[] the fact that the sexes are not similarly situated in certain circumstances."[36] As the late Justice Ruth Bader Ginsburg wrote for the Supreme Court, "[p]hysical differences between men and women . . . are enduring."[37] The Constitution does not require states to ignore these differences and treat "'things which are different in fact . . . in law as though they were the same.'"[38]

The recognition of these differences is particularly relevant to interscholastic athletics, where states maintain a legitimate and important governmental interest in redressing past discrimination against women

---

[27] Model Policies, *supra* note 1, at 12.

[28] *Id.* at 16.

[29] Section 22.1-23.3(A) (emphasis added).

[30] *Id.*

[31] Section 22.1-23.3(A)(8).

[32] *Id.*

[33] Fed. Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100 (1941) (noting that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle"); Auer v. Commonwealth, 46 Va. App. 637, 645-46 (2005) ("[T]he word 'includes' is 'usually a term of enlargement, and not of limitation' and therefore 'conveys the conclusion that there are other items includable, though not specifically enumerated'" (quoting Fed. Elec. Comm'n v. Mass. Citizens for Life, 769 F.2d 13, 17 (1st Cir. 1985), *aff'd*, 479 U.S. 238 (1986))). *See also* 2022 Op. Va. Att'y Gen. 50, 52 (noting that the term "'including' followed by a list 'typically indicates a partial list'" (quoting BLACK'S LAW DICTIONARY 912)).

[34] United States v. Virginia, 518 U.S. 515, 533 (1996).

[35] Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 273 (1979).

[36] Michael M. v. Superior Ct. of Sonoma Cnty., 450 U.S. 464, 469 (1981). *See also* cases cited therein.

[37] *Virginia*, 518 U.S. at 533.

[38] *Michael M.*, 450 U.S. at 469 (quoting Rinaldi v. Yeager, 384 U.S. 305, 309 (1966)).

and in promoting equality of opportunity between the sexes.[39] Given that physical differences provide males an undue advantage in competing against women in sports, sex-based segregation in athletics bears a substantial relationship to those interests.[40] Indeed, states may implement policies that accommodate "the special [needs] of women."[41] Consequently, the exclusion of males from female sports teams does not violate the Equal Protection Clause.[42]

Title IX does not demand otherwise. Federal regulations implementing Title IX direct that "[n]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against" in school-sponsored athletic programs.[43] Nevertheless, a school "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[44] "[I]t would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs . . . ."[45] "The drafters of the regulations recognized a situation that Congress well understood: Male athletes had been given an enormous head start in the race against their female counterparts for athletic resources, and Title IX would prompt universities to level the proverbial playing field."[46] Accordingly, Title IX generally does not require sex-integrated sports teams.[47] To the contrary, its purpose is to *encourage* sex-separate sports teams in order to address "the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs."[48] Indeed, "commingling both biological sexes in the realm of female athletics[] would 'threaten[] to undermine one of [Title IX's] major achievements, giving young women an equal opportunity to participate in sports.'"[49]

Nor does the VHRA's prohibition against discrimination on the basis of gender identity require a different result. Model Policy H classifies student-athletes on the basis of their biological sex—not gender identity. Indeed, Model Policy H draws no distinctions of any kind on the basis of gender identity; rather both sides of the classification—biological males and biological females—include transgender students and treat them identically to all similarly situated students of the same sex. A policy "can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status."[50] Indeed, the text of the VHRA demonstrates that the General Assembly necessarily understood the categories of

---

[39] Clark, By & Through Clark v. Arizona Interscholastic Ass'n, 695 F.2d 1126, 1131 (9th Cir. 1982); Williams v. Sch. Dist., 998 F.2d 168, 179 (3d Cir. 1993).

[40] *Clark*, 695 F.2d at 1131. The "substantial relationship" standard does not require that "the [policy] under consideration must be capable of achieving its ultimate objective in every instance." Nguyen v. INS, 533 U.S. 53, 70 (2001).

[41] Weinberger v. Wiesenfeld, 420 U.S. 636, 653 (1975).

[42] *Clark*, 695 F.2d at 1131.

[43] 34 C.F.R. § 106.41(a).

[44] 34 C.F.R. § 106.41(b).

[45] *Williams*, 998 F.2d at 175.

[46] Neal v. Bd. of Trustees of California State Univs., 198 F.3d 763, 767 (9th Cir. 1999).

[47] Mercer v. Duke Univ., 190 F.3d 643, 647 (4th Cir. 1992).

[48] *Williams*, 998 F.2d at 175 (also articulating that "'[a]thletic opportunities' means real opportunities").

[49] Adams By & Through Kasper v. Sch. Bd. of St. Johns Cnty., 57 F.4th 791, 818 (11th Cir. 2022) (Lagoa, J., concurring) (second and third alterations in original) (quoting Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1779 (2020) (Alito, J., dissenting)).

