**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)**

| | |
|---|---|
| S.W., et. al.;  *Plaintiffs*, | ) ) ) ) ) ) ) ) ) |
| v. | |
| LOUDOUN COUNTY SCHOOL BOARD,  *Defendant*. | |

Case No. 1:25-cv-1536

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# INTRODUCTION

The only issue currently before the Court is the narrow question of whether to enjoin the Defendant Loudoun County School Board ("School Board" or "LCPS") from imposing an *immediate* ten-day suspension on Plaintiff S.W. and entering a finding of Title IX Sexual Harassment against S.W. and J.S. Indeed, without such relief from this Court, it appears virtually certain that the Defendant will implement the immediate and irreparable harm of a two-week out-of-school suspension. The Defendant argues that such punishment is justified and appropriate under the conditions, citing to the same flawed, and ill-motivated investigation underlying the allegations in the verified complaint.

If the Defendant is allowed to prevail on this motion, it sends a clear message that it can run roughshod over any student's constitutional rights and impose swift—and effectively irreversible—discipline without judicial review. Whereas Plaintiffs seek only to hold disciplinary action in abeyance while the Court hears the merits of this civil action, the Defendant seeks to impose harsh, even irreversible, consequences on the Plaintiffs for daring to question why a female was allowed in the boys' locker room, where she was engaging in a surreptitious video recording. Therefore, for the reasons articulated in their Memorandum in Support of Motion for Preliminary Injunction and in this Reply Brief in Support of Preliminary Injunction, the Court should enter an order granting the Plaintiffs' Motion for Preliminary Injunction.

# ARGUMENT

I.  **Plaintiffs' Verified Complaint is Sufficient for the Grant of a Preliminary Injunction.**

The Fourth Circuit has held that "a *verified* complaint is the equivalent of an opposing affidavit for summary judgment purposes." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). This Court has applied the same reasoning to a preliminary injunction posture. *See Lighthouse*

*Fellowship Church v. Northam*, 462 F. Supp. 3d 635, 645 n.5 (E.D. Va. 2020). Yet the Defendant still attempts to challenge the sufficiency of the Plaintiffs' verification under 28 U.S.C. § 1746. *See* Doc. 39 at 9–10, n.11. Specifically, it argues that stating "to the best of my knowledge" makes the verification noncompliant with § 1746 in that the Plaintiffs did not specify which allegations were based upon personal knowledge. *Id.* This argument is incorrect.

Courts in the Fourth Circuit have consistently held that the language "true and accurate to the best of my knowledge" complies with the requirements of § 1746. *See, e.g., Am. Mgmt. Servs., LLC v. Dep't of the Army*, 842 F. Supp. 2d 859, 868 n.6 (E.D. Va. 2012) (collecting cases); *see also Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 353 (D. Md. 2011); *Kobe v. Haley*, No. 3:11-1146, 2013 WL 4067921, at *8 (D.S.C. Aug. 12, 2013).

Similarly, at the preliminary injunction stage, "the standard for admissibility of evidence is lower than at the preliminary injunction stage than at summary judgment." *Signature Flight Support v. Landow Aviation Ltd. P'ship*, No. 1:08-cv-955, 2009 WL 90849, at * 3 (E.D. Va. Jan. 13, 2009) (citing *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3rd Cir. 2004) (collecting cases)). "[T]he weight to be accorded affidavit testimony is within the discretion of the court." *Imagine Medispa, LLC v. Transformations, Inc.*, 999 F. Supp. 2d 862, 869 (S.D. W.Va. 2014) (citing 11A WRIGHT AND MILLER'S FEDERAL PRACTICE & PROCEDURE § 2949). Consequently, this Court has the prerogative to weigh the proffered evidence at this stage; the plaintiffs need not specify or designate specific allegations.

