**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| S.W., by his parents and next friends, )<br>    SETH WOLFE and AMANDA WOLFE; )<br>    )<br>and )<br>    )<br>J.S., by his parents and next friends, )<br>    JEFFERY SMITH and RENAE SMITH; )<br>    )<br>     *Plaintiffs*, )<br>    )<br>v. )<br>    )<br>LOUDOUN COUNTY SCHOOL BOARD, )<br>    )<br>     *Defendant*. )<br>    ) | **JURY TRIAL DEMANDED**<br><br><br><br>Case No. 1:25-cv-1536-LMB-WEF |

<u>**AMENDED COMPLAINT FOR DECLARATORY RELIEF,**</u>
<u>**INJUNCTIVE RELIEF, AND DAMAGES**</u>

Plaintiffs S.W., a minor by his parents and next friends, Seth Wolfe and Amanda Wolfe, and J.S., a minor by his parents and next friends, Jeffery Smith and Renae Smith, for their Amended Complaint against Loudoun County School Board—the government entity that governs the Loudoun County School System (together with the School Board, "LCPS")—state as follows:

### INTRODUCTION

1.     This civil rights action arises under the Free Speech, Equal Protection, Due Process, and Free Exercise of Religion Clauses of the U.S. and Virginia Constitutions, as well as under Title IX of the Education Amendments of 1972 ("Title IX") and Virginia's Religious Freedom Restoration Act ("VRFRA").

2. LCPS violated each of these provisions by intentionally and invidiously discriminating against Plaintiffs, who are Christian boys, after they spoke out against being required to share a locker room with a female student (the "Female Student)—who in every meaningful way appeared female—and by punishing them with what are acknowledged as improper Title IX findings and a suspension for their protected speech and religious expression.

3. In determining that the Plaintiffs violated Title IX, LCPS relied almost entirely on the testimony of the Female Student, despite finding that she made serious and false allegations in her Title IX complaint and despite having reliable evidence that she made numerous materially false statements throughout the Title IX investigation.

4. While using the boys' locker room at a public school, the Plaintiffs asked questions and shared opinions with each other when they noticed the Female Student was also inside the boys' locker room. No material disturbance or disruption ever took place. No altercations, fights, or verbal confrontations ever happened. And the Plaintiffs never spoke adversely—or in any other way—to the Female Student.

5. Thereafter, the Female Student complained to LCPS about the expressions of discomfort she heard from boys inside the locker room while she was in the boys' locker room.

6. LCPS also received an accusation that the Female Student recorded the Plaintiffs and others inside the boys' locker room, including allegations from student witnesses that the Female Student recorded a male student while using the bathroom, which violates LCPS policies.

7. When making her complaints against the Plaintiff students, the Female Student also accused a third student of the same conduct, and in fact, included additional, more severe accusations against the third student, who was a Muslim ("the Muslim Student").

8.     But LCPS dismissed its investigation against the Muslim Student, stating that even if the allegations were true, it would not constitute a Title IX violation.

9.     LCPS dismissed the Title IX complaint against the Muslim Student because of political pressure from the Muslim community and because it feared litigation related to its earlier discrimination against the student based on his Muslim faith.

10.     LCPS refused to investigate whether the Female Student violated Title IX or LCPS's corresponding Policy 8035, despite learning of missing evidence that the Female Student recorded a boy using the bathroom in the locker room.

11.     Additionally, LCPS deleted a recording of yet another boy using the bathroom whom the Female Student had recorded, thus denying the Plaintiffs the opportunity to present potentially exonerating evidence during the Title IX investigation.

12.     Despite this, LCPS continued investigating the Plaintiffs and ultimately punished S.W. and J.S. with suspensions.

13.     In doing so, LCPS engaged in marked, invidious discrimination by refusing to give the Plaintiffs the same treatment it provided to the Muslim Student and the Female Student. Instead, it punished them with baseless Title IX findings of sexual harassment and disciplined them with a ten-day out-of-school suspension.

14.     In doing this, LCPS violated the Plaintiffs' rights to free speech and free exercise of religion as protected by the Constitutions of the United States and Virginia.

15.     Furthermore, despite LCPS offering sex-segregated locker rooms as authorized by Title IX and permitted under the Fourteenth Amendment's Equal Protection Clause and Article I, Section 11 of the Virginia Constitution, LCPS permitted a female to access a male locker room, thereby denying the Plaintiffs privacy from the other sex. Furthermore, when the Plaintiffs

requested of LCPS the right to use a male locker room without the presence of the female student, LCPS denied their request and explained that pursuant to LCPS Policy 8040 and Regulation 8040, the Plaintiffs should be the ones to use a private changing area while the Female Student was permitted to continue accessing the male locker room.

16.     LCPS discriminated against the Plaintiffs on the basis of sex in violation of Title IX, the Fourteenth Amendment's Equal Protection Clause, and Article I, Section 11 of the Virginia Constitution.

17.     LCPS also violated the Plaintiffs' right to the free exercise of religion as protected by the Virginia Constitution.

18.     LCPS caused Plaintiffs great harm and significant emotional distress.

19.     LCPS Policy 8040 and Regulation 8040 facially violate Title IX, in that they authorize LCPS to allow female students to access locker rooms designated as male-only and for male students to access locker rooms designated as female-only.

20.     LCPS conspired with Loudoun for All, a Virginia limited liability company and political action committee, to retaliate against the Plaintiffs with false and defamatory statements in order to injure, oppress, threaten, and/or intimidate them and their families for exercising their rights to file a Title IX complaint against the Female Student and petition this Court for redress of grievances through this lawsuit.

21.     The Plaintiffs reserve the right to amend and add any additional claims that might come to their attention through discovery or that the facts support but are not expressly pled herein.

22.     The Court has subject-matter jurisdiction over the federal-law aspects of this matter pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a) (deprivation of a federal right).

23.     The Court has subject-matter jurisdiction over the state-law aspects of this matter pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction) because the state-law claim is sufficiently related to the federal-law claim in this action such that they form part of the same case or controversy.

24.     This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief pursuant to 28 U.S.C. §§ 2201–02; the requested injunctive relief pursuant to 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988 and VA. CODE § 57-2.02(D).

25.     Venue is proper in this Court because the acts supporting this Complaint took place in this district and because Defendant has its place of business in this district.

26.     This Amended Complaint is timely pursuant to Fed. R. Civ. P. 15(a)(1)(B) as the Defendant has not yet filed a responsive pleading in this case.

THE PARTIES

27.     S.W. is a resident of Loudoun County, Virginia. He has been a student at Stone Bridge High School ("Stone Bridge") from 2023 to the present. He was in the tenth grade during the 2024–2025 school year. In August 2025, he began the eleventh grade.

28.     J.S. was a resident of Loudoun County, Virginia, until the summer of 2025. He was a student at Stone Bridge from 2023 through the end of the 2024–2025 school year. He was in the

tenth grade during the 2024–2025 school year. In the summer of 2025, J.S. moved out of state and unenrolled from Stone Bridge and the LCPS system.

29.    Plaintiffs are Christians and hold religious beliefs directing the importance of personally maintaining basic distinctions between males and females, and hold significant religious objections to being in a state of undress in the presence of the opposite sex or with an undressed member of the opposite sex, particularly in sex-separate changing facilities.

30.    Plaintiffs were known to be Christians at Stone Bridge and frequently wore necklaces displaying a cross, signifying their Christian faith.

31.    Since 2023, S.W. has spearheaded and continues to lead a Bible club open to his high school peers, which meets at Stone Bridge. This activity has been well-known by both students and staff at Stone Bridge.

32.    Having power to sue and be sued pursuant to VA. CODE § 22.1-71, Defendant Loudoun County School Board is the public body that operates Loudoun County Public Schools.

33.    LCPS receives federal funding.

34.    LCPS controls and operates Stone Bridge High School.

## FACTS

***LCPS allows students to use locker rooms designated for the opposite sex.***

35.    Virginia Code § 22.1-23.3 requires every Virginia school board, including Loudoun County School Board, to adopt policies concerning "sex specific … school facilities," such as locker rooms, that are consistent with the current model policies provided by the Virginia Department of Education ("VDOE").

36. Over two years ago—in July 2023—VDOE released its most current model policies regarding transgender students. These policies provide that the use of Virginia public school locker rooms must be separated based on biological sex.

37. Article I, Section 11 of the Virginia Constitution prohibits "government discrimination upon the basis of [] sex," but explicitly states that "the mere separation of the sexes shall not be considered discrimination."

38. The Virginia legislature has recognized that "sex" does not mean "gender identity." Virginia Code § 2.2-3900.

39. Title IX of the Education Amendments of 1972 ("Title IX") states that "No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). (emphasis added).

40. Title IX also authorizes schools to maintain "separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33.

41. LCPS states on the "Misinformation and Disinformation" section of its website that Title IX claims are governed by "the 2020 Title IX Regulations."[1]

42. Sex, as defined by Title IX and the 2020 Regulations, means biological sex.[2]

43. Title IX contains no language prohibiting educational institutions that receive Federal financial assistance from discriminating on the basis of "gender identity."

44. At all relevant times, LCPS received Federal financial assistance.

---

[1] *Misinformation and Disinformation*, LOUDON CNTY. PUB. SCHS., https://perma.cc/N9HC-A4TB.
[2] Memorandum from Reed. D. Rubinstein, Principal Deputy Gen. Couns., U.S. Dep't of Educ., to Kimberly M. Richey, Acting Assistant Sec. of the Off. for Civil Rts., U.S. Dep't of Educ. (Jan. 8, 2021), https://perma.cc/SX46-QA73.

45. LCPS Policy 8035 incorporates Title IX and states that the "Title IX Coordinator is responsible for ensuring that once any school division employee has actual notice of sex discrimination, sexual harassment, or sexual misconduct *as defined by Title IX Regulations* and this policy, the division takes immediate and appropriate steps to investigate what occurred and takes prompt and effective action to stop the discrimination or harassment, prevent the recurrence, and remedy the effects." (emphasis added).

46. LCPS Regulation 8035 states: "In accordance with Title IX of the Education Amendments of 1972, LCPS programs and activities cannot exclude from participation, or deny benefits or subject to discrimination any student based on sex, *sexual orientation, or gender identity.*" (emphasis added).

47. LCPS Regulation 8035 misstates the requirements of Title IX by adding "gender identity," a category that is definitionally distinct and incompatible with sex.

48. LCPS Regulation 8035 states, "The Title IX Coordinator *shall* dismiss the Formal Complaint or specific allegations in the Formal Complaint if a preliminary investigation establishes that the misconduct: (a) does not constitute Title IX Sexual Harassment as defined; (b) did not occur in a LCPS educational program or activity; or (c) did not occur against a person in the United States."

49. LCPS Regulation 8035 states, "The Title IX Coordinator may dismiss a Formal Complaint or specific allegations in the Formal Complaint if at any time during the Title IX Grievance Process … the respondent is no longer enrolled or employed by LCPS."

50. LCPS Regulation 8035 states that, when "the matter involves a student complainant and a student respondent" and "[t]he Title IX Coordinator has determined, through an initial assessment that the alleged conduct, if substantiated, would constitute Sexual Discrimination or

Sexual Harassment," the Title IX Coordinator can resolve the complaint with an informal resolution.

51.     LCPS Regulation 8035 states, "Before completion and submission of the Investigative Report, the Title IX investigator shall provide each party and party's advisor an equal opportunity to inspect and review the Directly Related Evidence."

52.     LCPS Regulation 8035 states that disciplinary "sanctions are evaluated on the totality of the circumstances and on a case-by-case basis [and] can include but are not limited to:

- Parent conference
- Removal of school privileges
- Restorative practice
- No contact with the complainant
- Restricting class selection/enrollment
- Alternative placement
- After school detention
- In-school restriction
- Suspension out of school
- Long-term suspension
- Expulsion"

53.     As a recipient of federal funding, LCPS's locker room facilities are, and have always been, segregated by sex.

54.     However, LCPS provides a broad exception to sex-segregated locker rooms under Policy 8040, entitled "Rights of Transgender and Gender-Expansive Students." Specifically, that policy provides that transgender and gender-expansive students "should be allowed to use [locker rooms] that correspond to their consistently asserted gender identity," rather than strictly based on biological sex.

55.     Regulation 8040 defines "transgender" as: "A self-identifying term that describes a person whose gender identity is different from their sex assigned at birth. A transgender girl is a girl who was presumed to be male when she was born, and a transgender boy is a boy who was

presumed to be female when he was born. Note that there is a wide range of gender identities in addition to transgender male and transgender female, such as nonbinary. A transgender student is a student who consistently and sincerely asserts a gender identity different from the gender identity associated with the student's sex assigned at birth."

56.     Regulation 8040 states the following about the term "gender-expansive": "Gender-expansive/gender-diverse/gender-fluid/gender nonbinary/agender: Terms that convey a wider, more inclusive range of gender identity and/or expression than typically associated with the social construct of a binary (two discrete and opposite categories of male and female) gender system.

57.     Regulation 8040 defines "gender identity" as: "A person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary. Gender identity is an innate part of a person's identity and can be the same or different from the sex they were assigned at birth."

58.     Per Policy 8040, LCPS staff are required to accept a student's claimed transgender or gender-expansive status without any substantiating evidence.

### *In October of 2024, Plaintiffs raised concerns to LCPS about the Female Student in the boys' locker room.*

59.     In August 2024, Plaintiffs began the tenth grade at Stone Bridge.

60.     Plaintiffs both participated in physical education ("P.E.") class, and they regularly used the school's boys' locker room before and after athletic activities and P.E. class.

61.     The boys' locker room at Stone Bridge is designed for and has been used by male students—including Plaintiffs—to undress and change their clothes or to shower. The boys' locker room also has bathroom stalls and urinals.

62. During the fall months of 2024, when Plaintiffs attempted to use the boys' locker room, they routinely encountered a female student (hereafter, the "Female Student") who also accessed the boys' locker room, often while the Plaintiffs were also present.

