# EXHIBIT
# A

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| S.W., by his parents and next friends, )<br>    SETH WOLFE and AMANDA WOLFE )<br>)<br>   and )<br>)<br>J.S., by his parents and next friends, )<br>    JEFFERY SMITH and RENAE SMITH, )<br>)<br>       Plaintiffs )<br>)<br>    AND )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>      Plaintiff-Intervenor )<br>)<br>   v. )<br>)<br>LOUDOUN COUNTY SCHOOL BOARD )<br>)<br>      Defendant. )<br>) | No. l:25cv1536 (LMB/WEF) |

## [PROPOSED] UNITED STATES' COMPLAINT IN INTERVENTION

The United States brings this Complaint in Intervention pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000h-2, and alleges:

## INTRODUCTION

1.  S.W. and J.S. ("Plaintiffs") hold the sincere religious belief that God creates each person immutably male or female. As teenage boys, they live out their Christian faith as high school students, which regularly occasions interactions with their fellow students, including when

the students must share intimate spaces like bathrooms or locker rooms. Their faith requires them to use language to describe or address someone that accurately reflects that person's sex and use the intimate spaces designated for boys. They also believe the sexes should be separated for purposes of using the bathroom or changing clothes—activities that occur in intimate spaces, often while other students are present.

2.      The Loudoun County School Board ("School Board" or "Defendant")—the government entity that governs the Loudoun County Public Schools ("LCPS")—implemented Policy 8040, "Rights of Transgender and Gender-Expansive Students," and its enacting Regulation 8040 (collectively, "Policy 8040" or "the Policy"). Policy 8040 establishes and promotes the School Board's view of matters related to "sex, sexual orientation, transgender status, or gender identity/expression," including that students may "use their chosen name and gender pronouns that reflect their consistently asserted gender identity without any substantiating evidence"; "participate in [interscholastic, co-curricular, and extra-curricular] activities in a manner consistent with the student's gender identity"; and "use the [bathroom or locker room] facility that corresponds with their consistently asserted gender identity."

3.      Policy 8040 requires staff and students to affirm and promote the School Board's understanding of "gender identity." The School Board disfavors any view of "sex, sexual orientation, transgender status, or gender identity/expression" that does not align with its own.

4.      In Fall 2024, Plaintiffs' religious beliefs inevitably collided with Policy 8040 when one of their fellow Stone Bridge High School ("Stone Bridge") students, a female student who purportedly subjectively identifies as a boy ("Female Student"), entered the boys' locker room.

5.      Plaintiffs spoke about their confusion and discomfort with Female Student's presence in the boys' locker room, and they made school administrators aware of their concerns.

6. Instead of taking their faith-based concerns seriously, school administrators warned Plaintiffs they could face negative consequences if they continued to speak out.

7. Plaintiffs faced a choice: violate their consciences or stay true to their beliefs.

8. Plaintiffs resolved to maintain their sincerely held religious beliefs.

9. In March 2025, Female Student, in violation of school policy, secretly video-recorded Plaintiffs and other male students in the Stone Bridge boys' locker room. The recording captures audio of several male students expressing their disbelief and discomfort with Female Student being in their locker room, including several accurate references to her being a "girl."

10. Female Student used the recording and a false accusation that she was verbally threatened with violence to file complaints with school administrators against Plaintiffs and another male Stone Bridge student, K.C., who practices Islam.

11. On March 28, 2025, LCPS opened Title IX investigations into Plaintiffs and K.C., based on an identical set of facts, to determine if they had violated School Board Policy 8035, which prohibits "sex-based discrimination," "sexual harassment," and "sexual assault."

12. LCPS broadened its investigation of K.C. to include an additional accusation about an incident that occurred during the 2023–24 school year.

13. No new allegations were added to Plaintiffs' investigations.

14. LCPS later dismissed the complaint against K.C. after he told investigators he was willing to use Female Student's preferred name and pronouns.

15. Plaintiffs made no concessions, so LCPS continued its investigations into Plaintiffs.

16. On August 15, 2025, the Title IX Decision-makers informed Plaintiffs they had determined they violated Policy 8035. In letters detailing the outcomes of the investigations, LCPS consistently cited the content of Plaintiffs' speech as the basis for violations of Policy 8035.

17.     In separate letters, the School Board—through the LCPS Office of Student Administration—issued punishment including (1) "no-contact" orders regarding Female Student; (2) for each, development of a "Comprehensive Student Support Plan" intended to change the content of Plaintiffs' speech; and (3) ten-day suspensions.

18.     Policy 8040 establishes the School Board's view on a set of controversial issues and only allows staff and students to speak in accordance with its view.

19.     The School Board uses vague and overbroad language that makes complying with the Policy impossible for Plaintiffs.

20.     LCPS and the School Board inconsistently apply Policy 8040, and only Plaintiffs have been punished.

21.     Policy 8040 violates the Constitution by penalizing Plaintiffs for their speech and religious views. In enforcing Policy 8040, LCPS and the School Board denied Plaintiffs equal protection.

22.     The law authorizes the United States to stand up for Plaintiffs' rights.

23.     The United States invokes its authority pursuant to 42 U.S.C. § 2000h-2 here and files this Complaint in Intervention for declaratory and injunctive relief to remedy the School Board and LCPS's unconstitutional discrimination against Plaintiffs.

**PARTIES**

24.     Plaintiff S.W. is a resident of Loudoun County, Virginia.  He has been a student at Stone Bridge High School from 2023 to present.  He was a sophomore during the 2024-2025 school year.  Now a junior, he began the 11th grade in August 2025.

