# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

<table>
<tr><td>

S.W. and J.S.,

        *Plaintiffs*,

v.

LOUDOUN COUNTY SCHOOL BOARD,

        *Defendant*.

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Case No. 1:25-cv-1536-LMB-WEF

</td></tr>
</table>

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Andrew J. Block, Esq. (VSB No. 91537)
Ian D. Prior, Esq.*
Nicholas R. Barry, Esq.*
Robert A. Crossin, Esq.*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave. SE #231
Washington, D.C. 20003
Telephone: (202) 836-7958
andrew.block@aflegal.org
ian.prior@aflegal.org
nicholas.barry@aflegal.org
bobby.crossin@aflegal.org

*Counsel for Plaintiffs*
*\* Admitted Pro Hac Vice*

Joshua A. Hetzler, Esq. (VSB No. 89247)
Michael B. Sylvester, Esq. (VSB No. 95023)
FOUNDING FREEDOMS LAW CENTER
707 E. Franklin Street
Richmond, VA 23219
Telephone: (804) 971-5509
michael@foundingfreedomslaw.org
josh@foundingfreedomslaw.org

Ellis L. Bennett, Esq. (VSB No. 71685)
DUNLAP BENNETT & LUDWIG PLLC
211 Church Street SE
Leesburg, VA 20175
Telephone: (703) 777-7319
ebennett@dbllawyers.com

<u>**TABLE OF CONTENTS**</u>

**TABLE OF AUTHORITIES** ................................................................................................. iii

**INTRODUCTION** .............................................................................................................. 1

**PROCEDURAL HISTORY** ............................................................................................... 1

**FACTS** ............................................................................................................................... 2

   I.    The Female Student consistently used the boys' locker room during the 2024–25 school year, recorded students on multiple occasions, and then filed complaints when boys objected to her presence in the locker room ....................................................... 2

   II.   LCPS investigated the claims but ignored the witness statements of 26 witnesses, weighing only the Female Student's account, which changed multiple times ................... 5

**STANDARD OF REVIEW** ................................................................................................ 8

**ARGUMENT** ..................................................................................................................... 8

   I.    The Amended Complaint complies with FED. R. CIV. P. 8(a)(2) ........................................ 8

   II.   On the current procedural posture, the Court must take the Plaintiffs' allegations as true and view allegations in a light most favorable to them ............................................ 10

   III.  The Plaintiffs sufficiently plead facts to support their free speech claims ....................... 11

        a.  *LCPS violated the Plaintiffs' First Amendment free speech rights* ..................... 11

        b.  *LCPS violated the Plaintiffs' free speech rights under the Virginia Constitution* ............................................................................................................ 13

   IV.  The Plaintiffs sufficiently plead facts to support their equal protection religious discrimination claims ....................................................................................................... 14

        a.  *The Plaintiffs have adequately alleged that LCPS discriminated against them on the basis of religion in violation of the 14th Amendment* ......................... 14

        b.  *The Plaintiffs have adequately alleged that LCPS discriminated against them on the basis of religion in violation of Article I, Section 11 of the Virginia Constitution* .................................................................................... 15

   V.   The Plaintiffs sufficiently plead facts to support their claims pursuant to VA. CODE § 57-2.02 ......................................................................................................................... 15

   VI.  The Plaintiffs sufficiently plead facts to support their free exercise claims ................... 16

VII.   The Plaintiffs sufficiently plead facts to support their equal protection sex discrimination claims ....................................................................................................18

      a.   *The Plaintiffs have adequately alleged that LCPS discriminated against them on the basis of sex in violation of the 14th Amendment* ...............................18

      b.   *The Plaintiffs have adequately alleged that LCPS discriminated against them on the basis of sex in violation of Article I, Section 11* ...............................21

VIII.   The Plaintiffs sufficiently plead facts to support their Title IX claims............................22

IX.   The Plaintiffs have pled facts sufficient to support their due process claims ...................24

      a.   *LCPS's application of its policies to the Plaintiffs violated their 14th Amendment due process rights* ............................................................................24

      b.   *LCPS's application of its policies to the Plaintiffs violated their Article I, Section 11 due process rights* ................................................................................27

X.   The Plaintiffs sufficiently plead facts to support their conspiracy claims .......................27

**CONCLUSION** ......................................................................................................................30

**TABLE OF AUTHORITIES**

Page(s)

**UNITED STATES SUPREME COURT CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................ 8

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011)................................................................................ 11

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999)................................................................................ 23

*Dept. of Educ. v. Louisiana,*
    603 U.S. 866 (2024)................................................................................ 23

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020)................................................................................ 14

*Folwell v. Kadel,*
    145 S. Ct. 2838 (2025)........................................................................... 22

*Frontiero v. Richardson,*
    411 U.S. 677 (1973)................................................................................ 23

*Greyned v. City of Rockford,*
    408 U.S. 104 (1972)................................................................................ 25

*Jackson v. Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005)................................................................................ 23

*Janus v. Am. Fed'n of State, Cnty. & Munic. Emps. Council 31,*
    585 U.S. 878 (2018)................................................................................ 11

*Milkovich v. Lorain J. Co.,*
    497 U.S. 1 (1990)............................................................................. 28, 29

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)................................................................................ 18

*South Carolina v. Doe,*
    2025 WL 2610400 (U.S. Sept. 10, 2025) ........................................... 22

*Tinker v. Des Moines Indep. Sch. Dist.,*
    393 U.S. 503 (1969)........................................................................... 12, 13

*Trump v. Orr*,
     2025 WL 3097824 (U.S. Nov. 6, 2025).....................................................23, 27

*United States v. Skrmetti*,
     605 U.S. 495 (2025)...........................................................................22, 23, 24

*United States v. Virginia*,
     518 U.S. 515 (1996).....................................................................................18

*West Viginia v. B.P.J.*,
     No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025)..............................19, 22, 23

*West Virginia State Bd. of Educ. v. Barnette*,
     319 U.S. 624 (1943).....................................................................................12

**OTHER FEDERAL CASES**

*Adams v. Sch. Bd. of St. Johns Cnty.*,
     57 F.4th 791 (11th Cir. 2022) .....................................................................23

*B.P.J. v. W. Va. State Bd. of Educ.*,
     98 F.4th 542 (4th Cir. 2024) .......................................................................22

*Carter v. Dep't of Game and Inland Fisheries*,
     2018 WL 3614975 (E.D. Va. Jul. 27, 2018) ...................................................9

*Constantine v. Rectors and Visitors of George Mason Univ.*,
     411 F.3d 474 (4th Cir. 2005) ................................................................27, 28

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
     158 F.4th 732 (6th Cir. 2025) (en banc) ......................................................26

*Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*,
     895 F. Supp. 2d 752 (E.D. Va. 2012) .............................................................8

*Doe v. Fairfax Cnty. Sch. Bd.*,
     No. 1:25-cv-1662 (E.D. Va. Nov. 28, 2025)..................................................22

*Doe v. Hanover Cnty. Sch. Bd.*,
     2024 WL 3850810 (E.D. Va. Aug. 16, 2024) ................................................22

*Doe v. Marshall Univ. Bd. of Governors*,
     683 F. Supp. 3d 522 (S.D. W. Va. 2023) .......................................................21

*Doe v. South Carolina,*
    2025 WL 2375386 (4th Cir. Aug. 15, 2025) ..................................................... 22

*Goines v. Valley Cnty. Services Bd.,*
    822 F.3d 159 (4th Cir. 2016) ................................................................... 10, 11

*Grimm v. Gloucester Cnty. Sch. Bd.,*
    972 F.3d 586 (4th Cir. 2020) ................................................ 19, 20, 21, 22, 24

*Hearns v. San Bernardino Police Dep't,*
    530 F.3d 1124 (9th Cir. 2008) ................................................................... 8, 9

*Jeandron v. Bd. of Regents of Univ. Sys. of Md.,*
    510 Fed. App'x 223 (4th Cir. 2013) ........................................................ 27, 30

*Kadel v. Folwell,*
    100 F.4th 122 (4th Cir. 2024) ....................................................................... 22

*Kuel v. F.D.I.C.,*
    8 F.3d 905 (1st Cir. 1993) ............................................................................... 9

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ................................................................... 11, 12

*Morrison v. Garraghty,*
    239 F.3d 648 (4th Cir. 2001) ................................................................... 14, 18

*N. Ind. Gun & Outdoor Shows, Inc.,*
    163 F.3d 449 (7th Cir. 1998) ................................................................... 10, 11

*O'Toole v. Northrop Grumman Corp.,*
    499 F.3d 1218 (10th Cir. 2007) ................................................................... 27

