# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| S.W., by his parents and next friends,<br>SETH WOLFE and AMANDA WOLFE,<br><br>and<br><br>J.S., by his parents and next friends,<br>JEFFERY SMITH and RENAE SMITH,<br><br>Plaintiffs,<br><br>v.<br><br>LOUDOUN COUNTY SCHOOL BOARD ,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. l:25cv1536 (LMB/WEF) |

## UNITED STATES' STATEMENT OF INTEREST

### INTRODUCTION

The United States respectfully submits this Statement of Interest to express its views on the proper application of federal law to protect Plaintiffs' free-exercise rights under the First and Fourteenth Amendments to the United States Constitution. The United States asserts that S.W. and J.S. ("Plaintiffs") have sufficiently pleaded facts to establish that the Loudoun County School Board ("Defendant" or "School Board"), intentionally discriminated on the basis of religion in violation of the Equal Protection Clause of the Fourteenth Amendment. The United States submits this Statement of Interest pursuant to 28 U.S.C. § 517, which permits "any officer of the Department of Justice . . . to attend to the interests of the United States" in any case pending in

federal court[1] and respectfully requests that this Court consider this Statement of Interest in its review of Defendant's Motion to Dismiss Plaintiffs' Amended Complaint.

## INTEREST OF THE UNITED STATES

The United States has a significant interest in the proper application of the United States Constitution in ensuring equal access to educational opportunities in public K-12 schools and preventing the denial of equal protection of the laws on account of religion. In this case, the School Board unconstitutionally implemented and applied Policy 8040, "Rights of Transgender and Gender-Expansive Students," and its enacting Regulation 8040 (collectively, "Policy 8040" or "the Policy") in a discriminatory manner. Policy 8040 permits students to choose which intimate spaces (bathrooms and locker rooms) they use based solely on their asserted "gender identity." Policy 8040 also requires staff and students to adopt the School Board's understanding of "gender identity" and conform their speech and behavior to fit that understanding. Plaintiffs, who are Christian, male students at Stone Bridge High School ("Stone Bridge"), have sincerely held beliefs that require them to use language to describe or address someone that accurately reflects that person's sex and prohibit them from sharing intimate spaces (*i.e.*, bathrooms and locker rooms) with members of the opposite sex. Plaintiffs' religious beliefs inevitably collided with Policy 8040 when one of their fellow Stone Bridge students, a female student who purportedly identifies as a boy ("Female Student"), entered the boys' locker room. After Plaintiffs expressed their views on this matter, which are grounded in their religious beliefs and upbringing, Loudoun County Public Schools ("LCPS"), which the School Board operates, punished Plaintiffs. Sanctions include: (1) "no-contact" orders regarding Female Student; (2) for each, development of a "Comprehensive

---

[1] The United States notified counsel for Plaintiffs and Defendant that it intended to file this Statement of Interest and informed them that the United States would not oppose their seeking leave from the Court to file a response.

Student Support Plan" that is intended to change Plaintiffs' "behavior" in a way that conforms to Policy 8040; and (3) 10-day suspensions, equaling two weeks of class time.

Plaintiffs have pleaded a focused and thoroughly supported claim of intentional religious discrimination by the School Board in violation of the United States Constitution.[2] After reviewing the ample evidence supporting Plaintiffs' claims and considering the shocking nature and far-reaching legal implications of their allegations, the Attorney General certified this case as being of general public importance pursuant to Section 902 of Title IX of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000h-2.[3] ECF 80-2. As such, the United States has an interest in this important case being adjudicated beyond the pleadings stage, specifically with respect to Count III in Plaintiffs' Amended Complaint. The United States' federal civil rights enforcement authority and interests are implicated by Defendant's Motion to Dismiss, namely its contention that Plaintiffs failed to plead a religious discrimination claim under the Equal Protection Clause.

For the reasons set forth below, the United States asserts the following: (1) Defendant has waived any argument that Count III should be dismissed; (2) Plaintiffs have sufficiently pleaded *Monell* liability for their Equal Protection claim, which is brought under § 1983; and (3) Plaintiffs have stated a religious discrimination claim under the Equal Protection Clause by sufficiently alleging that (a) their beliefs are religious in nature and sincerely held, (b) they were similarly situated to a fellow student who escaped punishment, and (c) their religious exercise has been substantially burdened.