[50] *Id.* at 809.

"sex" and "gender identity" to be distinct because it separately enumerated prohibitions against discrimination on each basis.[51] In prohibiting discrimination on the basis of gender identity, the VHRA does just that—prohibits discrimination on the basis of gender identity. Discrimination on the basis of sex is different from discrimination on the basis of gender identity. Because Model Policy H treats all persons identically irrespective of their gender identity, it does not discriminate on the basis of gender identity under the VHRA.

As one court recently opined, transgender girls are biological males and "biological males are not similarly situated to biological females for purposes of athletics."[52] This stands to reason because a person's nonconforming gender identity does not negate the physical differences associated with biological sex.[53] Therefore, I conclude that Model Policy H's instruction that sex separation of athletic programs shall be determined by biological sex rather than gender or gender identity comports with the Equal Protection Clause, Title IX, and the VHRA.

*Model Policy D – Student Information and Identification*

To promote parents' ability "to make the best decisions with respect to their child," Model Policy D ensures that parents are kept "fully informed about all matters that may be reasonably expected to be important to a parent"[54] by prohibiting school divisions from "encourag[ing] or instruct[ing] teachers to conceal material information about a student from the student's parent."[55] The policy makes clear, however, that school divisions will "comply with all laws that prohibit disclosure of information to parents, including but not limited to *Code of Virginia* § 22.1-272.1(B) (prohibiting parental contact where student is at imminent risk of suicide related to parental abuse or neglect)."[56] Model Policy D further directs, in part, that school "personnel shall refer to each student using only the pronouns appropriate to the sex appearing in the student's official record—that is, male pronouns for a student whose sex is male, and female pronouns for a student whose sex is female."[57] It also provides, however, that "pronouns other than those appropriate to the sex appearing in the student's official record" are to be used "if an eligible student or a student's parent has instructed [the school division] in writing that such other name or other pronouns be used."[58]

Model Policy D thus appropriately emphasizes the statutory and constitutional rights of parents and other legal and constitutional principles that govern how schools educate students. As noted, parents enjoy a time-honored fundamental right to make decisions regarding the upbringing and education of their

---

[51] Virginia courts "disfavor a construction of statutes that renders any part of the statute useless or superfluous." Shoemaker v. Funkhouser, 299 Va. 471, 488 (2021); *see also* Postal Tel. Cable Co. v. Norfolk & W. R.R. Co., 88 Va. 920, 926 (1892) ("It is not to be presumed that the legislature intended any part of [a] statute to be without meaning[.]"). Moreover, when the legislature "uses two different terms in the same act, those terms are presumed to have distinct and different meanings." Indus. Dev. Auth. v. Bd. of Supvrs., 263 Va. 349, 353 (2002).

[52] B.P.J. v. W. Va. State Bd. of Ed., No. 2:21-cv-00316, slip op. 23, 2023 WL 111875, at *9 (S.D.W. Va. Jan. 5, 2023).

[53] Courts recognize biological sex, like race, as an immutable characteristic determined by birth. *See, e.g.*, Frontiero v. Richardson, 411 U.S. 677, 686 (1973). Gender identity is a trait distinct from biological sex. *Bostock*, 140 S. Ct. at 1746-47 (stating that "transgender status [is a] distinct concept[] from sex"). Accordingly, "transgender persons fall into the preexisting classifications of sex—i.e., male and female." *Adams*, 57 F.4th at 814.

[54] Model Policies, *supra* note 1, at 3.

[55] *Id.* at 15 (Model Policy D(7)).

[56] *Id.*

[57] *Id.* at 14 (Model Policy D(3)).

[58] *Id.* (Model Policy D(4)).

children.[59] Access to important information regarding their "child's health, and social and psychological development"[60] is critical to making those decisions, and schools need to provide, not conceal, such information. Additionally, because the manner in which a child is addressed by school officials is inextricably tied to the educational upbringing of that child, parents' fundamental rights necessarily encompass the prerogative to decide how their child will be addressed while at school. The means of addressing students also implicates constitutional rights of teachers that must be respected at school,[61] including rights in the expression of sincerely held religious beliefs.[62] The Commonwealth therefore has a compelling interest in ensuring that its school divisions respect the constitutional rights of parents, teachers, and students.