**II.     Granting a Preliminary Injunction Will Prevent Irreparable Harm to Plaintiffs and Will Not Harm Defendant.**

    A.     <u>A 10-day Suspension is Irreparable Harm.</u>

If a preliminary injunction is not entered, S.W. will be suspended from all school activities for 10 days, or two full weeks, of school during his junior year in high school. The Supreme Court

of the United States has direct, controlling, and binding precedent for this very scenario. In *Goss v. Lopez*, the Court held that a "total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child." *Goss v. Lopez*, 419 U.S. 565, 576 (1975). As to the entry of derogatory findings as to both S.W. and J.S., the *Goss* Court held, "If sustained and recorded, those charges could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Id.* at 575.

Despite this Court's prior ruling, Doc. 10 at 2, and the Supreme Court of the United States having already ruled otherwise, the Defendant continues to argue that a 10-day out-of-school suspension is not irreparable. Doc. 39 at 26–27. In support thereof, it cites several inapplicable, out-of-circuit cases related to higher education. *Id.* For example, the Defendant claims that *Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 205 (2d Cir. 2007), supports its contention that a 10-day suspension is *de minimis*. It omits, though, that the appellate court in *Coleman* did not overturn the district court on the grounds that a suspension from school was not irreparable harm—rather the court ruled that the district court lacked jurisdiction because the plaintiff had failed to exhaust administrative remedies before proceeding to federal court. *Id.*

The Defendant's citation to *Doe v. George Washington Univ.*, 305 F. Supp. 3d 126 (D.D.C. 2018) is equally as unpersuasive and misleading. The Defendant claims *Doe* stands for the proposition that "delay in education due to [a] disciplinary matter does not constitute irreparable harm." Doc. 39 at 27. But *Doe* simply recognized the difference between a delay between college and graduate school (which did not constitute irreparable harm) and an interruption of attendance already in progress (which would constitute irreparable harm). *Doe,* 305 F. Supp. 3d at 135 (citing

3

*Walter v. Giuliani*, 1998 WL 712423, at *1 (2d Cir. 1988)). In this case, S.W.'s *attendance* at school is being interrupted, rendering *Doe* inapplicable.

The Defendant next turns to the unreported case of *Doe v. Vassar*, 2019 WL 6222918, at *6 (S.D.N.Y. 2019). In that case, the Court determined that a college student's suspension for one semester during his senior year was not irreparable harm, as the plaintiff did not indicate an intent to graduate school, did not claim that his potential employers required him to complete college, and the plaintiff was free to make up for the lack of instruction time by taking additional courses for credit at other universities or during school breaks at Vassar. *Id. Doe v. Vassar* is a very different situation than the case at bar, where the Plaintiffs are in their junior year in high school and a sustained Title IX sexual harassment charge and resultant suspension will not only deprive S.W. of his fundamental right to an education (*Scott v. Commonwealth*, 247, Va. 379, 386 (1994)) but will paint a scarlet letter of sexual harasser on both Plaintiffs' records which will absolutely interfere with their college application process.

Defendant's reliance on *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015) is also unhelpful on this point. Doc. 39 at 27. In *Pierre*, the court held that the plaintiff's delay in filing suit until one month *after* the suspension undermined his allegation of irreparable harm. *Id.*

The Defendant and the *Pierre* court relied on another distinguishable case, *Medlock v. Trs. Of Ind. Univ.,* 2011 WL 4068453 (S.D. Ind. 2011). In *Medlock*, a student at Indiana University was suspended for possession of a prohibited substance. *Id.* at *2. The Court found that there was not a threat of irreparable harm because he had applied to George Mason University, was accepted, and *voluntarily declined* admission. *Id.* at *9. Therefore, the court easily denied the motion for

4

preliminary injunction because the student had other educational opportunities available to him and he was eligible for reinstatement at Indiana. *Id.*

Finally, the Defendant cites *Mahmood v. Nat'l Bd. Of Med. Exam'r*, 2012 WL 2368462 (E.D. Pa. June 21, 2012). Doc. 39 at 27. Again, the case is inapplicable. The court found that the plaintiff, who was suspended for three years after being arrested for starting a restroom fire at the University of Chicago Medical School, had not shown irreparable harm because she did not discuss whether the university would grant her an extension on the seven-year graduation requirement or whether she was denied the ability to finish her degree at another school. *Id.* at *5.