63. At all times, the Female Student had no right to be in the boys' locker room.

64. State and federal law prohibited LCPS from allowing the Female Student to use the boys' locker room.

65. During these instances where the Female Student would use the boys' locker room, she expressed herself as a female—having the physical characteristics of a young woman. She had long hair, painted fingernails, and wore makeup.

66. During these times, the Female Student had access to a female, sex-segregated locker room that did not have boys in it.

67. In early October of 2024, S.W. had a conversation with friends in the boys' locker room in which he expressed his discomfort with the Female Student being in the locker room.

68. On October 9, 2024, S.W. was taken out of class to meet with Assistant Principal Lisa Tartaglia ("A.P. Tartaglia") and Counselor Catherine Donovan.

69. They told S.W. that "somebody alerted" them that S.W. was uncomfortable sharing a locker room with a "transgender student."

70. S.W. told them that he held religious beliefs that there are men and women and that men belong in men's locker rooms and vice versa.

71. The administrators responded that the Female Student had a right to be in the locker room and that S.W. could change his clothes elsewhere if he was uncomfortable. A.P. Tartaglia also offered S.W. mental health support.

72.     That evening, A.P. Tartaglia called S.W.'s mother and informed her that someone had filed a Title IX complaint against S.W., but that he was not in trouble and that the claim was unfounded.

73.     The Title IX complaint had been filed by the Female Student and alleged that on October 8, 2024, S.W. "screams and points" while saying "Yo, why is there a girl in the locker room?" and "Somebody get this girl out of the locker room" and that "he screams at [her] to get out."

74.     According to the Female Student, she also separately reported J.S. and a third student, K.C., because they allegedly had said in the locker room: "I'm going to need to get my own locker room, because they're letting girls in here."

75.     LCPS dismissed the Female Student's October 2024 Title IX claim because her allegations did not constitute a Title IX violation.

76.     At some point in October of 2024, J.S. informed his P.E. teacher, Hunter Manspile, that J.S. had sincerely held religious objections to sharing a locker room with the Female Student because she was a biological female. Manspile told J.S. that the Female Student could use the locker room and that J.S. should not say anything about the situation.

77.     Following their October 2024 encounters with LCPS personnel, S.W. and J.S. believed that they could not speak freely to staff about their concerns regarding the Female Student in the locker room without facing discipline.

78.     At no point after the October discussions with S.W. and J.S. did LCPS ever tell the Female Student that she should or could use an alternative changing space.

79.    There was, however, an equivalent female locker room that the Female Student could have used, and in fact, that other females in the P.E. class did use, in which no male students were present.

80.    By allowing the Female Student to continue to use the boys' locker room, LCPS denied Plaintiffs' appropriate privacy—so much so that, they would conscientiously refrain from fully undressing whenever the Female Student was present in the boys' locker room to avoid the indignity and awkwardness of being seen unclothed by the opposite sex.

81.    Additionally, Plaintiffs were aware that, at any time, the Female Student could begin to fully undress herself or use the boys' locker room shower facilities, which also made them uncomfortable.

82.    Despite this, LCPS took no action to assist with the Plaintiffs' concerns except informing S.W. that he was free to change his clothes elsewhere.

83.    After October 2024, the Plaintiffs kept their discomfort and privacy concerns to themselves for the rest of the fall 2024 school semester.

### *In March of 2025, the Female Student began making videos of students in the boys' locker room and fabricated a story that the Plaintiffs threatened to beat her up.*

84.    On February 12, 2025, the Office of Civil Rights for the United States Department of Education ("OCR") opened a civil rights investigation into LCPS to determine whether Policy 8040 and Regulation 8040 violated Title IX. This garnered significant media attention locally.

85.    Seeing these actions and reports, and believing that state and federal law prohibited LCPS from allowing the Female Student to use the boys' locker room, the Plaintiffs renewed their objections to LCPS allowing the Female Student to use the boys' locker room.

86.    On March 19, 2025, Plaintiffs were in the boys' locker room and were both preparing for P.E. class.

87.     Then, as Plaintiffs continued their preparation for P.E. class, from a distance, they saw the Female Student enter the boys' locker room.

88.     In every meaningful way, the Female Student appeared to be a female.

89.     As was the case on past occasions, having a girl in the boys' changing facility was very awkward and uncomfortable for Plaintiffs. They did not understand why she was there.

90.     Plaintiffs then began speaking among themselves and questioning why there was a girl in the boys' locker room.

91.     Neither Plaintiff spoke to the Female Student, either on March 19, March 21, March 25, or March 27, 2025, or on any other occasion in High School.

92.     As she entered the boys' locker room on March 19, 2025, the Female Student was partially concealing a cell phone that was turned on to "record."[3] Over twenty boys were in the locker room at the time.

93.     The boys' locker room is an echoey environment, and on this recording, various boys' voices could be heard from considerable distance creating a cacophonous set of chattering voices. However, some boys who were concerned about having a female student in the locker room could be heard on the Female Student's video recording.

94.     The Female Student made at least three recordings that day. The first recording ("Recording No. 1") is approximately 2 minutes and 22 seconds long and contains audio and video of several students in the locker room.

95.     The full transcript of Recording 1 provided to the Plaintiffs during LCPS's Title IX investigation reads as follows:

> "Speaker 1: I'll find out stay here.
> Speaker 2: All right.

---

[3] LCPS Policy 8655 prohibits students from recording in locker rooms.

Speaker 3: [inaudible 00:00:32]
Speaker 4: Bro
Speaker 3: [inaudible 00:00:32]
Speaker 4: [inaudible 00:00:32]
Speaker 3: [inaudible 00:00:32]
Speaker 4: [inaudible 00:00:32]
Speaker 3: [inaudible 00:00:32] Jason [inaudible 00:00:32]
Speaker 4: [inaudible 00:00:32] in here?
Speaker 3: [inaudible 00:01:34]
Speaker 4: [inaudible 00:01:35]
Speaker 3: [inaudible 00:01:45]
Speaker 4: [inaudible 00:01:47]
Speaker 3: Why is there a girl? [inaudible 00:01:21]
Speaker 4: [inaudible 00:01:21]
Speaker 3: I'll just stay with you [inaudible 00:02:02] a girl.
Speaker 4: Nah. A female, bro.
Speaker 3: [inaudible 00:02:04]
Speaker 4: Boy.
Speaker 3: Bro, [inaudible 00:02:22]
Speaker 4: What the heck? Why are you [inaudible 00:02:22]
Speaker 3: Bro [inaudible 00:02:22]
Speaker 5: [inaudible 00:02:22] is taking a video."

96. Cross-referencing Recording No. 1 with LCPS's transcript reveals that the following statements were made by various males inside the boys' locker room: "There's a girl in here?"; "Why is there a girl?"; "I'm so uncomfortable there's a girl." One male voice said to another male, "A female? Bro," and the other male responded, "get out of here."

97. The last statement, "Get out of here", was clearly said from a distance away from the Female Student, made between boys in a separate part of the locker room from where the Female Student was, made either to indicate the boys' own intention to leave the locker room to avoid any problems or as a colloquial expression of disbelief, similar to saying "You've got to be joking" or "No way, that's wild." The statement was not made in a confrontational fashion.

98. For every one of the statements documented in Recording No. 1, no male student— including Plaintiffs—spoke to the Female Student directly or had any physical contact with her. Plaintiffs remained at a distance and eventually left the locker room.

99.     In creating Recording No. 1, the Female Student deliberately attempted to provoke a negative reaction from the boys to get them into trouble.

100.     At the start of Recording No. 1, while still outside the boys' locker room in the gymnasium, the Female Student is heard saying, "I'll find out" to another student. She then entered the boys' locker room while recording.

101.     After making Recording No. 1, the Female Student then left the locker room and made another recording ("Recording No. 2"). Recording No. 2 is eleven seconds long, was taken in the hallway, and was intended to capture the identities of individuals leaving the locker room. The transcript of Recording No. 2 provided to the Plaintiffs during the Title IX investigation reads as follows:

> "Speaker 1: [inaudible 00:00:00]
> Speaker 2: I got it."

102.     In making Recording No. 2, the Female Student engaged in a premeditated act to try to provoke an adverse reaction from the boys to get them in trouble.

103.     On March 21, 2025, and as documented in LCPS Threat Assessment #37468, the Female Student reported to Stone Bridge Assistant Principal Calvin Adams ("A.P. Adams") that on March 20, 2025, J.S., S.W., and K.C. had called her "it" and "girlboy" in the locker room and that they told her that if she continued to use the boys' locker room that they were going to "beat his ass."

104.     As a result of the Female Student's report, LCPS opened Threat Assessment #37464 on March 21, 2025.

105.     At 10:40 a.m., A.P. Adams conducted a threat assessment interview of the Female Student. The Female Student said, "These guys have been harassing me the entire year. It has been non-stop bullying. It has been during every PE class. This has progressed to the hallways where

they are staying[sic] thing[sic]. They are saying they were going to beat my ass if I ever come in *there* (boys' locker room)." (emphasis added)

106.    The Female Student then changed her description of the threat to "we are going to beat your ass if I ever come in *here again*." (emphasis added).

107.    The Female Student claimed that K.C. had been bullying her for years, then S.W. started doing it in the locker room, and that J.S. was the loudest.

108.    At 11:19 a.m., before conducting a threat assessment interview of J.S., S.W., or K.C., A.P. Adams submitted a Title IX Incident Report based on "Allegations of unwanted touching or specified acts of sexual violence."

109.    The involved parties were listed as the Female Student, S.W., J.S., and K.C.

110.    A.P. Adams detailed the incident stating: "[The Female Student] reported that several students harass him for using the boys locker room. They are calling him 'it' and 'girlboy.' [The Female Student] reported that they told him if he used the boys' locker they were going to 'beat his ass.'"

111.    A.P. Adams also noted: "Student reported this has been occurring all year. This was addressed in the fall and a Title IX was submitted then. It has continued but this time involved a threat to 'beat your ass.'"

112.    Finally, in response to the question of whether the "alleged conduct impacted the [Female Student's] educational access," A.P. Adams stated: "No."

113.    At 12:00 p.m., J.S., S.W., and K.C. were brought into the administration office at Stone Bridge for threat assessment interviews.

114.    A.P. Adams conducted the threat assessment interview of J.S.

115.    During the interview, J.S. stated that he was uncomfortable with the Female Student in the locker room and that many boys are uncomfortable about it.

116.    J.S. said that he never told the Female Student that he was going to beat her up and that everyone in the locker room refrained from saying anything to her. J.S. was asked if he wanted to change in a separate space and he said no.

117.    A.P. Tartaglia conducted the threat assessment interview of S.W., who stated that he was having a conversation with his peers about how he was uncomfortable with a girl in the boys' locker room and didn't understand why it was still happening after recent directives from the federal government.

118.    S.W. stated that he had never heard anyone say anything directly to the Female Student and that he questioned why the Female Student was able to record people in the locker room. A.P. Tartaglia told S.W. that this was not going to be a big deal. S.W. was asked if he wanted to change in a separate space and he said no.

119.    After the interviews, A.P. Adams and A.P. Tartaglia called J.S.'s mother and told her J.S. was not in trouble but that it was J.S.'s responsibility to tell them if he felt uncomfortable. They also called S.W.'s parents to explain the situation and told them that S.W. was not in trouble.

120.    Assistant Principal Phuong Lue ("A.P. Lue") conducted the threat assessment interview of K.C.

121.    K.C. said that he and others had been talking about why there was a girl in the boys' locker room. He further stated that he never heard or observed anyone telling the Female Student "I'm going to beat you up."

122.    On March 21, 2025, LCPS closed out the threat assessment investigation as "Priority 4: Not a Threat." For LCPS threat assessments, "Priority 4" notates a finding of low or no risk.

123.    Separately on March 21, 2025, A.P. Adams called the parents of student G.D. and stated that Stone Bridge had "uncovered" a video of G.D. and other boys in the locker room during the course of an investigation ("Recording No. 3"). A.P. Adams said that G.D. may be called as a witness, but that the parents should not be concerned because their son was not in any trouble. When G.D.'s parents asked to see the video, A.P. Adams responded: **"Don't worry, its already been deleted."**

124.    G.D. gave the following statement to LCPS when interviewed as part of the Title IX investigation into S.W., J.S., and K.C.: "I was using the bathroom. I heard people on the other side saying, 'why is there a girl in here?' I leave the bathroom, I turn around, and she's just standing there recording me. And she walks out first, says 'I got you on video,' in a proud sort of tone. I don't know what to think of it, so I just walk out." (emphasis added).

125.    A.S. also recalled the Female Student recording him and G.D. coming out of the bathroom and that she said to them: "I've got you on video now, you fuckers! I've got this shit on video now!"

126.    Student O.B. also gave a statement to LCPS as part of the Title IX investigation in which he stated that his friend S.A. was once using the bathroom in the locker room and the Female Student took out her phone and recorded him while he was going to the bathroom. ("Recording No. 4").

127.     The Female Student noted during one of her Title IX interviews that on or about March 21, 2025, LCPS "checked her whole phone" and disciplined her by "taking her phone away for the next ten days."

128.     Also on March 21, 2025, A.P. Adams submitted a Title IX Incident Report based on the Female Student recording a video in the boys' locker room stating: "Complainant Recorded A Video In The Boys' Locker Room While He Was Trying To Capture A Student Bullying Him. The SRO Reviewed The Video As Well. There Is Not Nudity Visible In The Video. It Was Reported By Two Student[sic] So Far During TA [threat assessment] Interviews They Felt Uncomfortable About There Being A Recording." The report failed to mention the deleted video of G.D. or any other recordings on the Female Student's phone.

129.     LCPS declined to open a Title IX investigation into A.P. Adams' Title IX Incident Report related to the Female Student's recordings.

130.     On or about March 21, 2025, LCPS turned over the videos from the Female Student's phone to the Loudoun County Sheriff's Office, which launched a criminal investigation into the Female Student.[4]

### *LCPS initiates a Title IX Investigation into S.W., J.S., and K.C.*

131.     Despite LCPS closing out the threat assessment, the same day they opened it, as "not a threat", LCPS opened a Title IX investigation into whether J.S., S.W., and K.C. threatened the Female Student.