25.     Plaintiff J.S. was a resident of Loudoun County, Virginia, until the summer of 2025. He was a student at Stone Bridge High School from 2023 through the end of the 2024-2025 school

year. He was a sophomore during the 2024-2025 school year. In the summer of 2025, J.S. moved out of Virginia and unenrolled from Loudoun County Public Schools.

26. Plaintiff-Intervenor is the United States of America.

27. Defendant Loudoun County School Board ("School Board") is the public body with the power to sue and be sued, pursuant to Va. Code § 22.1-71, that governs Loudoun County Public Schools.

28. The School Board is the official policy-making body of Loudoun County Public Schools ("LCPS").

29. The School Board acts through the Loudoun County Public Schools Superintendent and other LCPS employees.

30. Loudoun County Public Schools receives federal funding.

31. Loudoun County Public Schools controls and operates Stone Bridge High School.

## JURSIDICTION AND VENUE

32. This civil-rights action raises federal questions under the United States Constitution; Title IX, 20 U.S.C. § 1681; and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

33. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

34. This Court is authorized to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

35. Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant resides in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

36. This action concerns, among other things, a violation of the Equal Protection Clause. The United States Attorney General has certified this case is of public importance. *See*

U.S. Mot. to Intervene, Ex. B. The United States is therefore authorized to intervene in this action pursuant to 42 U.S.C. § 2000h-2.

## FACTS

### A.  THE SCHOOL BOARD IS THE FINAL AUTHORITY REGARDING STUDENT DISCIPLINE

37.     The Constitution of Virginia vests the control and supervision of the public school system in local school boards. VA. CONST. art. VIII, § 7.

38.     Under Virginia law, "[e]ach local school board shall maintain and follow-up-to-date policies" and "[a]ll school board policies shall be reviewed at least every five years and revised as needed." VA. CODE § 22.1-253.13:7 B.

39.     Virginia law further provides:

> Each local school board shall ensure that policies are developed giving consideration to the views of teachers, parents, and other concerned citizens and addressing the following: . . . The standards of student conduct and attendance and enforcement procedures designed to provide that public education be conducted in an atmosphere free of disruption and threat to persons or property and *supportive of individual rights* . . . .

VA. CODE § 22.1-253.13:7 C.3 (emphasis added).

40.     As the official policy-making body of LCPS, the authority for final approval of any policy lies *solely* with the School Board.[1]

41.     School Board Policy 8205, titled "Discipline Authority," outlines the scope of the School Board's authority:

> In accordance with its responsibility to *supervise LCPS*, the School Board adopts policies governing student behavior and *authorizes the Superintendent and Division-wide Administrators* to develop and implement regulations and the "Student and Families Rights and Responsibilities" consistent with Virginia's Standards of Quality, which require "standards of student conduct and attendance and enforcement procedures designed to provide that public education be conducted in an atmosphere free of disruption and threat to persons or property and

---

[1] Loudoun County School Board, Policies and Regulations, https://www.lcps.org/o/lcps/page/policy-and-regulations (emphasis added).

supportive of individual rights." *The School Board, acting through the Superintendent*, holds all school employees responsible for supervising student behavior when students are legally under the supervision of the School Division. *The School Board* holds all students responsible for appropriate conduct as defined in School Board policies and regulations, the LCPS Student and Families Rights and Responsibilities, and its annual supplements.

School Board Policy 8205 A. Scope of School Board Authority (emphasis added).

42.     The Office of School Administration "determin[es] school disciplinary outcomes *on behalf of the Superintendent*; resolving petitions for review of short-term suspensions from school."[2]

43.     Because the School Board acts through the LCPS Superintendent, all actions of the LCPS Superintendent (and the Superintendent's designees) are actions of the School Board.

44.     School Board Policy 8210, titled "Introduction to Student Discipline," states that at the "school level," the School Board has given school-based administrators, which are principals and assistant principals, the "primary responsibility" for enforcing the School Board policy and the rules of behavior set forth in the Student's Rights and Responsibilities Handbook. School Board Policy 8210 D.1.

45.     School Board Policy 8210, states that at the "school division level," the School Board has designated the "Director of School Administration" as the Superintendent's designee. School Board Policy 8210 further states that:

Director of School Administration conducts disciplinary hearings, has authority to suspend for more than ten (10) days, investigates incidents, reviews appeal for short and long-term suspensions, expulsions, and involuntary transfers, schedules hearings and prepares recommendations for action by the School Board.

School Board Policy 8210 D.2.

---

[2] Loudoun County Public Schools, Office of School Administration, About OSA, https://www.lcps.org/o/dsl/page/school-administration (emphasis added).

46.     School Board Policy 8210 further states that:

In accordance with Virginia laws and regulations, only the School Board has the authority to establish student conduct policies and procedures, often referred to as "discipline policies." *Final administrative authority for all disciplinary matters rests with the School Board* to determine how and under what circumstances a disciplinary action may be appealed.

School Board Policy 8210 D.3 (emphasis added).

47.     Through School Board Policy 8220, the School Board has authorized "the principal, assistant principal, or teacher designee" to suspend students. School Board Policy 8220 "Student Disciplinary Consequences".

48.     School Board Policy 8035, "Title IX, Sex-Based Discrimination, Sexual Harassment" ("Title IX Policy") states that the LCPS Superintendent is responsible for appointing the Division Title IX Coordinator to oversee the regulations and administration of the Title IX program. School Board Policy 8035 B.