*Ostrzenski v. Seigel,*
    177 F.3d 245 (4th Cir. 1999) ......................................................................... 8

*Phillips v. Pitt Cnty. Mem'l Hosp.,*
    572 F.3d 176 (4th Cir. 2009) ................................................................... 25, 30

*Sewraz v. Guice,*
    2008 WL 3926443 (E.D. Va. Aug. 26, 2008) ................................................. 9

*Sewraz v. Long,*
    407 Fed. App'x 718 (4th Cir. 2011) ........................................................... 8, 9

*Soule v. Conn. Ass'n of Schs.*
 90 F.4th 34 (2d Cir. 2023) ........................................... 22

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*,
 28 F.4th 529 (4th Cir. 2022) ....................................... 12

*United States v. Burgos*,
 94 F.3d 849 (4th Cir. 1996) ........................................ 29

*United States v. Jaensch*,
 665 F.3d 83 (4th Cir. 2011) .................................... 24, 25

*Willis v. Town of Marshall, N.C.*,
 275 Fed. App'x 227 (4th Cir. 2008) ........................... 14

**STATE CASES**

*Doe v. Fairfax Cnty. Sch. Bd.*,
 No. 24-3171 (Fairfax Cnty. Cir. Ct. Sept. 25, 2025) ................ 21, 22

*Ibanez v. Albermarle Cnty. Sch. Bd.*,
 80 Va. App. 169 (2024) ...................................... 15, 16, 17

*Loudoun Cnty. Sch. Bd. v. Cross*,
 2021 WL 9276274 (Va. Aug. 30, 2021) .................... 15, 16, 17

*Vlaming v. West Point Sch. Bd.*,
 302 Va. 504 ............................... 11, 12, 13, 15, 16, 17, 21

**STATE CONSTITUTIONAL PROVISIONS**

Va. Const. art. I, § 11 .................................... 15, 17, 21, 22, 27

Va. Const. art. I, § 12 .......................................... 13, 15, 17

Va. Const. art. I, § 16 .......................................... 13, 16, 17

**STATE STATUTES**

Va. Code § 1-230 ...................................................... 29

Va. Code § 2.2-3900(B) ............................................... 22

Va. Code § 57-2.02 ............................................. 1, 15, 16

## INTRODUCTION

This 12(b)(6) motion to dismiss comes before the Court after the Court has already heard arguments on several of the underlying issues in this case. From the timing of the School Board's decision to suspend S.W., which forced him into a de facto one-day suspension before this Court promptly issued a Temporary Restraining Order, ECF No. 10, to the School Board's refusal to hold disciplinary action in abeyance during this litigation, to now filing a motion to dismiss after the Court has granted both a TRO and Preliminary Injunction, the School Board has, at every turn, attempted to thwart or delay judicial review of its actions.

The Defendant's brief laments the length of the Amended Complaint. In fairness, it is not the regular practice of the undersigned counsel to file lengthy complaints. But it is also the duty of an attorney to represent his client's interests zealously. Here, that required demonstrating the countless flaws, omissions, and inconsistencies in the Title IX investigation (and its accompanying 556-page record). The Plaintiffs are obliged to put LCPS on notice of their claims. Facing the full weight of the school district's bureaucracy and resources, these two high school juniors have met that obligation and they will carry their burden in this case to vindicate their rights guaranteed by the constitutions of the United States of America and the Commonwealth of Virginia.

## PROCEDURAL HISTORY

On October 29, 2025, Plaintiffs S.W. and J.S. filed an Amended Complaint in which they alleged that Defendant Loudoun County School Board ("LCPS") violated their rights under the United States and Virginia Constitutions, Title IX of the Education Amendment Acts of 1971, and VA. CODE § 57-2.02. Specifically, they allege that they were reported, investigated, and disciplined for speaking out against LCPS's Policy 8040, which resulted in a Female Student being allowed to use the boys' locker room with them and other boys before and after P.E. class. On November

26, 2025, LCPS filed a Motion to Dismiss, and made a stunning admission: the Plaintiffs were indeed disciplined for failing to accept and comply with the requirements of Policy 8040, which not only allows students to use opposite sex locker rooms consistent with their subjective sense of "gender identity," but also mandates that students use the preferred names and pronouns of gender expansive and transgender students. ECF 39-1, at pp. 1–2.

Policy 8040, along with its implementing Regulation 8040, has been the subject of civil litigation, a special grand jury,[1] a Department of Education Investigation, and a widely debated issue in Loudoun County (and beyond) since its controversial passage in August 2021. While not solely related to Policy 8040, the substance of the policy has been addressed by the Virginia Department of Education (and a related opinion from the Virginia Attorney General), as well as the Virginia Supreme Court. Policy 8040, and its effects, are undoubtedly a matter of public concern that merits the highest constitutional scrutiny. Despite all of that, LCPS has demonstrated that it will vigorously exercise its power to enforce Policy 8040 regardless of financial costs, legal setbacks, and most importantly, the rights of its students, teachers, and parents.

### FACTS

I. **The Female Student consistently used the boys' locker room during the 2024–25 school year, recorded students on multiple occasions, and then filed complaints when boys objected to her presence in the locker room.**

In October of 2024, while a sophomore at Stone Bridge High School ("SBHS"), Plaintiff S.W. encountered a student in the boys' locker room who "expressed herself as a female." Amended Complaint, ECF No. 53 ¶ 65 (hereinafter "Compl."). S.W. discussed this situation with

---

[1] On December 5, 2022, the Loudoun County Circuit Court unsealed the report of a special grand jury that was investigating LCPS for its handling of a sexual assault that occurred when a boy entered the girls' bathroom at Stone Bridge High School ("SBHS"). Rep. of the Special Grand Jury on the Investigation of Loudoun Cnty. Pub. Schs., *In re: Special Grand Jury Procs.*, No. CL-22-3129 (Loudoun Cnty. Cir. Ct. Dec. 2, 2022), https://perma.cc/J3A3-GARP. The special grand jury confirmed, "The incident at SBHS is related to policy 8040."

others in the locker room and "expressed his discomfort with the Female Student being in the locker room." *Id.* ¶ 67. Shortly thereafter, administrators removed him from class to inform him they were aware of the comments he had made. *Id.* ¶¶ 68–69. S.W. told the administrators that his religious beliefs were that there are two sexes and "men belong in the men's locker room." *Id.* ¶ 70. The administrators told S.W. that "the Female Student had a right to be in the locker room and that S.W. could change his clothes elsewhere if he was uncomfortable." *Id.* ¶ 71.

Concurrently, the Female Student filed a Title IX Complaint against S.W., alleging that he "'screams and points' while saying 'Yo, why is there a girl in the locker room' and 'Somebody get this girl out of the locker room' and that 'he screams at her to get out." *Id.* ¶ 73. SBHS Assistant Principal Lisa Tartaglia ("A.P. Tartaglia") informed S.W.'s mother of the complaint but said that he was not in trouble and that "the claim was unfounded." *Id.* Thus, LCPS dismissed the October 2024 Title IX Complaint against S.W. "because her allegations did not constitute a Title IX violation." *Id.* ¶ 75. The Female Student made no reports of harassment between October 9, 2024, and March 19, 2025. *Id.* ¶ 152.

Also in October, the Female Student reported Plaintiff J.S. and K.C. for allegedly saying, "I'm going to need to get my own locker room, because they're letting girls in here." *Id.* ¶ 74. "J.S. informed his P.E. teacher, Hunter Manspile, that J.S. had sincerely held religious objections to sharing a locker room with the Female Student because she was a biological female." *Id.* ¶ 76. Manspile told J.S. that the Female Student could use the locker room and that "J.S. should not say anything about the situation." *Id.* After these discussions, the Plaintiffs "kept their discomfort and privacy concerns to themselves for the rest of the fall 2024 school semester." *Id.* ¶ 83. But on February 12, 2025, the United States Department of Justice opened a civil rights investigation into LCPS to determine whether its Policy 8040 and Regulation 8040 constituted discrimination under

Title IX. *Id.* ¶ 84. Thereafter, S.W. and J.S. had conversations among themselves and others in the boys' locker room in which they questioned why there was a girl in the boys' locker room and discussed their discomfort with the situation. *Id.* ¶ 90.

On March 19, 2025, the Female Student entered the boys' locker room and began recording S.W., J.S., and others. *Id.* ¶¶ 92–96. The recording captured several boys talking and included statements substantially like those reported and dismissed in October 2024, such as: "There's a girl in here," "Why is there a girl," and "I'm so uncomfortable there's a girl." The recording also captured a speaker saying, "A female? Bro," and another speaker responding, "get out of here." *Id.* ¶ 96. At no point in the video did any male student in the locker room address those or any other comments to the Female Student. *Id*. ¶ 98.