---

[2] Plaintiffs also assert other claims, but the United States takes no position on those claims.
[3] In order to protect its interests, the United States filed its Motion to Intervene, which is still pending. ECF 79.

## PROCEDURAL HISTORY

Plaintiffs S.W. and J.S. commenced this action on September 15, 2025. *See* Verified Compl., ECF 1. On October 10, 2025, the Court held a hearing and granted Plaintiffs' Motion for Preliminary Injunction. *See* Order, ECF 45. On October 29, 2025, Plaintiffs filed their Amended Complaint. *See* Am. Compl., ECF 53. On November 26, 2025, Defendant filed its Motion to Dismiss Plaintiffs' Amended Complaint ("Motion"), with accompanying Memorandum in Support. ECF 69-70. On December 8, 2025, the United States filed its Motion to Intervene, with accompanying Memorandum in Support, which included its Proposed Complaint in Intervention. ECF 79-80. On December 10, 2025, Plaintiffs filed their Opposition to Defendant's Motion. Defendant's Reply is due December 16, 2025.

## ARGUMENT

A.    <u>Defendant's Footnoted Argument Concerning Count III Is Waived.</u>

Defendant's Motion to Dismiss seeks to dismiss Count III of Plaintiffs' Amended Complaint, which is Plaintiffs' Equal Protection religious discrimination claim ("Equal Protection claim" or "Count III"). Defendant has not, however, set forth a proper challenge to Plaintiffs' Equal Protection claim and its cursory attempt constitutes waiver.

Defendant's 30-page Memorandum in Support relegates its supposed challenge to Count III to a single footnote. *See* Def.'s Mem. in Support of Mot. to Dismiss Am. Compl. ("Def. Mem. in Support") at 18 n.11. ECF 70. To the extent Defendant attempted to challenge Count III, its argument is waived. The Court of Appeals for the Fourth Circuit ("Fourth Circuit") has repeatedly stated that "[a] party waives an argument *by failing to develop its argument—even if its brief takes a passing shot at the issue*." *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (emphasis added). Indeed, the Fourth Circuit "will not hesitate to find that perfunctory and

underdeveloped arguments . . . are waived." *Penegar v. Lib. Mut. Ins. Co.*, 115 F.4th 294, 301 n.7 (quoting *Steve & Sons, Inc. v. Jeld-Wen, Inc.*, 988 F.3d 690, 727 (4th Cir. 2021)). *See also Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 n.* (4th Cir. 2014) (Where a party "assert[ed] in passing that the district court erred," the court deemed its "perfunctory and undeveloped claim waived.") (citing *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006) (conclusory assignment of error absent supporting argument is insufficient to raise an issue)). Fairness to the opposing party and judicial restraint animate the Fourth Circuit's position. The Fourth Circuit "has warned against ruling on a minimally addressed issue based on arguments only raised in a footnote, as it is unfair to the opposing party and would risk an improvident or ill-advised opinion on the legal issues raised." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 278 (4th Cir. 2022) (citation omitted) (quotation marks omitted). *See also Hunt v. Nuth*, 57 F.3d 1327, 1338 (4th Cir. 1995).

Important to the Court's consideration here, the Fourth Circuit has held that an argument *solely* identified in a footnote is not considered raised and is, therefore, waived. *See Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009) (determining that an issue raised only in a footnote and addressed with only a declarative sentence is waived). Indeed, the Fourth Circuit's reasoning in *Nuth* "has led district courts to decline to consider arguments only raised in a footnote." *Harvey*, 48 F.4th at 278 (citation omitted).

This Court has drawn the same conclusion—perfunctory arguments raised in footnotes are waived. *See e.g.*, *Clark v. Brown*, 536 F. Supp. 3d 56, 66 n.16 (E.D. Va. 2021). The defendant in *Clark* attempted to challenge the plaintiff's hostile work environment claim through a conclusory one-sentence footnote in its "initial threshold [m]otion to [d]ismiss" that contended "that Count 3 fails to allege facts sufficient to establish the existence of a hostile work environment based on

Plaintiff's protected whistleblowing activity." *Id.* The Court concluded that the "one sentence footnote d[id] not, however, sufficiently raise or preserve this argument for review." *Id.*

But one case from within the Fourth Circuit is particularly on point. In *Sanders v. Callender*, the defendant's motion to dismiss included "a footnote at the end of its section . . . arguing that [the defendant] [could] not be sued pursuant to Rule 17." The defendant's footnote stated: "It is also important to note that Plaintiffs have failed to address the civil liability of the Prince George's County Police Department in conformity of the requirements of *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)." No. DKC 17-1721, 2018 WL 337756, at *7 n.5 (D. Md. Jan. 9, 2018) (citation omitted).