Keeping parents informed about "all matters that may be reasonably expected to be important to a parent" does not trigger any anti-discrimination laws. Not only does Model Policy D embrace the rights of all parents to be kept informed about all their children's well-being, irrespective of the protected status of either parent or child, the policy also instructs school divisions to comply with conflicting laws that prohibit disclosure when they apply.[63] The model policy's establishment of a default student-identification rule for school personnel to follow also raises no legal concerns. Because the model policy ultimately vests the decision of pronoun reference with a student's parents, Model Policy D does not discriminate on the basis of sex; rather, the line drawn by Model Policy D is between students whose parents have instructed the school division to use pronouns other than those associated with a student's sex, and those whose parents have not. Students who wish to be referred to by certain pronouns without the approval of their parents are not a protected class under any relevant federal or state law. Model Policy D in no way "prefers one sex to the detriment of the other[,]"[64] and I must conclude that it suffers no infirmity under federal or state anti-discrimination laws.

*Model Policy G – Facilities*

Model Policy G requires "[o]vernight travel accommodations, locker rooms, and other intimate spaces used for school-related activities and events [to] be based on sex," with "reasonable modifications . . . to the extent required by law."[65] Similarly, every student "shall use bathrooms that correspond to his or her sex, except to the extent that federal law otherwise requires."[66] Again, "sex" is defined as "biological sex."[67]

---

[59] VA. CODE ANN. § 1-240.1; *Troxel*, 530 U.S. at 66; Eknes-Tucker v. Governor of Alabama, __ F.4th __, __, 2023 WL 5344981, at *11 (11th Cir. Aug. 21, 2023) (noting that "a line of Supreme Court decisions . . . recognized . . . parents' liberty interest to control the upbringing of their children" and that "[t]he majority of those cases . . . pertain to issues of education, religion, or custody").

[60] Model Policies, *supra* note 1, at 3.

[61] *See* Kennedy v. Bremerton Sch. Dist., 142 S. Ct. 2407, 2422 (2022).

[62] Loudoun Cnty. Sch. Bd. v. Cross, No. 210584, 2021 WL 9276274, at *6, *8 (Va. Aug. 30, 2021) (citing Meriwether v. Hartop, 992 F.3d 492, 509-17 (6th Cir. 2021)).

[63] Model Policies, *supra* note 1, at 15 (Model Policy D(7)).

[64] L. W. By & Through Williams v. Skrmetti, 73 F.4th 408, 419 (6th Cir. 2023) (citing Reed v. Reed, 404 U.S. 71, 76 (1971)).

[65] Model Policies, *supra* note 1, at 16 (Model Policy G(3)).

[66] *Id.* (Model Policy G(4)).

[67] *Id.* at 12.

The Fourth Amendment protects students' expectation of privacy in their "persons," including privacy in their personal hygiene and in shielding one's body from view of the opposite sex.[68] That right is not diminished simply because another student of the opposite sex identifies as a transgender student.[69] Securing this right for every student is a significant governmental objective of the Commonwealth.[70] The longstanding practice of separating the sexes in intimate settings, including shared sleeping quarters, locker rooms, and bathrooms, is substantially related to this interest.[71] Accordingly, Model Policy G comports with equal protection requirements.[72]

Model Policy G also satisfies Title IX. As with athletics, application of Title IX permits segregation of the sexes as appropriate for certain settings. The law expressly allows "separate living facilities [to be maintained] for the different sexes."[73] The implementing regulations further provide that schools do not violate the statute when they afford students "separate toilet, locker rooms, and shower facilities on the basis of sex," so long as the offered facilities are comparable.[74] Because Model Policy G falls squarely within these provisions, I conclude that the policy is not violative of Title IX.[75]

Nor does Model Policy G violate the VHRA's prohibition against discrimination on the basis of gender identity. Although the overnight accommodation, locker room, and bathroom policies "classif[y] students on the basis of biological sex," they do not "facially discriminate on the basis of transgender status."[76] As with the athletics policy set forth in Model Policy H, because the facility-use policies "divide[] students into two groups, both of which include transgender students, there is a lack of identity between the polic[ies] and transgender status."[77]

In sum, none of the questioned terms of Model Policies H, D, or G run afoul of the Equal Protection Clause, Title IX, or the VHRA.[78]

---

[68] *See, e.g.*, Henry v. Hulett, 969 F.3d 769, 778 (7th Cir. 2020) ("The privacy interest in one's body is clearly a heightened and fundamental one."); York v. Story, 324 F.2d 450, 455 (9th Cir. 1963) ("We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figured from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity."); Strickler v. Waters, 989 F.2d 1375, 1387 (4th Cir. 1993) (recognizing that compelled exposure of one's genitals to members of the opposite sex can constitute a violation of constitutional rights); *Adams*, 57 F.4th at 805. *See also* MacDonald v. Angelone, 69 F. Supp. 2d 787, 793 (E.D. Va. 1999) (individuals "have a right to be protected from gratuitous and unnecessary observation while they use [the] toilet[]").

[69] *See* West v. Radtke, 48 F.4th 836, 851 (7th Cir. 2022) (the "right to be free from highly invasive intrusions on bodily privacy by [members] of the opposite sex—whether on religious or privacy grounds—does not change based on the [other's] transgender status").