Ultimately, this case is most like *Goss*. Both cases involve the proposed 10-day suspensions of high school students who claim deprivation of their due process rights. 419 U.S. at 567. The Defendant offers no serious argument that a 10-day suspension does not constitute irreparable harm. In the instant case, like in *Goss*, a 10-day suspension for S.W. could damage his standing with his fellow pupils and teachers. Nor does the Defendant have an argument that entering a finding of Title IX sexual harassment against the Plaintiffs will not interfere with their opportunity for higher education or employment. Both S.W. and J.S. are juniors in high school and will be going through the normal process of applying for college and/or seeking employment before this litigation concludes. A recorded charge of sexual harassment will certainly result in significant interference with their applications to college and job prospects.

      B.      <u>The Most Important Factors Favor Plaintiffs: They Will Suffer Irreparable Injury and Defendant Fails to Show It Will Suffer Any Harm.</u>

Were all this not enough, the Plaintiffs also prevail on a traditional preliminary injunction four-factor balance-of-hardship test. This is especially true when considering the Fourth Circuit's guidance on how district courts should weigh the interaction between the first two factors. "There is a correlation between the likelihood of plaintiff's success and the probability of irreparable

5

injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction." *N.C. State Ports Auth. v. Dart Containerline Co. Ltd.*, 592 F.2d 749, 750 (4th Cir. 1979). Here, Plaintiffs have a strong case on *both* factors, but the threat of irreparable harm is so high, the required showing for likelihood of success on the merits can be lessened. And, the Fourth Circuit, continued, "Of all the factors, the two most important are those of probable irreparable injury to the plaintiff if an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented." *Id.* Here, the probable irreparable harm to the Plaintiffs is great if the injunction is not granted, while the harm to the Defendant is granted is virtually nonexistent.

The Defendant, which sends over 10,000 students to postsecondary education annually, claims that the Plaintiffs' parents can simply refuse to release their student records to third parties. This argument defies common sense. Any university to which they apply will require the Plaintiffs' student records. The Defendant cannot argue that it will be harmed by holding the Title IX findings and suspensions in abeyance during the pendency of this lawsuit. The Plaintiffs are not seeking an injunction against the Defendant's ability to discipline students pursuant to its policies or any other sweeping injunction. Instead, they seek a narrow order, preliminarily enjoining the Defendant from entering findings and discipline *against these plaintiff students* during the pendency of *this* litigation. If the Defendant succeeds, it can proceed with disciplinary action unprejudiced.

Finally, the Court has the authority to enter a preliminary injunction on the independent grounds that the Defendant's actions raise "grave or serious questions." *See N.C. State Ports Auth.,*

6

592 F.2d at 750. As set forth in the opening brief, and more fully below, the investigation and pursuit of discipline against the Plaintiffs violated several of their constitutional rights.

**III.     Plaintiffs Are Likely to Prevail on Their Religious Discrimination Claims.**

As stated in the Memorandum in Support of Preliminary Injunction, a plaintiff can prove a disparate treatment claim under the equal protection clause by employing the burden-shifting scheme articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Causey v. Balog*, 162 F.3d 795, 804 (4th Cir. 1998). This requires a plaintiff to "first to adduce evidence sufficient to establish a prima facie case of discrimination, and then to present evidence from which a fact finder could conclude that any legitimate basis proffered by the defendant for its adverse action is actually a pretext for discrimination." *Mwabira-Simera v. Morgan State Univ.*, 2013 WL 1285007, at *5 (D. Md. Mar. 26, 2013). It is not necessary for an individual's religion to be *the sole* motivating factor behind an adverse action for liability to attach; it must only be *a motivating* factor. *Diamond v. Colonial Life & Accident Ins. Co.,* 416 F.3d 310, 317 (4th Cir. 2005).