---

[4] Under VA. CODE § 18.2-386.1, it is a Class I misdemeanor to "knowingly and intentionally create any videographic or still image by any means whatsoever of any nonconsenting person if (1) that person is totally nude, clad in undergarments, or in a state of undress so as to expose the genitals, public area, buttocks or female breast in a restroom, dressing room, locker room." Pursuant to VA. CODE § 18.2-27, "Every person who attempts to commit an offense which is a misdemeanor shall be punished by the same punishment prescribed for the offense the commission of which was the object of the attempt."

132.    On March 25, 2025, J.S., S.W., and the Female Student used the boys' locker room before and after P.E. J.S. and S.W. did not say anything about the Female Student in the locker room to themselves or anyone else.

133.    P.E. ended at 4:18 p.m.

134.    At 4:46 p.m., less than thirty minutes after the end of P.E., A.P. Tartaglia submitted another Title IX Incident Report against only J.S. based on new allegations from the Female Student that J.S. had stated in the locker room at 4:16 p.m. that same day, "Bro, that's a her," and "I'm gonna get my own locker room."

135.    A.P Tartaglia stated in the report, with no accompanying details, that the Female Student's "grades are slipping." The Female Student's counselor, who provided her with academic support, made no mention of grades slipping when she was interviewed as part of the Title IX investigation.

136.    On March 27, 2025, J.S., S.W., and the Female Student used the boys' locker room before and after gym class. J.S. and S.W. did not say anything about the Female Student in the locker room to themselves or anyone else.

137.    At 4:44 p.m., less than thirty minutes after the end of P.E., A.P. Tartaglia submitted another Title IX Incident Report against only J.S. based on new allegations from the Female Student that J.S. had asked earlier that day in the locker room, "Yo, there's a girl again?" and "What happened to my private locker room?"

138.    At 5:13 p.m., the Female Student's mother filed another Title IX Incident Report (the fourth one in six days) against S.W., J.S., and K.C. The report contained the same statements that were included in the October 9, 2024, Title IX Incident Report (which was dismissed for not

alleging Title IX violations) as well as the statements alleged in the March 21, 2025, Title IX Incident Report filed by A.P. Adams.

139.    The Female Student's mother also included in the Title IX Incident Report a statement from the Female Student that S.W. was the first to start the "continuous harassment."

140.    This statement contradicted the Female Student's statement during the threat assessment interviews and later Title IX interviews that K.C. was the first to start "harassing" her.

141.    On March 25, 2025, at 1:05 p.m., Title IX coordinator Danyelle Reese ("Reese") interviewed the Female Student.

142.    On March 28, 2025, LCPS informed S.W., J.S., and K.C. that it had initiated formal investigations against each of them. At the time, LCPS stated it was investigating all three for identical accusations.

### *Plaintiffs use the Football locker room to avoid conflict.*

143.    On or about May 11, 2025, J.S.'s mother asked for an alternative changing room.

144.    The same day the school allowed J.S., to use the football locker room as an alternative to sharing the boys' locker room with a girl.

145.    The entrance to the football locker room was very close to the boys' locker room.

146.    Because the football locker room was typically locked during the school day, it required a school official to unlock it so the Plaintiffs could use it during school hours.

147.    When J.S. was allowed to begin using the football locker room (also on May 11), S.W. and approximately 15 other boys in the P.E. class also began to use the football locker room as an alternative to the boys' locker room, to avoid the awkward situation of having a girl in their locker room.

148.     One day, as the boys were waiting for a school official to unlock the football locker room, the Female Student was loitering outside of the door the boys would use to enter and exit that locker room, seemingly considering whether she would follow that group of boys into the football locker room as well.

***LCPS's Title IX Investigation was filled with inconsistencies, inaccuracies and contradictions that evince the Decision Panel's discriminatory motives against the Plaintiffs.***

149.     The Title IX investigation that LCPS conducted was severely flawed.

150.     Despite interviewing 19 students, who all independently recounted the facts substantially similarly, LCPS gave weight only to the Female Student's account, or people whose only knowledge of the facts came through her.

151.     For example, the Female Student's mother included in the Title IX Incident Report a statement from the Female Student that S.W., J.S., and K.C. "have been continuously harassing and bullying me in the boys' locker room every single PE class." It also claimed, "This is a continuous harassment that does not stop no matter how many times I go to report it to counselors."

152.     During the Title IX investigation, though, every member of LCPS staff that was interviewed—as well as the Female Student herself—stated the Female Student made no reports between October 9, 2024, and March 21, 2025.

153.     The Female Student contradicted herself and the findings of the investigation, on numerous occasions including:

154.     She alleged she had experienced "harassment, *not sexual*, just harassment in the locker room the entire year." (emphasis added).

155.     While she first stated that J.S., S.W., and K.C. would "get up in my face and threaten me" she later stated that she did not know who got in her face and later stated her back was turned and she did not even know who made the statement.

23

156. While she first alleged that the "beat your ass" comment occurred on Monday, March 17, 2025, she later stated in her report to A.P. Adams that this comment occurred on March 21, 2025.

157. She alleged that the harassment occurred throughout the entire school year, but she could not say when it started.

158. While she alleged that in P.E. class, J.S., S.W., and K.C. were all together "saying the same hateful stuff" to her such as "girl" or "female," *all three P.E. teachers* stated that they had *never seen or heard any interactions* between J.S., S.W., K.C. and the Female Student.

159. She alleged that in October, she told her counselor Ms. Fulcher that J.S., S.W., and K.C. were bullying her in the locker room but Ms. Fulcher separately stated to the Title IX investigator that the Female Student had never come to her with reports of bullying in the locker room.

160. The Female Student originally stated the last time S.W., J.S., and K.C. had said anything to her or about her was Wednesday, March 19, 2025, contradicting her other claims, from the threat assessment documents, that she told LCPS that S.W., J.S., and K.C. told her that they were going to "beat her ass" on March 21, 2025.

***The transcripts of the interviews from the Title IX investigation confirm that no reasonable person could conclude that "Sexual Harassment" occurred.***

161. On April 11, 2025, Reese interviewed the Plaintiffs' P.E. teacher Hunter Manspile ("Mr. Manspile"). Manspile stated that 25 to 30 percent of the students in P.E. used the locker rooms to change, contradicting the Female Student's claim that "nobody ever changes in the locker room." Mr. Manspile also stated that he never observed any interactions between the Plaintiffs and the Female Student and that the Plaintiffs' lockers were not in the same section as the Female Student's locker. Mr. Manspile stated that he told the Female Student that if anything ever

happened to make her uncomfortable in the locker room she should tell him, which she never did. When Mr. Manspile asked the Female Student if she needed anything after the March 19, 2025, incident in the locker room, the Female Student said "No, it's not a big deal."

162.     On April 14, 2025, Reese interviewed M.H., a student who is friends with the Female Student.[5] M.H. said that he heard S.W., J.S., and K.C. saying "Oh, there's a girl in the locker room" on March 19, 2025. He said he heard them ask around five or six times over the course of two to three weeks. M.H. did not hear any comments beyond that.

163.     M.H. told Reese that the Female Student had talked to him about the people who had said "oh, there's a girl in the locker room" on March 19, 2025. Specifically, M.H. said: "[The Female Student] was asking me if I heard the same people and asking me who were the people that were saying it, to be exact."

164.     M.H. was not asked, nor did he mention, whether the Female Student had told him someone had said to her "if you come in here again, we're going to beat your ass."

165.     On April 14, 2025, Reese interviewed O.M., a student who has been friends with the Female Student since the 7th grade.[6] O.M. did not know S.W. and could not identify him. She said that she knows of J.S. because he's in her grade but doesn't know him well. O.M. stated that once in P.E. she heard someone in a group of boys say "[t]hat's a boy-girl." O.M. thinks J.S. was in the group but could not confirm who said it. After class, when O.M. was walking with the Female Student, she thinks she heard someone in a group of boys behind her say "Oh, that's not a boy" and she thought it might be J.S. O.M. stated that the Female Student told her someone would make a comment in the boys' locker room "every once in a while." This contradicts the Female Student's allegations that the Plaintiffs harassed her "every day" in the locker room.

_____

[5] M.H. is listed as "Student Witness 1" in LCPS's Title IX investigative files.
[6] O.M. is listed as "Student Witness 2" in LCPS's Title IX investigative files.

166.     Reese asked O.M. whether the Female Student had ever told her about things that happened in the locker room, and O.M. stated: "I can't remember exactly what it is they say, bit I know [the Female Student] has just vaguely told me when he comes back from the locker room, he will be like 'Oh, [K.C.] said something again,' or whatever. I don't know. I can't remember if [the Female Student] ever really went into detail about that kind of stuff."

167.     O.M. further stated: "I know this was a problem because [the Female Student] has mentioned someone, I think it was either J.S. or K.C. that would say, 'Oh, you're in the wrong locker room, buddy,' or something. Or something along those lines. Other than that, I don't really know if I can remember for certain what somebody said."

168.     M.H. was not asked, nor did he mention, whether the Female Student had told him someone had said to her "if you come in here again, we're going to beat your ass."

169.     On April 14, 2025, Reese interview Brian Wolf ("Mr. Wolf"), who was the Plaintiffs' P.E. teacher along with Mr. Manspile. Mr. Wolf testified that the boys' locker room is very loud, and that twice he heard someone say "it's a she." He did not know who said it and he did not know if the Female Student was in the locker room at the time. Mr. Wolf said that there are about 40 boys that use the locker room before and after P.E. and that upwards of 10 boys change in the locker room. This contradicts the Female Student's claim that "nobody ever changes in the locker room."

170.     On April 30, 2025, Reese interviewed S.W.,[7] who admitted to asking in a private conversation with J.S. and his friend S.C. why there was a girl in the locker room and why LCPS allowed a girl to use the boys' locker room. He denied ever saying to the Female Student to "get out of the locker room," denied calling the Female Student a "boy-girl" or "girl-boy," and denied

---

[7] S.W. is listed as "Respondent 1" in LCPS's Title IX investigative files.

ever calling her "it." S.W. also stated that he never spoke directly to the Female Student and that K.C. hangs out with friends on the other side of the locker room and that he "doesn't ever talk to K.C." Finally, S.W. again denied ever saying to the Female Student "if you ever come in here again, we're going to beat your ass."

171.    During the interview, Reese asked S.W. whether he J.S. or S.C. had a reaction to him asking why a girl was in the locker room. S.W. stated, "I do not recall that." S.W. then said, "I really don't want to talk about anyone else." Despite the fact that S.W. had already answered Reese's question before he expressed his discomfort with speaking about others, Reese stated, "I do appreciate you being forthcoming about why you didn't want to provide that information."

172.    On May 2, 2025, Reese interviewed Erin Kozikowski ("Ms. Kozikowski"), who is the Female Student's P.E. teacher in the shared P.E. block with the Plaintiffs. Ms. Kozikowski stated that she never saw the Plaintiffs interact with the Female Student.

173.    On May 2, 2025, Reese interviewed Kristen Fulcher ("Ms. Fulcher"), who has been the Female Student's school counselor for the 2023-24 and 2024-25 school years. Ms. Fulcher stated that the Female Student never came to her with reports or concerns that students were making comments based on her gender identity or related to anything included in the Title IX allegations. Ms. Fulcher said that she primarily provided academic support to the Female Student, but she did not state that the Female Student's grades were slipping, and Reese did not ask any questions about that, despite it being included in A.P. Tartaglia's March 27, 2025, Title IX Incident Report. Ms. Fulcher also stated that the Female Student has talked to her about not wanting to go to P.E. class, but only in situations where there are outside activities. Fulcher noted that the Female Student doesn't enjoy the physical activities associated with P.E.

174. On May 2, 2025, Reese interviewed A.P. Tartaglia, who confirmed that the Female Student had not filed any complaints between October 2024 and March 2025. Reese did not ask a single question about the circumstances that prompted A.P. Tartaglia to submit Title IX Incident Reports on March 25, 2025, and March 27, 2025.

175. Reese did not interview A.P. Adams, despite him filing a Title IX Incident Report on March 21, 2025.

176. On May 5, 2025, Reese interviewed S.C.,[8] who did not recall discussing the Female Student with S.W. and J.S. and did not recall hearing any student making comments about the Female Student's gender identity.

177. On May 5, 2025, Reese interviewed the Female Student for a second time. Reese asked the Female Student questions about Recording No. 2. Reese played Recording No. 2, and the interview transcript reads: "Audio from Recording: [inaudible 00:03:13]. I got it."

178. When Reese asked the Female Student if she could recall what was going on in the video, the Female Student said: "Yeah, it cut off most of his sentence, but he was saying like "Boy, girl, boy, girl," and stuff like that."

179. Reese followed up and said: "I want to play it again because I want you to tell me … Listen to the audio that's there and tell me if at any point in this recording you hear a part of the sentence you were referring to. Okay?" Reese played Recording No. 2 again and the interview transcript again reads: "Audio from Recording: [inaudible 00:004:30]. I got it." The Female Student then said that the video "started off in the middle of the sentence."

180. Reese again followed up and said: "In the audio, on the video, and again, there's a lot of … you can hear commotion. You can tell there's students in the hallway, it may be a

---

[8] S.C. is listed as "Student Witness 3" in LCPS's Title IX investigative files.

transition period. Do you hear the words at all on this recording?" The Female Student then said: "Hear, boy, girl? Yeah, because that's what he was saying the whole time."

181. Reese followed up a final time and said: "Okay, I'm going to play it again and tell me when you hear it. Okay?" Reese played Recording No. 2 again and the interview transcript again reads: "Audio from Recording: [inaudible 00:005:26]." Reese says "then?" and the Female Student says "yeah." Reese then stated, "that would be at minute marker, 5 second."

182. When Reese played Recording No. 2 for J.S. four days later on May 9, 2025, she said of the recording: "I cannot understand any audio that's on it."