49.     School Board Policy 8035 further states that the LCPS Superintendent is also responsible for issuing the regulations outlining Title IX compliance including a grievance process and developing disciplinary sanctions. School Board Policy 8035 B. 2., 4.

50.     School Board Regulation 8035 REG sets forth the regulations for the School Board's Title IX Policy. Under School Board Regulation 8035-REG, the School Board must maintain records of Title IX investigations. School Board Regulation 8035 REG § F.

## B.  THE SCHOOL BOARD'S GENDER IDENTITY POLICIES

51.     Although Stone Bridge High School's locker room facilities are, and have always been, segregated by sex, School Board Policy 8040 on the "Rights of Transgender and Gender-Expansive Students" creates a broad exception to sex-segregated locker rooms.

52.     School Board Policy 8040 states:

All students are entitled to have access to restrooms and locker rooms that are sanitary, safe, and adequate, so that they can comfortably and fully engage in their school programs and activities. *Students should be allowed to use the facility that corresponds to their consistently asserted gender identity.* While some transgender students will want that access, others may want alternatives that afford more privacy. Taking into account existing school facilities, administrators should take steps to designate gender-inclusive or single-user restrooms commensurate with the size of the school.

School Board Policy 8040 § F (emphasis added).

53. School Board Regulation 8040 defines "gender identity" as:

A person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary. Gender identity is an innate part of a person's identity and can be the same or different from the sex they were assigned at birth.

School Board 8040 REG § A.5

54. School Board Regulation 8040 defines "transgender" as:

A self-identifying term that describes a person whose gender identity is different from their sex assigned at birth. A transgender girl is a girl who was presumed to be male when she was born, and a transgender boy is a boy who was presumed to be female when he was born. Note that there is a wide range of gender identities in addition to transgender male and transgender female, such as nonbinary. A transgender student is a student who consistently and sincerely asserts a gender identity different from the gender associated with the student's sex assigned at birth.

School Board 8040 REG § A.11

55. School Board Regulation 8040 defines "gender-expansive/gender-diverse/gender-fluid/gender nonbinary/agender" as:

Terms that convey a wider, more inclusive range of gender identity and/or expression than typically associated with the social construct of a binary (two discrete and opposite categories of male and female) gender system.

School Board 8040 REG § A.6.

56. School Board Regulation 8040 further defines "nonbinary" as:

[A] term used to refer to people whose gender identity is *not exclusively male or female*, including those who identify with a different gender, *a combination of genders*, or no gender. Nonbinary may be considered a subset of transgender or a

distinct identity. Other similar terms may include genderqueer, gender fluid, agender, or Two-Spirit (for Native American Indian, Alaska Native, First Nation, or Indigenous communities).

School Board 8040 REG § A.9 (emphasis added).

57.     School Board Regulation 8040 also states:

Transgender and gender-expansive students have the right to equitable access to school sponsored events, after-school programs, and overnight field trips and shall be permitted to participate in accordance with the student's consistently asserted gender identity. Staff shall not require the student to stay in a single-occupancy accommodation when such accommodation is not required of other students participating in the same event. Students may be assigned to a room related to their consistently asserted gender identity. *Any student uncomfortable sharing a sleeping area, shower, restroom, or any sex-segregated facility, shall, upon request, be provided with a designated safe, non-stigmatizing alternative.*

School Board 8040 REG § F (emphasis added).

58.     School Board Regulation 8040 further states:

School staff shall, at the request of a student *or* parent/legal guardian, use a student's chosen name and gender pronouns.

School Board Policy 8040 REG § B (emphasis added).

59.     Under School Board Policy 8040, staff are required to accept a student's claimed transgender or gender-expansive status without any substantiating evidence. In addition, School Board Regulation 8040 makes clear that neither parental notification nor consent are required for the School Board to accept a student's claimed transgender or gender-expansive status.

60.     School Board Policy 8040 further states:

The use of gender-neutral pronouns are appropriate. Inadvertent slips in the use of names or pronouns may occur; however, staff or students who intentionally and persistently *refuse to respect* a student's gender identity by using the wrong name and gender pronoun are in violation of this policy.

School Board Policy 8040 § A (emphasis added).

## C. PLAINTIFFS' RELIGIOUS BELIEFS CONFLICT WITH THE SCHOOL BOARD'S VIEWS ON GENDER IDENTITY

61.     Plaintiffs are Christians and hold the sincere religious beliefs that God creates each person immutably male or female, which is that person's sex.

62.     Plaintiffs believe that no person can change his or her sex.

63.     Plaintiffs' faith requires them to honor God's design for the sexes and not blur the line between male and female, which means they use language to describe or address someone that accurately reflects that person's sex.

64.     Plaintiffs believe the sexes should be separated for purposes of using the bathroom or changing clothes—activities that occur in intimate spaces, often while other students are present—and thus only use the intimate spaces designated for boys.

65.     Because of their faith, Plaintiffs object to being in a state of undress in the presence of the opposite sex or with an undressed member of the opposite sex, particularly in sex-separate changing facilities.

66.     Plaintiffs were known to be Christians at Stone Bridge High School and frequently wore necklaces displaying a cross, signifying their Christian faith.

67.     S.W. has been active with Christian student groups at Stone Bridge. He is a leader with Young Disciples of Christ, a Bible Study group, which he joined when he was a sophomore.

68.     At times, J.S. expressed his Christian beliefs during class discussions on topics such as human reproduction.

69.     Plaintiffs' religious beliefs conflict with the School Board's views expressed in School Board Policy 8040 and its enacting regulations.

70.     Plaintiffs reject the School Board's definitions of "transgender," "gender-expansive/gender-diverse/gender-fluid/gender nonbinary/agender," and "nonbinary."