In a separate video, the Female Student recorded other students using the bathroom and exiting it. *Id.* ¶ 124. When one of the students exited the bathroom, the Female Student said to him, "I got you on video." *Id.* The Female Student also said to a group of students, "I got you on video now, you fuckers! I've got this shit on video now!" *Id.* ¶ 125. SBHS Assistant Principal Calvin Adams ("A.P. Adams") called the father of one of the students captured in the video, exiting the bathroom, and told him, "Don't worry, it's already been deleted." *Id.* ¶ 123.

On March 21, 2025, the Female Student reported to A.P. Adams that S.W., J.S., and K.C. told her that if she used the locker room again, they would "beat his ass." *Id.* ¶ 110. SBHS staff then conducted a Threat Assessment in which they interviewed the Female Student, S.W., J.S., and K.C. *Id.* ¶ 113. LCPS concluded that there was no threat. *Id.* ¶ 122. SBHS told S.W. that the complaint was "not a big deal." When S.W. and J.S. expressed their discomfort sharing the boys' locker room with a female, they asked them if they wanted to change in a separate space, to which

they replied "no." *Id.* ¶¶ 115, 117, 118. SBHS staff also called S.W.'s mother to explain the situation and told them S.W. was "not in trouble." *Id.* ¶ 119.

On March 27, 2025, the Female Student's mother filed a Title IX Complaint, alleging that S.W., J.S., and K.C. made statements about the Female Student similar to the Title IX Complaint she had filed against S.W. in October, which was dismissed. *Id.* ¶ 138. On March 28, 2025, three days after LCPS's Title IX coordinator interviewed the Female Student, S.W., J.S., and K.C. all received a Notice of Investigation and Allegation ("NOIA") informing them that they were being investigated for identical allegations, specifically that they had constantly screamed at the Female Student "Boy-girl," "It," and "Girl Female." *Id.* ¶ 248. The NOIA further stated that they were being investigated for saying things "like, 'Yo somebody get this girl out of the locker room,' Yo why is there a girl/female in the locker room?' and 'Yo there's a girl-boy in here.'" *Id* ¶ 248. The NOIA also informed S.W., J.S., and K.C. that LCPS was investigating whether they said, "If you ever come in here again, we're going to beat your ass." *Id.* ¶¶ 249, 255. J.S. and S.W. deny ever threatening the Female Student, telling her to "get out" of the locker room, and calling her "It," "Boy-Girl," or "Girl-Boy." *Id.* ¶¶ 170, 191.

## II. LCPS investigated the claims but ignored the witness statements of 26 witnesses, weighing only the Female Student's account, which changed multiple times.

From March 21, 2025, LCPS Title IX Investigator Danyelle Reese ("Reese") interviewed twenty-six people, including S.W., J.S., K.C., the Female Student, four SBHS staff members, and eighteen student witnesses. *Id.* ¶¶ 161–243. While some students told Reese that a group of boys, including S.W. and J.S., had been discussing why there was a girl in the locker room before the Female Student made her recordings, most students did not recall ever hearing anyone refer to the Female Student as "It," "Girl-Boy," or "Boy-Girl" in the locker room. Notably, no witness told Reese *that they saw S.W. or J.S. refer to the Female Student with those terms*. *Id.* Similarly, no

witness reported that S.W. or J.S. ever spoke to or confronted the Female Student in the locker room, nor did they say that S.W., J.S., or anyone else threatened her or told her to "get out" of the locker room. To the contrary, Reese interviewed the Female Student three times; and each time the Female Student changed her version of events and descriptions of her allegations. This is especially important with respect to her claim that S.W., J.S., and K.C. threatened to "beat her ass." *Id.* ¶¶ 153–160, 177–189, 231–236. Several other witnesses, including the Female Student's counselor, contradicted material allegations made by the Female Student during their interviews with Reese. *Id.* ¶¶ 162–163, 173, 236–237. The Female Student did admit, however, that she did not stop using the locker room because of alleged harassment, but rather "because we can't use the gym anymore because they're renovating the gym." *Id.* ¶ 185.

While interviewing K.C. on May 13, 2025, (before LCPS dismissed the charges against him), K.C. told Reese that he had been denied the opportunity to go to the prayer room with other Muslim students the prior year. *Id.* ¶ 210. Reese told him that she would raise the issue to the attention of the school administration. *Id.* Also around that time, a member of K.C.'s mosque's board of directors contacted school board member Arben Istrefi ("Istrefi") to ask why he was not helping protect K.C. from the poor treatment he was receiving from LCPS (i.e. the Title IX investigation). *Id.* ¶ 256. Istrefi replied that "he was doing what he could." *Id.* On May 30, 2025, LCPS sent a letter to K.C. informing him that it was dismissing the Title IX Complaint against him, stating in bold that while the investigation did not corroborate the Female Student's allegations, **"the conduct alleged would not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved."** *Id.* ¶ 247, 250.

On August 15, 2025, LCPS issued a decision finding that the Plaintiffs violated LCPS Policy 8035 through impermissible sexual harassment and sex-based discrimination as defined by

Title IX because of the Plaintiffs' statements made in the Stone Bridge boys' locker room. *Id.* ¶ 265. LCPS made this finding despite correctly dismissing identical allegations against K.C. and despite having dismissed substantially identical allegations against S.W. the prior year.

As detailed in the Amended Complaint, LCPS relied almost exclusively on the Female Student's "superior credibility" to substantiate the claims. *Id.* ¶ 275, 288. LCPS ignored: 1) the numerous material misstatements by the Female Student that several witnesses independently contradicted; 2) the three different versions of events she told of the allegation that she was physically threatened (which LCPS even admitted was not true); 3) the explanation she provided for why she stopped using the locker room; and 4) her admission that the alleged statements were annoying but not something she dwelled on. *Id.* ¶¶ 268–308.

LCPS ignored the exonerating fact that *no student or staff member interviewed ever witnessed S.W. or J.S. refer to the Female Student by any of the alleged names*. Instead, LCPS selectively quoted witness interviews to make it appear that they were corroborating the Female Student's allegations when the full interviews indicate they had not done so. *Id.* Based on these findings, LCPS suspended S.W. and J.S. for ten days, despite having less severe progressive discipline alternatives available, and despite J.S. having withdrawn from LCPS. *Id.* ¶¶ 52, 265, 309–312.

Defendant's motion continues to defend its actions using the same methods it employed in its Title IX findings. It selectively summarizes language from a case that ultimately presents the opposite legal proposition for which it was cited, makes several legal arguments that are directly contradicted by existing law, and misstates the contents of publicly available documents that it relies on in support of its position. Ultimately, however, no amount of sleight of hand can change the fact that S.W. and J.S. plead sufficient facts to state a facially plausible claim for relief.

## STANDARD OF REVIEW

To defeat a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). When considering a Rule 12(b)(6) motion to dismiss, the court "accepts as true the facts as alleged in the complaint [and] views them in the light most favorable to the plaintiff." *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999). This stands in stark contrast to the standard of review for a preliminary injunction, where courts can, even must, weigh evidence and the relative strengths and weaknesses of the parties' claims and defenses. *Diamonds Direct USA, Inc. v. BFJ Holdings, Inc.*, 895 F. Supp. 2d 752, 755 n.2 (E.D. Va. 2012).

## ARGUMENT

### I.  The Amended Complaint complies with FED. R. CIV. P. 8(a)(2).

On October 10, 2025, the Court held a hearing on the Plaintiff's Motion for a Preliminary Injunction, which had attached as an exhibit the LCPS's findings that S.W. and J.S. violated Title IX. The Plaintiffs did not attach the 556-page Title IX file that contained the witness interviews and video transcripts that the LCPS Title IX hearing officers reviewed. At the hearing, the Court noted that the hearing officers had reached a unified decision. Considering those findings, the Court believed there were several weaknesses in the Plaintiffs' case. ECF No. 51, at pp. 11, 22.