After citing the standard for *Monell* liability (and in two sentences instead of one), Defendant offers a strikingly similar footnote:

> It is far from clear which *Monell* prong Plaintiffs intend to proceed under as it pertains to Count III. Presumably it is prong (2) and/or (3), with focus on School Board Policy 8040. They fail to demonstrate how this policy is unconstitutional in light of *Grimm* or how the action taken against them violated any provision of the Constitution. *See also Polk v. Montgomery Cnty. Pub. Sch.*, 2025 U.S. Dist. LEXIS 8969 (D. Md. Jan. 17, 2025) (which supports the notion that LCPS's Policy 8040, properly analyzed, is constitutional).

Def.'s Mem. in Support at 18 n.11. ECF 70.

As in *Sanders*, "[n]owhere else in the motion is the standard for liability of a county discussed or is an argument that the complaint fails to plead a claim in accordance with *Monell* presented." 2018 WL 337756, at *7 n.5 (relying on *Wahi* and *Hunt* in declining to consider defendant's footnote). If Defendant "wanted to raise an argument that the complaint failed to comply with *Monell*, the footnote was an inadequate means to do so and any such argument [should] not be considered." *Id.* (collecting out-of-Circuit district court cases holding the same).

The same is true regarding Defendant's contention that Plaintiffs failed to show that Policy 8040 is unconstitutional. Defendant has not articulated how, in its view, *Grimm* applies to the facts of this case. *Grimm* does not contemplate the free-exercise rights of religious students, so Defendant cannot shield itself from liability simply by uttering that case's name. Its lone cite to *Polk v. Montgomery* is unavailing for the same reason. Further, *Polk* concerned a religious discrimination claim by a substitute teacher regarding "gender identity" guidelines for teachers— not a minor student forced to share a locker room with the opposite sex. *See* Civ. No. DLB-24-1487, 2025 WL 240996, at *1 (D. Md. Jan. 17, 2025). For the foregoing reasons, Defendant's failure to lodge a proper argument is sufficient reason to deny its Motion to Dismiss with respect to Count III.

B.    Plaintiffs Have Adequately Pleaded *Monell* Liability for Count III.

Count III is an intentional religious discrimination claim under the Fourteenth Amendment, brought under 42 U.S.C. § 1983. Defendant briefly challenges Count III in Footnote 11 of its Memorandum. *See* Def.'s Mem. in Support at 18 n.11. Defendant's Memorandum merely cites the *Monell* factors and immediately concludes that Plaintiffs "fail to demonstrate how the Policy is unconstitutional in light of *Grimm*[4] or how the action taken against them violated any provision of the Constitution." *Id.*

---

[4] Under *Grimm v. Gloucester County School Board*, the Fourth Circuit currently interprets Title IX and the Equal Protection Clause to require schools to allow students who identify as "transgender" to use the bathroom of their choice. 972 F.3d 586, 618–19 (4th Cir. 2020), *cert denied* 141 S. Ct. 2878. Although it is the position of the United States that *Grimm* was wrongly decided and should be overturned, nothing in *Grimm* requires the School Board to violate its students' First Amendment rights. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022) ("[I]n no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights."). Defendant's brief footnote has not shown otherwise.

When "determining liability under *Monell*, local school boards in Virginia are treated as municipalities." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 532 (4th Cir. 2022) (citing *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 522 n.3 (4th Cir. 2000)). *Monell* liability for a municipality's policy or custom that violates a constitutional right can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." 28 F.4th at 533. At a minimum in this case, the School Board is liable under *Monell* prong (1), for implementing the inherently discriminatory Policy 8040, and prong (2), for ratifying actions taken pursuant to Policy 8040 in a manner that violated Plaintiffs' constitutional Equal Protection rights.

The Supreme Court of the United States ("Supreme Court") explained in *Monell* that "[l]ocal governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a . . . decision officially adopted and promulgated by that body's officers." 436 U.S. at 690 (footnote omitted). Even "a single decision taken by the highest officials responsible for setting policy in that area of the government's business" can render a municipality subject to suit under *Monell*. *Starbuck*, 28 F.4th at 533 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)).