[70] Grimm v. Gloucester Cnty. Sch. Bd., 972 F.3d 586, 613 (4th Cir. 2020); *Adams*, 57 F.4th at 804-05.

[71] *See Virginia*, 518 U.S. at 550 n.19 (noting that in, converting a previously all-male university into a co-educational institution, campus changes may be "necessary to afford members of each sex privacy from the other sex in living arrangements").

[72] *See Adams*, 57 F.4th at 808.

[73] 20 U.S.C. § 1686.

[74] 34 C.F.R. § 106.33.

[75] *See Adams*, 57 F.4th at 815.

[76] *Id.* at 809.

[77] *Id.* (some punctuation omitted).

[78] I, of course, am aware of inconsistent court decisions on some of these issues rendered in other jurisdictions. *See, e.g.*, Hecox v. Little, __ F.4th __ (9th Cir. Aug. 17, 2023). These decisions do not bind Virginia, and to the extent some of these decisions disregard of the ordinary meaning of "sex" as used in the context of the applicable law, I do

In reaching this conclusion, I have determined that the decision of the United States Court of Appeals for the Fourth Circuit in *Grimm v. Gloucester County School Board*[79] does not compel a different result. *Grimm* involved an as-applied challenge brought by a former student who, in the face of an "invented classification" of "biological gender," had sought to use the public-school bathroom matching the student's gender identity.[80] In ruling that the school board's policy, as applied to that student, was not substantially related to the proffered government objective of protecting student privacy, the Fourth Circuit did not address athletics, pronoun usage, a parent's right to information, or any facilities other than the bathrooms at the former student's high school.[81] Moreover, the Fourth Circuit considered only the proffered governmental interest of student privacy.[82] Despite expressly acknowledging that school boards do have an important interest in protecting students' privacy,[83] the court found, based on the particular facts of the student's high school as established in the record before the court, that the school board had failed to demonstrate how its policy, when applied to those facts, was substantially related to its purported goal.[84] Accordingly, *Grimm* does not impose a blanket rule forbidding sex-separate facilities in all situations, let alone govern policies related to athletics, access to information, or pronoun usage.

Notably, the Department's model policies expressly address situations where federal law or a binding decision interpreting federal law may require a departure from the model policy's default rule. The model policies instruct school boards to comply with federal law and expressly describe areas where federal law relates to school facilities provided to each sex.[85] Indeed, the model policy addressing bathrooms requires students to use "bathrooms that correspond to [their] sex, *except to the extent federal law requires otherwise*," and expressly cites *Grimm* as an example of a federal law that may require otherwise.[86] Other parts of Model Policy G similarly direct schools to depart from sex-based classifications where law requires it.[87] A model policy that instructs school divisions to follow federal law, including *Grimm*, cannot possibly conflict with federal law and *Grimm*. Model Policies H and D contain similar language.[88]

Your inquiry regards policies that involve a classification that is not "invented" but instead rooted in history and tradition, that aim to protect parents' fundamental right to direct the upbringing and education of their children, and that require reasonable modifications where the law compels them. As explained above, the default rules established by Model Policies H, D, and G offend neither the Equal Protection Clause, Title IX, nor the VHRA. Consequently, these federal and state laws do not preclude local school boards from adopting the model policies as directed under Code § 22.1-23.3. School boards therefore must adopt model policies consistent with those developed by the Department.

---

not find them persuasive. *Cf. Adams*, 57 F.4th at 807-10, 812-15 ("To say that [a] policy relies on impermissible stereotypes because it is based on the biological differences between males and females is incorrect." *Id.* at 810). None of these decisions invalidate the model policies discussed herein. Moreover, the model policies themselves account for any and all federal law that binds Virginia in this area. *See* Model Policies, *supra* note 1, at 12, 16.

[79] 972 F.3d at 586.

[80] *Id.* at 593, 619.

[81] *See id.* at 607; *see also id.* at 596 ("[T]oday's question is limited to how school bathroom policies implicate the rights of transgender students . . . .").

[82] *See id.* at 613-15.

[83] *Id.* at 613.

[84] *Id.* at 614.

[85] *See* Model Policies, *supra* note 1, at 12, 16.

[86] *See id.* at 16 (emphasis added).

[87] *Id.*

[88] *See id.* at 15, 16 (Model Policies D(7) & H).

## Conclusion

Accordingly, it is my opinion that Model Policies H, D, and G, as set forth in the "Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools" that are now in effect, do not violate federal or state anti-discrimination laws. It therefore is my further opinion that, pursuant to Code § 22.1-23.3, local school boards are required to adopt policies that are consistent with these model policies.

With kindest regards, I am

Very truly yours,

Jason S. Miyares
Attorney General