The Plaintiffs have presented undisputed evidence that they are Christian, that the Defendant took an adverse action against them, but did not take adverse action against a Muslim student who was accused of the same actions (and more) than the Plaintiffs. After the Female Student filed a Title IX complaint, the Defendant investigated the two Plaintiffs, who are Christian, and another student, who is Muslim. Doc. 1 at ¶¶ 81–83. The allegations against the Plaintiffs and the Muslim student were the same, except that the Defendant was also investigating the Muslim for additional statements that the Female Student claimed he made to her. Doc. 1 at ¶¶ 84–85. On May 30, 2025, the Defendant dismissed the accusations against the Muslim student but continued to investigate the Plaintiffs for another ten weeks, until it issued its decision on August 15, 2025,

7

that the Plaintiffs had violated Title IX. Doc. 1 at ¶¶ 87–89, 95. The Plaintiffs have thus pled a prima facie case of religious discrimination.

The Defendant's attempts to justify its discriminatory actions fail. First, the Defendant argues that it had a legitimate reason for treating the two Plaintiffs differently from the Muslim student. It argues that it could not verify that the Muslim student said what the Female Student accused him of saying. Doc. 39 at 10–11. But this is inconsistent with their dismissal of the student which explicitly stated that "even if proved," the "conduct alleged would not constitute sexual harassment." Doc. 1 at ¶ 87. This statement is game, set, and match. The allegations leveled at the Plaintiffs were identical to those leveled at the Muslim Student but only the Muslim student benefited from the finding that the allegations could not constitute sexual harassment under Title IX. Second, the Defendant dismissed the allegations against the Muslim student only *after* a cleric from the Muslim student's mosque intervened. Doc. 1 at ¶ 86. The investigation into the Plaintiff students continued on another two and a half months. Defendant does not dispute this fact.

Therefore, not only have the Plaintiffs set forth a prima facie case, but they have also set forth undisputed evidence from which a reasonable person could conclude that the Defendant's proferred justification was pretext and that its motive in treating the Plaintiff students worse than the Muslim student was based, at least in part, on religion. The Plaintiffs' evidence gives rise to grave and serious questions of religious discrimination, and they are likely to succeed on the merits of their religious discrimination claims.

## IV. Plaintiffs Are Likely to Prevail on Their Sex Discrimination Claims.

### A. Plaintiffs Have Pled a Prima Facie Case

The Plaintiffs allege that the Defendant discriminated against them on the basis of sex because they allowed the Female Student to feel safe and comfortable undressing in a boys' locker

room, but did not allow the Plaintiffs to feel safe and comfortable undressing in the same boys' locker room. Doc. 1 at ¶¶ 165–191. Specifically, S.W. alleged that he was told by school staff that if there was an issue using a boys' locker room at the same time as the Female Student, he should change elsewhere, while the Female Student was not told that she should change elsewhere. Doc. 1 at ¶ 55. Despite the Defendant's complaints about the inadequacy of the verifications in this case, it offers no form of admissible evidence to support its contentions. Thus, the Plaintiffs have pled a case of sex discrimination. And this Court has previously recognized that these allegations are sufficient for preliminary relief. Doc. 10 at 2.