183. When discussing Recording No. 1, the Female Student explained that the first part of the video was just her walking to the locker room and that she stopped recording after "she had gotten what she needed." The Female Student alleged that it was J.S. who said, "there's a girl in here" and "I'm so uncomfortable because there's a girl." After first stating that she did not know who said, "there's a female bro, get outta here," the Female Student changed her story and said it was S.W.

184. The Female Student also stated during the interview that the Plaintiffs made comments about her gender identity "a little bit more than five times" during the 2024–25 school year. This contradicts her claim from the March 27, 2025, Title IX Incident Report that the Plaintiffs harassed her "[t]hroughout nearly the entire school year … in the boys locker room every single P.E. class."

185. The Female Student also told Reese that she stopped using the boys' locker room in March "because we can't use the gym anymore because they're renovating the gym."

186. The Female Student described to Reese the effect the alleged statements J.S., S.W., and K.C. had on her: "[I]t is annoying and sometimes it does make me feel a little bit bad, but I guess it's not something I'd dwell on too much."

187. During the interview, the Female Student changed her story about the circumstances of the alleged threat to "beat [her] ass." Whereas in her March 25, 2025, interview she claimed that S.W., J.S., and K.C. all got in her face and said, "if you come in here again, we're going to beat your ass," this time she said, despite being in her face, she didn't know who said it, that it might be S.W., but knew that it was not K.C.

188. The Female Student claimed that she knew it wasn't K.C. because "when he says stuff like that, he usually just talks it." The Female Student did not explain, and was not pressed to explain, how it was that she did not know who got in her face and threatened her.

189. Finally, the Female Student claimed that S.W. and K.C. "always stick together," but S.W. had earlier told Reese that K.C. hangs out with friends on the other side of the locker room and that S.W. "doesn't ever talk to K.C."

190. On May 7, 2025, Mr. Moy sent K.C. an amended Notice of Investigation and Allegations ("NOIA") that included an allegation from the Female Student stating that "during science class at Stone Bridge High School during the 2023-2024 school year, [K.C.] would say [to the Female Student], 'You guys are a disappointment to humanity' regarding the Female Student's gender identity. It is also alleged that [K.C.] in Science class would consistently misgender [Female Student], always calling him a girl."

191. On May 9, 2025, Reese interviewed J.S.,[9] who admitted having conversations with S.W. and S.C. in the locker room in which he asked, "Why is there a girl in here?" and "I'm

---

[9] J.S. is listed as "Respondent 2" in LCPS's Title IX investigative files.

uncomfortable." J.S. denied referring to the Female Student as "boy-girl" or "it," denied saying "Somebody get it out of here," and denied saying to or about the Female Student, "If you come in here again, we're going to beat your ass."

192.     During the interview, Reese played Recording No. 2 and stated: "I cannot understand any audio that's on it."

193.     J.S. learned for the first time during the interview that the Female Student had filed a separate Title IX Incident Report against him, alleging that he sexually harassed her on March 25, 2025.

194.     Reese did not disclose that J.S. was the subject of another Title IX Incident Report against him, accusing him of sexual harassment of the Female Student on March 27, 2025.

195.     On May 13, 2025, Reese interviewed J.B.,[10] who remembers hearing a group discussing on March 19, 2025, he "heard someone say, like why is there a girl in the locker room"? He further said "he heard something along the lines of, why is there a girl in the locker room" three or four times, that it was in the context of a conversation between different people, was not screamed or shouted, and was not directed towards anyone. J.B. did not know who was involved in that conversation and did not hear anyone say "girl, boy," "it," or "boy/girl."

196.     Reese did not ask J.B. any questions about S.W. or J.S. and their names never came up during the interview.

197.     On May 13, 2025, Reese interviewed M.J.,[11] who remembers people in the locker room asking why the Female Student was recording people, but did not hear anyone making comments about a student's gender identity and did not hear anyone using the terms "girl boy,"

---

[10] J.B. is listed as "Student Witness 5" in LCPS's Title IX investigative files.
[11] M.J. is listed as "Student Witness 6" in LCPS's Title IX investigative files.

"it," or "boy girl." M.J. further stated that his friend Y.A. had been recorded by the Female Student in the locker room. LCPS did not follow up and interview Y.A.

198.    Reese did not ask M.J. any questions about S.W. or J.S. and their names never came up during the interview.

199.    On May 13, 2025, Reese interviewed V.B.,[12] who said that he did not particularly like J.S. However, V.B. explained that J.S. and S.W. "were saying stuff, but that they were only saying like 'why is there a girl in the locker room?" V.B. told Reese that he generally heard people use the terms "girl-boy," "boy-girl," and "it," because "for boys our age, we usually, if we don't know someone's gender, we usually call them, like, they, them, or it." V.B. mentioned that he never heard those terms used in the locker room and did not say that he had ever heard J.S. or S.W. use those terms.

200.    On May 13, 2025, Reese interviewed A.K.,[13] who said he was not in the locker room on March 19, 2025, and had never heard anyone asking why there is a girl in the locker room, never heard the terms "girl-boy," "boy-girl," or "it" used in the locker room, and had never heard anyone telling anyone to get out of the locker room.

201.    Reese did not ask K.A. any questions about S.W. or J.S. and their names never came up during the interview.

202.    On May 13, 2025, Reese interviewed A.P.,[14] who said he heard some boys in the locker room talking amongst themselves about how they were uncomfortable that the Female Student was using the locker room. He recalls hearing someone ask, "why is there a girl in here?" but did not know who asked the question. A.P. said that he never heard anyone in the locker room

---

[12] V.B. is listed as "Student Witness 7" in LCPS's Title IX investigative files.
[13] A.K. is listed as "Student Witness 8" in LCPS's Title IX investigative files.
[14] A.P. is listed as "Student Witness 9" in LCPS's Title IX investigative files.

use the terms "girl-boy," "boy-girl," or "it," and he had never heard anyone tell someone to get out of the locker room.

203.   Reese did not ask A.P. any questions about S.W. or J.S. and their names never came up during the interview.

204.   On May 13, 2025, Reese interviewed D.L.,[15] who said that he has heard conversations between other boys in which the question of "why is there a girl in [the locker room]?" was asked. He does not know who was involved in those conversations but thinks he has heard such conversations around five times over the past two years. D.L. stated that he never heard anyone in the locker room use the terms "girl-boy," "boy-girl," or "it," and he has never heard anyone tell anyone to get out of the locker room.

205.   Reese did not ask D.L. any questions about S.W. or J.S. and their names never came up during the interview.

206.   On May 13, 2025, Reese interviewed K.C.[16] K.C. denied ever participating in continuous harassment of the Female Student based on gender identity and did not threaten to "beat [the Female Student's] ass." He stated that "once in a while," he heard "'Why is there a girl in here? I'm so uncomfortable. I don't want a girl seeing me change' stuff like that." K.C. did not know who made those comments but indicated that it was coming from another side of the locker room from where his locker was located.

207.   When asked whether K.C. had ever referred to the Female Student as "boy-girl, it, or girl-female," he said that the previous year he may have unknowingly misgendered in the third person, but that he never spoke to her, and she never corrected him. K.C. confirmed that he was

---

[15] D.L. is listed as "Student Witness 10" in LCPS's Title IX investigative files.
[16] K.C. was originally one of the respondents in the Female Student's Title IX complaint, but because the complaint was dismissed against K.C. on May 30, 2025, he is listed as "Student Witness 4" in LCPS's investigative files.

one of the boys captured on Recording No. 1, but that the recording did not capture any comments made by him.

208.    Reese did not ask K.C. any questions about S.W. or J.S. The only time S.W. and J.S. were mentioned was when Reese stated that they were also respondents to the Female Student's Title IX complaint.

209.    K.C. indicated that he believed that Recording No. 1 and Recording No. 2 were not the only videos that the Female Student made, and that she had also recorded his friend G.D. He further indicated that the other students in Recording No. 1 were Y.A., S.A., G.B., R.B., and V.H. LCPS did not interview Y.A., S.A., R.B., or V.H.

210.    K.C., who is Muslim, also told Reese that, "the school, they provide a prayer room for Muslims who wanted to go pray during the school day. And many times, I would ask and I was declined. So, my science teacher wouldn't let me go to the prayer room." When asked by Reese whether K.C. had ever reported this to anyone, K.C. said that he hadn't. Reese then said: "Okay. All right. That is something I will make the school administration aware of, so someone likely will follow up with you, one of the administrators to speak with you about that. Thank you for sharing that with me. I'll make the school aware."

211.    On May 15, 2025, Reese interviewed G.D.,[17] who told her that "a few times" he had heard someone in the boys' locker room saying, "why is there a girl in the locker room?" "I'm uncomfortable, and "I don't know how to feel about this." G.D. did not know who made those statements and did not believe that it was always the same person. G.D. testified that he had never heard the term "boy-girl" in the locker room.

---

[17] G.D. is listed as "Student Witness 12" in LCPS's Title IX investigative files.

212.    G.D. also stated the following during his interview: "I was using the bathroom. I heard people on the other side saying, 'Why is there a girl in here?' I leave the bathroom, I turn around, and she's just standing there recording me. *And she walks out first, says 'I got you on video,' in a proud sort of tone.* I don't know what to think of it, so I just walk out." (emphasis added).

213.    Reese did not ask G.D. any questions about S.W. or J.S. and their names never came up during the interview.

214.    On May 15, 2025, Reese interviewed G.B.,[18] whose locker is on the same side of the locker room as J.S. and S.W. G.B. stated that over a period of five P.E. classes there was a female in the boys' locker room and that there was a group of five boys discussing it during that time. He recalls hearing the question "why is there a girl in the boys locker room?" and that "in total of the five days maybe I would say twice a day. So maybe 10 times in total." He does not know who had asked the question. G.B. further stated that he had never heard phrases such as "girlboy, it, or boygirl" used in the locker room.

215.    On May 15, 2025, Reese interviewed M.W.,[19] who stated that he heard people ask, maybe once a week, "Why is there a girl in here?" and "that was pretty much it." He did not know who asked the question but said it's generally boys in a group having a conversation. M.W. did not believe that it was always the same person asking. When asked to identify the boys in the group, M.W. identified J.S. because "he's very loud," but he did not specifically indicate that J.S. had asked "Why is there a girl in here?"

216.    At first, M.W. stated he did not hear any other comments based on someone's gender or appearance. When Reese pressed him on whether he "ever heard terms like girl-boy, it,

[18] G.B. is listed as "Student Witness 11" in LCPS's Title IX investigative files.
[19] M.W. is listed as "Student Witness 13" in LCPS's Title IX investigative files.

or boy-girl," M.W. stated that "[t]hey call [the Female Student] like a girl-boy, or boy-girl, or whatever." M.W. did not indicate who "they" was, and he did not specify whether he heard that in the locker room or somewhere else. [M.W.] could not say specifically who may have used those terms. [M.W.] later said: "I am going to be completely honest. I did not remember a girl-boy or a boy-girl, but when you said it I did remember that. So I can't really place what they said."

217.    M.W. did not know if he had ever heard the statement "get out of the locker room" and he did not know whether a student had ever been surrounded, threatened, or confronted in the locker room.

218.    Reese did not ask M.W. any questions about S.W. and his name did not come up in the interview.

219.    On May 15, 2025, Reese interviewed A.S.,[20] said that, once or twice, he "probably" heard J.S. and S.W. talking "amongst themselves" about "why there is a girl in the locker room." A.S. stated that he never heard any jokes about anyone's gender identity and had not heard any terms like "girl-boy, boy-girl, or it" used in the locker room. A.S. also told Reese that he had never heard anyone to say "get out of here" to anyone else in the locker room and had not seen anyone threaten, surround, or confront any other students in the locker room.

220.    On May 15, 2025, Reese interviewed E.A.,[21] who said that he had heard someone ask if there was a girl in the locker room, but that he did not know who asked this and had not heard that question more than five times. E.A. further stated that he never heard anyone use terms like "girl-boy/it or boy girl" in the locker room or during P.E., that he never heard anyone say, "get out of this locker room," and had never seen or observed a student being surrounded, threatened, or confronted while in the locker room.

---

[20] A.S. is listed as "Student Witness 14" in LCPS's Title IX investigative files.
[21] E.A. is listed as "Student Witness 15" in LCPS's Title IX investigative files.

221. Reese did not ask E.A. any questions about S.W. or J.S. and their names never came up during the interview.

222. On May 15, 2025, Reese interviewed S.B.,[22] who told her that "when the transgender person was first into our locker room earlier in the year, a lot of people were concerned like, why is there a girl in the locker room? And it was more quiet chatter. It wasn't a whole lot of, nobody was making fun of anybody in there. It was just kind of outside talk … amongst themselves."

223. S.B. had never heard "girl boy, it, or boy girl" used in the locker room but did hear someone say, "transgender girl."

224. S.B. could not say who exactly used this term but stated that "[s]ome people have been calling her a transgender girl and it's mainly just a wide group, but you can't really pinpoint it on one specific person. It's mainly just a group of people." S.B. had only heard the term "transgender girl" used in the locker room "a couple of times" and it was just in discussion amongst themselves. S.B. said he never heard anyone say, "get out of the locker room" and never heard or seen a student be surrounded, confronted, or threatened while in the locker room.

225. Reese did not ask S.B. any questions about S.W. or J.S. and their names never came up during the interview.

226. On May 15, 2025, Reese interviewed N.S.,[23] who told her that he had heard multiple students saying, "there's a girl in our locker room." He estimated that he heard that maybe eight or nine times in total, but "not every day."

227. N.S. said that he heard people use the term "it" when referring to the Female Student but explained it as "they didn't want to assume; that's what they said." When asked if he

---

[22] S.B. is listed as "Student Witness 16" in LCPS's Title IX investigative files.
[23] N.S. is listed as "Student Witness 17" in LCPS's Title IX investigative files.

ever heard anyone say, "get out of this locker room," N.S. stated he heard the same people saying amongst themselves, "we should get out of here." N.S. never saw or heard anyone being surrounded, threatened, or confronted in the locker room.