**D.  FEMALE STUDENT'S USE OF BOYS' LOCKER ROOM**

71.     Plaintiffs observed that Female Student expressed herself as female—and had the physical characteristics of a teenage girl. For example, Plaintiffs observed that Female Student wore her hair long, had painted fingernails, and wore makeup.

72.     The Stone Bridge boys' locker room is designed for, and has been used by, male students—including Plaintiffs—to undress, change their clothes, or to shower. The boys' locker room also has bathroom stalls and urinals.

73.     In August 2024, Plaintiffs started the tenth grade at Stone Bridge.

74.     Plaintiffs regularly used the Stone Bridge boys' locker room before and after participating in P.E. and extracurricular athletic activities.

75.     During this time, Plaintiffs and Female Student were in the combined class for eighth block P.E., so Female Student used the boys' locker room at the same time as Plaintiffs.

76.     Plaintiffs felt awkward and uncomfortable in the presence of a girl in the boys' changing facility.

77.     During the Fall 2024 school semester, when Plaintiffs attempted to use the boys' locker room, they routinely encountered Female Student, who also often accessed the boys' locker room when Plaintiffs did.

78.     Stone Bridge did not notify Plaintiffs, their fellow male students, or their respective parents in advance about Female Student's use of the boys' locker room.

79.     During the Fall 2024 school semester, Plaintiffs spoke with school administrators about Female Student using the boys' locker room, notifying them of their faith-based concerns with a female student being present while they used the boys' locker room.

80.     By allowing Female Student to continue to use the Stone Bridge boys' locker room, the School Board denied Plaintiffs appropriate privacy—so much so, Plaintiffs would

conscientiously refrain from fully undressing whenever Female Student was present in the boys' locker room to avoid the indignity and awkwardness of being seen unclothed by the opposite sex.

81. Plaintiffs were also aware that, at any time, Female Student (or any other female believing herself to be transgender or gender-expansive) could begin to fully undress herself or use the Stone Bridge boys' locker room shower facilities, which also made them uncomfortable.

82. Aware of Plaintiffs' concerns, LCPS took no action to assist them, except to inform S.W. that he was free to change his clothes elsewhere and to recommend he use mental health services.

**E. PLAINTIFFS' COMPLAINTS IN OCTOBER 2024**

83. In approximately October 2024, during the Fall 2024 semester, Female Student again re-entered the boys' locker room. At that time, several male students—including Plaintiffs—were using the boys' locker room and expressed discomfort about Female Student being present.

84. Upon learning about the boys' expressed concerns—*i.e.*, their constitutionally protected speech—school administrators took the male students aside and directed them not to make any comments about a female student being in their locker room.

85. Specifically, S.W. was taken out of class to meet with two Stone Bridge employees—Assistant Principal Lisa Tartaglia ("A.P. Tartaglia") and Student Counselor Catherine Donovan—who told him that an unnamed person had reported S.W.'s concerns.

86. S.W. responded by informing the Stone Bridge employees of his sincerely held religious beliefs about male students and female students remaining separate in sex-segregated intimate spaces.

87. The administrators dismissed S.W.'s concerns by stating that Female Student had a right to be in the boys' locker room and that S.W. could change his clothes elsewhere.

88. Instead of seriously considering and addressing S.W.'s concerns based on his religious beliefs, the administrators offered him mental health services to address his discomfort.

89. In approximately October 2024, J.S. told his P.E. teacher, Hunter Manspile ("Manspile"), that he objected to sharing the boys' locker room with Female Student.

90. Manspile responded that Female Student could use the boys' locker room.

91. Manspile also told J.S. not to say anything about Female Student's use of the boys' locker room.

92. Manspile, who also taught J.S.'s sex education class, knew J.S. held sincere Christian beliefs regarding the existence of only two sexes—male and female. J.S. spoke about his Christian beliefs during class when discussing topics such as human reproduction, which covered the male and female reproductive systems.

93. Following their October 2024 encounters with school administrators, S.W. and J.S. believed that they could not speak freely to staff about their concerns regarding Female Student's presence in the boys' locker room without facing discipline.

94. Plaintiffs followed these unconstitutional directives and kept their discomfort and privacy concerns to themselves for the rest of the Fall 2024 school semester.

F. THE TRUMP ADMINISTRATION TAKES ACTION

95. In January 2025, President Donald J. Trump issued EO 14168: Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government,[3] and EO 14190: Ending Radical Indoctrination in K-12 Schooling.[4]

---

[3] Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025), available at https://bit.ly/3FntuWb.
[4] Ending Radical Indoctrination in K-12 Schooling, 90 Fed. Reg. 8853 (Jan. 29, 2025), available at https://bit.ly/44XuWZX.

96.     Taken together, these executive orders set forth the official policy of the U.S. Government—pursuant to Title IX, all public schools receiving federal funding were barred from permitting students to access locker room facilities designated for use by the opposite sex.

97.     Consistent with these executive orders, in February 2025, the United States Department of Education Office of Civil Rights ("OCR") opened a civil rights investigation into LCPS to determine whether Policy 8040 and Regulation 8040 violated Title IX.[5]

98.     The Trump executive orders and OCR's investigation were covered extensively on local media and social media sites. Learning about the Trump executive orders via social media sites like TikTok, and believing that state and federal law prohibited LCPS from allowing Female Student to use the boys' locker room, Plaintiffs renewed their objections to LCPS allowing Female Student to use the boys' locker room.