Upon consideration of the Court's concerns, the Plaintiffs filed an Amended Complaint on October 29, 2025. In this filing, they summarized for the Court LCPS's relevant policies, the entire 556-page Title IX record, the actual witness statements, transcripts of the relevant videos, and significant errors and misrepresentations made by the Title IX hearing officers. The Amended Complaint presents the facts in chronological order, further divided by subject and related

timeframe. It details factual information, not argument, that is clear, well-organized, and asserts legally valid claims. *See Hearns v. San Bernardino Police Dep't,* 530 F.3d 1124, 1127 (9th Cir. 2008) (overturning district court's dismissal of 81-page complaint that included "excessively detailed factual allegations" that were "coherent, well-organized, and stated legally viable claims") (cited with approval by *Sewraz v. Long*, 407 Fed. App'x 718, 719 (4th Cir. 2011)).

LCPS incorrectly argues that the Court should dismiss the Amended Complaint because it violates Fed. R. Civ. P. 8.[2] ECF No. 70, at pp. 9–11. LCPS cites several cases in support of its argument, none of which apply here. First, several of the cases LCPS cites have nothing to do with Rule 8. For instance, *Carter v. Dep't of Game and Inland Fisheries* came before the court on a motion to amend. 2018 WL 3614975 (E.D. Va. Jul. 27, 2018). But even cases that do apply Rule 8 clearly do not apply here. For example, in *Kuel v. F.D.I.C.*, the original complaint contained 36 counts against 28 defendants, and the plaintiff disregarded the court's express instruction to file an amended complaint with fewer defendants by adding defendants. 8 F.3d 905, 906–908 (1st Cir. 1993). The case of *Sewraz v. Guice*, where the court dismissed the plaintiff's 191-page amended complaint that included 134 causes of action against 92 defendants, is similarly inapplicable here. 2008 WL 3926443, at *1 (E.D. Va. Aug. 26, 2008).

The instant case implicates state and federal constitutional and statutory claims, arises out of a five-month Title IX process, which included 26 total witness interviews and a 556-page Title IX record. Contrary to LCPS's claim, that is a reasonable explanation for filing a detailed, well-organized Amended Complaint that states the relevant facts supporting the Plaintiffs' claims.

---

[2] LCPS claims that the court must dismiss the Amended Complaint because "Plaintiffs launch into legal arguments in violation of Rule 8(a)." While inaccurate, the Plaintiffs note that the cases LCPS cites in support of its argument analyzed motions to strike under Rule 12(f), which LCPS has not filed.

**II.** **On the current procedural posture, the Court must take the Plaintiffs' allegations as true and view allegations in a light most favorable to them.**

The Defendant's main argument in its brief is that because the Plaintiffs attached LCPS's Title IX findings as an exhibit to their Motion for Preliminary Injunction, those findings should be treated as true and control the outcome of the case. This ignores the claims the Plaintiffs make about the process to arrive at those findings, would turn the Rule 12(b)(6) standard of review on its head, and relies on misrepresented case law. Specifically, LCPS argues that "where a court considers documents appended to the complaint or those relied upon by plaintiff for his claims, it is proper for the court to credit the documents over conflicting allegations in the complaint. *See Goines v. Valley Cnty. Services Bd.,* 822 F.3d 159, 167 (4th Cir. 2016)." ECF No. 70, at p. 8. This is a misrepresentation by omission of *Goines*.

In *Goines*, a plaintiff brought a §1983 case alleging that he was detained by the police in violation of his constitutional rights. 822 F.3d at 163. The defendant argued that the court should affirm the district court's decision to accept the truth of the incident report because it was quoted throughout the plaintiff's complaint. *Id.* at 164. The Fourth Circuit disagreed and made the following statement, from which LCPS derives its out-of-context language:

> When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper. *But in cases where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the documents as true.*

*Id.* at 167 (emphasis added). The court went on to state:

> The purpose for which the document is offered is particularly important where the document is one prepared by or for the defendant. Such unilateral documents may reflect the defendant's version of events or contain self-serving, exculpatory statements that are unlikely to have been adopted by the plaintiff. Treating the contents of such documents as true simply because

it was attached or relied upon in the complaint, even though the plaintiff
relied on it for purposes other than truthfulness, would be 'contrary to the
concept of notice pleading' and 'would enable parties to hide behind
untested, self-serving assertions.

*Id.* at 168 (citing *N. Ind. Gun & Outdoor Shows, Inc.,* 163 F.3d 449, 455 (7th Cir. 1998)).

The court in *Goines* ruled "the district court erred by treating as true the factual statements

contained in the Incident Report. The district court instead should have treated the Report as what

it was—a document prepared by Officer Shaw representing the Officers' view of events, not a

document representing the true facts." *Id.* at 168.

Here, the Plaintiffs' entire case is premised on their claim that LCPS's Title IX

investigation and findings improperly violated their rights. There is no conceivable argument that,

by attaching those findings to their Motion for Preliminary Injunction, they were adopting the very

findings that they contest in their Amended Complaint. Consequently, the Court should ignore

LCPS's arguments that the Plaintiffs adopted the truthfulness of the report.

**III.    The Plaintiffs sufficiently plead facts to support their free speech claims.**

a.    LCPS violated the Plaintiffs' First Amendment free speech rights.

The "government has no power to restrict expression because of its message, its ideas, its

subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790–91 (2011). "Gender

identity" is a "sensitive political topic," and speech on this topic is "undoubtedly" a matter of

"profound value and concern to the public," and "occupies the highest rung of the hierarchy of

First Amendment values and merits special protection." *Janus v. Am. Fed'n of State, Cnty. &

Munic. Emps. Council 31,* 585 U.S. 878, 913–14 (2018) (internal quotations omitted). "The

ideological nature of gender-identity-based pronouns involves a palpable 'struggle over the social

control of language in a crucial debate about the nature and foundation, or indeed real existence,

of the sexes.'" *Vlaming v. West Point Sch. Bd.*, 302 Va. 504, 569 (quoting *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021)).

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506 (1969). Nor does the First Amendment permit schools to prohibit students from engaging in "factual, nonthreatening speech," especially when they are conversing about "current event[s] that [are] uniquely salient to the lives of American teenagers." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 536 (4th Cir. 2022). Schools also may not compel student speech by "prescribe[ing] what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Taking the facts alleged as true, and the inferences in light most favorable to the Plaintiffs, the Amended Complaint pleads a First Amendment infringement. S.W. and J.S. questioned why LCPS allowed a girl to use the boys' locker room by discussing it in that locker room and by raising their concerns (multiple times) with LCPS staff and administrators. Compl. ¶¶ 67–72, 76, 86–90, 170, 191. They have denied ever referring to the Female Student by the names alleged. *Id.* ¶¶ 170, 191. In fact, they deny ever speaking with her at all. *Id.* ¶ 91. They further alleged that "no material disturbance or disruption" ever took place in the locker room, and no witnesses, aside from the complainant, spoke of any confrontations in the locker room.

The Plaintiffs claim that LCPS retaliated against them through a flawed Title IX investigation with a predetermined outcome. This claim is supported by the Title IX findings that misrepresented student and staff interviews, mischaracterized video evidence, and relied almost entirely on the statements of the Female Student, despite her credibility issues. LCPS contends it did not violate the Plaintiffs' rights because they caused significant disruption to school activities

and/or infringed on the Female Student's sex-based rights under Title IX and her rights under Policy 8040. These arguments require the Court to look beyond the standard of review for the current motion. Based on the Amended Complaint, the Plaintiffs have sufficiently alleged a violation of their First Amendment rights to warrant denying LCPS's Motion to Dismiss.

At trial or on summary judgment, LCPS will have the opportunity to satisfy *Tinker's* demanding standard of proof required to justify their suspension of the Plaintiffs. But viewing the facts alleged in the light most favorable to them, the Plaintiffs were speaking on a matter of public concern about a current event that is uniquely salient to the lives of American teenagers. They caused no disturbance or disruption, and the Female Student was not denied any educational opportunity or benefit. Thus, the Court should deny LCPS's motion to dismiss.

   b. <u>LCPS violated the Plaintiffs' free speech rights under the Virginia Constitution.</u>

LCPS offers no substantive argument as to why Count II should be dismissed. While Article I, Section 12 is generally coextensive with the First Amendment; LCPS fails to mention the recent exception the Supreme Court of Virginia explained in *Vlaming v. West Point Sch. Bd,* 302 Va. 504 (2023). In finding that a teacher had stated a claim for violation of his Article I, Section 12 and 16 rights, after he was fired for not using a transgender student's preferred pronouns, the *Vlaming* court held that, "When religious liberty merges with free-speech protections," the government may only restrict that speech where it "invariably posed some substantial threat to public safety, peace or order." 302 Va. at 540–41. Taking the facts in the light most favorable to the Plaintiffs, the Court cannot, as a matter of law, hold that the Plaintiffs' speech and concerns, which were motivated by their religious beliefs (Compl. ¶¶ 29–31) posed a substantial threat to public safety, peace, or order. Therefore, the Court must deny LCPS's Motion to Dismiss as to Count II.