In this case, the School Board is a policy-setting entity for the purposes of *Monell* liability. *See* Am. Compl. ¶ 35 (alleging the School Board wields policymaking authority pursuant to state law). "[W]hether a particular official has final policymaking authority is a question of state law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (cleaned up) (emphasis omitted). The

Fourth Circuit has recognized that "Virginia vests control of the public school system in the local school boards" and therefore, "the [School] Board retain[s] the final 'say-so'" over student suspensions, including short-term suspensions. *Riddick*, 238 F.3d at 523–24. As the Fourth Circuit stated in *Starbuck*, "under Virginia law, the School Board has final policymaking authority over short-term suspensions," which "means that the School Board's actions regarding student suspensions can serve as 'policies' for the purpose of municipal liability under *Monell.*" 28 F.4th at 533.

Section 1983 liability also arises "when a final policymaker has the authority to review the decision of a subordinate," and "approv[es] of that allegedly unconstitutional decision." *Id.* at 534 (citing *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994) (quoting *Praprotnik*, 485 U.S. at 127)). In this instance, "if the School Board ratified the suspension of a student by subordinates, the School Board would be liable for any deprivation of constitutional rights caused by that suspension." *Starbuck*, 28 F.4th at 534. Even where ratification is lacking, the independent act of the final policymaker provides another means of holding it liable under *Monell*. *Id.* Thus, whether a school board ratifies a student's suspension or independently imposes it, that school board's act will be sufficient to hold it liable for constitutional violations resulting from that act. *See id.*

The same conclusion is warranted here. First, Plaintiffs allege that Virginia law requires the School Board to adopt policies concerning "'sex specific . . . school facilities' such as locker rooms" and that Policy 8040 "allow[s] female students to access locker rooms designated as male-only." Am. Compl. ¶¶ 19, 35. Second, Plaintiffs allege that on July 25, 2025, the U.S. Department of Education Office of Civil Rights ("OCR") concluded an investigation into LCPS and determined that Policy 8040 violated Title IX. Am. Compl. ¶¶ 84, 262. As Plaintiffs allege, OCR's

proposed resolution required the School Board to rescind Policy 8040, which the School Board, by a vote, refused to accept. Am. Compl. ¶¶ 262-63. Third, Plaintiffs allege that on September 16, 2025, OCR concluded a *separate* investigation into LCPS and found that LCPS violated Title IX by discriminating against Plaintiffs on the basis of sex. Am. Compl. ¶ 325. OCR informed LCPS that it would lose federal funding if it did not, within ten days, take a series of remedial actions, which included rescinding Plaintiffs' suspensions and apologizing for its failure to investigate Plaintiffs' Title IX complaint against Female Student. Am. Compl. ¶ 326. Plaintiffs allege that LCPS has not complied with OCR's demands. Am. Compl. ¶ 327. Finally, Plaintiffs allege that the School Board operates LCPS. Am. Compl. ¶ 32. Taken together, these allegations establish that the School Board ratified Plaintiffs' suspensions and their implementation of Policy 8040 renders them liable under *Monell* prongs (1) and (2) for violating Plaintiffs' Equal Protection and religious free exercise rights.

C.     Plaintiffs Have Stated an Equal Protection Claim for Religious Discrimination.

Defendant's Memorandum also challenges the adequacy of Plaintiffs' state-law religious discrimination claims in Counts IV and V of the Amended Complaint. As noted above, the United States focuses its Statement of Interest on the sufficiency of Count III of the Amended Complaint. However, certain aspects of Defendant's arguments regarding Counts IV and V are relevant to the sufficiency of Plaintiffs' Count III. Specifically, Defendant's Memorandum asserts that the Amended Complaint failed to allege sufficient facts that: (1) Plaintiffs' beliefs are religious in nature and sincerely held; (2) Plaintiffs were similarly situated to their Muslim classmate, K.C.; or (3) Plaintiffs religious exercise has been substantially burdened. Defendant's contentions fail.