And this Court is not the only authority to be troubled by the Defendant's actions here. The list of investigations and findings into this very issue continues to grow. On July 25, 2025, the United States Department of Education found that the Defendant's locker room policies unlawfully discriminated on the basis of sex in violation of Title IX. Press Release, U.S. Dep't of Educ., *U.S. Department of Education Finds Five Northern Virginia School Districts in Violation of Title IX* (July 25, 2025), https://perma.cc/9MF2-3CUW. On August 19, 2025, the Defendant was placed on "high risk" status, putting its federal funding at risk, because of the Department of Education's determination that the Defendant's locker room policies discriminated on the basis of sex. Press Release, U.S. Dep't of Educ., *U.S. Department of Education Places Five Northern Virginia School Districts on High-Risk Status and Reimbursement Payment Status for Violating Title IX* (Aug. 19, 2025), https://perma.cc/TVL8-U99T. On June 2, 2025, Virginia Attorney General Jason Miyares determined that the Defendant violated the Plaintiffs' Title IX rights and referred the matter to the United States Departments of Education and Justice. Press Release, Off. of the Att'y Gen. of Va., *Attorney General Miyares Announces Results of Title IX Investigation into LCPS* (June 2, 2025), https://perma.cc/7TEF-QK9Q. Finally, on September 16, 2025, the Department of Education

announced its findings that the Defendant had violated the Plaintiffs' Title IX rights and offered them ten days to rescind the suspensions. Press Release, U.S. Dep't of Educ., *U.S. Department of Education Concludes Loudoun County Public Schools Violated Title IX and Retaliated Against Male Students Amid Sexual Harassment Claims* (Sept. 16, 2025), https://perma.cc/AN6T-4F79.

Once a prima facie case of sex discrimination is made, the government must show that the disparate treatment serves "important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *U.S. v. Virginia*, 518 U.S. 515, 524 (1996). Here, the Defendant argues its important government objective is complying with *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) and the Virginia Department of Education's 2023 Model Policies ("2023 Model Policies"). It claims that Policy 8040, which allowed the Female Student to use the boys' locker room, "is consistent with and mandated" by *Grimm* and that it is also consistent with the 2023 VA Model Policies ("Model Policies"). Both of those claims are patently false as a matter of law, and the Plaintiffs are therefore likely to succeed on the merits of this claim, which raises grave and serious questions.

B. The Defendant Has Offered No Legitimate Defense, and *Grimm* Does Not Apply.

*Grimm* involved an as-applied challenge brought by a biologically female student who was prohibited from using the male restroom, despite claiming a male gender identity. *Id.* at 593, 619. In deciding that the school board had violated the plaintiff's equal protection and Title IX rights, the court stated that "there have always been people who '*consistently, persistently, and insistently*' express a gender that, on a binary, we would think of as opposite to their assigned sex." *Id.* at 594 (emphasis added). The court further noted that transgender people "represent approximately 0.6% of the United States adult population" and that just like "being cisgender, being transgender is natural and is not a choice.*" Id.* The court also opined that "there are other gender-expansive youth

10

who may identify as nonbinary, youth born intersex who do or do not identify with their sex-assigned-at-birth, and others whose identities belie gender norms." *Id.* at 596. However, the court explicitly stated that the question at issue in *Grimm* did not address such identities and was "limited to how school bathroom policies implicate the rights of transgender students who '*consistently, persistently, and insistently*' express a binary gender." *Id.* The court also made clear that it was not addressing the school's locker room policy, as that was not being challenged. *Id.* at 601.

With those limitations fully set forth, the *Grimm* court found that the student was sufficiently part of the quasi-suspect class of transgender persons. Specifically, the court found:

> "At around the age of 12, [Grimm] started presenting [herself] as a boy . . . [and] [a]round the time of [her] 15th birthday, in the spring of 2014, Grimm came out to his parents as a transgender boy." *Id.* at 628. Further, "[Grimm's] psychologist diagnosed [her] with 'gender dysphoria' . . . [and] [s]oon thereafter, Grimm obtained a court order legally changing [her] name from the female name [she] was given at birth to Gavin Elliot Grimm."

*Id.* at 629. The court also noted that the plaintiff's mother was fully involved in requesting accommodations from the school in order to "socially transition at school" which was "part of [her] treatment for gender dysphoria." *Id.* Finally, as part of her "transition," the plaintiff began taking cross-sex hormones in 10th grade, underwent breast removal surgery in 11th grade, and was permitted to amend her birth certificate in 12th grade. *Id.* at 629–30.