228. Reese did not ask N.S. any questions about S.W. or J.S. and their names never came up during the interview.

229. On May 15, 2025, Reese interviewed O.T.,[24] who did not hear any terms in the locker room like "boy, girl" or "girl, boy" and he did not hear anyone ask why there was a girl in the locker room. When asked about whether he could identify the Female Student as the individual who made the complaint, O.T. stated "He looks like … Wait, what? Am I going to get in trouble because of saying what they were?"

230. Reese did not ask O.T. any questions about S.W. or J.S. and their names never came up during the interview.

231. On May 15, 2025, Reese conducted a third interview of the Female Student. During that interview, the Female Student again claimed that K.C. had said to her the following related to her gender identity: "You guys are a disappointment to humanity."

232. When asked about the alleged threat that J.S., S.W., and K.C. said to her that "if you ever come in here again, we're going to beat your ass," the Female Student once again changed her story. During this interview, she said that she "barely remembered it," but that she was either "exiting or entering the locker room." Then she said that she "remember[ed] saying stuff before that happened. So I think it was we had already entered the locker room. Then, as we were exiting, then one of them said that."

---

[24] O.T. is listed as "Student Witness 18" in LCPS's Title IX investigative files.

233.     The Female Student said that she did not actually witness J.S. or S.W. make the comment because they were "behind [her]. She also said that they were "[n]ot super far away, but not super close." She further stated, "I turned around. They were both looking at me, but I don't know who said it. I actually don't remember where [K.C.] was during that, but I know it wasn't him."

234.     The Female Student said that she believes that it was J.S. and S.W. "[b]ecause they were looking at me when I turned back around and they're the only ones who they loudly say stuff in that locker room." When asked if anyone else was looking at her when she turned around, she said, "I think a guy glanced at me. I don't know." The Female Student could not provide Reese with the name of a single witness to the alleged threat.

235.     When asked when the alleged threat in the locker room occurred, the Female Student said: "It couldn't have been more than a week before [making Recording No. 1]. I don't remember though." The Female Student claimed that she told M.H., O.M., and C.M. about the threat.

236.     The Female Student claimed that she told M.H. "once we left the locker room," but then said that M.H. "wasn't there when it happened."

237.     Both M.H. and O.M. told Reese that they discussed with the Female Student what may have been said in the locker room, but neither of them told Reese that the Female Student had told them that anyone had said to her, "if you come in here again, we're going to beat your ass."

238.     Reese did not interview C.S.

239.    On May 16, 2025, Reese interviewed O.B.,[25] who said that he had heard, maybe five times, boys in the locker room asking, "why are there girls in the locker room?" O.B. stated that he never saw anyone confront the Female Student in the locker room.

240.    When asked whether O.B. had ever heard anyone refer to the Female Student as "girl-boy," "boy-girl," or "it," O.B. said: "A lot of the time people know that she is a girl. I mean, sorry … He is a girl. I do it too by accident. When I refer to him, I say her. And a lot of people, they just don't know what to say so they say 'it.'" Reese did not ask whether J.S. or S.W. ever referred to the Female Student as "girl-boy," "boy-girl," or "it."

241.    O.B. also told Reese: "So my friend [S.A.], he was using the bathroom in the locker room and [the Female Student] took out her phone and recorded him while he was using the bathroom. I don't know if that's something that was already addressed because I don't know the consequences of what happened. But yeah, my friend told me about it and he said the video was found. I just don't know what they did with it."

242.    LCPS did not interview S.A.

243.    Reese did not ask O.B. any questions about S.W. or J.S. and their names never came up during the interview.

244.    In addition to the 19 students Reese interviewed, LCPS identified 21 other witnesses, many of whom had been recorded by the Female Student. Reese did not interview them and conducted no further interviews after May 16, 2025.

245.    On May 20, 2025, Newsweek reported that School Board Chair Melinda Mansfield said it was "untrue" that S.W., J.S., and K.C. had been subjected to the Title IX disciplinary process.

---

[25] O.B. is listed as "Student Witness 19" in LCPS's Title IX investigative files.

246.    On May 29, 2025, the Virginia Attorney General's Office emailed LCPS Division Counsel Wesley Allen to confirm whether the Female Student had taken a video of G.D., whether it was deleted, and if so, by whom and at whose direction.[26] Upon information and belief, LCPS did not respond.

***LCPS dismisses the Female Student's Title IX complaint against K.C. and send amended Notice of Investigations to S.W. and J.S.***

247.    On May 30, 2025, LCPS sent a letter to K.C. informing him that it had dismissed the Female Student's Title IX complaint against him.

248.    The letter repeated the Female Student's allegations that were contained in the March 28, 2025, NOIA sent to K.C. and the May 7, 2025, NOIA sent to K.C. and stated as follows: "Specifically, it is alleged the Respondents constantly screamed at the [Female Student] calling him a 'Boy-girl,' 'It,' and 'Girl Female.' It is alleged the Respondents repeatedly yelled out things like 'Yo somebody get this girl out of the locker room' 'Yo why is there a girl/female in the locker room?' 'Yo there's a girl-boy in here repeatedly and continuously and very loudly they will say these sorts of things, in front of all students."

249.    The dismissal letter further stated: "It is alleged on March 21, 2025, the Respondents threatened the [Female Student] by getting in their face and saying 'If you ever come in here again, we're gonna beat your ass'" and that "during science class at Stone Bridge High School during the 2023-2024 school year, [K.C.] would say [to the Female Student], 'You guys are a disappointment to humanity' regarding the [Female Student's] gender identity. It is also alleged [K.C.] in Science class would consistently misgender [Female Student], always calling him a girl."

---

[26] Nick Minock, *AG document contradicts Loudoun Co. Schools claim about locker room investigation*, WJLA (June 11, 2025), https://perma.cc/R96A-F5F4.

250.    The dismissal letter went on to read: "The U.S. Department of Education, Office for Civil Rights, which administers Title IX of the Education Amendments of 1972, requires institutions to dismiss formal complaints in some circumstances. Consistent with these requirements, this Formal Complaint must be dismissed from the Title IX grievance process for the following reasons: **the conduct alleged would not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved."**

251.    The dismissal letter went on to add that it found that "K.C. did not make loud comments about [the Female Student in the boys' PE locker room." He only laughed along with other students." Notably, LCPS decided to credit the Female Student's second story about K.C.— that he laughed along with other students—even though the only "evidence" of that was the Female Student's second version of events related to K.C.

252.    The dismissal letter also found that K.C. did not make the threat that was the impetus for the Female Student filing the Title IX complaint and that she had alleged, in the first version of her constantly changing story, that K.C. had said.

253.    Finally, the dismissal notice determined that K.C. did not say to the Female Student that "'You guys are a disappointment to humanity' regarding [the Female Student's] sex and gender identity."

254.    On the same day that LCPS informed K.C. that the statements he was alleged to have made, even if proven true, would not constitute Title IX sexual harassment, LCPS sent to S.W. and J.S. and amended NOIA stating that the exact same statements K.C. was alleged to have made would not only continue to be investigated as Title IX sexual harassment, but would also be investigated as Title IX sex-based discrimination. The letter repeated the allegations contained in

the original March 28, 2025, NOIA letters to J.S. and S.W. and in the dismissal letter sent to K.C. that indicated those allegations did not qualify as harassment under Title IX.

255.     The letters read: "Specifically, it is alleged the Respondents constantly screamed at the [Female Student] calling him a 'Boy-girl,' 'It,' and 'Girl Female.' It is alleged the Respondents repeatedly yelled out things like 'Yo somebody get this girl out of the locker room' 'Yo why is there a girl/female in the locker room?' 'Yo there's a girl-boy in here' repeatedly and continuously and very loudly they will say these sorts of things, in front of all students. It is alleged on March 21, 2025, the Respondents threatened the [Female Student] by getting in their face and saying 'If you ever come in here again, we're gonna beat your ass.'"

256.     At some point before May 30, 2025, Amir Sahib ("Sahib") reached out to LCPS School Board Member Arben Istrefi ("Istrefi"). Sahib is on the board of directors for the Adams Center, a mosque that K.C. attends. Sahib asked Istrefi why he had not been helping to protect K.C. from the poor treatment he had been receiving from LCPS because of its Title IX investigation. Istrefi replied that he could not speak about the case with Sahib, but that he was doing what he could.

257.     Istrefi is up for re-election in November of 2025, and the Muslim community in Loudoun County has been extremely vocal about its opposition to LCPS's policy that allow students to use the locker rooms that correspond with gender identity instead of sex.

*The Virginia Attorney General announces results of investigation into LCPS.*

258.     On June 2, the Virginia Attorney General published a report detailing the results of its investigation into LCPS's improper application of Title IX in the investigation of S.W., J.S., and K.C.

259. The Attorney General determined that LCPS used an unlawful, discriminatory, and retaliatory Title IX investigation to silence dissent on the application of LCPS Policy 8040 to the boys' locker room and that the Title IX investigation itself relied almost exclusively on discredited allegations and non-credible claims by the Female Student, and that LCPS had compromised its own investigation by deleting potentially exculpatory video evidence that may have helped the students prepare their defense to LCPS's Title IX charges.

260. The Attorney General also noted that "the Loudoun County School Board and Loudoun County Public Schools have a disturbing and recent history of taking adverse and potentially unlawful actions against parents, teacher, and public speakers who exercise their constitutional right to petition the government and speak on matters of public concern." The Attorney General highlighted the following as examples:

    a. "The suspension in 2021, and later court ordered reinstatement, of Leesburg Elementary teacher Tanner Cross after he objected, based on his Christian faith, to a proposed policy requiring him to address transgender students by their preferred pronouns."

    b. "The association of multiple campaign volunteers, supporters, and staff of several then-elected members of the Loudoun County School Board with the 'Loudoun Love Warriors' Facebook group, which promulgated threats of violence and reprisal against parents who spoke out at Loudoun County School Board meetings."

    c. "The firing of LCPS teacher Erin Brooks because she testified in a special grand jury that the LCPS administration failed to appropriately address instances in which she was sexually assaulted by a student in the classroom."

d. "The sworn testimony of former at-large Loudoun County School Board member Denise Corbo that there existed a 'retaliation culture' within LCPS that made teachers afraid to speak up about policies and actions they disagreed with."

e. "The alleged retaliatory firing of former Heritage High School teacher Tonya L. Smith (litigation pending)".

f. "The abrupt termination in 2024 of public comment during a school board meeting at which parents sought to lodge concerns regarding a potentially dangerous student's connection to MS-13, leading parents who were silenced to file a federal lawsuit."

g. "The recent claim by elected Loudoun County School Board chair Melinda Mansfield that it is 'untrue' that [S.W., J.S., and K.C.] have been subjected to the Title IX disciplinary process."

261. In his report, the Attorney General informed the public that he was referring the matter to the United States Department of Education Office for Civil Rights and the United States Department of Justice Civil Rights Division for further investigation.

### *DOE OCR determines that LCPS's Policy 8040 and Regulation 8040 violate Title IX*

262. On July 25, 2025, the United States Department of Education's Office of Civil Rights ("OCR") announced that it had "determined that [LCPS's] policies, which allow students to access intimate, sex segregated facilities based on the students' subjective 'gender identity,' violate Title IX of the Education Amendments of 1972." OCR offered a proposed resolution agreement to LCPS which would require it to rescind Policy 8040 and Regulation 8040, issue a memorandum to each school explaining that any future policies related to access to intimate

45

facilities must be consistent with Title IX by separating students strictly on the basis of sex and that Title IX ensures women's equal opportunity in any education program or activity, and to adopt biology-based definitions of the words "male" and "female" in all practices related to Title IX.

263.    On August 12, 2025, the School Board voted to refuse to accept OCR's proposed resolution agreement.[27]

**_LCPS issues Title IX findings against S.W. and J.S._**

264.    On June 6, 2025, Reese submitted to the Title IX Decision Makers the "Confidential Investigative Report of [S.W.] and [J.S.], Students, Stone Bridge High School," along with the Title IX Incident Reports, witness interviews, the LCPS Threat Assessment, Recording Nos. 1 and 2, transcripts of Recording Nos. 1 and 2, NOIA letters to S.W. and J.S., and the dismissal letter sent to K.C.

265.    On July 10, 2025, J.S.'s parents informed LCPS that he was permanently unenrolling from LCPS and asked that, pursuant to LCPS Regulation 8035, LCPS dismiss the Title IX complaint against him. LCPS refused.

266.    On August 15, 2025, just three days after refusing to come into compliance with Title IX, LCPS issued a decision against both Plaintiffs. LCPS concluded that both Plaintiffs violated LCPS Policy 8035 through impermissible sexual harassment and sex-based discrimination as defined by Title IX because of the Plaintiffs' statements made in the Stone Bridge boys' locker room.

267.    In its formal findings, the Title IX Decision Makers falsely stated that the Female Student had filed Title IX Incident Reports against S.W. on March 25, 2025, and March 27, 2025.

---

[27] As a result of LCPS's unwillingness to comply with Title IX, on August 19, 2025, the United States Department of Education placed LCPS on "high risk" status and transitioned it to a reimbursement-only payment structure.

268.    In their findings, Title IX Decision Makers gave significant weight to the value of Recordings No. 1 and 2, while omitting any mention of deleted Recording No. 3 and missing Recording No. 4. Specifically, Title IX Decision Makers state that Recordings No. 1 and 2 "have a powerfully positive effect on the [Female Student's] credibility. At the same time, the recordings manifest an equally powerful negative impact on the [Plaintiffs'] credibility."

269.    The findings misrepresent the content of Recordings No. 1 and 2.

270.    The Title IX Decision Makers accepted the Female Student's claim that, in Recording No. 1, J.S. made all the comments from 1:30 to 2:00 and that S.W. made the comment "that's a female bro get out of here." This contradicts LCPS's own transcript of Recording No. 1, which indicates that the audio from 1:30 to 2:00 was a conversation between two speakers who each made multiple statements. It also contradicts LCPS's transcript, which indicates that the speaker who said, "a female bro" was not the same speaker as "get out of here."