99.     During the 2025 Spring semester, Plaintiffs once again engaged their peers in discussions about Policy 8040 and its implications in light of the OCR investigation.

## G.  FEMALE STUDENT MAKES SECRET VIDEO RECORDINGS IN BOYS' LOCKER ROOM

100.    Female Student made at least four (4) recordings capturing boys in the boys' locker room—three (3) video recordings on March 19, 2025 (*i.e.*, Recording No. 1, Recording No. 2, and Recording No. 3) and a fourth video recording in May 2025 (*i.e.*, Recording No. 4).

101.    On approximately March 19, 2025, Plaintiffs were in the Stone Bridge boys' locker room preparing for P.E. class.

102.    As Plaintiffs prepared for P.E. class, from a distance they saw Female Student enter the boys' locker room.

---

[5] OCR investigated five Northern Virginia school districts: LCPS, Alexandria City Public Schools, Arlington Public Schools, Fairfax County Public Schools, and Price William County Public Schools (the "Divisions"). OCR determined the Divisions' policies allowing students to access intimate, sex-segregated facilities on the based of gender identity violated Title IX.

103.     Based on her appearance, Female Student presented as female.

104.     As on past occasions, Plaintiffs felt awkward and uncomfortable in the presence of a girl in the boys' changing facility.

105.     Plaintiffs then began speaking among themselves and questioning why there was a girl in the boys' locker room.

106.     In order to secretly record the boys in the locker room, as she entered the boys' locker room, Female Student partially concealed her cell phone, which was turned on to "record."

107.     More than 20 boys were in the locker room at that time.

108.     Female Student's conduct clearly violated School Board Policy 8655 (and possibly state law[6]), which provides that "[p]hotography, audio, or video recording is prohibited in . . . locker rooms" and that, absent an emergency or medical need, "[s]tudents are prohibited from using phones, tablets, and other personal technology devices" in locker rooms.

109.     Female Student's secret video recordings created significant privacy concerns for all male students who use Stone Bridge's locker rooms, including Plaintiffs, regarding the risk of possible future secret video recording when undressing, changing clothes, showering, or using the bathrooms within the locker room.

110.     Stone Bridge leadership, including Assistant Principal Calvin Adams, knew about Female Student's recordings.

---

[6] Under VA. CODE § 18.2-386.1, it is a Class I misdemeanor to "knowingly and intentionally create any videographic or still image by any means whatsoever of any nonconsenting person if (1) that person is totally nude, clad in undergarments, or in a state of undress so as to expose the genitals, pubic area, buttocks or female breast in a restroom, dressing room, locker room." Pursuant to VA. CODE § 18.2-27, "Every person who attempts to commit an offense which is a misdemeanor shall be punished by the same punishment prescribed for the offense the commission of which was the object of the attempt."

111.    Despite being notified that Female Student's secret video recordings invaded the boys' privacy rights, LCPS never investigated her.

112.    Specifically, Plaintiffs filed complaints against Female Student, but LCPS refused to investigate whether her actions violated school policies.

113.    During the Title IX investigation, Female Student stated that LCPS "checked her whole phone" and disciplined her by "taking her phone away for the next ten days."

114.    On or about March 21, 2025, LCPS turned over the videos from Female Student's phone to the Loudoun County Sheriff's Office, which launched a criminal investigation into Female Student.

115.    Unfortunately, Female Student's conduct on March 19, 2025, was not an isolated incident. During the Title IX investigation, a student witness, O.B., stated that in early May 2025, Female Student made Recording No. 4 by secretly recorded a *different* male student, A.B., as he used the urinal inside the bathroom in the boys' locker room. There is no indication the Title IX investigator followed up on this issue and this fact does not appear in the summary of findings.

116.    The School Board's policies allowed Female Student to repeatedly abuse her access to the boys' locker room in order to secretly record male students in vulnerable states, such as engaging in private bodily functions.

**H. MARCH 19, 2025 RECORDINGS CAPTURE BOYS VOICING DISTRESS, DISCOMFORT, AND DISAGREEMENT**

117.    Recording No. 1, which is approximately 2 minutes and 22 seconds, captures audio of several male students talking loudly in an environment with poor acoustics, although some male students can be heard voicing their concerns about Female Student's presence.

118.    At the start of Recording No. 1, Female Student is heard saying, "I'll find out" to another student before walking into the boys' locker room while filming.

119.     After making Recording No. 1, Female Student left the locker room and made Recording No. 2, which is 11 seconds long, and was taken in the hallway in an attempt to capture the identities of the boys leaving the locker room.

120.     Recording No. 3 captured two other boys, A.S. and G.D., as they exited the bathroom in the boys' locker room. Female Student said to them "I got you on video now, you fuckers! I've got this shit on video now!"

121.     After discovering Recording No. 3, Assistant Principal Adams spoke with G.D.'s parents, who asked to see the recording. Adams informed them that Recording No. 3 had been deleted.

122.     Female Student's actions recording male students in the boys' locker room were intended to provoke negative reactions from the male students, which she would then report to Stone Bridge employees.

123.     On both occasions in which Female Student secretly recorded them in the boys' locker room, Plaintiffs neither spoke to Female Student nor had any physical contact with Female Student.

124.     None of the recordings made secretly by Female Student contains evidence of any male student threatening Female Student with violence.

125.     None of the recordings made secretly by Female Student contains evidence of any male student making sexually explicit, lewd, or vulgar comments.

126.     When Assistant Principal Adams called J.S. into the school office about Female Student's recording, J.S. reiterated what he said to his P.E. teacher—that he was uncomfortable because the situation violates his Christian beliefs.