IV. **The Plaintiffs sufficiently plead facts to support their equal protection religious discrimination claims.**

    a. <u>The Plaintiffs have adequately alleged that LCPS discriminated against them on the basis of religion in violation of the 14th Amendment.</u>

"The Free Exercise Clause, which applies to States under the Fourteenth Amendment, "protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status." *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020) (internal quotations and citations omitted). To establish an equal protection religious discrimination claim, a plaintiff must show "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001). A plaintiff and comparator are similarly situated when the plaintiff shows "an extremely high degree of similarity between [himself] and the person[] to whom [he] compare[s] himself." *Willis v. Town of Marshall, N.C.*, 275 Fed. App'x 227, 233 (4th Cir. 2008) (internal citations and quotations omitted). The determination of whether a plaintiff and a comparator are similarly situated for an equal protection claim is generally "a factual issue for a jury." *Id.* at 233.

Plaintiffs have sufficiently alleged in the Amended Complaint that they were similarly situated to K.C. Compl. ¶¶ 248–49. But they were treated differently because, in dismissing the Title IX complaint against K.C., LCPS emphasized, writing in bold, that **"the conduct alleged would not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, even if proved."** *Id.* ¶ 250. Nevertheless, LCPS relied on the same allegations and regulations to hold the Plaintiffs liable under Title IX.[3] The only difference, the Plaintiffs allege,

---

[3] LCPS continues to argue that it determined that K.C. did not make the statements he was accused of and thus he was not similarly situated to the Plaintiffs. This misses the crucial point entirely. According to LCPS's own admission, its

is that, during the investigation, K.C. made LCPS aware of its potential liability for denying him the right to pray with other Muslims, Compl. ¶ 210, and the advocacy of the Muslim community and a Muslim school board member on K.C.'s behalf. *Id.* ¶¶ 256–57.

In sum, the Plaintiffs have more than met their burden of stating facts that plausibly allege that, because of his religion, K.C. was treated more favorably than the Plaintiffs, and the Court should deny LCPS's Motion to Dismiss as to Count III.

      b. <u>The Plaintiffs have adequately alleged that LCPS discriminated against them on the basis of religion in violation of Article I, Section 11 of the Virginia Constitution.</u>

LCPS only additional argument directly addressing Count IV is that, with the exception of Article I, Section 11's takings clause, "courts have uniformly treated [Section 11] as non-self-executing" and the Plaintiffs have "no private cause of action." ECF No. 70, at 19. LCPS's legal contention is not warranted by existing law. *See Ibanez v. Albermarle Cnty. Sch. Bd.,* 80 Va. App. 169, 191 (2024) (holding "the first paragraph of §11 and the entirety of §12 are self-executing" and further that "Because Article I, §§11 and §12 are self-executing, private citizens may sue the Commonwealth for violating those constitutional rights.").

As argued in Section IV(b), the Plaintiffs have sufficiently alleged facts to support a cause of action for religious discrimination.

## V.  The Plaintiffs sufficiently plead facts to support their claims pursuant to Vₐ. Cᴏᴅᴇ § 57-2.02.

LCPS's argument that there is little case law applying Va. Code § 57-2.02(B) relies on a 2020 decision from this Court interpreting Oklahoma law. Again, LCPS ignores the more recent decisions in *Vlaming* and *Loudoun Cnty. Sch. Bd. v. Cross*, 2021 WL 9276274 (Va. Aug. 30,

---

determination that K.C. did not make the alleged statements was entirely irrelevant—even if he made the alleged statements, they did not constitute sexual harassment under Title IX.

2021).[4] In *Vlaming*, the court found that the teacher had sufficiently stated a claim under § 57-2.02 by alleging that being required to address transgender student by her preferred pronouns "coerced him into violating his conscience by endorsing an ideology at odds with his sincerely held religious beliefs." 302 Va. at 561.[5] In *Cross,* the Virginia Supreme Court held that an LCPS teacher, who was suspended for speaking out against Policy 8040 and its implementation, had sufficiently alleged entitlement to relief under § 57-2.02(B) because "his views and expression related to gender-identity education policy are motivated by his sincerely held religious beliefs, are avenues through which he exercises his religious faith, and constitute a central component of his sincerely held religious beliefs." 2021 WL 9276274, at *2.

*Vlaming* and *Cross* are clear: there is no heightened pleading requirement under § 57-2.02 as LCPS argues. The Plaintiffs have stated that they "are Christians and hold religious beliefs directing the importance of personally maintaining basic distinctions between males and females, and hold significant objections to being in a state of undress in the presence of the opposite sex or with an undressed member of the opposite-sex, particularly in sex-separate changing facilities." Compl. ¶ 29. The Plaintiffs have thus sufficiently alleged their religious beliefs to state a claim under § 57-2.02(E), and the Court should deny LCPS's Motion to Dismiss as to Count V.

## VI.   The Plaintiffs sufficiently plead facts to support their free exercise claims.

As with Count IV, LCPS's only argument to dismiss Count VI is that Article I, Section 16 of the Virginia Constitution is not self-executing and does not provide a private right of action.

---

[4] Ignoring *Cross* is particularly egregious since LCPS was the defendant in that case.
[5] LCPS also argues that it was justified in disciplining the Plaintiffs because § 57-2.02(E) states that "Nothing in this section shall prevent any governmental institution or facility from maintaining health, safety, security or discipline." ECF No. 70, at p. 22. LCPS's legal contention is not warranted by existing law; it is the **exact same failed argument** that the defendant school board raised in *Vlaming*, and the Virginia Supreme Court flatly rejected: "Such a construction of Code § 57-2.02(E) would eviscerate the VRFRA. We cannot adopt an interpretation of the VRFRA that would 'render it a dead letter and defeat its essential purpose." 302 Va. at 562. Thus, the court held, the teacher's termination "does not qualify under subsection E as a wholesale exemption from the VRFRA's reach. The literal text, historical context, and essential purpose of the VRFRA cannot so easily be set aside." *Id.* at 563.

ECF No. 70, at 20. Again, LCPS's legal position is unsupported by the relevant authority. In *Ibanez*, the Court of Appeals of Virginia held that the "negative prohibitions" contained in the Bill of Rights—enshrined at Article I, Sections 11 and 12—are self-executing. 80 Va. App. at 191. In reaching its conclusion, the *Ibanez* court cited *Vlaming* for its application of Section 16, which is also framed as a "negative prohibition" on government. *Id.* at 191–192. Furthermore, in *Cross*, the Supreme Court of Virginia held that the LCPS teacher was likely to succeed on the merits of his claims, which included a private right of action brought under Article I, Section 16. 2021 WL 9276274, at *2.

Unlike Article I, Section 11, the Virginia Supreme Court has made clear that Section 16 provides greater free exercise rights than does the United States Constitution. *Vlaming*, 302 Va. at 530. In *Vlaming*, the court thus articulated the standard for government regulation of speech motivated by religious beliefs—"whether the government's compelling state interest in protecting the public from [a substantial threat to public safety or order], when examined under the rigors of strict scrutiny, could be satisfied by less restrictive means." *Id.* at 540 (internal quotations omitted). The court went on to rule that the termination of a teacher for not using a transgender student's preferred pronouns did not meet that standard. *Id.* at 541.

Here, in a boys' locker room, the Plaintiffs asked questions about and discussed their discomfort with a female in that locker room; their objections were based on their religious beliefs. That did not pose a substantial threat to public safety, peace, or order. Even if LCPS could manufacture an argument that it did, LCPS Regulation 1035 provides numerous examples of less restrictive ways of addressing the situation than ten-day suspensions. The Court should deny LCPS's Motion to Dismiss as to Count VI.

**VII.** **The Plaintiffs sufficiently plead facts to support their equal protection sex discrimination claims.**

> a. The Plaintiffs have adequately alleged that LCPS discriminated against them on the basis of sex in violation of the 14th Amendment.

To state a claim under the equal protection clause, a plaintiff must plead that "he has been treated differently from others with whom he is similarly situated" and that the differential treatment was intentional. *Morrison*, 239 F.3d at 654. Intent can be demonstrated in several ways, including that a policy "has inevitable or foreseeable consequences." *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272 (1979) (when a legislature makes certain classifications, the classification itself supplies "a reason to infer antipathy."). Once intentional disparate treatment is demonstrated, the government must come forward with evidence that the disparate treatment serves "important governmental objectives and that the discriminatory means are substantially related to the achievement of those objectives." *United States v. Virginia,* 518 U.S. 515, 532–33 (1996).