*1.  Plaintiffs Sufficiently Allege Their Beliefs Are Religious in Nature and Sincerely Held.*

In evaluating religious discrimination cases, the sincerity analysis "seeks to determine an adherent's good faith in the expression of [her] religious belief" and "provides a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 470 (4th Cir. 2025) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). The "religious in nature" assessment "limit[s] the factfinder's inquiry to a determination whether 'the beliefs professed . . . are, in the claimant's own scheme of things, religious[.]'" *Barnett*, 125 F.4th at 470 (quoting *Patrick*, 745 F.2d at 157-58 (referencing *U.S. v. Seeger*, 380 U.S. 163, 185 (1965))). Therefore, "it follows . . . that the claim of the adherent that [her] belief is an essential part of a religious faith must be given great weight." *Barnett*, 125 F.4th at 470 (quotation marks omitted) (citation omitted).

As an initial matter, any challenge to the sincerity of Plaintiffs' religious beliefs is improper at the pleadings stage. The Supreme Court has explained that the threshold question of sincerity is a question of fact. *See U.S. v. Seeger*, 380 U.S. 163, 185 (1965). Indeed, the Fourth Circuit has stated, "the inquiry into sincerity is 'almost exclusively a credibility assessment' and 'can rarely be determined on summary judgment, let alone a motion to dismiss.'" *Barnett*, 125 F.4th at 470 (quoting *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007)). In *Barnett*, the Fourth Circuit reversed the dismissal of a Christian woman's Title VII reasonable accommodation claim regarding the Covid-19 vaccine because it determined that her allegations were "good faith in the expression of [her] religious belief" at that stage. 125 F.4th at 470-71 (quoting *Patrick*, 745 F.2d at 157). The Court also found that she sufficiently alleged her beliefs were religious in nature where she alleged that receiving the vaccine would be "sinful" and against her understanding of

the Bible. *Barnett*, 125 F.4th at 471. The Court concluded that "[a]t this stage, these allegations are sufficient to show that Barnett's "belief is an essential part of a religious faith" that "must be given great weight." *Id.* (quoting *Patrick*, 745 F.2d at 157-58).

Plaintiffs have made a similar showing. First, Plaintiffs have pleaded the sincerity of their Christian faith. Plaintiffs allege that they are Christians and, further, that they are known to be Christians at Stone Bridge because they wear necklaces displaying a cross, which is a recognized symbol of the Christian faith. Am. Compl. ¶¶ 29-30. Second, Plaintiffs plead that it is well-known by students and staff that S.W. spearheaded and continues to lead a Bible club that meets at Stone Bridge and is open to his fellow students. Am. Compl. ¶ 31. These allegations reflect that, through their attire and actions, Plaintiffs hold themselves out publicly as Christians among their Stone Bridge peers and administrators.

Plaintiffs have also adequately pleaded that their beliefs regarding Female Student's use of the boys' locker room are religious in nature. Plaintiffs pleaded that, as Christians, they "hold religious beliefs directing the importance of personally maintaining basic distinctions between males and females and hold significant religious objections to being in a state of undress in the presence of the opposite sex or with an undressed member of the opposite sex, particularly in sex-separate changing facilities."[5] Am. Compl. ¶ 29.

---

[5] Defendant seems to suggest Plaintiffs must cite scriptures to adequately state their claim. This is incorrect. Though Plaintiffs are presumably able to cite scripture that supports their religious beliefs, Defendant has not cited any caselaw stating that they are obligated to do so. And even if they had done so, determining whether Plaintiffs were correct is outside the purview of this Court. As the Supreme Court has recognized, "[i]t is not within 'the judicial function and judicial competence,' to determine whether a person appropriately interprets their faith as '[c]ourts are not arbiters of *scriptural interpretation.*'" *U.S. v. Lee*, 455 U.S. 252, 257 (1982) (quoting *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 716 (1981)) (emphasis added).

The boys pleaded that when school administrators asked S.W. about his private discussions, in which he told his peers he was uncomfortable sharing the boys' locker with Female Student because she's a girl, he told them he "held religious beliefs that there are men and women and that men belong in men's locker rooms and vice versa." Am. Compl. ¶ 70. Plaintiffs also plead that J.S. told his P.E. teacher that he had "religious objections to sharing a locker room with Female Student because she was a biological female." Am. Compl. ¶ 76. Plaintiffs allege that comments about Female student using the boys' locker room were "informed by their sincerely held religious and philosophical beliefs." Am. Compl. ¶ 346. Plaintiffs allege that they "have significant moral, religious, and science-based objections to the concept of gender identity, as well as being in a state of undress in the presence of the opposite sex or with someone of the opposite sex who is in a state of undress, particularly in sex-separate changing facilities." Am. Compl. ¶ 349. Plaintiffs also allege that when Female Student used the boys' locker room, they "felt very uncomfortable and conflicted with their religious upbringing." Am. Compl. ¶ 387. They also allege that that their "significant privacy concerns" about a girl using the boys' locker room were "motivated by their faith and their dignity". Am. Compl. ¶ 350.