The factual predicate of *Grimm* is that, for a student to be categorized as "transgender" for equal protection purposes, that individual must "consistently, persistently, and insistently" expresses themselves as the sex opposite from their biological sex and that there must be significant evidence demonstrating the persons consistent, persistent, and insistent expression as the opposite sex, including medical treatment, parental involvement, and efforts to legally recognize the individuals expressed sex.

11

None of that is present here. Policy 8040 is a far cry from the limited ruling of *Grimm* and thus does not "substantially relate" to its claimed "important government interest" of complying with that ruling. Policy 8040 explicitly applies to "gender-expansive/gender-diverse/gender-fluid/gender-nonbinary/agender" students (Doc. 1 at ¶¶ 38, 40)—categories to which *Grimm* either did not contemplate or explicitly declined to extend its ruling. Policy 8040 extends to locker rooms (Doc. 1 at ¶ 38), which is, again, explicitly outside of *Grimm's* ruling. Finally, Policy 8040 provides that a student's claimed transgender or gender-expansive status must be accepted "without any substantiating evidence." Doc. 1 at ¶ 42. Conversely, *Grimm* relied on substantial evidence to justify its holding.

In short, the Defendant offers no authority from Virginia, the Eastern District of Virginia, or the Fourth Circuit that suggests Policy 8040, which was the basis for allowing the Female Student to use a boys' locker room and requiring uncomfortable boys to use a different changing location, is mandated by law and is not a clear violation of the equal protection clause and Title IX. Assuming, *arguendo*, locker rooms were covered by *Grimm,* the Defendant offers no evidence to contradict the Plaintiffs' assertions that the Female Student did not "consistently, persistently, and insistently" identify as a male as *Grimm* requires.

C.      Nor Do the State Model Policies Save the Defendant's Actions.

The Defendant's argument that the Virginia Department of Education's Model Policies save its action are equally faulty. The Model Policies explicitly define sex to mean "biological sex." Doc. 39-4 at 10. Further, the Model Policies state that, "Overnight travel accommodations, *locker rooms*, and other intimate spaces used for school-related activities and events *shall be based on sex*. [School Division] shall provide reasonable modifications to this policy *only to the extent*

12

*required by law*." (emphasis added).[1] Doc. 39-4 at 18. These distinctions are consistent with the Constitution of Virginia which provides that "the mere separation of the sexes shall not be considered discrimination." art. 1 § 11. And again, no law requires the Defendant to allow girls to use boys' locker rooms, nor does any law require the Defendant to weigh the rights of girls over those of boys in the use of a boys' locker room.

      D.      <u>The Defendant's Argument that It Treated Complaints from the Plaintiffs and the Female Student the Same is Belied by the Facts.</u>

Finally, the Plaintiffs have alleged that the Defendant investigated the Female Student's Title IX complaints against them, but did not investigate the Plaintiffs' Title IX complaint that the Female Student videotaped them in the locker room in violation of their privacy rights. *See, e.g., Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 496–99 (6th Cir. 2008) (anyone who surreptitiously videotapes students in a locker room violates "personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution."). The Defendant's own Policy 1035 states that the division must "investigate what occurred and take prompt and effective action to stop the discrimination or harassment" once it has "actual notice of sex discrimination, sexual harassment, or sexual misconduct" and that "Actual notice is considered to have been provided when a division employee has knowledge of an allegation of sex discrimination sexual harassment." Doc. 39-2 at 2.

The Defendant does not dispute that the Plaintiffs filed Title IX complaints, does not dispute that it ignored the Plaintiffs' Title IX complaints, and cannot dispute what its own Policy 8035 requires. Instead, the Defendant argues—with absolutely no support—that the Plaintiffs'

---

[1] The 2023 Model Policies also state that students shall use bathrooms that correspond to his or her sex, except to the extent required by *Grimm*. Doc. 39-4 at 16. Notably, the opinion from Attorney General Miyares, which the Defendant relies upon in its opposition brief, explicitly and correctly stated that *Grimm* did not even create "a blanket rule forbidding sex-separate facilities in all situations." Doc. 39-5 at 9.