271.    The Title IX Decision Makers did not include in their description of Recording No. 1 the statements that were made by other students who had been recorded by the Female Student.

272.    Also in its findings, the Title IX Decision Makers said that in Recording No. 2, "[a] speaker can be heard saying "girl boy" three times between the start of the video and the 0:05 timestamp. The speaker then yells the same phrase twice at the 0:06 timestamp and the 0:08 timestamp. The Complainant turned the camera to show the speaker immediately before the 0:08 timestamp, and the video appears to show J.S. yelling the phrase in the hallway."

273.    The Title IX Decision Makers findings are a misrepresentation of Recording No. 2. Not only do the Title IX Decision Makers omit that the Female Student's voice can be heard saying "I got it" while laughing, which is relevant to whether her educational experience was actually affected, but LCPS's own transcript describes all but the Female Student's comment as

"inaudible." In fact, the Female Student even admitted in her May 5, 2025, interview that the video "cut off most of his sentence" and that "it started in the middle of the sentence."

274.     The Title IX Decision Makers also ignored in its findings the fact that its own Title IX investigator said about Recording No. 2: "I cannot understand any audio that's on it."

275.     Ultimately, the Title IX Decision Makers addressed five alleged statements in its Title IX findings: (1) "If you ever come in here again, we're gonna beat your ass"; (2) "Boy/Girl" or "Girl/Boy"; (3) "Get out"; (4) "It"; and (5) "There's a girl in the locker room" or "Why is there a girl in the locker room" or "girl."

276.     The Title IX Decision Makers ultimately found that "there is no corroborative evidence" that the Plaintiffs said to the Female Student, "if you ever come in here again, we're gonna beat your ass."

277.     While the Title IX Decision Makers touches on the Female Student's changing story with respect to her claim that the Plaintiffs threatened her, it leaves out that LCPS determined that the threat did not happen before it even launched a Title IX investigation, that the Female Student significantly changed her story during each of three interviews, changed the date of the alleged threat three times, and misrepresented to Reese that she told O.M. and M.H. about the alleged threat after it happened.

278.     The Title IX Decision Makers also did not note in its findings that LCPS dismissed the complaint against K.C. after it determined that he did not say the things to the Female Student that she alleged, nor did they note that the Female Student's allegations concerning K.C. and the threat were so at odds with each other, that one of them must be a false charge.

279.     The Title IX Decision Makers also left out the fact that the Female Student falsely claimed to have reported the alleged harassment to her school counselor, that "nobody ever

changes in the locker room," and that M.H. testified that the Female Student did not actually know who had made comments in the locker room.

280.    On the Title IX Incident Report that the Female Student filed was the following language: "False Statements Prohibited: Students of School Board employees who knowingly make false charges of harassment or discrimination are subject to disciplinary action."

281.    Despite its acknowledgment of the seriousness of making false charges of harassment or discrimination, LCPS has not disciplined the Female Student for her false charges against K.C. and the charges that the Plaintiffs threatened her, which LCPS determined to be false. Instead, the Title IX Decision Makers claimed that the "[Female Student's] testimony is generally credible" and that her "comparative credibility is high" on the balance of the evidentiary record.

282.    The Title IX Decision Makers then applied the Female Student's "credibility" to corroborate her own charges against the Plaintiffs for the rest of the statements, while misrepresenting the statements of the witnesses whose testimony LCPS cites.

283.    The Title IX Decision Makers rely on "three pieces of evidence [to] corroborate the likelihood that the statements 'boy/girl' and/or 'girl/boy' were made in the locker room." First, they rely on M.W.'s recollection of hearing statements like "boy/girl" and "girl/boy" in the locker room. The Title IX Decision Makers omit that M.W. stated: "I am going to be completely honest. I did not remember a girl-boy or a boy-girl, but when you said it I did remember that. So I can't really place what they said." M.W. also did not identify J.S. as having said "boy/girl" and "girl/boy" in the locker room and S.W. did not come up at all during M.W.'s interview.

284.    Second, the Title IX Decision Makers claim that J.S. repeatedly said "boy/girl" on Recording No. 2. Notwithstanding the fact that LCPS's transcript and Title IX investigator made clear that Recording No. 2 was inaudible outside of the Female Student's comment, the Title IX

Decision Makers stated in the Title IX finding that the phrase that was repeated in Recording No. 2 was "girl/boy," not "boy/girl."

285.     Third, the Title IX Decision Makers rely on O.M. stating that the phrase "boy/girl" had been used once in P.E. and once in the school hallway, but LCPS does not claim that O.M. stated that J.S. or S.W. (who O.M. said she didn't know and couldn't identify) were the ones who said "boy/girl."

286.     Ultimately, the Title IX Decision Makers determined that there was a "preponderance of evidence show[ing] that the phrase "boy/girl" and/or "girl/boy" was made in the locker room.

287.     The Title IX Decision Makers also addressed in its Title IX findings that the Female Student alleged that the Plaintiffs would "tell her to get out." They noted that Recording No. 1 contains the words, "get out of here," and it referenced a single witness, N.S. who, according to the Title IX Decision Makers, "believes that he possibly heard 'get out' in the locker room, though he could not fully recall whether he heard it himself or whether it was repeated to him by someone telling him about it." They leave out of their Title IX findings that what N.S. said was: "But they were saying it to themselves. They were saying, 'We should get out of here.'"

288.     The Title IX Decision Makers relied on the Female Student's "superior credibility" and "the [Title IX] Decision-Makers [found] it credible that [the Female Student] heard the statement 'get out' or some variation of that statement in the locker room multiple times."

289.     The Title IX Decision Makers also found that "[t]he preponderance of the evidence is sufficient to conclude that the [Plaintiffs] made several statements about the [Female Student] in the locker room that referred to the [Female Student] as 'it' or "an 'it.'"

290.    The Title IX Decision Makers cite three reasons for their findings. The first reason was the "aggregated statements from several credible witnesses" which included O.B., N.S., and V.B.

291.    The Title IX Decision Makers state that O.B. "heard 'it' approximately five times in the locker room and the hallway from the beginning of the school year until May."

292.    This misrepresents what O.B. said in his interview.

293.    O.B. said he heard people asking "Why are there girls in the locker room?" five times and attributed that to three unidentified speakers. The only thing that O.B. said about people referring to the Female Student as "it" was as follows: "A lot of the time people know that she is a girl. I mean, sorry … He is a girl. I do it too by accident. When I refer to him, I say her. And a lot of people, they just don't know what to say so they say 'it.'"

294.    While the Title IX Decision Makers appear to accurately represent N.S.'s statements, N.S. also said that he heard people use the term "it" when referring to the Female Student but explained it as "they didn't want to assume; that's what they said."

295.    At no point in his interview does N.S suggest that J.S. and/or S.W. referred to the Female Student as "it" or "an it." In fact, neither J.S. nor S.W. come up at all during N.S.'s interview.

296.    The Title IX Decision Makers also claim in their findings that V.B., "whose friendship with the [Plaintiffs] was acknowledged by the witness," said the term "it" was used in reference to the Female Student by multiple students, including the Plaintiffs. Again, the Title IX Decision Makers are misrepresenting the content of a student interview. V.B. did not acknowledge friendship with S.W., and he said that J.S. is "annoying." Further, V.B. stated in his interview that J.S. and S.W. "were saying stuff, but that they were only saying like 'why is there a girl in the

locker room?" V.B. told Reese that he had generally heard people using the terms "girl-boy," "boy-girl," and "it," because "for boys our age, we usually, if we don't know someone's gender, we usually call them, like, they, them, or it." V.B. said that he never heard those terms used in the locker room and he did not indicate that he had ever heard J.S. or S.W. use those terms.

297.    The second reason why the Title IX Decision Makers determined that S.W. and J.S. had referred to the Female Student as "it" or "an it" was because Mr. Wolf heard an unidentified speaker say "it" or "it's a she" in the locker room.

298.    The third reason why the Title IX Decision Makers determined that S.W. and J.S. had referred to the Female Student as "it" or "an it" was because of "[the Female Student's] superior credibility, as previously outlined."

299.    Other than the Female Student herself, no witnesses told LCPS that S.W. and J.S. had referred to the Female Student as "it" or "an it."

300.    Finally, the Title IX Decision Makers noted that "there's a girl in the locker room," "why is there a girl in the locker room," and "girl," consisted of a statement, a question, and a single word. However, the Title IX Decision Makers said that "for the purposes of analysis and in the context of the allegations, each formulation was alleged to have conveyed the same message – questioning whether the [Female Student] should be using the boys' locker room."

301.    The Title IX Decision Makers determined that the Plaintiffs repeatedly question whether the Female Student should be using the boys' locker room.

302.    Ultimately, despite no evidence or credible testimony to support their findings, the Title IX Decision Makers determined that S.W. was the speaker of "statements that included terms 'it,' 'boy/girl,' or 'girl/boy' and 'get out of here.'"

303. Additionally, and despite no evidence or credible testimony to support their findings, the Title IX Decision Makers determined that J.S. was the speaker of "statements that included terms 'it,' 'boy/girl,' or 'girl/boy' and 'get out of here.'"

304. LCPS admitted in its dismissal letter to K.C. that statements that included the terms "it," "boy/girl," "girl/boy," "get out of here," "get out of here," "there's a girl in the locker room," "why is there a girl in the locker room," and "girl," do not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved.

305. In its analysis of whether the Plaintiffs' statements denied the Female Student "equal access to the LCPS education program or activity," the Title IX Decision Makers falsely stated that the Female Student "stopped using the locker room," without disclosing that she stated in her interview that she wasn't using the locker room because it was closed for renovations.

306. The Title IX Decision Makers also excused the Female Student for recording in the boys' locker room because "the harassment was not ending," but did not note her laughing on Recording No. 2 as she said, "I got it," nor did they note that she recorded other boys in the locker room, including one while he was using the bathroom.

307. In further finding that the Female Student had been denied "equal access to the LCPS education program or activity," the Title IX Decision Makers cited to the March 27, 2025, Title IX Incident Report against J.S. in which A.P. Tartaglia has noted: "Students grades are slipping." They did not cite any further evidence from the Title IX investigation to support that claim and did not note that the Female Student's school counselor, who provided academic support, did not mention the Female Student's grades slipping and was not asked about it.

308.    The Title IX Decision Makers also ignored the March 21, 2025, Title IX Incident Report, in which it indicated that the Female Student's access to educational opportunities had not been impacted, and they also ignored her statements that she had not been "sexually harassed."

309.    Also on August 15, 2025, LCPS issued letters to the Plaintiffs outlining the discipline LCPS had chosen considering the "information provided in the Title IX Decision Maker's grievance process outcome letter."

310.    First, LCPS directed that S.W. have no classes with the Female Student and permanently have no contact with the Female Student while on LCPS property. This requirement was not directed toward J.S. because he is no longer enrolled in the LCPS system.

311.    Second, without any details, LCPS directed that Plaintiffs must be subjected to a "Comprehensive Student Support Plan" intended to change Plaintiffs' behavior."

312.    Third, and most significantly, LCPS directed that both Plaintiffs be subjected to a period of suspension lasting ten school days, equal to two weeks of class time. J.S.'s suspension was made contingent upon his return to LCPS as a student.

313.    After Plaintiffs appealed this decision, on September 10, 2025, LCPS affirmed its decision that Plaintiffs violated LCPS Policy 8035.

314.    On September 10, 2025, LCPS made a final decision upholding its decision to suspend the Plaintiffs from school for ten days.

315.    A ten-day suspension from eleventh-grade school attendance, especially one that runs from the early portions thereof, can have significant, detrimental effects on student growth and achievement.

316.     Eleventh grade is commonly considered to be the hardest and most rigorous year of high school, and it is a critical period for academic achievement used by colleges to determine eligibility for acceptance and scholarships.

317.     A student who misses the early portions of eleventh-grade instruction, at a time when more core concepts are being taught and developed, places students at a marked disadvantage by setting them back significantly since they will perpetually be playing catch-up from missing key, foundational instruction.

318.     Likewise, the early portions of a school year are a critical time for students because it is at that time when they are forming their friend and support groups in their new classes, connections which help them through their scholastic experience.

319.     LCPS' actions against Plaintiffs have caused them great harm, irreparable injury, and significant emotional distress.

320.     LCPS continues to permit the Female Student to use the male locker room.

***LCPS conspires with a political action committee to retaliate against the Plaintiffs and their parents for filing this action.***

321.     On September 15, 2025, the Plaintiffs, by their parents and next friends, filed this lawsuit.

322.     LCPS refused to hold S.W.'s suspension in abeyance to allow the Court to decide on the Plaintiffs motion for a temporary restraining order.

323.     S.W. was not permitted to go to school on September 16, 2025.

324.     On September 16, 2025, the Court entered a temporary restraining order to allow S.W. to attend school.

325.     On September 16, 2025, the United States Department of Education's Office for Civil Rights ("OCR") found that LCPS violated Title IX by discriminating against the Plaintiffs

on the basis of sex.[28] Specifically, OCR determined that LCPS "failed to meaningfully investigate complaints of sexual harassment by two male students concerning the presence of a member of the opposite sex in male-only intimate spaces yet thoroughly investigated the female student's sexual harassment complaint about the boys."

326.     OCR indicated that LCPS would lose federal funding if they did not, within ten days, do the following: rescind the suspensions imposed on the Plaintiffs, review its findings against the Plaintiffs to determine if discipline was warranted, apologize for its failure to investigate the Plaintiffs' Title IX complaint against the Female Student, investigate the Plaintiffs' Title IX complaint against the Female Student, and provide training to all LCPS staff that receives or responds to reports of sexual harassment under Title IX.

327.     LCPS has not complied with OCR's demands.

328.     On October 10, 2025, the Court entered a preliminary injunction that prohibited LCPS from suspending the Plaintiffs or making the Title IX findings part of their student record during the pendency of the litigation.