127.     By expressing their distress, discomfort, and disagreement in response to Female Student's presence in the boys' locker room, Plaintiffs spoke on a matter of significant public concern.

## I.   LCPS LAUNCHES TITLE IX INVESTIGATION AGAINST PLAINTIFFS

128.     Female Student made complaints against Plaintiffs (S.W. and J.S.) and K.C.

129.     Female Student falsely claimed that Plaintiffs threatened her with violence.

130.     On or about March 28, 2025, the School Board—through Christopher Moy, LCPS Title IX Coordinator—notified Plaintiffs and K.C. that it had initiated a formal Title IX investigation against each of them for possibly violating School Board Policy 8035 (which prohibits "sex-based discrimination," "sexual harassment," and "sexual assault"), based on Female Student's complaints.

131.     At that time, LCPS stated it was investigating Plaintiffs and K.C. for identical accusations.

132.     On May 7, 2025, LCPS informed K.C. that it was also investigating him for additional accusations.

133.     At that point, all of the accusations against each of the three boys were the same, except that, against K.C., Female Student had made additional, specific accusations, alleging that he "consistently misgender[ed]" her by referring to her with female pronouns when she preferred male pronouns and by stating directly to her: "You guys are a disappointment to humanity," regarding her supposed transgender identity.

134.     Except for the accusation involving a threat of violence—which Plaintiffs denied and LCPS concluded to be false—LCPS's investigations regarding Plaintiffs and K.C. were about the respective content of each students' speech.

135.     Plaintiffs and K.C. were similarly situated.

19

136.    The School Board's Title IX investigation was conducted by Danyelle Reese, Deputy Title IX Coordinator for LCPS.

137.    On or about May 30, 2025, the School Board—through its LCPS Title IX Coordinator—dismissed the complaint against K.C., stating that the Title IX complaint "must be dismissed" because, as it stated in bold: **"[T]he conduct alleged would not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved.**"

138.    On the same day that LCPS informed K.C. that his alleged statements, even if proven true, would not constitute Title IX sexual harassment, LCPS notified S.W. and J.S. that the charges against them—based on allegations identical to those made against K.C.—would not only continue to be investigated as Title IX sexual harassment, but would also be investigated as Title IX sex-based discrimination.

139.    LCPS found Female Student's accusation that Plaintiffs threatened her with physical harm to be not credible based on a complete lack of corroborative evidence and Female Student's shifting description of the alleged interaction.

140.    All additional accusations made by Female Student were based on the content of Plaintiffs' speech.

141.    During LCPS's investigation, Plaintiffs were subjected to a "Threat Assessment" that included a mental health assessment. LCPS closed out the Threat Assessment as "Priority 4: Not a Threat"—a finding of low or no risk.

142.    On July 10, 2025, J.S.'s parents apprised LCPS that he was permanently unenrolling from LCPS.

143.    School Board Regulation 8035 provides that when a student unenrolls from its school system, LCPS is permitted to end a Title IX disciplinary investigation against that student.

144.	J.S., requested that LCPS end its investigation against him because he was unenrolling from the Loudoun County Public Schools system.

145.	LCPS, however, persisted with its investigation and declined to dismiss the Title IX complaint against J.S.

## J.	PLAINTIFFS USED THE FOOTBALL LOCKER ROOM TO AVOID CONFLICT

131.	On or about May 11, 2025, J.S.'s mother asked for an alternative changing room.

132.	The same day, Stone Bridge staff offered J.S. the use of the football locker room as an alternative to sharing the boys' locker room with a girl.

133.	The entrance to the football locker room was very close to the boys' locker room.

134.	Because the football locker room was typically locked during the school day, it required a school official to unlock it so the Plaintiffs could use it during school hours.

135.	When J.S. was allowed to begin using the football locker room (also on May 11), S.W. and approximately 15 other boys in their P.E. class also began to use the football locker room as an alternative to the boys' locker room, to avoid the awkward situation of having a girl in their locker room.

136.	One day, as the boys were waiting for a school official to unlock the football locker room, Female Student was loitering outside of the door the boys would use to enter and exit that locker room, seemingly considering whether she would follow that group of boys into the football locker room as well.

## K.	U.S. DEPARTMENT OF EDUCATION DETERMINES SCHOOL BOARD POLICIES VIOLATE TITLE IX

137.	In Virginia, every public school board, including the School Board, is required to have policies directing that public school locker rooms be separated by biological sex, not gender identity.

138. Under Virginia Code § 22.1-23.3, every Virginia school board, including the School Board, must adopt policies concerning "sex specific . . . school facilities," such as locker rooms, that are consistent with the current model policies provided by the Virginia Department of Education ("VDOE").

139. In July 2023, VDOE released its most current model policies regarding transgender students, which require that the use of Virginia public school locker rooms be separated based on biological sex.

140. Title IX also authorizes schools to maintain "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33.

141. Under Title IX, "sex" means "biological sex".

142. In February 2025, the United States Department of Education Office of Civil Rights ("OCR") opened a civil rights investigation into Loudoun County Public Schools to determine whether Policy 8040 and Regulation 8040 violated Title IX.

143. On July 25, 2025, OCR announced it had "determined that [LCPS's] policies, which allow students to access intimate, sex segregated facilities based on the students' subjective 'gender identity,' violate Title IX of the Education Amendments of 1972."

144. OCR offered a proposed resolution agreement to LCPS, which would, among other things, require the School Board to rescind Policy 8040.