Policy 8040 states its purpose: "All students are entitled to have access to restrooms and locker rooms that are safe, sanitary, and adequate, so they can comfortably and fully engage in their school programs and activities." ECF No. 70, at 23. Policy 8040 further states, "Students should be allowed to use the facility that corresponds to their consistently asserted gender identity," and that this includes "transgender students." *Id.* Finally, Policy 8040 requires LCPS to accept their students' "gender identity" without any substantiating evidence. *Id.* Consequently, the government must demonstrate, through evidence, that any preferential treatment of students who merely claim to be transgender or gender expansive, without substantiating evidence, is substantially related to the achievement of those objectives, i.e., intermediate scrutiny.[6]

---

[6] As discussed in Sections VII(b) and VIII, the mere separation of sexes in facilities meets intermediate scrutiny.

LCPS attempts to meet its burden by relying on *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020).[7] LCPS misunderstands the narrow, as-applied ruling in *Grimm's* denial of the school board's motion for summary judgment, though, and so it applies the case's reasoning too broadly, both regarding Policy 8040 generally and its specific application. First, the *Grimm* court explicitly excluded locker room use from its analysis, reasoning that bathrooms do not raise the same privacy concerns because children can "enter[] a stall and clos[e] the door." *Id.* at 601, 613. Locker rooms do not offer this level of privacy.

Additionally, in *Grimm*, the plaintiff—who was a biological female—presented evidence at the summary judgment stage that she had "consistently, persistently, and insistently" identified and presented as male, had been medically diagnosed with gender dysphoria, legally changed her name, and undergone medical surgeries. *Id.* at 628–30. The court emphasized that "there are other gender-expansive youth who may identify as nonbinary, youth born intersex who do or do not identify with their sex-assigned-at-birth, and others whose identities belie gender norms," but clarified that its decision was "limited to how school bathroom policies implicate the rights of transgender students who 'consistently, persistently, and insistently' express a binary gender." *Id.* at 596. The *Grimm* decision, far from a sweeping requirement, was a narrow decision that, by its own terms, did not apply to the locker room setting.

LCPS further incorrectly asserts that Policy 8040 is mandated by *Grimm* because the court stated that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual based on sex." 972 F.3d at 616. If this were accurate, it would

---

[7] LCPS fails to acknowledge that *Grimm* faces a significant risk of being overturned by the Supreme Court this term when it hears arguments in January in the case of *B.P.J.*, where it granted certiorari on the Questions Presented "1. Whether Title IX prevents a state from consistently designating girls' and boys' sports teams based on biological sex determined at birth. 2. Whether the Equal Protection Clause prevents a state from offering separate boys' and girls' sports teams based on biological sex determined at birth." Pet. for Cert. at I–II, *West Virginia v. B.P.J.*, No. 24-43 (U.S. July 11, 2024), *cert. granted* 2025 WL 1829164 (U.S. July 3, 2025).

suggest that a student could simply make a vague and unverified claim that she was transgender or gender-expansive to use the boys' locker room. If LCPS denied her that opportunity, she could have a sex discrimination claim against it because it discriminated against her based on her asserted sex being different from her biological sex. But, if treating a student unfairly in that situation counts as discrimination, the opposite would also be true. Thus, a girl whose claimed sex differs from her biological sex and is treated more favorably than a boy whose claimed sex matches his biological sex—as is the case here—could also claim sex discrimination against LCPS.

*Grimm* did not need to directly address this issue because no other students were asserting their sex-based rights against the plaintiff in that case. Nonetheless, the court seemed to anticipate such a scenario by setting a high standard for a student to access sex-segregated restrooms—they must provide reliable evidence that only students who "consistently, persistently, and insistently" present and identify as the opposite sex could access the exception, and even then, only in bathrooms that allow other students some privacy—something not possible in open locker rooms.

In this case, the Plaintiffs alleged that they tried to access the boys' locker room so they could "comfortably and fully engage" in their "school programs and activities." They repeatedly told SBHS staff that they could not comfortably and fully participate in their school programs with the Female Student using the boys' locker room. Compl. ¶ 15. Instead of asking the Female Student to use the girls' locker room or a private changing area, the school told the Plaintiffs they would need to change elsewhere if they were uncomfortable because the Female Student had a right to be in the boys' locker room. *Id.* Thus, LCPS granted the Female Student a right to be comfortable and fully participate in her school programs by using either a girls' locker room or a boys' locker room, while the Plaintiffs' right to use the boys' locker room with their peers became a conditional

right, dependent entirely on the Female Student's subjective preferences.[8] This is sex discrimination, and it warrants the Court denying LCPS's Motion to Dismiss as to Count VII.

Additionally, the Plaintiffs have alleged an equal protection violation in that LCPS fully investigated the Female Student's Title IX Complaint against them, but dismissed their complaint against her for conduct that occurred during the same timeframe. That is sufficient to state a plausible equal protection claim. *See Doe v. Marshall Univ. Bd. of Governors,* 683 F. Supp. 3d 522, 540 (S.D. W.Va. 2023) (plaintiff was similarly situated to a female Title IX complainant when she was treated more favorably in the investigation of her complaint than the plaintiff was in the investigation of his Title IX cross-complaint). The Court should deny LCPS's Motion to Dismiss as to Count VII.

      b. <u>The Plaintiffs have adequately alleged that LCPS discriminated against them on the basis of sex in violation of Article I, Section 11.</u>

As discussed in Section 4(b), LCPS's legal contention that Article I, Section 11 is not self-executing is not warranted by existing law. Additionally, the court made clear in *Vlaming* that *Grimm* does not apply to the Virginia Constitution. 302 Va. at 583. Following that decision, the Fairfax County Circuit Court addressed a similar fact pattern to the one in this case. Specifically, a female student who was uncomfortable with a boy who was using the girls' bathroom was told that the boy had a right to be in the girls' room and that the female student should use a private restroom if she was uncomfortable. The circuit court ruled that she had sufficiently alleged a violation of Article I, Section 11. Tr. of Dec. 6, 2024 Hr'g at 35–45, *Doe v. Fairfax Cnty. Sch. Bd.*,

---

[8] J.S.'s use of the football locker room to privately change without his peers after May 11, 2025, was still a burden on his rights. He was essentially left without a choice given that, despite his protests of discomfort to SBHS staff, the Female Student was still allowed to the boys locker room with no limitations and, further, he was under a Title IX investigation based on the fact that the Female Student filed three separate Title IX incident reports against J.S. and recording him and others after he had made his concerns known to SBHS staff.

No. 24-3171 (Fairfax Cnty. Cir. Ct. Dec. 6, 2024) (on file with counsel).[9] Further, LCPS cannot argue that requiring locker rooms to be separated on the basis of sex would constitute discrimination that violates Article I, Section 11, because it explicitly states: "the mere separation of the sexes shall not be considered discrimination."[10]

Therefore, and for the same reasons they argue that LCPS discriminated against them under the Equal Protection Clause, the Plaintiffs have adequately alleged that they were discriminated against on the basis of sex in violation of Article I, Section 11, and the Court should deny LCPS's Motion to Dismiss as to Count VIII.

## VIII.  The Plaintiffs sufficiently plead facts to support their Title IX claims.

LCPS spills much ink attempting to argue the false proposition that "the law is well-established that discrimination based on 'gender identity' is discrimination based on sex under Title IX."[11] ECF No. 70, at 25. That couldn't be further from the truth. Again, the Supreme Court

---

[9] Prior to trial in circuit court, and after successfully prevailing on two demurrers and a motion for summary judgment, Doe voluntarily dismissed her case in Fairfax County Circuit Court, refiled in the Eastern District of Virginia to add Title IX and federal to her Virginia Constitutional claims, and accepted a Rule 68 Offer of Judgment from Fairfax County Public Schools on November 28, 2025. Notice of Acceptance of Def.'s Offer of J., *Doe v. Fairfax Cnty. Sch. Bd.,* No. 1:25-cv-1662 (E.D. Va. Nov. 28, 2025) (ECF No. 7).

[10] When the Virginia Constitution was amended in 1971 to include sex discrimination, the common understanding of "sex" was biological sex. Further, as recently as 2020, the Virginia Human Rights Act (VA. CODE § 2.2-3900(B)(1) and (2)) made clear that sex and gender identity are not the same.