Plaintiffs have sufficiently pleaded that their beliefs are religious in nature and have connected their challenged speech to those beliefs. At this early stage of the case, these allegations are sufficient to show that Plaintiffs' "belief[s] [are] an essential part of a religious faith that must be given great weight." *Barnett*, 125 F.4th at 471 (quotation marks omitted). Defendant's Motion should be denied.

> 2. *Plaintiffs Allege They Were Similarly Situated to Their Muslim Classmate Who Went Unpunished for the Same Alleged Speech.*

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

XIV, § 1. The Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Morrison v. Garraghty*, 239 F.3d 648, 653 (4th Cir. 2001) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). *See also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 (1985) (stating that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike"). To prove an equal protection violation, the plaintiff must identify someone materially identical to him or her who has received different treatment and that the different treatment was the result of intentional or purposeful discrimination.

In challenging Count IV, Defendant contends that Plaintiffs were not similarly situated to K.C., their Muslim classmate, because the findings were different. But these findings are part and parcel of the School Board's overall discriminatory conduct. Indeed, Defendant's contention sidesteps Plaintiffs' allegations, which set forth that the materials the Title IX Decision-Makers allegedly relied on (*i.e.*, interviews with nearly 20 Student Witnesses) reveal that *before* the findings were made, all three boys were similarly situated.

Plaintiffs have met their burden by alleging that they were similarly situated to K.C. in all relevant aspects. First, Plaintiffs and K.C. are similarly situated with respect to the alleged misconduct:

- Female Student alleged that Plaintiffs and K.C. "were all together 'saying the same hateful stuff' to her such as 'girl' or 'female'" in P.E. class. Am. Compl. ¶ 158.

- Female Student falsely accused Plaintiffs and K.C. of threatening her with physical violence—namely, that they would "beat [her] ass." Am. Compl. ¶ 103-22.

- The School Board's Notice of Investigation and Allegations ("NOIA") letters regarding the Title IX investigation indicated that Plaintiffs and K.C. made statements that included: "it," "boy/girl," "girl/boy," "get out of here," "get out of here," "there's a girl in the locker room," "why is there a girl in the locker room," and "girl" (collectively, "Alleged Terms"). *See* Am. Compl. ¶¶ 248, 250 (re-stating allegations in K.C.'s dismissal letter); ¶¶ 254-255 (noting and restating the allegations in Plaintiffs' initial and amended NOIA letters).

Despite being accused of the same misconduct, the School Board determined that for K.C. (and K.C. only) the Alleged Terms "do not constitute sexual harassment as defined in 34 CFR § 106.30 of the Title IX regulations, *even if proved*." Am. Compl. ¶ 304. (emphasis added). On the same day that the School Board dismissed the charges against K.C., it sent Plaintiffs an Amended NOIA indicating that its investigation into the exact same statements would continue to be investigated as Title IX sexual harassment and would also be investigated as Title IX sex-based discrimination. Am. Compl. ¶ 254.

Second, Plaintiffs and K.C. are similarly situated with respect to the *evidence* from Title IX interviews with 19 Student Witnesses, who, with the exception of one student, used the boys' locker room.[6] Most important is the fact that 12 of the 14 Student Witnesses who were in the boys' locker room—and heard any of the Alleged Terms—did not identify or confirm Plaintiffs *or* K.C. as the speakers of the Alleged Terms.[7]

In fact, the remaining two Student Witnesses who were in the locker room and could be said to have corroborated Female Student's allegations are Female Student's friend (*i.e.*, M.H., Student Witness 1)) and a student that admitted he "did not particularly like J.S." (*i.e.*, V.B.,

---

[6] O.M., Student Witness 2, is a girl and did not use the boys' locker room. She did not know and could not identify S.W. She also could not confirm any alleged statements by Plaintiffs or K.C. *See* Am. Compl. ¶¶ 165-67.