13

Title IX complaints "did not possibly meet the elements of a violation of Title IX" and thus did not open an investigation pursuant to Policy 1035. Doc. 39 at 12.

Furthermore, not only is videotaping other students in a locker room prohibited by Defendant's Policy 8655, but doing so can also be a Class 1 Misdemeanor in Virginia (VA. CODE § 18.2-386.1) as well as an attempt to do so (VA. CODE § 18.2-27). Thus, the Defendant opted not to investigate the Female Student's deprivation of the Plaintiffs' fundamental right to privacy, her violation of the Defendant's own policy, and her potential attempted violation of VA. CODE § 18.2-386.1, while investigating and disciplining the Plaintiffs for calling the Female Student a "girl" and a "female" and questioning her right to be in a boys' locker room.

In short, the Defendant treated the Female Student more favorably than the Plaintiffs with respect to the use of the boys' locker room. It's proffered "important government interest" was to comply with *Grimm* and the Model Policies, but it is clear from their own policies and application of those policies to this case that their reasons for disparate treatment were not "substantially related" to its stated interest. The Defendant also discriminated against the Plaintiffs by conducting a full Title IX investigation into the Female Student's complaints, yet dismissed the Plaintiffs' Title IX complaints (which included potential criminal activity) and offered no justification beyond a bare conclusion that their complaints didn't meet the Title IX standards. Therefore, not only do the Plaintiffs raise grave and serious questions, but they are likely to prevail on the merits of their sex discrimination claims.

**V.      Plaintiffs Are Likely to Prevail on Their Free Speech Claims.**

The Plaintiffs' speech related to why a girl was allowed to be using a boys' locker room is clearly protected speech. "In interpreting the First Amendment, the Supreme Court has long held that students do not 'shed their constitutional rights to freedom of speech or expression at the

schoolhouse gate." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.,* 28 F.4th 529, 536 (4th Cir. 2022) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). "Student speech falls within the protection of the First Amendment unless it 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others, … or (at least as applied to on-campus speech) is 'indecent,' 'lewd,' or 'vulgar,' 'promotes illegal drug use,' or is communicated through a school-sponsored activity." *Id.* (quoting *Mahoney Area Sch. Dist. v. B.L. ex rel. Levy,* 141 S.Ct. 2038, 2045 (2021)) (cleaned up). It is inappropriate to silence peer-to-peer student speech "on the basis that it communicates controversial or upsetting ideas." *Id. See also Vlaming v. West Point Sch. Bd*, 302 Va. 504, 569 (2023) (speech related to the concept of "gender identity" is among many "controversial subjects" that are rightly perceived as "sensitive political topics" and merit special free speech protections).

The Plaintiffs' speech did not disrupt classwork, and it was not indecent, lewd, vulgar, promoting illegal drug use, or communicated through a school-sponsored activity. Knowing this, the Defendant tries to argue that the Plaintiffs' speech "sought to harm an individual" (i.e. the Female Student) and "interfere with [her] rights." Doc. 39 at 15, 18. The right interfered with, according to the Defendant, was the Female Student's right to be free from sexual harassment that "is so severe, pervasive, and objectively offensive that it denie[d] [her] the equal access to education that Title IX is designed to protect." *See Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 652 (1999). Doc. 29-3 at 20–21. And referring to a girl in a boys' locker room as a "girl" or a "female," while she is in a boys' locker room, is simply not the kind of objective, offensive sexual harassment that could reasonably support a Title IX finding of sexual harassment.