329.     On or about October 14, 2025, LCPS conspired with Loudoun for All to injure, oppress, threaten, and/or intimidate the Plaintiffs in the free exercise and/or enjoyment of their rights, including their rights to petition the government for redress of grievances by filing a Title IX complaint and filing a lawsuit in this Court.[29]

330.     Loudoun for All is a limited liability company and political action committee organized under the laws of the Commonwealth of Virginia. It raises and spends money for attack

---

[28] Press Release, U.S. Dep't of Educ., U.S. Department of Education Concludes Loudoun County Public Schools Violated Title IX and Retaliated Against Male Students Amid Sexual Harassment Claims (Sept. 16, 2025), https://perma.cc/QLQ6-6WPB.

[29] Under 18 U.S.C. § 241, it is a felony for "two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same."

advertisements against school board candidates and members who disagree with the policies and decisions of LCPS's Superintendent Aaron Spence and the school board chair, Melinda Mansfield.

331.    Loudoun for All has a history of working with the Loudoun County School Board to serve as the LCPS's "public relations" catspaw to attack community members that criticize LCPS's decisions and policies.

332.    Loudoun for All's board members, officers, and volunteers had previously been active participants in an activist organization that discussed retribution for community members who opposed LCPS's locker room policy, including discussion of threats involving violent retaliation against those community members.

333.    Specifically, on or about October 14, 2025, LCPS collaborated with Loudoun for All to draft a press release and timeline for the purposes of slandering the Plaintiffs and their parents in retaliation for their efforts to vindicate their rights through the filing of the allegations in this lawsuit.

334.    On October 15, 2025, Loudoun for All issued a press release (the "press release") in which they accused the Plaintiffs' parents of having "orchestrated a coordinated campaign of disinformation, knowingly misrepresenting facts to fuel political outrage." The press release further indicated that the Plaintiff filed pleadings in this Court "that they knew [were] false." The press release also misrepresented that "24 staff and student witnesses" corroborated that they had been engaged in "relentless harassment over the course of a year."

335.    The press release also celebrated the Court's requirement that the Plaintiffs' families post a $125,000 bond, stating that the Court's order served to "undercut[] the narrative being circulated by their parents," and to set forth the truth that the Plaintiffs' parents are "defending harassment," "manipulat[ing] the story," trying to "inflame voters ahead of an

election," and are "us[ing] LCPS students, educators, and families as political pawns in a cynical effort to stoke fear and division."

336.    The press release was sent to the media and posted on Loudoun for All's website, Facebook page, Reddit account, and Bluesky account.

337.    Loudoun for All's release links to its "Updated Timeline of Events: Locker Room Incident & Title IX Investigation" ("the timeline"). The timeline repeats a number of false and defamatory allegations against the Plaintiffs and their parents including, but not limited to, false claims that 24 witnesses corroborated that the Plaintiffs said to the Female Student "girl," "it," "girl-boy," and "get out," in the boys' locker room.

338.    The timeline also includes detailed discussions of previously non-public information that was exempt from the Virginia Freedom of Information Act on the grounds of LCPS's attorney-client privileged communication.

339.    For example, the timeline included details of a May 29, 2025, voicemail that LCPS Division Counsel Wes Allen ("Allen") left for Virginia Deputy Attorney General Theo Stamos regarding this case. The details of that email were specific and exact and had been communicated to the LCPS School Board via an email from Allen to the school board on or about June 4, 2025.

340.    The timeline also included the particulars of an email sent by LCPS Superintendent Aaron Spence to the Virginia Attorney General on June 9, 2025, which had been shared with the school board in a privileged attorney-client email from Allen and is not subject to the Virginia Freedom of Information Act.

341.    On October 15, 2025, the Ashburn Patch news site posted a story titled, "Locker Room Lawsuit Against LCPS Involves Misinformation, Loudoun4All Says." Relying on the information in the press release and timeline, the story stated that "the families suing Loudoun

County Public Schools over a locker room Title IX investigation at Ashburn's Stone Bridge High School knowingly provided misinformation about an interaction with a transgender student." The story also included the following: "Loudoun4All says the male students and their families, attorneys and some media knowingly misrepresented that the students were disciplined solely for "expressing discomfort" about a transgender student in the boys' locker room." Finally, the story included a quote from Loudoun for All that, "[t]his deceit has real victims. It has re-traumatized the targeted student, endangered LGBTQ+ youth across the county, and forced LCPS and taxpayers to shoulder the cost of defending against a narrative built on lies," Loudoun4All said in a statement." It has once again used LCPS students, educators, and families as political pawns in a cynical effort to stoke fear and division."

342.    While J.S. and his family have moved to a different state, S.W. and his family still live in Ashburn, S.W. and his minor siblings attend school in Ashburn, and S.W.'s father operates a business in Ashburn.

343.    The false and defamatory release and timeline publicized by Loudoun for All and composed with the assistance of the LCPS school board has cause significant distress to the Plaintiffs and their families, who fear retribution and retaliation from members of Loudoun for All and other allies of the school board who have a documented history of such behavior towards community members who challenge the decisions and policies of the LCPS school board and superintendent.

**COUNT I**
**First Amendment: Freedom of Speech**
**(42 U.S.C. § 1983)**

344.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

345. By expressing distress, discomfort, and disagreement with LCPS allowing the Female Student to be in the boys' locker room, Plaintiffs spoke on a matter of significant public concern.

346. Likewise, by expressing distress, discomfort, and disagreement with LCPS allowing the Female Student to be in the boys' locker room, Plaintiffs directly engaged in protected expression by stating viewpoints directly informed by their sincerely held religious and philosophical beliefs.

347. The issue relating to transgender school policies is a topic often discussed in news media, in school board meetings around the Commonwealth, by state and federal executive officials, and by religious ministers around the nation.

348. The Supreme Court has held that school children do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). And that speech on issues such as "sexual orientation and gender identity" are matters of "profound value and concern to the public" occupying "the highest rung of the hierarchy of First Amendment values" and meriting "special protection." *Janus v. Am. Fed'n of State Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018).

349. Plaintiffs have significant moral, religious, and science-based objections to the concept of gender identity, as well as being in a state of undress in the presence of the opposite sex or with someone of the opposite sex who is in a state of undress, particularly in sex-separate changing facilities.

350. Likewise, Plaintiffs held significant privacy concerns, motivated by their faith and their dignity, about a girl entering the boys' changing facility.

351.     When the Female Student used the boys' locker room, Plaintiffs felt very uncomfortable and would conscientiously refrain from fully undressing whenever a female student was present in the boys' locker room to avoid the indignity and awkwardness of being seen unclothed by the opposite sex.

352.     For any occasion when Plaintiffs expressed distress, discomfort, and disagreement with the Female Student using the boys' locker room, they never materially and substantially interfered with the school environment and never impinged upon the rights of any other student, including the Female Student.

353.     Throughout the 2024–2025 school year, Plaintiffs never spoke directly to the Female Student or made any physical contact with her. They created no material disturbance or altercation.

354.     By expressing this distress, discomfort, and disagreement in the boys' locker room, Plaintiffs only spoke among themselves. They never harassed, spoke derisively to, accosted, or confronted the Female Student, nor did they prevent the Female Student from using the boys' locker room.

355.     Indeed, LCPS acknowledged that most of the statements made in the locker room, attributed to Plaintiffs, "were made more passively" and "not [] in a directly confrontational manner," and that none of those "statements amounted to a true threat."

356.     When Plaintiffs expressed this distress, discomfort, and disagreement in the boys' locker room on March 21, 2025, and on other occasions when this occurred, no teacher or other LCPS staff member was present. The students were not involved in instructional or curricular activities during these discussions.

357. State and federal law prohibited LCPS from allowing the Female Student to access the boys' locker room, but LCPS persistently defied these laws through its Policy 8040.

358. LCPS's decisions to censor and then punish Plaintiffs' statements expressing distress, discomfort, and disagreement with LCPS permitting the Female Student to use the boys' locker room are neither justified by a compelling state interest nor accomplished through the least restrictive means.

359. If Plaintiffs had not expressed distress, discomfort, and disagreement with the Female Student using the boys' locker room, and if they instead sincerely celebrated her presence in the locker room, LCPS would not have censored or punished Plaintiffs' speech.

360. The level of punishment that LCPS imposed on Plaintiffs was severe and drastically disproportionate to the conduct at issue.

361. The Title IX Decision Makers' factual findings and resultant discipline were not supported by evidence or credible testimony.

362. LCPS has admitted that the allegations made by the Female Student in her Title IX complaints do not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved.

363. By censoring Plaintiffs' speech, punishing Plaintiffs for their speech, and imposing a severe punishment against Plaintiffs' speech, LCPS committed impermissible viewpoint discrimination, censorship of speech, and retaliation against speech in violation of the Free Speech Clause of the First Amendment of the U.S. Constitution.

## COUNT II
### Virginia Constitution: Freedom of Speech
#### (VA. CONST. art. I § 12)

364. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

365. Virginia Constitution Article I § 12 provides robust protections for freedom of speech, stating it is "among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak … his sentiments on all subjects … [and] that the General Assembly shall not pass any law abridging the freedom of speech."

366. By censoring Plaintiffs' speech, punishing Plaintiffs for their speech, and imposing a severe punishment against Plaintiffs' speech, LCPS committed impermissible viewpoint discrimination, censorship of speech, and retaliation against speech in violation of Article I § 12 of the Virginia Constitution.

## COUNT III
### Fourteenth Amendment: Intentional Religious Discrimination
### (42 U.S.C. § 1983)

367. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

368. The Female Students' accusations against Plaintiffs and the Muslim Student were identical, except that she included additional accusations against the Muslim Student, plainly presenting him in the worst light compared to Plaintiffs.

369. Plaintiffs and the Muslim Student were in every way similarly situated, except for the distinction between the Muslim Student and the Christian Plaintiffs' different faiths and the fact that the Muslim Student faced additional accusations beyond those made against Plaintiffs.

370. Despite this similarity, on May 30, 2025, LCPS concluded that it "must" dismiss the accusations against the Muslim Student that were the exact same as those against the Plaintiffs because, "*even if proved*" the accusations would not violate the rules LCPS considered. But then, that same day, LCPS evaluated the identical (and somewhat better) allegations against the Plaintiffs, who are Christians, and found these allegations had merit. This denied Plaintiffs, Christians, the same benefits that LCPS conferred on the Muslim Student.

371. While consciously having full view of the Female Student's accusations against Plaintiffs and the Muslim Student and reviewing these accusations in the same collection of disciplinary cases, LCPS determined it simply would not further investigate the Muslim Student's actions while simultaneously determining that it would continue to investigate whether to punish Plaintiffs and indeed expanding the charges against Plaintiffs.

372. LCPS's discriminatory, selective enforcement of its rules only against Plaintiffs— and not the Muslim Student—was the product of intentional, invidious discrimination against Plaintiffs' religion.

373. LCPS's discriminatory, selective enforcement of its rules only against Plaintiffs— and not the Muslim Student—was motivated by political pressure from the Muslim community, which opposed LCPS's locker room policy and the improper application of Title IX to gender identity.

374. LCPS's discriminatory, selective enforcement of its rules only against Plaintiffs— and not the Muslim Student—was also motivated by its awareness of exposure to the Muslim student's viable claim that he had been discriminated against because of his Muslim faith in the 2023-23 school year.

375. Additionally, despite the fact that the Female Student created privacy concerns of enormous proportion by video-recording boys within the boys' locker room—thus violating LCPS Policy 8655, when the Plaintiffs filed complaints against the Female Student for this disturbing action, LCPS specifically refused to investigate whether her actions violated Title IX or LCPS Policy 8035.

376. The Female Student has not identified herself as holding Christian beliefs.

377. Plaintiffs are well known to Stone Bridge as being Christians, and one way that LCPS was able to identify which students took which course of action related to the Female Student's accusations was based on the cross necklaces both Plaintiffs were known for wearing.

378. Despite the accusations against Plaintiffs, the Muslim Student, and the Female Student all being related and considered by LCPS in the same context, the only students that LCPS targeted were the Plaintiffs, who were known as Christians.

379. The Fourteenth Amendment's Equal Protection Clause prohibits the government from intentionally treating similarly situated people differently based on a protected characteristic, including religion.

380. No justifiable basis exists for LCPS's decision to pursue Plaintiffs for punishment while refusing to even finish investigating the Muslim Student or to investigate the Female Student for alleged violations of Title IX or LCPS 8035.

381. Through LCPS's intentional, discriminatory choice to pursue Plaintiffs for punishment while refusing to even finish investigating the Muslim Student or to investigate the Female Student for alleged violations of Title IX or LCPS 8035, it violated the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution through illegal, selective enforcement based on religion.

## COUNT IV
### Virginia Constitution: Religious Discrimination
#### (VA. CONST. art. I § 11)

382. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

383. Virginia Constitution Article I § 11 provides "that the right to be free from any governmental discrimination upon the basis of religious conviction, race, color, sex, or national

origin shall not be abridged, except that the mere separation of the sexes shall not be considered discrimination."

384.     Through LCPS' intentional, discriminatory choice to pursue Plaintiffs for punishment while refusing to even finish investigating the Muslim Student or to investigate the Female Student at all for alleged violations of Title IX or LCPS 8035, it intentionally discriminated against Plaintiffs based on religion in violation of Article I § 11 of the Virginia Constitution.

**COUNT V**
**Virginia Religious Freedom Restoration Act**
**(VA. CODE § 57-2.02)**

385.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

386.     Virginia's Religious Freedom Restoration Act prohibits Virginia government from inhibiting or curtailing religiously motivated expression unless it demonstrates, by clear and convincing evidence, that its application of the burden to the person is "essential to further a compelling governmental interest" and "the least restrictive means of furthering that compelling governmental interest." VA. CODE § 57-2.02.

387.     Plaintiffs have significant religious objections to being in a state of undress in the presence of the opposite sex, particularly in sex-separate changing facilities. When the Female Student used the boys' locker room, Plaintiffs felt very uncomfortable and conflicted with their religious upbringing. Accordingly, they would conscientiously refrain from fully undressing whenever a female student was present in the boys' locker room to avoid the indignity and awkwardness of being seen unclothed by the opposite sex.