145. In August 2025, the School Board refused to accept OCR's proposed resolution agreement.[7]

## L. THE SCHOOL BOARD AND LCPS PUNISH PLAINTIFFS

---

[7] On August 19, 2025, the United States Department of Education placed LCPS on "high risk" status and transitioned it to a reimbursement-only payment structure.

146.    On August 15, 2025, just three days after refusing OCR's proposed resolution agreement, the School Board—through the LCPS Title IX Decision-Makers[8]—issued its decision against Plaintiffs, which determined that Plaintiffs violated School Board Policy 8035 through impermissible sexual harassment and sex-based discrimination because of statements made in the Stone Bridge boys' locker room.

147.    In reaching this decision, LCPS acknowledged that most of the statements attributed to Plaintiffs, and made in the locker room, "were made more passively" and "not [] in a directly confrontational manner." LCPS further acknowledged that, of the statements attributed to Plaintiffs in the locker room, "none of [those] statements amounted to a true threat."

148.    LCPS's decision was based solely on its evaluation of the content of Plaintiffs' speech.

149.    LCPS did not find that Plaintiffs threatened Female Student with violence.

150.    LCPS did not find that Plaintiffs made sexually explicit, lewd, or vulgar comments.

151.    LCPS did not find that Plaintiffs' speech substantially disrupted the work of the school or impinged upon the rights of other students.

152.    LCPS used the unconstitutional speech code outlined in Policy 8040 to determine that Plaintiffs had violated Policy 8035.

153.    Following its decision, on the same day the School Board—through Dana Scanlan, Director for the LCPS Office of School Administration—imposed a severely disproportionate punishment against Plaintiffs.

---

[8] The three (3) Title IX Decision-Makers were Kimberly A. Pacelli, M.Ed., J.D.; Saundra K. Schuster, M.S., J.D.; and Joseph Vincent, M.L.S.

154. First, LCPS issued a "no contact" order against S.W., mandating that he have no classes with Female Student and have no contact with Female Student while on LCPS property. This requirement was not directed toward J.S. because he is no longer enrolled in the Loudoun County Public Schools system.

155. Second, without any details, LCPS directed that Plaintiffs must be subjected to a "Comprehensive Student Support Plan," which is intended to change the content of Plaintiffs' speech.

156. Third, LCPS directed that both Plaintiffs be subjected to a period of suspension lasting ten school days, which is equal to two weeks of class time. J.S.'s suspension was made contingent upon his return to Loudoun County Public Schools as a student.

157. On August 18, 2025, Plaintiffs appealed the suspensions and on August 19, Plaintiffs appealed the entire decision.

158. Discipline was stayed during the pendency of Plaintiffs' appeals.

159. On September 10, 2025, the School Board—through Title IX Appellate Decision-Maker Stephen Vaughn—dismissed the appeals and affirmed the decision that Plaintiffs violated School Board Policy 8035. Vaughn noted that his decision was "final and not subject to further appeal."

160. On September 15, 2025, the School Board—through Rae H. Mitchell, Chief of Schools for LCPS Department of School Leadership—made a final decision upholding the decision to suspend Plaintiffs from school for ten days.

161. Plaintiffs' suspension was set to start on September 16, 2025.

**M. LCPS AND THE SCHOOL BOARD RETALIATE AGAINST PLAINTIFFS FOR FILING SUIT**

162. On September 15, 2025, Plaintiffs, by their parents and next friends, filed their lawsuit.

163.    LCPS and the School Board refused to hold S.W.'s suspension in abeyance to allow the Court to decide Plaintiffs' motion for a temporary restraining order.

164.    S.W. was not permitted to go to school on September 16, 2025.

165.    On September 16, 2025, the Court entered a temporary restraining order to allow S.W. to attend school.

**N.  U.S. DEPARTMENT OF EDUCATION DETERMINES LCPS'S TREATMENT OF PLAINTIFFS VIOLATED TITLE IX**

166.    In 2025, OCR opened an additional investigation into LCPS's treatment of Plaintiffs.

167.    On September 16, 2025, OCR found that LCPS violated Title IX in its response to Plaintiffs' Title IX complaints. OCR further found that LCPS retaliated against Plaintiffs by imposing a ten-day suspension on them because they complained about the presence of a female student in the boys' locker room.

168.    Moreover, OCR found that LCPS did not objectively evaluate all relevant evidence in responding to Female Student's formal complaint, including inculpatory and exculpatory evidence, before finding Plaintiffs responsible and imposing disciplinary sanctions on them. OCR determined that by investigating Female Student's complaint, but not Plaintiffs' factually related complaints, LCPS failed to treat Plaintiffs equitably during its grievance process and in its decisions regarding responsibility and sanctions.

169.    OCR offered a proposed resolution agreement to LCPS, which would require it to rescind the suspensions and issue letters to Plaintiffs apologizing for its failure to investigate and retaliation and further notifying Plaintiffs that it will promptly investigate their complaints in a manner compliant with the requirements of Title IX. Following its investigations, LCPS should

modify its findings concerning Female Student's Title IX complaint and determine whether any discipline of Plaintiffs is warranted.

170.    OCR's proposed resolution also requires LCPS to provide training to all Stone Bridge staff and all LCPS staff who receive or respond to reports of sexual harassment regarding the Division's Title IX grievance procedures and its Title IX obligations in responding to reports or complaints of sexual harassment, including its prohibition of retaliation.

171.    As of this filing, the School Board has not accepted OCR's proposed resolution agreement.

172.    The School Board's refusal to accept OCR's proposed resolution signifies its approval and further ratification of the actions taken by LCPS administrators against Plaintiffs.