[11] There are, once again, significant problems with the LCPS's case citations in support its argument. LCPS cites *Doe v. Hanover Cnty. Sch. Bd.*, 2024 WL 3850810 (E.D. Va. Aug. 16, 2024), and notes that that case relies on *B.P.J. v. W.Va. State Bd. of Educ.,* 98 F.4th 542 (4th Cir. 2024), but fails to mention that the Supreme Court is hearing the appeal of that case this term. *See supra* note 7. Similarly, LCPS cites *Kadel v. Folwell,* 100 F.4th 122 (4th Cir. 2024), but did not note that the Supreme Court vacated and remanded that case for consideration in light of *Skrmetti. Folwell v. Kadel,* 145 S.Ct. 2838 (2025) (Mem.). Then LCPS cites a concurrence in *Soule v. Conn. Ass'n of Schs.,* without referring the fact that the court held that the plaintiffs had standing to allege a Title IX violation for denial of equal athletic opportunities based on a transgender athlete's participation in track and field competitions. 90 F.4th 34 (2d Cir. 2023) (en banc). Finally, LCPS's reliance on *Doe v. South Carolina* does not alter the analysis—that case granted an injunction against a South Carolina law, allowing a student who lives consistently with "his male identity in all aspects of his life" to use the male bathroom, based on the *Grimm* decision. 2025 WL 2375386, at *2 (4th Cir. Aug. 15, 2025). South Carolina sought emergency relief from the Supreme Court, which denied the application based on the standard applicable for obtaining emergency relief but took the unusual step of noting that, "The denial of the application is not a ruling on the merits of the legal issues presented in the litigation." *South Carolina v. Doe,* 2025 WL 2610400, at *1 (U.S. Sept. 10, 2025) (Mem.). Justices Thomas, Alito, and Gorsuch would have granted the application to stay the Fourth Circuit's ruling. Relatedly, Justices Thomas, Alito, and Barrett all filed concurring opinions in *Skrmetti,* disagreeing with *Grimm's* holding that transgender status was not a quasi-suspect class. *United States v. Skrmetti,* 605 U.S. 495, 526, 559 (2025).

will hear arguments next month in *West Virginia v. B.P.J.,* which will determine whether Title IX's protections extend beyond biological sex. *See* No. 24-43. But even without the benefit of the Supreme Court's forthcoming decision, Title IX's protections are based on biological sex.

Title IX prohibits recipients of federal funds from subjecting any person to discrimination based on sex. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Congress enacted Title IX pursuant to its Spending Clause powers. *See id.* at 181. This requires "unambiguous notice of the conditions they are assuming when they accept" federal funding. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 637 (1999). "The regulations implementing Title IX explicitly permit schools receiving federal funds to 'provide separate toilet, locker room, and shower facilities on the basis of sex." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (en banc) (quoting 34 C.F.R. § 106.33).

The same year as Title IX was enacted, the Supreme Court held that "sex" meant "biological sex", stating, "Sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Frontiero v. Richardson,* 411 U.S. 677, 686 (1973); *see also Adams*, 57 F.4th at 812 ("Reputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females.") (collecting authorities). Indeed, when the Department of Education enacted a Title IX rule in 2024 that expanded the definition of sex discrimination to include discrimination based on "gender identity," the Supreme Court unanimously upheld an injunction against that expansion. *Dept. of Educ. v. Louisiana*, 603 U.S. 866, 866–67 (2024). The Supreme Court also held in *Skrmetti* that a law that prohibited minors from accessing medical treatment to help affirm their gender identity "d[id] not prohibit conduct for one sex that it permits for the other" and thus was not unconstitutional

discrimination. 605 U.S. at 514–15. Finally, in *Trump v. Orr*, 2025 WL 3097824 (U.S. Nov. 6, 2025), the Supreme Court ruled that it was not discriminatory for passports to be required to note only the holder's biological sex, as it is "a historical fact."

Further, despite LCPS's repeated overreliance on *Grimm*, the court's decision as to Title IX mirrored its decision on the equal protection clause; it did not extend its ruling to locker rooms, and it set a demanding evidentiary standard for a student to demonstrate transgender status.[12]

There is simply no basis for LCPS to argue that Title IX permits students to use opposite-sex locker rooms based on their gender identity. Ultimately, the Female Student was provided the unconditional right to "comfortably and fully engage in [her] school programs and activities" through the use of the boys' locker room, whereas the male Plaintiffs' rights to the same were denied to accommodate the Female Student. Because LCPS is a recipient of federal funds, that is a violation of Title IX, and the Court should deny LCPS's Motion to Dismiss as to Count IX.

## IX.    The Plaintiffs have pled facts sufficient to support their due process claims.

### a.    LCPS's application of its policies to the Plaintiffs violated their 14th Amendment due process rights.

A law or regulation "is impermissibly vague if it either (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement." *United States v. Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011) (internal quotations and citations omitted). The "constitutionality of a vague statutory standard is closely related to whether that standard

---

[12] Again, LCPS makes a significant misrepresentation by claiming that Policy 8040 is consistent with the Virginia Department of Education's *Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools* ("2023 Model Policies") and the Attorney General's August 23, 2023, Opinion on the 2023 Model Policies. Not only does Policy 8040 continue to link to the 2021 Model Policies (which are the exact opposite), but the 2023 Model Policies and the Attorney General's Opinion both make very clear that Virginia's public schools shall segregate locker rooms based on biological sex. 2023 Model Policies, ECF No. 39-4, at pp. 14–18; Va. Att'y Gen. Op. to Gov. Youngkin (Aug. 23, 2023), ECF No. 39-5, at pp. 7–8.

incorporates a requirement of *mens rea*." *Id.* at 90 (internal quotations and citations omitted). "If arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Greyned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

LCPS Policy 8035 incorporates Title IX, prohibits discrimination and harassment based on sex, and provides specific examples of what constitutes sexual harassment—sexual assault, dating violence, domestic violence, stalking. ECF No. 29-3, at 1. While Policy 8035 is not vague on its face, it was vague as applied to the Plaintiffs. Specifically, Regulation 8035 incorrectly adds that Title IX applies to "gender identity," but provides only examples of sex discrimination and sexual harassment, and no examples of what constitutes discrimination or harassment based on "gender identity."[13] Policy 8210 (F)(12), which LCPS apparently used in determining that the Plaintiffs' conduct was gender identity harassment, prohibits "hateful language and actions based on … gender identity." Policy 8210(F)(12) does not include a *mens rea* requirement, nor does it attempt to prohibit fighting words, defamation, or some other speech categorically exempted from First Amendment protections. Finally, LCPS admits in its Motion to Dismiss that the baseline for its interpretation of the Plaintiffs' harassing behavior comes from Policy 8040, which states: "The use of gender-neutral pronouns are appropriate. Inadvertent slips in the use of names or pronouns may occur; however, staff or **students who intentionally and persistently refuse to respect a student's gender identity by using the wrong name and gender pronoun are in violation of**

---

[13] The Court can take judicial notice of LCPS's website (*see Phillips v. Pitt Cnty. Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009)), which contains its Policies and Regulations. *See Regulation 8035-REG,* Loudoun Cnty. Pub. Schs., https://perma.cc/PPW6-CBY4.

**this policy.**" ECF No. 70, at p. 26 n.12 (emphasis in original). Policy 8040 does not specify whether "intentional" refusal consists of a requirement of malice.[14]

Thus, the first question is whether, as a matter of law at the motion to dismiss stage, a high school student of ordinary intelligence would understand that asking questions and expressing discomfort about the Female Student in the boys' locker room would violate Policy 8035 and Title IX, based on Regulation 8035's reference to "gender identity," which is further informed by Policy 8210(F)(12)'s "hateful language and actions … based on gender identity," which is further informed by Policy 8040's requirement that students refer to other students by their chosen pronouns that correspond with their subjective sense of gender identity? All while navigating Regulation 8040's definition of gender identity as "person's internal sense of their own identity as a boy/man, girl/woman, another gender, no gender, or outside the male/female binary" and its numerous categories of gender identity, including "[g]ender-expansive/gender-diverse/gender-fluid/gender nonbinary/agender." Compl. ¶ 56. The answer is no—it is clearly a question that a jury must answer.

The second question is whether the Plaintiffs have sufficiently pleaded that the labyrinthine intersection of LCPS's policies authorizes or even encourages arbitrary and discriminatory enforcement. In this case, not only does it authorize or encourage arbitrary and discriminatory enforcement, but it has also resulted in arbitrary and discriminatory enforcement. For example, the Plaintiffs and K.C. were accused of making the same statements, which were found not to constitute a violation of LCPS's Title IX policies for K.C., even if proven true. However, these statements were found to be violations for the Plaintiffs. Additionally, the very nature of gender identity, according to LCPS, is entirely subjective. So what one's gender identity is and what

---

[14] The full Sixth Circuit recently enjoined a policy akin to Policy 8040 because it likely violated the First Amendment. *See Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732 (6th Cir. 2025) (en banc).

constitutes offensive or hateful speech based on gender identity depends entirely on one's subjective feelings. This is precisely what happened here and what the "void for vagueness" doctrine seeks to avoid. Further, to the extent that the Plaintiffs used the historical fact[15] of the Female's sex—"girl" or "female"—when asking questions about why the Female Student was in the boys' locker room, Policy 8040 addressed pronouns and names, not nouns.[16] Finally, while the Plaintiffs deny ever calling the Female Student "it," that term is a gender neutral pronoun, which is permitted by the letter of Policy 8040. Notably, one student witness stated that "for boys our age, we usually, if we don't know someone's gender, we usually call them, like, they, them or it" but did not say that the Plaintiffs or anyone else had used those terms in the locker room. Compl. ¶ 198. Nevertheless, only the Plaintiffs were investigated and disciplined for allegedly using the term "it."[17]

The Plaintiffs have thus sufficiently alleged that the policies applied to them are unconstitutionally vague, and the Court should deny LCPS's Motion to Dismiss as to Count X.

      b. <u>LCPS's application of its policies to the Plaintiffs violated their Article I, Section 11 due process rights.</u>

Based on the same arguments that the Court should deny LCPS's Motion to Dismiss as to Count X, it should also deny LCPS's Motion to Dismiss as to Count XI.

**X.    The Plaintiffs sufficiently plead facts to support their conspiracy claims.**

To state a claim for First Amendment retaliation, a plaintiff "must allege that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely

---

[15] *See Trump v. Orr*, 2025 WL 3097824.

[16] While the Plaintiffs deny calling the Female Student "boy-girl" or "girl-boy," those are not pronouns and are not prohibited by Policy 8040's terms.

[17] Courts may take judicial notice of the fact of publication on a website. *See Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 Fed. App'x 223, 227 (4th Cir. 2013) (citing *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007)). The "Gender Census 2025: Worldwide Report," which is published on the Gender Census website, noted that the preferred pronouns of 22.8% of gender expansive individuals surveyed are "it/its/itself." *Gender Census 2025: Worldwide Report*, GENDER CENSUS, https://perma.cc/9SB5-85SB.

affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

LCPS argues that the Plaintiffs' claim is "non-sensical" and "easily disposed of" because the Plaintiffs "were not deprived of their right to seek redress," as demonstrated by the fact that they already "filed both a Title IX complaint and a lawsuit in this court" when the retaliation occurred. ECF No. 70, at 26, 29. LCPS discounts the plain and obvious meaning of the word "retaliation," and again ignores case law directly on point. Specifically, the Fourth Circuit held in *Constantine*:

> We reject the defendants' suggestion that this inquiry depends upon the actual effect of the retaliatory conduct on a particular plaintiff. We have never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether. The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely. Moreover, such a subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight. We believe that an objective standard better instructs public officials as to their obligations under the First Amendment. Thus, for purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights.

*Id.* at 500.

In this case, Loudoun for All issued a statement falsely claiming that "24 staff and student witnesses" confirmed the Plaintiffs had "relentlessly harassed" the Female Student for over a year. Loudoun for All further asserted that the Plaintiffs and their families had "orchestrated a coordinated campaign of disinformation, knowingly misrepresenting facts to fuel political outrage." Compl. ¶¶ 334–335. Because S.W. filed a verified complaint in this case through his parents, the second statement is defamatory *per se. See Milkovich v. Lorain J. Co.*, 497 U.S. 1

(1990) (inferring that a plaintiff lied under oath constituted defamation *per se*). Following Loudoun for All's press release and timeline, a local media outlet published a story which stated: "the families suing Loudoun County Public Schools over a locker room Title IX investigation at Ashburn's Stone Bridge High School knowingly provided misinformation about an interaction with a transgender student." Compl. ¶ 341. Based on these allegations, the Plaintiffs have alleged that retaliatory conduct, orchestrated through a conspiracy between LCPS and Loudoun for All, would deter a person of ordinary firmness from exercising their constitutional rights against LCPS.

LCPS also argues that the Plaintiffs' conspiracy claim must fail because they have not plausibly alleged the members of the conspiracy. That is patently false. The Plaintiffs clearly identified the parties to the conspiracy: LCPS (a corporate entity) and Loudoun for All (a corporate entity).[18] A corporation is a person. *See* VA. CODE § 1-230. A conspiracy requires "two or more persons." *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996).

Lastly, "By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement … Hence, a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced." *Id.* A conspiracy "may be proved wholly by circumstantial evidence, which includes evidence of "a defendant's relationship with other members of the conspiracy, the length of this association, the defendant's attitude and conduct, and the nature of the conspiracy... A conspiracy, therefore, may be inferred from a development and collocation of the circumstances." *Id.* (cleaned up).

LCPS does not argue that the Plaintiffs have not plausibly alleged that LCPS and Loudoun for All acted jointly and in concert and that an act was done in furtherance of a conspiracy. And

---

[18] LCPS's reliance on *Moschetti v. Nixon Peabody, LLP* is misplaced—unlike the plaintiff in that case, the Plaintiffs do not allege that unnamed individuals in LCPS conspired with unnamed individuals at Loudoun for All; they alleged that LCPS, a corporate entity, conspired with Loudoun for All, a separate corporate entity.

they cannot as the Plaintiff alleged, "LCPS collaborated with Loudoun for All to draft a press release and timeline for the purpose of slandering the Plaintiffs and their parents." ECF No. 57 ¶ 333. They alleged that the timeline included detailed discussions of previously non-public information that was exempt from the Virginia Freedom of Information Act. *Id.* ¶ 338. And they alleged that Loudoun for All "has a history of working with the Loudoun County School Board to serve as LCPS's "public relations" catspaw to attack community members critical of the School Board. *Id.* ¶ 331. In fact, Loudoun for All has sent at least three press releases related to the facts of this case dating back to May 7, 2025, when the Title IX investigation was ongoing, and appears to constitute most of the organization's activity in 2025.[19] Then, just thirteen days after the operative press release attacking the Plaintiffs and their families, LCPS school board chair Melinda Mansfield donated $1,500 to Loudoun for All.[20] These alleged facts, on this posture, state a claim for conspiracy to retaliate, and the Court should deny LCPS's Motion to Dismiss Count XI.

## CONCLUSION

For the foregoing reasons, the Court should deny LCPS's Motion to Dismiss the Plaintiffs' Amended Complaint. To the extent the Court grants any portion of LCPS's Motion to Dismiss, the Plaintiffs respectfully request leave to further amend.

Respectfully submitted,                                    Dated: December 10, 2025

  */s/ Andrew J. Block*
Andrew J. Block, Esq. (VSB No. 91537)          Joshua A. Hetzler, Esq. (VSB No. 89247)
Ian D. Prior, Esq.*                                          Michael B. Sylvester, Esq. (VSB No. 95023)
Nicholas R. Barry, Esq.*                                 FOUNDING FREEDOMS LAW CENTER
Robert A. Crossin, Esq.*                                 707 E. Franklin Street
AMERICA FIRST LEGAL FOUNDATION               Richmond, VA 23219
611 Pennsylvania Ave. SE #231                       Telephone: (804) 971-5509

---

[19] *See Jeandron*, 512 Fed. App'x at 227 (taking judicial notice of publications online); *See Fact Sheets and Info Statements*, LOUDOUN4ALL https://perma.cc/D972-URPJ.
[20] *See Phillips,* 572 F.3d at 180 (taking judicial notice of official records); VA. STATE BD. OF ELECTIONS, LARGE CONTRIBUTION REPORT (Oct. 28, 2025)*,* https://perma.cc/C8NK-8FX8..

Washington, D.C. 20003
Telephone: (202) 836-7958
andrew.block@aflegal.org
ian.prior@aflegal.org
nicholas.barry@aflegal.org
bobby.crossin@aflegal.org


*Counsel for Plaintiffs*
*\* Admitted Pro Hac Vice*

michael@foundingfreedomslaw.org
josh@foundingfreedomslaw.org

Ellis L. Bennett, Esq. (VSB No. 71685)
DUNLAP BENNETT & LUDWIG PLLC
211 Church Street SE
Leesburg, VA 20175
Telephone: (703) 777-7319
ebennett@dbllawyers.com

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which caused it to be served on all counsel who have appeared in this case.

 */s/ Andrew J. Block*
Andrew Block