[7] *See* Am. Compl. ¶¶ 195-96 (J.B., Student Witness 5); ¶¶ 202-03 (A.P., Student Witness 9); ¶¶ 204-05 (D.L., Student Witness 10); ¶¶ 211-13 (G.D., Student Witness 11); ¶ 214 (G.B., Student Witness 12); ¶¶ 215-18 (M.W., Student Witness 13); ¶ 219 (A.S., Student Witness 14) ¶¶ 220-21 (E.A., Student Witness 15); ¶¶ 222-25 (S.B., Student Witness 16); ¶¶ 226-28 (N.S., Student Witness 17); ¶¶ 239-243 (O.B., Student Witness 19); ¶¶ 206-208 (K.C., Student Witness 4).

Student Witness 7)[8]. Am. Compl. ¶¶ 162, 199. The remaining four students did not recall hearing the Alleged Terms at all.[9]

Also, in the vast majority of interviews, the Title IX Investigator did not ask the Student Witnesses about Plaintiffs, and their names never came up.[10]

Moreover, Plaintiffs allege that all three P.E. teachers stated they had never seen or heard any interaction between Plaintiffs, K.C., and Female Student. Am. Compl. ¶¶ 159-60. And with respect to the alleged threats, if Female Student's false claim of violence did not count against K.C., then it should not continue to be held against Plaintiffs.

Read in a light most favorable to Plaintiffs, these facts warrant the conclusion that Plaintiffs have set forth sufficient allegations that K.C., a similarly situated individual outside the protected class, was treated differently from Plaintiffs. Specifically, these allegations show that the School Board discriminated against Plaintiffs when it singled them out for punishment because of their Christian faith, while deliberately declining to punish K.C., who is Muslim (and, indeed, absolved K.C. of blame based on the same facts that they used to justify their continued investigation of and ultimate punishment against Plaintiffs). At a minimum, this issue warrants further findings of fact precluding dismissal at the pleadings stage.

---

[8] V.B. stated that J.S. and S.W. were only asking why a girl was in their locker room. Am. Compl. ¶ 199.

[9] *See* Am. Compl. ¶ 176 (S.C. Student Witness 3); ¶¶ 197-98 (M.J., Student Witness 6); ¶¶ 229-30 (O.T., Student Witness 18); ¶¶ 200-01 (A.K., Student Witness 8).

[10] *See e.g.,* Am. Compl. ¶ 196 (J.B., Student Witness 5); ¶ 198 (M.J., Student Witness 6); ¶ 201 (A.K., Student Witness 8, who is referred to as K.A.); ¶ 203 (A.P., Student Witness 9); ¶ 205 (D.L., Student Witness 10); ¶ 208 (K.C., Student Witness 4 (Plaintiffs' names only came up when the investigator stated they were also under investigation.)); ¶ 213 (G.D., Student Witness 11); ¶ 218 (M.W., Student Witness 13 (Reese didn't ask about S.W.)); ¶ 221 (E.A., Student Witness 15); ¶ 225 (S.B., Student Witness 16); ¶ 228 (N.S., Student Witness 17); ¶ 230 (O.T., Student Witness 18); ¶ 243 (O.B., Student Witness 19).

*3. Plaintiffs Have Alleged Substantial Burden.*

At the outset, it must be noted that the substantial-burden analysis "will always be fact-intensive." *Mahmoud v. Taylor*, 606 U.S. 522, 550 (2025). Specifically, are the policies or actions "'hostile' to religious viewpoints and designed to impose upon students a 'pressure to conform'?" *Id.* (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 211 (1972)). Despite Defendant's contentions, this "fact-intensive" analysis cannot be performed at the motion to dismiss stage.

The Supreme Court has held that the Constitution protects against policies that "compel children to depart from the religious practices of their parents" and also "more subtle forms of interference." *Mahmoud*, 606 U.S. at 548. The Maryland school in that case violated the Free Exercise Clause when it made mandatory instruction that was "clearly designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *Id.* at 550. A substantial burden "'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs,'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)) or "forces a person to 'choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand,'" *id.* (quoting *Sherbert v. Verner*, 374 U.S. 398, 404).

Plaintiffs have alleged that School Board Policy 8040 and the Board's actions substantially burden Plaintiffs' free-exercise rights. First, Plaintiffs' allegations reflect that school administrators' actions in October 2024 pressured them into silence. Plaintiffs were repeatedly pulled out of class and into meetings with teachers, counselors, and assistant principals—school administrators with escalating levels of authority. Am. Compl. ¶¶ 68–71. When Plaintiffs articulated their religious views in these meetings, they were offered mental health support or told

to be quiet. Am. Compl. ¶¶ 71, 76. Indeed, the tacit suggestion that one's religious beliefs should be addressed through mental health services is egregious and demonstrates the "hostility" toward religious beliefs that the Supreme Court rejected in *Mahmoud*. *See* 606 U.S. at 568.

Plaintiffs' allegations also indicate that their parents were called after (not before) these meetings. *See e.g.*, Am. Compl. ¶ 72. As Plaintiffs allege, based on their encounters with LCPS personnel, Plaintiffs "believed that they could not speak freely to staff about their concerns regarding Female Student in the locker room without facing discipline." Am. Compl. ¶ 77. Plaintiffs allege that, as a result, they "kept their discomfort and privacy concerns to themselves for the rest of the fall 2024 school semester." Am. Compl. ¶ 83.

Second, Plaintiffs' allegations concerning several actions taken by LCPS and the School Board since the March 2025 locker room incident reflect increased pressure on Plaintiffs. Plaintiffs allege that after they saw reports about OCR's investigation into LCPS and Policy 8040, they began speaking up again because they believed state and federal law prohibited LCPS from allowing Female Student to use the boys' locker room. Am. Compl. ¶ 85. While LCPS quickly initiated Title IX proceedings against Plaintiffs after the locker room incident, LCPS refused to investigate the Title IX Complaints Plaintiffs filed concerning Female Student's conduct. Am. Compl. ¶¶ 10, 20, 375. In addition, when J.S. informed LCPS that he was permanently unenrolling from the school system and moving out of state, it refused to dismiss the charges against him— even though its own policy allows it to do so. Am. Compl. ¶ 265.

The School Board's punishment exerts severe pressure on Plaintiffs to abandon their religious practice by engaging in activities that violate their religious beliefs. Plaintiffs allege that a ten-day suspension would have detrimental effects on student growth and achievement for a junior in high school, which would ultimately put them at a disadvantage for college acceptance

and scholarships. Am. Compl. ¶¶ 315–19. Most tellingly, the School Board's punishment also subjects Plaintiffs to a "Comprehensive Student Support Plan" which, by definition, is intended and designed to be a behavior modification program. Am. Compl. ¶ 311.

Having been notified in advance that S.W. would seek a temporary restraining order in an effort to protect his rights, the School Board refused his request to hold his suspension in abeyance and did not allow him to attend school on September 16, 2025. Am. Compl. ¶¶ 322–23.[11] Plaintiffs also plausibly allege a conspiracy involving the Loudoun4All political action committee with sufficient facts to show that Defendant took its pressure campaign against Plaintiffs well outside the schoolhouse gates. This vicious and vindictive public-facing campaign defamed Plaintiffs, who are still minor children, and their families. Am. Compl. ¶¶ 321–43.

## CONCLUSION

Accepting the well-pleaded facts in the Amended Complaint as true and construed in the light most favorable to Plaintiffs, Defendant's 12(b)(6) Motion to Dismiss should be denied on the following bases: (1) Defendant has waived any argument that Count III should be dismissed; (2) Plaintiffs have sufficiently pleaded *Monell* liability; and (3) Plaintiffs have stated a religious-discrimination claim under the Equal Protection Clause.

---

[11] During the October 10, 2025 Hearing on Plaintiffs' Motion for Preliminary Injunction, this Court acknowledged the harm that a student suffers when "deprived of several days of education". Hr'g Tr. at 13:16-21.

DATED: December 16, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

JEFFREY MORRISON
Acting Chief, Educational Opportunities Section

*/s/ Brian L. Repper*
JORDAN K. CARPENTER (TN No. 035074)
Counsel
BRIAN L. REPPER (VA No. 90254)
LADAWN BURNETT (MO No. 68881)
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 514-3847
Email: brian.repper@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2025, I filed the foregoing through the Court's CM/ECF electronic filing system, which will transmit a Notice of Electric Filing (NEF) to all counsel of record in the case.

/s/ *Brian L. Repper*
BRIAN L. REPPER
Attorney for the United States