The Defendant argues that it did not require the Plaintiffs to affirm the Female Student by using pronouns and other speech, but rather that it is punishing them for referring to the Female

15

Student as "girl" and "she." The school knows it cannot "force" the plaintiffs to acquiesce to the Female Student's demands that they acknowledge her as a boy, so instead it simply punished them for not doing so. This is a clear violation of their free speech rights, and it is one of the obvious and principal reasons for their punishment: because these Plaintiffs called the Female Student a girl. This is viewpoint discrimination, and it is being enforced as pretextual sex discrimination through Title IX.

Ultimately, and as argued in the opening brief, the actual reason for the Defendant's unlawful application of Title IX to discipline the Plaintiffs was that it was trying to prohibit discrimination based on gender identity. The Defendant claims this is not the case, stating in its opposition that the Plaintiffs' argument is "flawed." Doc. 39 at 22. But, just a few pages earlier, the Defendant admitted the Plaintiffs' argument is not "flawed," but entirely accurate when it stated that the Plaintiffs "were suspended because they created a hostile environment for Complainant and discriminated against him based on his gender identity and sex." Doc. 39 at 18. This is a startling admission of a fact that is nevertheless obvious, especially since all nine justices of the Supreme Court agreed that extending Title IX to prohibit discrimination and harassment based on "gender identity" likely violated the First Amendment. *Dep't of Educ. v. Louisiana,* 603 U.S. 866 (2024).

Finally, the Defendant's own actions make clear that it knowingly applied Title IX improperly to punish the Plaintiffs. It bears repeating—the Defendant asserted that the exact same speech, when attributed to the Muslim student, "would not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, *even if proved*." Doc. 1 at ¶ 87. Thus, the Defendant's actions not only raise serious and grave constitutional questions, but the Defendant's actions and admissions make the Plaintiffs' success on the merits more likely than not.

16

**VI.     The Balance of Equities and Public Interest Inquiries Favor the Plaintiffs.**

For the reasons articulated in the Plaintiffs Memorandum in Support of Preliminary Injunction and section II of this brief, the balance of equities and public interest support the granting of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs S.W. and J.S., by and through counsel, respectfully request that this Court issue the Preliminary Injunction requested, and such other relief as this Court deems appropriate, including but not limited to, fees and costs associated herewith.

Dated: October 8, 2025                                                                  Respectfully Submitted,

  /s/ Andrew J. Block
Andrew J. Block, Esq. (VSB No. 91537)
Ian D. Prior, Esq.*
Nicholas R. Barry, Esq.*
Robert A. Crossin, Esq.*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, D.C. 20003
Telephone: (202) 836-7958
andrew.block@aflegal.org
ian.prior@aflegal.org
nicholas.barry@aflegal.org
bobby.crossin@aflegal.org

*Counsel for Plaintiffs*
* *Admitted Pro Hac Vice*

Joshua A. Hetzler, Esq. (VSB No. 89247)
Michael B. Sylvester, Esq. (VSB No. 95023)
FOUNDING FREEDOMS LAW CENTER
707 E. Franklin Street
Richmond, VA 23219
Telephone: (804) 971-5509
michael@foundingfreedomslaw.org
josh@foundingfreedomslaw.org

Ellis L. Bennett, Esq. (VSB No. 71685)
DUNLAP BENNETT & LUDWIG PLLC
211 Church Street SE
Leesburg, VA 20175
Telephone: (703) 777-7319
ebennett@dbllawyers.com

17

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2025, I filed the foregoing with the Clerk of Court using the CM/ECF system, thereby causing it to be served on all counsel who have appeared in this case, including:

Heather K. Bardot, Esq. (VSB No. 37269)
MCGAVIN, BOYCE, BARDOT, THORSEN, & KATZ, P.C.
9990 Fairfax, Boulevard, Suite 400
Fairfax, Virginia 22030
Telephone: (703) 385-1000
Facsimile: (703) 385-1555
hbardot@mbbtklaw.com

       /s/ *Andrew J. Block*
Andrew J. Block
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE, #231
Washington, D.C. 20003
(202) 836-7958
andrew.block@aflegal.org