388.     By expressing this distress and discomfort in the boys' locker room, Plaintiffs only spoke among themselves. They never harassed, spoke derisively to, accosted, or confronted the Female Student, nor did they prevent the Female Student from using the boys' locker room.

389.     By expressing this distress and discomfort in the boys' locker room, Plaintiffs were presenting protected religious expression in opposition to the undignified position they had been placed in.

390.     When Plaintiffs expressed this distress, discomfort, and disagreement in the boys' locker room on March 21, 2025, no teacher was present, and the students were not involved in curricular activities.

391.     Virginia's Religious Freedom Restoration Act (VA. CODE § 57-2.02) provides:

"No government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability unless it demonstrates that application of the burden to the person is (i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest."

392.     Under this law, "'Substantially burden' means to inhibit or curtail religiously motivated practice." VA. CODE § 57-2.02(A).

393.     And this law places on the government the burden of proving that its burdening of religious expression was "(i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest."

394.     LCPS' punishment of Plaintiffs' was neither essential to further a compelling governmental interest nor the least restrictive means of furthering such interests.

395.     By censoring Plaintiffs' religious expression, punishing Plaintiffs for their religious expression, and imposing a severe punishment against Plaintiffs' speech, LCPS impermissibly deprived Plaintiffs of their rights protected by Virginia's Religious Freedom Restoration Act, impermissibly burdening their religious expression.

**COUNT VI**
**Virginia Constitution: Free Exercise of Religion**
**(VA. CONST. art. I § 16)**

396.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

397.    Virginia Constitution Article I § 16 emphatically protects religious expression, stating:

> "That religion or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience … No man shall be … enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities."

398.    This protection is all the more strengthened when viewed in conjunction with the free speech protections contained in the First Amendment to the U.S. Constitution and Article I § 12 of the Virginia Constitution.

399.    By expressing distress, discomfort, and disagreement with LCPS allowing the Female Student to be in the boys' locker room, Plaintiffs directly engaged in religious expression by stating viewpoints informed by their sincerely held religious beliefs.

400.    Plaintiffs did not engage in any action that would pull their expressions outside of the protections of Virginia Constitution Article I § 16.

401.    For every occasion when Plaintiffs expressed distress, discomfort, and disagreement with having the Female Student in the boys' locker room, they simply asked questions or spoke opinions among each other. No material disturbance developed. No altercations, fights, or verbal confrontations occurred.

402. By expressing distress, discomfort, and disagreement with having the Female Student in the boys' locker room, Plaintiffs never engaged in overt acts against peace and good order.

403. By punishing Plaintiffs for expressing distress and discomfort with having the Female Student in the boy's locker room, LCPS violated Virginia Constitution, Article I § 16.

## COUNT VII
### Fourteenth Amendment: Sex Discrimination
### (42 U.S.C. § 1983)

404. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

405. The Plaintiffs sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

406. The Female Student sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

407. When the Plaintiffs expressed that they did not feel safe and comfortable dressing and undressing in a sex-segregated, male locker room because of the presence of the Female Student, they were told by LCPS that they should cease discussing their discomfort and were free to use a private changing area.

408. LCPS did not advise the Female Student that she should use a private changing area.

409. LCPS intentionally discriminated against the Plaintiffs based on sex by treating the Female Student more favorably as it concerned the use of a sex-segregated, male locker room.

410. LCPS did not have an important government interest in allowing the Female Student to use the sex-segregated, male locker room. Further, LCPS's decision to allow the Female

Student to use the sex-segregated, male locker room was not substantially related to any important government interest.

411. LCPS also discriminated against the Plaintiffs in violation of Title IX by investigating and disciplining them pursuant to the Female Student's Title IX complain, while dismissing the Title IX complaint against the Female Student, despite knowing that the Female Student has made several recordings in the boys' locker room, including deleted and missing recordings filming students using or coming out of the bathroom.

412. LCPS did not have an important government interest in dismissing the Title IX complaint against the Female Student and the dismissal of that Title IX complaint was not substantially related to any important government interest.

413. Consequently, LCPS violated the Plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause.

**COUNT VII**
**Virginia Constitution: Sex Discrimination**
**(VA. CONST. art. I § 11)**

414. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

415. The Plaintiffs sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

416. The Female Student sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

417. When the Plaintiffs expressed that they did not feel safe and comfortable dressing and undressing in a sex-segregated, male locker room because of the presence of the Female Student, they were told by LCPS that they should cease discussing their discomfort and were free to use a private changing area.

418. LCPS did not advise the Female Student that she should use a private changing area.

419. LCPS intentionally discriminated against the Plaintiffs on the basis of sex by treating the Female Student more favorably as it concerned the use of a sex-segregated, male locker room.

420. LCPS did not have an important government interest in allowing the Female Student to use the sex-segregated male locker room. Further, LCPS's decision to allow the Female Student to use the sex-segregated male locker room was not substantially related to any important government interest.

421. LCPS also discriminated against the Plaintiffs in violation of Title IX by investigating and disciplining them pursuant to the Female Student's Title IX complain, while dismissing the Title IX complaint against the Female Student, despite knowing that the Female Student has made several recordings in the boys' locker room, including deleted and missing recordings filming students using or coming out of the bathroom.

422. LCPS did not have an important government interest in dismissing the Title IX complaint against the Female Student and the dismissal of that Title IX complaint was not substantially related to any important government interest.

423. Thus, LCPS violated the Plaintiffs' rights under the Virginia Constitution.

**COUNT IX**
**Title IX: Sex Discrimination**
**(20 U.S.C. ch. 38 § 1681 et seq.)**

424. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

425. At all times relevant herein, LCPS was a recipient of federal funds.

426. The Plaintiffs sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

427. The Female Student sought the ability to use a sex-segregated, male locker room to feel safe and comfortable while dressing and undressing.

428. When the Plaintiffs expressed that they did not feel safe and comfortable dressing and undressing in a sex-segregated, male locker room because of the presence of the Female Student, they were told by LCPS that they should cease discussing their discomfort and were free to use a private changing area.

429. LCPS did not advise the Female Student that she should use a private changing area.

430. LCPS did not require the Female Student to use a private changing area.

431. LCPS did not require the Female Student to use the female changing area

432. LCPS intentionally discriminated against the Plaintiffs on the basis of sex by treating the Female Student more favorably as it concerned the use of a sex-segregated, male locker room.

433. Consequently, LCPS violated the Plaintiffs' rights under Title IX.

434. Furthermore, Policy 8040 and Regulation 8040 facially violate Title IX, as those provisions require LCPS to violate Title IX by allowing students to invade the sex-segregated locker rooms of the opposite sex and requiring students to find private alternatives when they believe their safety, comfort, and privacy are compromised by a member of the opposite sex being allowed to dress and undress in school locker rooms.

## COUNT X
### Fourteenth Amendment: Deprivation of Due Process
### (42 U.S.C. § 1983)

435.     Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

436.     Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

437.     Sex is distinct from "gender identity."

438.     LCPS arbitrarily found that the Plaintiffs engaged in sexual harassment and sex discrimination on the basis of "gender identity," which is distinct from sex discrimination under Title IX and LCPS's policies, regulations, and practices.

439.     To the extent that Policy and Regulation 8035 prohibit discrimination based on "gender identity," it falsely states that Title IX prohibits discrimination on the basis of "gender identity."

440.     LCPS defines "gender identity" as "[a] person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary. Gender identity is an innate part of a person's identity and can be the same or different from the sex they were assigned at birth."

441.     LCPS's policies, regulations, and related practices, including Regulation 8035 and Policy 8210, are so vague, ambiguous, and/or contradictory, that ordinary citizens must guess at its meaning, will differ as to the regulation's application, and do not have a reasonable opportunity to know what is prohibited.

442.     LCPS's policies, regulations, and related practices further burden speech based on arbitrary and subjective feelings of other students.

443.    LCPS's policies, regulations, and related practices are also contradictory, in that they prohibit discrimination on the basis of "sex" and "gender identity," which are inherently in conflict.

444.    The United States Constitution prohibits the deprivation of liberty without due process of law.

445.    LCPS's policies, regulations, and related practices that censor student speech that is subjectively offensive to a student based on their subjective belief of the arbitrary term "gender identity" were unconstitutionally applied to the Plaintiffs and are void for vagueness.

## COUNT XI
### Virginia Constitution: Deprivation of Due Process
### (VA. CONST. art. I § 11)

446.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

447.    Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

448.    Sex is distinct from "gender identity."

449.    LCPS arbitrarily found that the Plaintiffs engaged in sexual harassment and sex discrimination on the basis of "gender identity," which distinct from sex discrimination under Title IX and LCPS's policies, regulations, and practices.

450.    To the extent that Policy and Regulation 8035 prohibit discrimination based on "gender identity," it falsely states that Title IX prohibits discrimination on the basis of "gender identity."

451.    LCPS defines "gender identity" as "[a] person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary. Gender

identity is an innate part of a person's identity and can be the same or different from the sex they were assigned at birth."

452. LCPS's policies, regulations, and related practices, including Regulation 8035 and Policy 8210, are so vague, ambiguous, and/or contradictory, that ordinary citizens must guess at its meaning, will differ as to the regulation's application, and do not have a reasonable opportunity to know what is prohibited.

453. LCPS's policies, regulations, and related practices further burden speech based on arbitrary and subjective feelings of other students.

454. LCPS's policies, regulations, and related practices are also contradictory, in that they prohibit discrimination on the basis of "sex" and "gender identity," which are inherently in conflict.

455. The Virginia Constitution prohibits the deprivation of liberty without due process of law. LCPS's policies, regulations, and related practices that censor student speech that is subjectively offensive to a student based on their subjective belief of the arbitrary term "gender identity" were unconstitutionally applied to the Plaintiffs and are void for vagueness.

## COUNT XII
**Conspiracy**
**(42 U.S.C. § 1983)**

456. Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.

457. LCPS conspired with Loudoun for All, a Virginia limited liability company and political action committee, to injure, oppress, threaten, and/or intimidate the Plaintiffs in the free exercise and/or enjoyment of their rights, including their rights to petition the government for redress of grievances by filing a Title IX complaint and filing a lawsuit in this Court.

458. LCPS directed and assisted Loudoun for All in the publication of a press release and timeline that was false and defamatory to the Plaintiffs and their families for the purpose of retaliating against the Plaintiffs for filing a Title IX complaint against the Female Student and bringing this lawsuit to vindicate their rights under the laws of the United States.

459. No justifiable basis exists for LCPS's conspiracy with Loudoun for All to issue a false and defamatory press release and timeline for the purpose of retaliating against the Plaintiffs for filing a Title IX complaint against the Female Student and bringing this lawsuit to vindicate their rights under the laws of the United States.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand the following relief:

a. A trial by jury on all triable issues of fact;

b. Declaratory relief holding that LCPS violated the U.S. Constitution's Free Speech and Equal Protection Clauses, the Virginia Constitution's Article I §§ 11, 12, and 16, the Virginia's Religious Freedom Restoration Act, and Title IX of the Educational Amendment Acts of 1972;

c. Temporary, preliminary, and permanent injunctive relief ordering LCPS, and/or its agents and employees, to retract and expunge its punishments and adverse findings against Plaintiffs;

d. Temporary, preliminary, and permanent injunctive relief ordering LCPS, and/or its agents and employees, to prohibit students from using the locker rooms of the opposite sex;

e. Monetary and Compensatory damages, including Punitive damages to the extent permissible by law;

f. Nominal damages;

g. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, VA. CODE § 57-2.02; VA. CONST. art. I § 11, 12, and 16;

h.  Pre- and post-judgment interest; and

i.  Such other relief as appears appropriate and equitable in the judgment of the Court.


Dated: October 29, 2025,                          Respectfully submitted,

S.W., by his parents and next friends, SETH WOLFE and AMANDA WOLFE,
and J.S., by his parents and next friends, JEFFERY SMITH and RENAE SMITH,

By Counsel:


  */s/ Andrew J. Block*

| | |
|---|---|
| Andrew J. Block, Esq. (VSB No. 91537) | Joshua A. Hetzler, Esq. (VSB No. 89247) |
| Ian D. Prior, Esq.* | Michael B. Sylvester, Esq. (VSB No. 95023) |
| Nicholas R. Barry, Esq.* | FOUNDING FREEDOMS LAW CENTER |
| Robert A. Crossin, Esq.* | 707 E. Franklin Street |
| AMERICA FIRST LEGAL FOUNDATION | Richmond, VA 23219 |
| 611 Pennsylvania Ave. SE #231 | Telephone: (804) 971-5509 |
| Washington, D.C. 20003 | michael@foundingfreedomslaw.org |
| Telephone: (202) 836-7958 | josh@foundingfreedomslaw.org |
| andrew.block@aflegal.org | |
| ian.prior@aflegal.org | Ellis L. Bennett, Esq. (VSB No. 71685) |
| nicholas.barry@aflegal.org | DUNLAP BENNETT & LUDWIG PLLC |
| bobby.crossin@aflegal.org | 211 Church Street SE |
| | Leesburg, VA 20175 |
| | Telephone: (703) 777-7319 |
| | ebennett@dbllawyers.com |

*Counsel for Plaintiffs*
*\* Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 29, 2025, I served the foregoing document with the Clerk

of Court using the Court's ECF system, thereby serving all counsel who have appeared in this case,

including:


Heather K. Bardot, Esq. (VSB No. 37269)
McGavin, Boyce, Bardot, Thorsen, & Katz, P.C.
9990 Fairfax, Boulevard, Suite 400
Fairfax, Virginia 22030
Telephone: (703) 385-1000
Facsimile: (703) 385-1555
hbardot@mbbtklaw.com


                                        ___/s/ Andrew J. Block
                                        Andrew J. Block
                                        America First Legal Foundation
                                        611 Pennsylvania Ave. SE, #231
                                        Washington, D.C. 20003
                                        (202)-836-7958
                                        andrew.block@aflegal.org