**O.  PLAINTIFFS FACE IRREPARABLE HARM**

173.    The 2025-26 school year started in August 2025.

174.    Plaintiffs will endure significant educational and social harms if they miss ten days of school simply for exercising their constitutionally protected rights.

175.    The School Board's decision will remain on Plaintiffs' respective school and disciplinary records, which they will have to disclose when applying to colleges, enlisting in the military, or searching for gainful full-time employment.

176.    The severity of the charges—sexual harassment and sex-based discrimination—and the imposition of a "no-contact order" insinuate that Plaintiffs have committed egregious acts, often associated with violence, against Female Student, which damages their character and reputations.

177.    Given that Female Student's video has gone viral, garnering nationwide attention, Plaintiffs must now navigate the aftermath of being thrust into the public sphere.

178. LCPS and the School Board forced—and would continue to force—Plaintiffs to decide between exercising their constitutionally protected rights or affirm its views on gender ideology.

179. The actions taken by the School Board and LCPS against Plaintiffs have caused them great harm, irreparable injury, and significant emotional distress.

180. The School Board continues to permit Female Student to use the Stone Bridge boys' locker room.

181. Plaintiffs and the United States need judicial relief declaring that the School Board's policies and actions are unconstitutional.

182. Plaintiffs and the United States also need injunctive relief prohibiting LCPS and the School Board from penalizing Plaintiffs for exercising their constitutionally protected rights.

## COUNT I

### VIOLATION OF EQUAL PROTECTION CLAUSE
### First Amendment Right to Free Exercise of Religion

183. The United States re-pleads the preceding paragraphs and incorporates them herein by reference.

184. The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

185. The Equal Protection Clause protects against government action that targets a suspect class or burdens a fundamental right.

186. The First Amendment right to free exercise of religion is a fundamental right, and religion is an inherently suspect classification.

187.    The First Amendment right to free exercise encompasses religious speech and practice as a way of life, protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life.

188.    State law classifications that infringe on the free exercise of religion are subject to strict scrutiny under the Equal Protection Clause, which requires the government action to be narrowly tailored to achieve a compelling governmental interest.

189.    The First Amendment prohibits the government from restricting ideas through content-based regulations.

190.    The First Amendment prohibits the government from requiring an individual to adhere to state-favored orthodoxies.

191.    From using preferred pronouns to sharing intimate spaces with students of the opposite sex, the School Board's policy unconstitutionally directs Plaintiffs to go against their religious commitments by its requirements of word and deed.

192.    LCPS applied School Board Policy 8040 to Plaintiffs in an unconstitutional manner when it attempted to limit Plaintiffs' religious expression and later punished them when they expressed their religious beliefs.

193.    LCPS's application of School Board Policy 8040 to Plaintiffs burdens their First Amendment right to free exercise.

194.    The School Board condoned and ratified the actions taken by LCPS against Plaintiffs regarding School Board Policy 8040.

195.    When an Equal Protection violation is based on a First Amendment claim, courts fuse the First Amendment into the Equal Protection Clause and analogize the claim under the First Amendment.

196.     When assessing whether strict scrutiny should apply to government action that burdens religious exercise, the question is whether the policy, as applied, is neutral and generally applicable.

197.     A facially neutral law need not exclusively burden religious persons to be regarded as non-neutral in operation.

198.     By adopting and implementing Policy 8040, the School Board and LCPS require students and faculty to affirm and promote an understanding of gender identity that may be contrary to their sincerely held religious beliefs.

199.     School Board Policy 8040 is clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected.

200.     School Board Policy 8040 stands in opposition to traditional understandings of gender often held by those with religious viewpoints, which means it applies disproportionately to those who observe certain religious faiths.

201.     School Board Policy 8040 coerces Plaintiffs to affirm School Board-favored gender ideology and suppress sharing their own beliefs.

202.     School Board Policy 8040, as applied to Plaintiffs, is neither neutral nor generally applicable.

203.     Defendant's policies and actions substantially burden Plaintiffs' free exercise of religion, are presumptively unconstitutional, and trigger strict scrutiny.

204.     Defendant's policies and actions do not serve a compelling governmental interest and are not narrowly tailored to achieve any purported compelling interest.

205.     Defendant seeks to continue its unconstitutional infringement of Plaintiffs' right to free exercise through the implementation of a "Comprehensive Student Support Plan."

206.     Defendant's policies and actions therefore violate the Free Exercise Clause and the Equal Protection Clause.

207.     Unless restrained by this Court, Defendant will continue to violate the First Amendment and Equal Protection Clause and cause Plaintiffs irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court grant the following relief:

(a) A declaratory judgment that School Board Policy 8040 and its regulations regarding gender identity violate the rights of Plaintiffs under the U.S. Constitution;

(b) A preliminary and a permanent injunction prohibiting Defendant, and their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with Defendant, from:

   (1) enforcing School Board Policy 8040 and its regulations regarding gender identity against S.W., J.S., and any other similarly situated student;

   (2) further violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

(c) An award of any applicable costs and fees; and

(d) An award of all such other additional relief as the interests of justice may require.

DATED: December 8, 2025

Respectfully submitted,

LINDSEY HALLIGAN
United States Attorney and
Special Attorney
Eastern District of Virginia

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

JEFFREY MORRISON
Acting Chief, Educational Opportunities Section

*/s/ Brian L. Repper*
JORDAN K. CARPENTER (TN No. 035074)
Counsel
LADAWN BURNETT (MO No. 68881)
BRIAN L. REPPER (VA No. 90254)
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 514-3847
Email: brian.repper@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA